**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

MATTHEW A. MORTON and                                   Case No. 3:21-cv-00540-NJR
JOSHUA A. MORTON,

     Plaintiffs,

v.

THOMAS J. VILSACK, in his official
capacity as Secretary of Agriculture; ZACH
DUCHENEAUX, in his official capacity as
Administrator, Farm Service Agency,

     Defendants.

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Matthew A. Morton and Joshua A. Morton, by counsel and pursuant to Fed. R.

Civ. P. 56, for the reasons stated in the accompanying brief, move for summary judgment on the

grounds that no dispute of material fact exists and Plaintiffs are entitled to judgment as a matter of

law on their claims.

Dated: February 1, 2022.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

s/ Glenn E. Roper
Glenn E. Roper
Colo. Bar No. 38723
Lead Counsel
1745 Shea Center Dr., Suite 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: GERoper@pacificlegal.org
Service: IncomingLit@pacificlegal.org

Wencong Fa
Cal. Bar No. 301679*
Christopher M. Kieser
Cal. Bar No. 298486*
555 Capitol Mall, Suite 1290
Sacramento CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email:  WFa@pacificlegal.org
Email:  CKieser@pacificlegal.org

*Attorneys for Plaintiffs*
*\* Pro Hac Vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MATTHEW A. MORTON and
JOSHUA A. MORTON,

     Plaintiffs,

v.

THOMAS J. VILSACK, in his official
capacity as Secretary of Agriculture; ZACH
DUCHENEAUX, in his official capacity as
Administrator, Farm Service Agency,

     Defendants.

Case No. 3:21-cv-00540-NJR

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

   A.  The American Rescue Plan Act and Section 1005 ........................................... 2

   B.  USDA's History of Discrimination and Substantial Remedial Action.............. 4

   C.  This Lawsuit..................................................................................................... 8

   D.  History of Section 1005 Challenges ................................................................ 8

STANDARD OF REVIEW ........................................................................................... 9

ARGUMENT ............................................................................................................... 10

   I.   Section 1005 Violates the Equal Protection Component of the Fifth Amendment's Due Process Clause ............................................................ 10

      A.   Section 1005 Does Not Further a Compelling Interest............................. 11

        i.  Section 1005 Does Not Further an Interest in Remedying Past Discrimination................................................................................ 12

        ii.  Section 1005 Does Not Further an Interest in Remedying Present Discrimination................................................................................ 13

        iii. The Government's Interest in Achieving Racial Parity Is Not Compelling Enough to Warrant the Race-Based Relief in Section 1005........................................................ 16

      B.   Section 1005 Is Not Narrowly Tailored................................................... 17

        i.  Section 1005 Is Not Narrowly Tailored Because It Uses Race in a Rigid and Categorical Manner......................................................... 18

        ii.  Section 1005 Is Not Narrowly Tailored Because It Is Both Overinclusive and Underinclusive.............................................. 19

        iii. Section 1005 Is Not Narrowly Tailored Because the Panoply of Race-Neutral Alternatives Suggests that Congress Did Not Use Race Only as a Last Resort ........ 22

   II.  A Nationwide Injunction Is the Appropriate Remedy ..................................... 25

CONCLUSION............................................................................................................ 27

CERTIFICATE OF SERVICE ................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995).................................................................................................1, 10

*In re Black Farmers Discrimination Litigation,*
    953 F. Supp. 2d 82 (D.D.C. 2013) ...............................................................................6

*Builder's Ass'n of Greater Chi. v. City of Chicago,*
    298 F. Supp. 2d 725 (N.D. Ill. 2003) .........................................................................18

*Builders Ass'n of Greater Chi. v. Cty. of Cook,*
    256 F.3d 642 (7th Cir. 2001) ...............................................................................12, 21

*City of Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020) .....................................................................................27

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.,*
    122 F.3d 895 (11th Cir. 1997) .............................................................................17, 22

*Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548 (11th Cir. 1994) ...............................11

*Faust v. Vilsack,* 519 F. Supp. 3d 470 (E.D. Wis. 2021) ...........................1, 9, 10, 25, 26

*Fisher v. Univ. of Texas at Austin,*
    570 U.S. 279 (2013) ...................................................................................................17

*Gratz v. Bollinger,* 539 U.S. 244 (2003).....................................................................19

*Grutter v. Bollinger,* 539 U.S. 306 (2003)......................................................17, 18, 22

*Hayes v. N. State Law Enforcement Officers Ass'n,*
    10 F.3d 207 (4th Cir. 1993) .......................................................................................22

*Holman v. Vilsack,* No. 21-1085-STA-jay,
    2021 WL 2877915 (W.D. Tenn. July 8, 2021) ..............................................1, 9, 22

*Johnson v. California,* 543 U.S. 499 (2005)..................................................................10

*Kent v. Vilsack,* No. 3:21-cv-540-NJR,
    2021 WL 6139523 (S.D. Ill. Nov. 10, 2021) ..............................................................9

*Kvapil v. Chippewa Cty.,* 752 F.3d 708 (7th Cir. 2014) ..............................................10

*Levin v. Commerce Energy, Inc.,* 560 U.S. 413 (2010) ...............................................25

*Ludwig v. United States,* 21 F.4th 929 (7th Cir. 2021) ..................................................9

*Midwest Fence Corp. v. U.S. Dep't of Transp.,*
    840 F.3d 932 (7th Cir. 2016) ...............................................................................18, 23

*Miller v. Johnson,* 515 U.S. 900 (1995).......................................................................23

*Miller v. Vilsack,*
    No. 4:21-cv-00595-O, ECF No. 60 (N.D. Tex. July 1, 2021) ...................1, 9, 12, 13

*Ne. Fla. Ass'n of Gen. Contractors v. City of Jacksonville*,
   508 U.S. 656 (1993)...................................................................................27

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)......................................................................10–13, 17

*Personnel Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)...................................................................................10

*Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999),
   *aff'd* 206 F.3d 1212 (D.C. Cir. 2001) ...........................................5, 6, 13

*Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .........................11, 15–17, 19, 21

*Segovia v. United States*, 880 F.3d 384 (7th Cir. 2018).................................25

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017)............................25, 26

*Shaw v. Hunt*, 517 U.S. 889 (1996) ..............................................................16

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021)..............................12, 15, 24

*Wynn v. Vilsack*, No. 3:21-cv-514-MMH-JRK,
   2021 WL 2580678 (M.D. Fla. June 23, 2021)...............................*passim*

## Statutes

5 U.S.C. § 704.................................................................................................25

5 U.S.C. § 706(2)(A)........................................................................................25

7 U.S.C. § 2279(a)(5)........................................................................................3

7 U.S.C. § 2279(a)(6)........................................................................................3

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ................2

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110–246, § 14012(b),
   122 Stat. 1651 (2008)....................................................................................6

## Other Authorities

Cowan, Tadlock & Feder, Jody, *The* Pigford *Cases: USDA Settlement of
   Discrimination Suits by Black Farmers*, Congressional Research Service, May
   29, 2013, *available at* https://nationalaglawcenter.org/wp-content/uploads/
   assets/crs/RS20430.pdf ..................................................................................5

Hr'g on USDA's Civil Rights Progs. and Responsibilities before The House
   Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on
   Agric., 106th Cong. 37 (1999).......................................................................6

The White House, Remarks by President Biden at Signing of American Rescue
   Plan, Mar. 11, 2021, https://www.whitehouse.gov/briefing-room/statements-
   releases/2021/03/11/remarks-by-president-biden-at-signing-of-the-american-
   rescue-plan ......................................................................................................2

## INTRODUCTION

Section 1005 of the American Rescue Plan Act of 2021 provides debt relief to farmers and ranchers on the basis of a single characteristic: their race. Farmers who are Black/African American, American Indian, Alaskan native, Hispanic/Latino, Asian American, or Pacific Islander are entitled to a payment of 120 percent of the outstanding balance on their government-issued or government-guaranteed farm loans regardless of individual circumstances. White farmers, like Plaintiffs Matthew and Joshua Morton, are categorically excluded from the debt relief program because of their race. Section 1005's remarkable fixation on race has led every one of the four courts to consider this issue to reach an unremarkable conclusion: Section 1005 violates the equal protection component of the Due Process Clause of the Fifth Amendment. *See Wynn v. Vilsack*, No. 3:21-cv-514-MMH-JRK, 2021 WL 2580678 (M.D. Fla. June 23, 2021) (granting motion for preliminary injunction); *Holman v. Vilsack*, No. 21-1085-STA-jay, 2021 WL 2877915 (W.D. Tenn. July 8, 2021) (same); *Miller v. Vilsack*, No. 4:21-cv-00595-O, ECF No. 60 (N.D. Tex. July 1, 2021) (granting motion for preliminary injunction and motion for class certification); *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) (issuing temporary restraining order).

The Constitution abhors distinctions based on race. Section 1005's race-based distinctions are presumptively unconstitutional, and for them to survive judicial review, the government must show they "are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 220 (1995). As all four courts that have considered this issue have held, Section 1005 fails both parts of the strict scrutiny inquiry. The government cannot show that Section 1005 furthers an interest in remedying past discrimination. It acknowledges that billions of dollars have been paid to compensate farmers who have actually suffered discrimination. It acknowledges that it lacks evidence of continued discrimination after

2010. And it defends Section 1005 based on statistical disparities that are attributable not to discrimination, but to the individual choices of farmers (e.g., to grow certain crops over others) and to other race-neutral factors such as farm size and experience in farming.

Section 1005 fares even worse when it comes to narrow tailoring. Narrow tailoring requires individualized consideration; Section 1005 permits no such thing. Narrow tailoring requires a close fit between the government's use of racial classification and the compelling interests that it identifies. But Section 1005 is both overinclusive in that it grants benefits to both individuals and groups that have not suffered discrimination *and* underinclusive in that its race-based measures (paying off farm loans) do not even provide relief to those who were discriminated against in obtaining farm loans. Finally, narrow tailoring requires the government to exhaust race-neutral alternatives to achieve its goals before turning to race as a last resort. But the government concedes that it has failed to try many of the obvious race-neutral alternatives available to cure the problems it identifies. Because Section 1005's race-based debt relief is plainly unconstitutional, and there are no material facts in dispute, this Court should grant Plaintiffs' Motion for Summary Judgment.

## STATEMENT OF FACTS

### A.    The American Rescue Plan Act and Section 1005

In response to the economic difficulties caused by the ongoing COVID-19 pandemic, Congress enacted the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4. Upon signing the bill on March 11, 2021, President Biden stated that "this historic legislation is about rebuilding the backbone of this country and giving people in this nation—working people and middle-class folks, the people who built the country—a fighting chance."[1] Within the 243-page

---

[1] The White House, Remarks by President Biden at Signing of American Rescue Plan, Mar. 11, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/11/remarks-by-president-biden-at-signing-of-the-american-rescue-plan.

bill is a provision, Section 1005, that offers debt relief for farmers with government-issued or government-guaranteed farm loans. Yet the relief is not available to everyone—instead, it is limited by the race of the borrower.

Section 1005 commands the Secretary of Agriculture to "provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher as of January 1, 2021" to pay off each "direct farm loan made by the Secretary" as well as each "farm loan guaranteed by the Secretary" for the socially disadvantaged farmer or rancher. § 1005(a)(2). A "socially disadvantaged farmer or rancher" is "a farmer or rancher who is a member of a socially disadvantaged group." *Id.* § 1005(b)(3) (incorporating 7 U.S.C. § 2279(a)(5)). A "socially disadvantaged group" is "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." *Id.* (incorporating 7 U.S.C. § 2279(a)(6)).

Under Section 1005, whether a farmer[2] qualifies for debt relief depends entirely on his or her race. As noted above, and as Defendants concede, the only qualification for a farmer to be "socially disadvantaged" is to be "a member of a socially disadvantaged group." *See* Exh. 3,[3] Defs.' First RFA Resp. 10 (quoting 7 U.S.C. § 2279(a)(5)). Given how that term is defined, this means that an individual farmer cannot qualify as "socially disadvantaged" based on his or her individual circumstances—only group racial identity is relevant. *Id.*, Defs.' First RFA Resp. 6, 8–10. And although the Secretary of Agriculture retains some discretion as to which groups qualify, that discretion does not include individual consideration; a farmer may only petition the Secretary

---

[2] For convenience, this brief uses the term "farmer" to include both farmers and ranchers.

[3] Unless otherwise noted, "Exh." cites refer to exhibits to Glenn Roper's declaration submitted in support of Plaintiffs' motion for summary judgment. Pinpoint citations to Defendants' discovery responses refer to the numbered discovery request (e.g., Request for Admission No. 10), rather than to the page number.

of Agriculture to include his or her *racial group* as "socially disadvantaged." *See id.*, Defs.' First RFA Resp. 12.

As implemented by the United States Department of Agriculture (USDA), the "socially disadvantaged" criterion operates to exclude members of only one racial group—white farmers.[4] USDA recognizes five racial groups on its Form AD-2047[5]—American Indian/Alaskan Native, Native Hawaiian/Other Pacific Islander, Asian, White, and Black/African American. *See* Exh. 3, Defs.' First RFA Resp. 18. It also recognizes two ethnicities—"Hispanic or Latino" and "Not Hispanic or Latino." *Id.* Out of all the possible racial and ethnic combinations that the USDA recognizes for purposes of distributing debt relief under Section 1005—the *only one* that it does not recognize as a socially disadvantaged group is "White" and "Not Hispanic or Latino." *Id.*, Defs.' First RFA Resp. 19, 20. As a group, white/non-Hispanic farmers have never been recognized as socially disadvantaged for the purposes of any USDA program. *See id.*, Defs.' First RFA Resp. 6.

## B.    USDA's History of Discrimination and Substantial Remedial Action

Congress did not make any findings specific to Section 1005 or its decision to employ a racial classification. *See* Answer ¶ 21, ECF No. 40. Yet the government asserts that the racial classification "furthers the government's interests in remedying the lingering effects of the well-documented history of discrimination against minority farmers in USDA farm loan programs and in preventing public funds from being allocated in a way that perpetuates the effects of

---

[4] For convenience, this brief uses the term "white farmers" to mean farmers or ranchers who are both "white" and "non-Hispanic." Similarly, the brief will use "race" as a shorthand to refer to both "race" and "ethnicity."

[5] This form is used to identify the race and ethnicity of individual farmers and ranchers for the purposes of determining eligibility for debt repayment under Section 1005. *See* Exh. 2, Defs.' Resp. to Interrog. 24; *see also* Customer Data Worksheet (Form AD-2047), https://www.fsa. usda.gov/Internet/FSA_File/ad2047.pdf.

discrimination." *See* Exh. 1, Defs.' Resp. to Interrog. 4. In support of that assertion, Defendants pointed to documents they cited in opposition to motions for preliminary injunction in other cases challenging Section 1005. *See id.*, Defs.' Resp. to Interrog. 5–6. As Defendants explained in that preliminary injunction briefing, these documents establish that the USDA has a history of discrimination against farmers of certain racial and ethnic backgrounds—particularly black and Hispanic farmers. *See Wynn*, No. 3:21-cv-514-MMH-JRK, Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 22 at 3–6.

It is undisputed, however, that the government has paid more than $2 billion in class action settlements to farmers who suffered alleged race- and sex-based discrimination by USDA. *See* Exh. 3, Defs.' First RFA Resp. 4; Exh. 7, Robb Report at 24–28; *Wynn*, No. 3:21-cv-514-MMH-JRK, Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 22 at 5; *see also* Tadlock Cowan & Jody Feder, *The* Pigford *Cases: USDA Settlement of Discrimination Suits by Black Farmers*, Congressional Research Service, May 29, 2013, *available at* https://nationalaglawcenter.org/wp-content/uploads/assets/crs/RS20430.pdf. The most well-known of these is the *Pigford* class action brought on behalf of black farmers. For the vast majority of claimants, who had "little or no documentary evidence" of discrimination, the *Pigford* consent decree provided "a virtually automatic cash payment of $50,000, and forgiveness of debt owed to the USDA." *Pigford v. Glickman*, 185 F.R.D. 82, 95 (D.D.C. 1999), *aff'd* 206 F.3d 1212 (D.C. Cir. 2001). Those farmers who could meet a higher "preponderance of the evidence standard in establishing discrimination" could receive even greater amounts. *Wynn*, 2021 WL 2580678, at *26 & n.13 (citing *Pigford*, 185 F.R.D. at 95). More than 15,000 Black farmers received compensation through this consent decree, and USDA forgave

more than $43 million in outstanding debt. Cowan & Feder, *supra*, at 6.[6] Congress then permitted black farmers who were too late to file a claim under the *Pigford* settlement to pursue their claims in new litigation. *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110–246, § 14012(b), 122 Stat. 1651 (2008). It appropriated an additional $1.15 billion to settle these claims in a similar manner as *Pigford*. *See In re Black Farmers Discrimination Litigation*, 953 F. Supp. 2d 82, 84–86 (D.D.C. 2013) (describing background of the second class action). Similar litigation and settlements occurred between USDA and classes of Native American and Hispanic farmers. *See* Exh. 7, Robb Report at 26; *see also* Am. Compl. ¶¶ 38–39, ECF No. 29; Answer ¶¶ 38–39, ECF No. 40.

Aside from these specific remedies, Congress has implemented "numerous alternatives to remedy historical discrimination in USDA's loan programs against minority farmers." Answer ¶ 33, ECF No. 40. And the USDA itself underwent substantial reforms beginning in the 1990s. *See, e.g.*, Hr'g on USDA's Civil Rights Progs. and Responsibilities before The House Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Agric., 106th Cong. 37 (1999) (noting that a congressionally appointed Civil Rights Action Team made a series of 92 recommendations to the USDA, and just two years later all but three of the 75 recommendations that did not require congressional action were in the process of being implemented—while Congress had enacted five of the other recommendations). Evidence of discrimination after the reforms and large settlements becomes spotty and anecdotal. *See, e.g.*, Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt., Org., and Procurement, Comm.

---

[6] While Defendants' expert report claims that fewer than 450 farmers received debt relief as part of the *Pigford* litigation, the report does not include the amount of debt relief given. *See* Exh. 7, Robb Report at 28 & n.86. And in any event, debt relief was *available* for all *Pigford* claimants.

on Oversight and Gov't Reform, 110th Cong. 137 (2008) (testimony of Lupe Garcia) (relaying a hearsay account of USDA employees destroying documents to deny loans to Hispanic farmers).

Defendants' expert report from Dr. Alicia Robb treads the same ground, citing the 2011 Jackson Lewis Report as evidence of ongoing discrimination at USDA. Exh. 7, Robb Report at 34–36. But the anecdotes cited in that Report were not buttressed by any statistical data—on the contrary, the Jackson Lewis Report noted that each minority group's direct loan participation in Fiscal Year 2010 "reasonably well reflected their respective Principal Operator populations." Exh. 11, Jackson Lewis Report, ARPA_WYNN_00003722. And the anecdotes reproduced in the Robb Report focus almost exclusively on Black, Hispanic, and Native American farmers, with minimal evidence of discrimination as to any other racial group. *See* Exh. 7, Robb Report at 34–36. They are also already at least eleven years old. *See id.* at 86 (noting that instances of discrimination were "documented as late as 2011"). The Robb Report does present some statistical data—but only in support of its questionable assertion that present-day disparities are the result of USDA's historical discrimination. *See id*. at 78. As the Mortons' expert demonstrates, Dr. Robb's data analysis cannot show that the observed disparities are caused by past USDA discrimination—let alone that the USDA has not already remedied past instances of intentional discrimination over the course of the various settlements. *See generally* Bronars Report, Exh. 1 to Decl. of Stephen G. Bronars (hereinafter "Bronars Report").

Nonetheless, Section 1005 bases eligibility for debt relief *solely* on a farmer's race. A farmer who entered the farming industry in 2020—nine years after the last documented instance of USDA discrimination—is entitled to repayment of 120 percent of the outstanding balance on his farm loan, regardless of the size of the loan—as long as he is not white. *See* Exh. 3, Defs.' First RFA Resp. 16; Exh. 4, Defs.' Second RFA Resp. 22–24. In fact, Section 1005 entitles a farmer in

a socially disadvantaged group to a payment in the amount of 120 percent of the outstanding balance on his or her eligible farm loans even if that farmer had already received payment as a result of a settlement related to a previous allegation of discrimination. *See* Exh. 3, Defs.' First RFA Resp. 5. And Defendants do not operate any similar debt repayment program limited to, for example, those farmers who suffered economic hardship due to the COVID-19 pandemic. *See id.*, Defs.' First RFA Resp. 14.

### C.    This Lawsuit

Plaintiffs are Matthew and Joshua Morton, brothers who grow corn, soybeans, and wheat together in Kell, Illinois. *See* Am. Compl. ¶ 9, ECF No. 29. The brothers are co-borrowers on a farm loan administered by the Farm Services Agency that had outstanding indebtedness as of January 1, 2021. *See id.* ¶¶ 9–10; Answer ¶¶ 9–10, ECF No. 40. Because they identify as non-Hispanic white farmers, *see* Answer ¶ 9, their otherwise qualifying farm loan is not eligible for repayment under Section 1005. *See id.* ¶¶ 9, 49. They brought this lawsuit challenging the race-based provisions of Section 1005 as a violation of the equal protection component of the Fifth Amendment's Due Process Clause and the Administrative Procedure Act. *See* Am. Compl. ¶¶ 53–64 (Due Process Clause allegations); *id.* ¶¶ 65–70 (Administrative Procedure Act allegations). Defendants are Secretary of Agriculture Thomas J. Vilsack and Farm Services Agency Administrator Zach Ducheneaux, in their official capacities. *Id.* ¶¶ 11–12.

### D.    History of Section 1005 Challenges

Soon after President Biden signed the Act, farmers across the country began challenging Section 1005's race-based debt relief. Ultimately, 12 cases were filed in various district courts. *See* Defs.' Motion to Stay, ECF No. 15 at 2–3 (listing cases in order of the date the complaint was filed). Little more than six weeks after the first case was filed, the Eastern District of Wisconsin

issued a nationwide temporary restraining order prohibiting the distribution of funds pursuant to Section 1005. *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021). Soon after that, the Middle District of Florida issued a nationwide preliminary injunction prohibiting the distribution of funds pending further order of the court. *Wynn v. Vilsack*, No. 3:21-cv-514-MMH-JRK, 2021 WL 2580678 (M.D. Fla. June 23, 2021). Additional preliminary injunctions followed in the Northern District of Texas, *Miller*, No. 4:21-cv-00595-O, ECF No. 60, and the Western District of Tennessee, *Holman*, No. 21-1085-STA-jay, 2021 WL 2877915. No court that has considered the merits of a challenge to Section 1005 has ruled in the government's favor.

Along with a preliminary injunction, the *Miller* court in Texas also granted a motion for class certification. *Miller*, No. 4:21-cv-595, ECF No. 60. The government then began moving to stay proceedings in the remaining cases, arguing that the plaintiffs in those cases were members of the class in *Miller* and thus the litigation in other districts was duplicative. This Court denied the government's motion. *See Kent v. Vilsack*, No. 3:21-cv-540-NJR, 2021 WL 6139523 (S.D. Ill. Nov. 10, 2021) (ECF No. 24). Following the Court's decision, Plaintiffs filed an amended complaint and the parties stipulated to using the written discovery produced in *Wynn*—with the exception of new expert reports. The parties also agreed that briefing on dispositive cross motions for summary judgment would begin on February 4, 2022—making this the first challenge to Section 1005 that will reach final briefing on the merits.

**STANDARD OF REVIEW**

"Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Ludwig v. United States*, 21 F.4th 929, 931 (7th Cir. 2021). "A genuine dispute as to any material fact exists if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted).

## ARGUMENT

**I.      Section 1005 Violates the Equal Protection Component of the Fifth Amendment's Due Process Clause**

"[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (citations omitted). "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). All such classifications are subject to strict scrutiny because they are "simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved*, 551 U.S. at 720 (internal quotations omitted).

Both on its face and in operation, Section 1005 contains an explicit racial classification. USDA concedes that under Section 1005, the "sole criterion" for whether a farmer is entitled to debt relief is that farmer's race. Exh. 1, Defs.' Resp. to Interrog. 11. Section 1005 is thus subject to strict scrutiny. *See Faust*, 519 F. Supp. 3d at 475 (holding that because Section 1005 "grants privileges to individuals based solely on their race, strict scrutiny applies"). Defendants do not argue otherwise.

Under this standard, "the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand*, 515 U.S. at 227). USDA must show both that Section 1005 furthers a compelling interest and that its race-based provisions are narrowly tailored toward that interest. It cannot do either. Thus, as each of the four courts that have

10

considered this issue has opined, Section 1005 violates the equal protection component of the Due Process Clause.

### A.     Section 1005 Does Not Further a Compelling Interest

The compelling interest requirement is designed to "assur[e] that the legislative body is pursuing a goal important enough to warrant use of" racial classifications—"a highly suspect tool." *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality op.). The Supreme Court has recognized only one relevant interest compelling enough to justify racial classifications: remedying the effects of past or present de jure discrimination. *Parents Involved*, 551 U.S. at 720–22.

Defendants claim that Section 1005's race-based relief "furthers the government's interests in remedying the lingering effects of the well-documented history of discrimination against minority farmers in USDA farm loan programs and in preventing public funds from being allocated in a way that perpetuates the effects of discrimination." *See* Exh. 1, Defs.' Resp. to Interrog. 4. For the Government to show that race-based measures are warranted based on these interests, it must "present evidence either that [its] prior remedial measures failed to adequately remedy the harm caused by USDA's past discrimination or that the Government remains a 'passive participant' in discrimination in USDA loans and programs." *Wynn*, 2021 WL 2580678, at *5; *see also id.* at *3 (noting that even where the nature of the interest offered by the government is accepted as compelling, courts must evaluate "the adequacy of the evidence of discrimination offered to show that interest") (quoting *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1564 (11th Cir. 1994)).

The Government cannot make this showing for three reasons. ***First***, although USDA points to decades-old discrimination in farming as a basis for Section 1005's race-based debt relief, it does not dispute that there have been sustained efforts to remedy that discrimination through a

11

series of settlement agreements and other measures over the last three decades. *See, e.g.*, Answer ¶¶ 36–39, ECF No. 40. As the *Wynn* court found after considering the government's evidence, the "evidentiary support for the inadequacy of past remedial measures is limited and largely conclusory." 2021 WL 2580678, at *5. **Second**, USDA contends that socially disadvantaged farmers have been largely left out of recent agricultural funding and pandemic relief. But it is uncontested that recent relief was not distributed on the basis of race, but instead on race-neutral factors such as farm size and crops grown. *Id.* at *6. "An observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way." *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021). **Third**, the government's ultimate goal in enacting Section 1005 appears to be achieving parity among racial groups. *See* Exh. 7, Robb Report at 100 (contending that socially disadvantaged farmers, as a whole, operate with smaller collateral, farm size, and farm revenue—which in turn affects their ability to obtain private credit). But the argument that racial discrimination is necessary to attain racial parity must be viewed with skepticism. *See Miller*, No. 4:21-cv-595, ECF No. 60 at 18. The concept of racial parity smacks of "racial balancing," which the Supreme Court has rejected as "patently unconstitutional." *Parents Involved*, 551 U.S. at 723.

### i.   Section 1005 Does Not Further an Interest in Remedying Past Discrimination

When the government enacts race-based legislation to remedy past, de jure discrimination, it must take care not to "discriminate more than is necessary to cure the effects of the earlier discrimination." *Builders Ass'n of Greater Chi. v. Cty. of Cook*, 256 F.3d 642, 646 (7th Cir. 2001). It may not "continue the remedy in force indefinitely, with no effort to determine whether, the remedial purpose attained, continued enforcement of the remedy would be a gratuitous discrimination against nonminority persons." *Id.*

12

Here, Congress undertook sustained and comprehensive efforts over the past three decades to remedy past discrimination against certain minority farmers. These include implementation of the "2501 Program" to increase outreach to socially disadvantaged farmers; entering into multiple class action settlements and awarding approximately $2.4 billion in relief to farmers who suffered racial discrimination; extending the statutory limitations period for individuals to file discrimination claims against USDA; creating formal officers that are responsible for ensuring compliance with civil rights laws; and more. *Wynn*, 2021 WL 2580678, at *5 (citing Gov't Resp. to Mot. for Prelim. Inj. at 7–8); *see also* Am. Compl. ¶¶ 36–39, ECF No. 29; Answer ¶¶ 36–39, ECF No. 40 (documenting the government's extensive efforts to remedy past discrimination).

Many farmers who are eligible for debt relief under Section 1005 have already benefitted from those prior remedies. According to USDA, of those eligible for debt relief under Section 1005, there are 370 farmers who have already received compensation under *Pigford* and other settlements. *See* Exh. 1, Defs.' Resp. to Interrog. 13. And it acknowledges that those payments total over $30 million. *Id.* "Due to the significant remedial measures previously taken by Congress, for purposes of this case, the historical evidence does little to address the need for continued remediation through Section 1005." *Wynn*, 2021 WL 2580678, at *5. To withstand scrutiny, Section 1005's race-based debt relief "must be justified on some other basis." *Parents Involved*, 551 U.S. at 721.

### ii. Section 1005 Does Not Further an Interest in Remedying Present Discrimination

Section 1005 also does not further an interest in remedying present discrimination. Indeed, as USDA conceded in another challenge to the same law, "the USDA is not currently discriminating against any socially disadvantaged farmers or ranchers." *Miller*, No. 4:21-cv-595, ECF No. 60 at 16 (citing Inj. Hearing Trans.). Perhaps for that reason, USDA has rested much of

13

its case on crude statistical disparities. The government contends that payments from "recent USDA programs [] have disproportionately benefited White farmers." *Wynn*, 2021 WL 2580678, at *6 (citing Gov't Resp. to Mot. for Prelim. Inj. at 9–10).[7] Yet USDA does not contend that the distribution of funds under those programs was done in a discriminatory manner. *See* Exh. 1, Defs.' Resp. to Interrog. 18; *see also* Exh. 7, Robb Report at 97 (conceding that the fact that recent payments have gone disproportionately to white farmers is "likely not intentional").

Here, the statistical disparities the government identifies are attributable to race-neutral factors such as the type of crop that is grown or farm size, not to racial discrimination. *Wynn*, 2021 WL 2580678, at *6. As Plaintiffs' expert explains, the government's crude group comparisons fail to control for race-neutral variables. *See, e.g.*, Bronars Report at 8 (noting that "Dr. Robb's comparisons do not control for the impact on participation of differences in the commodities produced by minority and non-minority farmers"); *id.* at 12 (noting that the "aggregate data tabulations presented by Dr. Robb do not allow her to make comparisons among farmers that account for the impact of farmer or farm characteristics on farm outcomes, nor do the tabulations allow her to determine whether some groups of minority farmers had larger or smaller disparities in farm outcomes relative to the white farmers to whom they should be compared"). Plaintiffs' expert concluded that even assuming arguendo that crude comparisons between the acreage and revenue of white farmers and socially disadvantaged farmers were appropriate, the disparities can be chalked up to race-neutral factors such as geographic differences and the disproportionate number of socially disadvantaged farmers who are also beginning farmers. *See id.* at 17–18 (noting that Dr. Robb's comparisons "conflate the impact of minority group membership with less farming

---

[7] Even this figure must be qualified by the fact that "[m]any participants in [those] programs did not provide information about their race or ethnicity, so the estimated percentage of minority recipients is subject to potential non-response bias." Bronars Report at 8.

experience"); *id.* at 21–24 (noting the impact of differences in where the farmers farm); *see also id.* at 18 ("Because a substantial share of minority farmers are new farmers who spend many days each year working off the farm, an understanding of the financial challenges faced by minority farmers should include an examination of differences in off the farm earnings opportunities between minority and white farmers. Dr. Robb did not investigate these differences in earnings opportunities.")

Defendants' expert also fails to account for individual values, choices, and actions. She "does not explain why the share of minority farmers would match the share of the minority population in rural areas in the absence of discrimination by the USDA." *Id.* at 13. Instead, the government's conclusions "rest[] upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Croson*, 488 U.S. at 507.

"Where a race-neutral basis for a statistical disparity can be shown, the Court can give that statistical evidence less weight." *Wynn*, 2021 WL 2580678, at *6. Here, the government's asserted statistical disparities cannot carry the weight of showing a compelling governmental interest in implementing a race-based program. The government's "observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way," *Vitolo*, 999 F.3d at 363, and does not justify Section 1005's race-based relief.

> ### iii.   The Government's Interest in Achieving Racial Parity Is Not Compelling Enough to Warrant the Race-Based Relief in Section 1005

Unable to support Section 1005's crude racial provisions with an interest in remedying discrimination, the government's actual interest in enacting those provisions appears to be achieving parity among racial groups. This is perhaps best summarized by the government's expert, who concludes that she "see[s] the lingering effects of this discrimination in the data from the most recent Census of Agriculture, which shows that minorities are underrepresented in farming." Exh. 7, Robb Report at 108. In her view, Section 1005's race-based debt relief represents "an important step towards leveling the playing field for minority farmers going forward." *Id.*

The interest in achieving equal outcomes among racial groups is not compelling enough to justify the race-based relief in Section 1005. Even if disparate outcomes among farmers were due to societal discrimination rather than independent choice—which even the government's expert has been unable to establish—that would not support Section 1005's distribution of funds based on crude racial distinctions. *See Shaw v. Hunt*, 517 U.S. 889, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."); *Croson*, 488 U.S. at 505 ("To accept [the government's] claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group.").

The government's goal of correcting broad group-based disparities has no limiting principle. It would permit Congress to continue to enact discriminatory laws until minority farmers reached economic parity with white farmers *even after* it has taken concrete action to remedy specific instances of the federal government's past discrimination. And it assumes without evidence that any racial disparities are not the result of an individual's values, choices, and actions,

but are necessarily the byproduct of racial discrimination. *Cf. Parents Involved*, 551 U.S. at 721 ("We have emphasized that the harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation, and that the Constitution is not violated by racial imbalance in the schools, without more." (quotation marks omitted)). The government's use of racial classifications—and the racial stereotypes that accompany it—"demeans us all." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 279, 316 (2013) (Thomas, J., concurring).

### B.    Section 1005 Is Not Narrowly Tailored

Even where a court finds that the government has demonstrated a compelling interest in its racial classifications, the court must ensure that the law is narrowly tailored to that compelling interest. This Court must scrutinize "the means chosen" and ensure that they "fit th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493 (plurality op.).

The hallmark of a narrowly tailored law is individualized consideration. *Grutter v. Bollinger*, 539 U.S. 306, 334 (2003). A law that uses race in a rigid, mechanical way flunks the narrow tailoring analysis. The requirement of a close fit is also central to the narrow tailoring analysis. Race-based provisions are constitutionally deficient where they are either *overinclusive* by providing gratuitous benefits on the basis of race or *underinclusive* by failing to further the compelling goals that the government intends to advance. Finally, USDA must show that it exhausted race-neutral alternatives to further those goals, and only turned to race-based remedies as a last resort. *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 926 (11th Cir. 1997). Section 1005 fails on all of these counts.

17

i.      **Section 1005 Is Not Narrowly Tailored Because It Uses Race in a Rigid and Categorical Manner**

As the *Wynn* court observed, "little if anything about Section 1005 suggests that it is narrowly tailored." *Wynn*, 2021 WL 2580678, at *7. A narrowly tailored law must provide "individualized consideration" and use race "in a flexible, nonmechanical way." *Grutter*, 539 U.S. at 334; *see also Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 945 (7th Cir. 2016) (a narrowly tailored law must use "individualized determinations"). Yet "Section 1005's rigid, categorical, race-based qualification for relief is the antithesis of flexibility." *Wynn*, 2021 WL 2580678, at *7. That is because, as USDA concedes, a farmer's race is the sole, determinative factor for every farmer who seeks debt relief. *See* Exh. 1, Defs.' Resp. to Interrog. 11. Every person who falls within "a socially disadvantaged group" and "who has a qualifying farm loan with an outstanding balance as of January 1, 2021, receives up to 120% debt relief—and no one else receives any debt relief." *Wynn*, 2021 WL 2580678, at *7. What's more, a "socially disadvantaged" farmer receives debt relief "regardless of farm size" and "regardless of whether [he] is having the most profitable year ever and not remotely in danger of foreclosure." *Id.* By contrast, "a small White farmer who is on the brink of foreclosure" does not qualify for any relief. *Id.* As one district court in this Circuit put it, a program is not narrowly tailored if a "third generation Japanese American from a wealthy family and with a graduate degree from MIT qualifies (and an Iraqi immigrant does not)." *Builders Ass'n of Greater Chi. v. City of Chicago*, 298 F. Supp. 2d 725, 739–40 (N.D. Ill. 2003). The similarity with Section 1005 is obvious.

USDA may argue, as it did previously, that Section 1005 is flexible because the Secretary maintains discretion to consider other racial groups as socially disadvantaged. *Wynn*, No. 3:21-cv-514-MMH-JRK, Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 22 at 33. Yet the undisputed record shows that the Secretary cannot make an individualized determination that particular individuals,

such as Plaintiffs, are disadvantaged, but only that their entire racial group is disadvantaged. *See* Exh. 3, Defs.' First RFA Resp. 10. This crude group-based determination is not only unlawful as a matter of principle, but implausible as a matter of practice. USDA recognizes five racial groups and two ethnicities. Individuals who are Hispanic or belong in any of four of the five racial groups have long been considered socially disadvantaged, and USDA adopted that recognition for Section 1005. *Wynn*, No. 3:21-cv-514-MMH-JRK, Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 22 at 12–13; *see also* Exh. 3, Defs.' First RFA Resp. 20. Only white, non-Hispanic farmers are not so considered. Exh. 3, Defs.' First RFA Resp. 19. There is no reasonable possibility—even under USDA's crude race-based approach—that Secretary Vilsack would accept a request to include white, non-Hispanic farmers as "socially disadvantaged." If everyone is considered socially disadvantaged, no one is.

In all, Section 1005 "is absolutely rigid in the relief it awards." *Wynn*, 2021 WL 2580678, at *9. For that reason, it is similar to other programs that the Supreme Court has "found not to be narrowly tailored in *Croson* and other similar cases." *Id.* (citing *Gratz v. Bollinger*, 539 U.S. 244, 271–72 (2003) (rejecting as not narrowly tailored a law school admissions policy that automatically distributed "20 points to every single applicant from an 'underrepresented minority' group," which had "the effect of making 'the factor of race . . . decisive' for virtually every minimally qualified underrepresented minority applicant")).

### ii.   Section 1005 Is Not Narrowly Tailored Because It Is Both Overinclusive and Underinclusive

Narrow tailoring requires that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493 (plurality opinion). That standard is not met here, as

"Section 1005 simultaneously manages to be both overinclusive and underinclusive." *Wynn*, 2021 WL 2580678, at *10.

Section 1005 is overinclusive for two reasons. *First*, Section 1005 provides "debt relief to [individuals] who may never have been discriminated against or faced any pandemic-related hardship." *Id.* A minority farmer "who applied for and received the only farm loan he or she ever sought on terms equivalent or even better than those given to other farmers is entitled to up to 120% debt relief despite never having faced any of the discrimination catalogued by the Government"—all because the farmer identifies with a "socially disadvantaged group." *Id.*; *see* Exh. 3, Defs.' First RFA Resp. 1. USDA admits, as it must, that not every socially disadvantaged farmer has been discriminated against by USDA. Exh. 3, Defs.' First RFA Resp. 3. Indeed, as the *Wynn* Court observed, "the Government conceded at the preliminary injunction hearing that the farm loans that will qualify for repayment 'are generally loans by folks new to the industry, starting their farms, things like that.'" *Wynn*, 2021 WL 2580678, at *10 (citing Prelim. Inj. Hearing Trans. at 52–53). And as to all farmers (new or not), USDA's data shows that there are thousands of socially disadvantaged farmers who operate farms that generate more revenue than the median white farmer. Bronars Report at 19. In the end, the only commonality that the USDA has identified between the group of farmers who have suffered actual racial discrimination and those who are entitled to debt relief under Section 1005 is that they include members with the same racial classification.

There is also "little evidentiary support for the magnitude of relief provided by Section 1005—up to 120% debt relief to all [socially disadvantaged individuals] with qualifying farm loans." *Wynn*, 2021 WL 2580678, at *10. As the *Wynn* court observed, Section 1005's blunderbuss distribution of debt relief "appears to duplicate or in some instances exceed the relief provided to

those who actually suffered the well-documented historic discrimination Congress sought to remedy through prior settlements." *Id.* The record bears this out. USDA confesses that 370 of the farmers eligible for debt relief under Section 1005 have already settled claims of past discrimination with the USDA—to the tune of over 30 million dollars. *See* Exh. 1, Defs.' Resp. to Interrog. 13. Section 1005 thus "discriminate[s] more than is necessary to cure the effects of the earlier discrimination." *Builders Ass'n*, 256 F.3d at 646.

*Second*, "Section 1005 provides debt relief to groups including Asians, Native Hawaiians, and Pacific Islanders, groups for which the evidence of prior discrimination by the USDA in farm loans, programs and services appears to be exceedingly thin." *Wynn*, 2021 WL 2580678, at *10. By some metrics, Asian farmers fared better than white farmers. *See* Exh. 8, Miller Disparity Study, ARPA_WYNN_00000394 (noting that, although only a small number of Asian farmers had registered yields, such farmers "often had higher yields than white male farmers"). Indeed, the government's own data shows that "more than half of the farms operated by White farmers earn less revenue than the typical (median) farm operated by an Asian farmer." Bronars Report at 6. The Seventh Circuit has explained that a government "that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks and Asian–Americans and women." *Builders Ass'n*, 256 F.3d at 646 (citations omitted). And the "random inclusion of racial groups" for which there is no evidence of past discrimination demonstrates that a program is not narrowly tailored. *See Croson*, 488 U.S. at 506.

Section 1005 is also not narrowly tailored because it is underinclusive. For all the USDA's talk about debt relief as a remedial measure, Section 1005 "fails to provide any relief to those who suffered the brunt of the discrimination identified by the Government." *Wynn*, 2021 WL 2580678, at *10. Although USDA acknowledges its sordid history of discrimination in distributing farm

loans, it ignores the obvious fact that Section 1005 "provides no remedy at all for [a socially disadvantaged farmer] who was *unable to obtain* a farm loan due to discriminatory practices or who no longer has qualifying farm loans as a result of prior discrimination." *Id.* (emphasis added). Now, months after the court in *Wynn* noted the primary defect with USDA's argument on this point, USDA has still not "explain[ed] how a remedy that by its own terms may have the effect of excluding past victims of the very discrimination it seeks to remedy is actually tailored, narrowly or not, to remedy that discrimination." *Id.*[8]

      **iii.**    **Section 1005 Is Not Narrowly Tailored Because the Panoply of Race-Neutral Alternatives Suggests that Congress Did Not Use Race Only as a Last Resort**

The narrow tailoring analysis requires the government to engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow them to achieve the interest they believe to be compelling. *Grutter*, 539 U.S. at 339. This means that racial preferences, to the extent they are employed at all, "must be only [used as] a 'last resort' option." *Eng'g Contractors*, 122 F.3d at 926 (quoting *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993)). Here, "Congress does not appear to have turned to the race-based remedy in Section 1005 as a 'last resort,' but instead appears to have chosen it as an expedient and overly simplistic, but not narrowly tailored, approach to addressing prior and ongoing discrimination at USDA." *Wynn*, 2021 WL 2580678, at *11. This is especially troubling given the number of obvious race-

---

[8] Section 1005 is also underinclusive because it excludes white female farmers, who have long been viewed as "socially disadvantaged" by the USDA for purposes other than Section 1005, and who the USDA has discriminated against on the basis of sex. *See* Exh. 3, Defs.' First RFA Resp. 7; *see also Holman*, 2021 WL 2877915, at *2 & n.7 ("There has been no explanation as to why female farmers were not included within the ambit of Section 1005 even though female restaurant owners were included in the restaurant portion of the [American Rescue Plan Act of 2021].").

neutral alternatives that were available to the government to address the problems it identifies. Three alternatives in particular merit discussion here.

First, USDA states that socially disadvantaged farmers were disproportionately more likely to be left out of previous COVID-19 relief programs. *Wynn*, 2021 WL 2580678, at *6 (citing Gov't Resp. to Mot. for Prelim. Inj. at 9–10). But it has long been the case that minority farmers were, on average, less likely to participate in Farm Services Agency Program Crops and more likely to be involved in livestock compared to white male farmers. *See* Exh. 8, Miller Disparity Study, ARPA_WYNN_00000378. USDA admits that it has never implemented a debt relief program that hinges eligibility for debt relief on the type of crops grown or livestock raised. *See* Exh. 3, Defs.' First RFA Resp. 15. If providing relief to those left out of prior programs were the goal, a race-neutral program that ties eligibility for payment to farmers who grew "specific crops that were left out of prior relief bills would also represent narrowly tailored relief, even though, according to the Government, that relief would disproportionately benefit" members of socially disadvantaged groups. *Wynn*, 2021 WL 2580678, at *11 & n.14.

Second, if Congress were concerned about providing aid to farmers in dire straits, it could have enacted legislation that tied relief to a farmer's specific socioeconomic status. Such a program would not base payments on crude assumptions about a farmer's economic status based on his or her race, but would allow for the type of "individualized determination" that is an integral part of equality under the law. *Midwest Fence*, 840 F.3d at 945; *see also Miller v. Johnson*, 515 U.S. 900, 911–12 (1995) ("Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution.") (cleaned up).

Third, USDA could continue or strengthen its efforts to remove internal barriers that it believes disproportionately affect the ability of socially disadvantaged farmers to obtain loans. For instance, it could provide outreach designed to curtail "distrust of the [federal] government" that may prevent some farmers from seeking a loan in the first place. *See* Exh. 9, Laura-Anne Minkoff-Zerne, *A new era of civil rights? Latino immigrant farmers and exclusion at the United States Department of Agriculture*, 34 Agric. Hum. Values 631 (2017), ARPA_WYNN_00002480–82. It could reconsider regulatory barriers that discourage farmers from applying for loans. *See id.* (noting that participation in some USDA programs require "detailed logs" and "adherence to [] operation and maintenance plan[s], which includes particular instructions."). It could better promote pandemic-related relief efforts so that farmers who are currently "not aware of available COVID-19 resources" can apply for them. *See* Exh. 10, 2020 Annual Report of the Federation of Southern Cooperatives/Land Assistance Fund, ARPA_WYNN00002494. It could create a host of objective standards that ensure that similarly situated applicants are treated alike. Exh. 7, Robb Report at 14 (observing that county officials, in assessing eligibility for servicing loans, were necessarily called to exercise subjective judgment on topics like plan feasibility and the "good faith" of the borrower, which created opportunities for intentional and unintentional discrimination). And it could provide race-neutral technical assistance for small farmers, who acknowledge the negative impact that "traditional, but dated" farming techniques have on their crop yields. Exh. 8, Miller Disparity Study, ARPA_WYNN0000407.

"Because these race-neutral alternatives exist," and have not been tried, let alone proven inadequate, "the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363. The government can "provide better outreach, education," or implement a host of race-neutral

measures designed to achieve its goals. *Faust*, 519 F. Supp. 3d at 476. "But it cannot discriminate on the basis of race." *Id.*[9]

## II.    A Nationwide Injunction Is the Appropriate Remedy

Plaintiffs' complaint seeks two alternative remedies—an injunction prohibiting Defendants from making any payments under Section 1005 *or* an injunction prohibiting Defendants from enforcing only the limitation of debt relief to "socially disadvantaged" farmers and ranchers. Am. Compl. at 19, ECF No. 29 (Prayer for Relief ¶¶ 2–3). The latter remedy would open Section 1005 benefits to all farmers and ranchers regardless of race, while the former would nullify Section 1005's debt relief in its entirety.

In Plaintiffs' view, the better of these alternative remedies is a permanent injunction prohibiting Defendants from making any payments under Section 1005. Once a federal statute is found to violate equal protection, the reviewing court "must adopt the remedial course Congress likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 (2017) (quoting *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010)). Typically, the proper remedy is "to extend the favorable treatment" provided under the statute "to all." *Segovia v. United States*, 880 F.3d 384, 389 n.1 (7th Cir. 2018). But that is not so "when extension 'would render the special treatment Congress prescribed . . . the general rule, no longer an exception.'" *Id.* (quoting *Morales-Santana*, 137 S. Ct. at 1701).

---

[9] Because Section 1005 violates the Due Process Clause of the Fifth Amendment, it also violates the Administrative Procedure Act. The parties agree that USDA's implementation of race-based debt relief of Section 1005 is not "preliminary, procedural, or intermediate." *See* Answer ¶ 65, ECF No. 40. Therefore, it is subject to review under the APA. *See* 5 U.S.C. § 704. Under the APA, this Court may set aside agency action, like USDA's implementation of Section 1005, that is "not in accordance with law," including the Constitution. *Id.* § 706(2)(A).

It is extremely unlikely that Congress would choose to grant Section 1005 debt relief to all farmers as opposed to none. A substantial majority of farm loans are held by white, non-Hispanic farmers not eligible for Section 1005 debt relief. *See* Exh. 7, Robb Report at 92 (Table 18). It follows that a universal debt relief program not limited by race would be substantially more expensive than the one Congress enacted. *See Faust*, 519 F. Supp. 3d at 477–78 (noting that while $3.8 billion had been allocated for Section 1005 payments, repaying the debt of white, non-Hispanic farmers and ranchers "would increase the cost of the program to $400 billion"). And as its title makes clear, Section 1005 was not intended to be a general loan forgiveness program, but a program specifically to provide "farm loan assistance for socially disadvantaged farmers and ranchers." Simply put, extension of this benefit to white farmers would "render the special treatment Congress prescribed" for non-white farmers "the general rule, no longer an exception." *Morales-Santana*, 137 S. Ct. at 1701.

Nor could Defendants or the Court cure the problem by simply permitting Plaintiffs to participate in the Section 1005 debt relief program. As Judge Griesbach explained, "[i]f the USDA forgave Plaintiffs' loans, it would be required to forgive every farmer's loan, since the only criteria for loan forgiveness is the applicant's race." *Faust*, 519 F. Supp. 3d at 478. And as the *Wynn* court held, an injunction expanding the program would also raise sovereign immunity concerns: "[j]udicially rewriting Section 1005 to create a debt relief program that would include a White farmer and ordering the Government to provide Plaintiff debt relief from it would not be monetary relief through inclusion in a governmental program" but instead "an alternate form of money damages" precluded by sovereign immunity. 2021 WL 2580678, at *15. In short, no remedy is sufficient and workable other than an injunction against the operation of Section 1005 in its entirety.

To be effective, this injunction must be nationwide in scope. In blessing a nationwide injunction halting the federal government's attempt to condition a municipality's receipt of grant funds on its adoption of certain immigration-related policies, the Seventh Circuit explained that a "court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to nonparties." *City of Chicago v. Barr*, 961 F.3d 882, 920–21 (7th Cir. 2020). The case for nationwide relief is particularly strong in an equal protection case, where the plaintiff's injury is "the unequal treatment based solely on race—and not merely Plaintiff's inability to benefit from Section 1005." *Wynn*, 2021 WL 2580678, at *13; *see also Ne. Fla. Ass'n of Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). Plaintiffs will suffer precisely that injury without a nationwide injunction. The statute's continued enforcement anywhere will ensure that Plaintiffs are denied equal treatment because of their race. The only way to remedy their injury is to prohibit Defendants from enforcing Section 1005 everywhere.

## CONCLUSION

This Court should grant Plaintiffs' Motion for Summary Judgment, enter the declaratory and injunctive relief requested in the complaint, and grant all other relief to which Plaintiffs may be entitled.

DATED: February 1, 2022.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

s/ Glenn E. Roper
Glenn E. Roper
Colo. Bar No. 38723
Lead Counsel
1745 Shea Center Dr., Suite 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email:  GERoper@pacificlegal.org
Service: IncomingLit@pacificlegal.org

Wencong Fa
Cal. Bar No. 301679*
Christopher M. Kieser
Cal. Bar No. 298486*
555 Capitol Mall, Suite 1290
Sacramento CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email:  WFa@pacificlegal.org
Email:  CKieser@pacificlegal.org

*Attorneys for Plaintiffs*
*\* Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2022, I caused the foregoing to be filed with the Court's

CM/ECF system, which will send notification of said filing to all counsel of record.

s/ Glenn E. Roper
Glenn E. Roper