# Exhibit 7

P. Mot. for Summ. J./D. Expert Report

Court: S.D. Ill.  Case No. 3:21cv540-NJR

Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento CA 95814 – 916.419.7111

Expert Report of

Alicia M. Robb, Ph.D.


In the matter of

*Morton v. Vilsack*, 3:21-cv-00540-NJR (S.D. Ill.)

January 7, 2022

## TABLE OF CONTENTS

I.  SUMMARY OF PRINCIPAL CONCLUSIONS ................................................... 1

II.  EXECUTIVE SUMMARY ................................................................ 2

III.  STATEMENT OF QUALIFICATIONS ..................................................... 6

IV.  SCOPE OF WORK....................................................................... 7

    A.  QUESTIONS CONSIDERED ............................................................ 7

    B.  COMPENSATION .................................................................... 7

    C.  MATERIALS RELIED UPON .......................................................... 7

V.  OVERVIEW OF FSA AND ITS LOAN PROGRAMS AND SERVICES ................... 8

    A.  FSA LENDING PROGRAMS ........................................................... 8

        1.  Loan application process ..................................................... 10

        2.  Loan servicing options ....................................................... 12

    B.  OTHER RELATED USDA PROGRAMS ................................................. 15

VI.  THERE IS SUBSTANTIAL EVIDENCE OF HISTORICAL DISCRIMINATION
     WITHIN USDA'S LOAN PROGRAMS ................................................. 16

        1965 USCCR Report ............................................................... 18

        1982 USCCR Report ............................................................... 22

        Litigation: 1997-2013 ........................................................... 24

        1997 CRAT Report ............................................................... 29

        1997 OIG Audit.................................................................. 31

        2011 Jackson Lewis Report ...................................................... 34

        Congressional Hearings .......................................................... 36

VII.  MINORITY FARMERS CONTINUE TO SUFFER THE EFFECTS OF PAST
      DISCRIMINATION IN USDA LOAN PROGRAMS ................................... 38

    A.  THE EVIDENT FAILURE OF PRIOR EFFORTS TO REMEDIATE HISTORIC
        DISCRIMINATION IN USDA LOAN PROGRAMS AND ITS EFFECTS .......................... 38

    B.  EXISTING DISPARITIES BETWEEN MINORITY AND NON-MINORITY FARMERS ....... 40

i

1.    *Underrepresentation of minority farmers* ................................ 41

    i.    *Underrepresentation based on comparisons with the national population* ..................................................................... 41

    ii.    *Underrepresentation based on comparisons with the rural population* ..................................................................... 47

    iii.    *Underrepresentation based on comparisons with state-level population data* ............................................................ 50

2.    *Smaller farms and lower revenues of minority farms* .............................. 55

3.    *Lower net worth of minority farmers* ........................................ 72

4.    *The differences between minority and non-minority farmers are not primarily attributable to race-neutral factors* ......................................... 74

C.    EXISTING DISPARITIES ARE CONSISTENT WITH THE EXPECTED EFFECTS OF PAST DISCRIMINATION IN USDA LOAN PROGRAMS ........................................ 78

D.    CYCLICAL EFFECTS OF PAST DISCRIMINATION IN USDA LOAN PROGRAMS ......... 91

1.    *Higher rates of delinquency, default, and foreclosure among minority farmers* ................................................................ 92

2.    *Less access to government payments by minority farmers* ...................... 96

3.    *Less access to private credit by minority farmers* ................................ 100

4.    *Borrower discouragement and distrust of USDA* ................................. 103

VIII.  **CONCLUSION** ........................................................... **109**

**LIST OF APPENDICES** ........................................................ **110**

A.    **CV OF ALICIA ROBB** ..................................................... **111**

B.    **LIST OF MATERIALS REVIEWED** ......................................... **117**

C.    **ADDITIONAL TABLES** ................................................... **122**

D.    **LIST OF TABLES AND FIGURES** ......................................... **128**

I.      **Summary of Principal Conclusions**

I, Alicia Robb, am an economic consultant and have previously served as an economist with several government agencies: the U.S. Small Business Administration (Office of Economic Research in the Office of Advocacy), the Federal Reserve (Board of Governors), and the U.S. Census Bureau (Center for Economic Studies). A full statement of my qualifications follows the Executive Summary of this report, which briefly describes my conclusions. I was retained by counsel for Defendants, the Secretary of Agriculture, who leads the United States Department of Agriculture ("USDA"), and the USDA Administrator of the Farm Service Agency, to evaluate the anecdotal and statistical evidence of discrimination against minority farmers in USDA's lending programs and provide an opinion on whether there are any lingering effects of this past discrimination that disadvantage individual groups of minority farmers in the present day.

Based on my review of historical program information, numerous non-governmental and governmental reports, including Government Accountability Office ("GAO") and Office of Inspector General ("OIG") reports and audits, census data, loan data, and various other documents described in Appendix B, I have reached the following conclusions:

1) These materials and data provide substantial evidence of past discrimination against minority farmers in USDA loan programs.

2) These materials and data reveal large and adverse disparities between minority and non-minority farmers today.

3) These disparities cannot be explained solely by differences between minority and non-minority farmers or other factors untainted by discrimination.

4) Instead, these disparities are consistent with what one would expect given both the well-established historical discrimination in USDA's loan programs and the nature of credit markets and the agricultural sector.

## II.    Executive Summary

This case involves the claim that white farmers are being discriminated against because the debt relief provided in Section 1005 of the American Rescue Plan Act ("ARPA") is being provided to farmers of certain races and ethnicities ("minority farmers"). I understand that the Government contends that debt relief to minority farmers is necessary to remedy the lingering effects of prior discrimination against minority farmers in USDA lending programs and to ensure that the allocation of government funding does not serve to perpetuate the effects of that discrimination. I have been asked to review the evidence of discrimination against minority farmers in USDA's lending programs, evaluate the data related to the status of minority farmers today, and opine on whether the data are consistent with the expected effects of the documented history of discrimination against minority farmers in USDA's lending programs. Based on my review and analysis, I have concluded that they are.

USDA has historically discriminated against minority farmers and ranchers in USDA farm loan programs, as amply demonstrated by evidence in numerous reports issued by the U.S. Commission on Civil Rights, the GAO, and the USDA OIG; reports funded by USDA itself; in Congressional testimony; and in numerous lawsuits that have resulted in payments to thousands of minority farmers totaling billions of dollars.

 This discrimination manifested in many ways throughout the loan cycle, including disparate treatment in: 1) outreach and education about existing loan programs and eligibility; 2) assistance with loan applications; 3) processing time for applications; 4) loan application approvals; and 5) post-disbursement loan servicing. In addition, various reports indicated that minority farmers were given additional requirements, such as needing a joint signature of an FSA representative for withdrawing funds for expenses, which were not typically imposed on white

2

farmers. The evidence tells a clear story: For decades, USDA discriminated against minority farmers in numerous ways in administering its loan programs.

That discrimination has been to the obvious and continuing detriment of minority farmers. The principal purpose of USDA's lending programs is to provide credit to farmers otherwise excluded from private credit markets so that those farmers can invest in, grow, and improve their farms—up to the point where they can then "graduate" from USDA programs and obtain credit in private markets. A major consequence of discrimination in USDA lending programs was that minority farmers who were already struggling were denied the very help they needed, while white farmers were given that help. Thus, minority farmers were unable to expand their farms or invest in them to grow their farm businesses, or were pushed out of farming entirely.

The results we see today are entirely consistent with this history of discrimination—which deprived generations of minority farmers of needed credit, payments, and technical assistance to run and expand their farms—and with the nature of an industry reliant on ready and frequent credit. For instance, the diminution of minority participation in farming is apparent. In 1920, minority farm owners made up 14.7% of all farm owners in the United States. By 2017, they made up just 4.3% of all farm owners, and minorities' participation in farming lagged well below what would be expected based on their shares of the general population and rural population. In addition to their underrepresentation in farming, the data show that minority farms are on average smaller and bring in lower revenues. By every metric—acreage, market value of production, government payments, net farm income, per-acre market value, and overall wealth—minority farmers generally lag behind their white counterparts.

Minority farmers may be harmed for decades after a discriminatory act. For example, minority farmers, with less wealth, are more vulnerable to negative shocks such as natural

3

disasters, poor growing seasons, or economic downturns. This is reflected in higher rates of delinquency and foreclosure among minority farmers today. Many government payment programs are based on crop-acreage or are targeted toward crops primarily grown on large farms, so minorities, who disproportionately have smaller farms, receive less government support. The reduced collateral and income caused by denied loans continue to hinder minority farmers seeking private credit to the present day. Moreover, historical discrimination in USDA loan programs may have caused minority farmers to become "discouraged borrowers" who may be less likely to seek future USDA assistance precisely because of past USDA discrimination and a resultant lack of trust. Data provided by USDA on loan applications and application withdrawal rates show that minority farmers were less likely to apply for USDA loans in the first place and that their loan applications were more likely to be withdrawn when they did apply.

These present-day disparities are consistent with the expected effects of the well-documented and systemic historical discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination. There are several additional reasons to attribute the present-day disadvantaged position of minority farmers to historical discrimination in USDA's loan programs. For one, the disparities are large and across several relevant, and interrelated, metrics. Second, the documented discrimination occurred over a long period of time until at least 2010. Given the longevity and recency of the prior discriminatory conduct, together with the investment timeline for agriculture, it is unsurprising that there are still effects of that discrimination only a decade later. Third, Congress and USDA have taken substantial steps to eliminate and remediate historical discrimination, but even as those efforts have had some success, the disparities have persisted. Finally, it is well understood that historical discrimination discourages minority groups that have

4

been discriminated against from seeking credit, even when they may both need it and objectively qualify for it. That pattern is consistent with the observed data. The data also show that these disparities are not largely explainable by race-neutral factors such as geography and types of agricultural products produced or by race-neutral characteristics of farmers, such as prior experience in farming or number of annual days devoted to farming, which might influence farming outcomes.

In summary:

1) The materials and data I reviewed provide substantial evidence of past discrimination against minority farmers in USDA loan programs;

2) These materials and data reveal large and adverse disparities between minority and non-minority farmers today;

3) These disparities cannot be explained solely by differences between minority and non-minority farmers or other factors untainted by discrimination;

4) Instead, these disparities are consistent with what one would expect given both the well-established historical discrimination in USDA's loan programs and the nature of credit markets and the agricultural sector.

The debt relief provided by Section 1005 addresses the lingering effects of discrimination, including by increasing minority farmers' available capital to permit reinvestment in their farm operations, by helping to ensure that minority farmers, who have higher rates of delinquency and foreclosure, do not lose their farms during a time of national distress, and by focusing targeted relief on those groups that have been disproportionately left out of previous government funding. While this relief may not fully remedy the effects of USDA's past discrimination against minority farmers, it is an important step towards leveling the playing field for minority farmers going forward to help ensure that they do not continue to experience the cyclical effects of prior discrimination in USDA's loan programs.

### III.    Statement of Qualifications

I have more than 25 years of experience in economic consulting, research, and publishing in the fields of economics, entrepreneurship and finance. I have previously served as an economist with several government agencies: the U.S. Small Business Administration (Office of Economic Research in the Office of Advocacy), the Federal Reserve (Board of Governors), and the U.S. Census Bureau (Center for Economic Studies). I was previously a senior fellow with the Kauffman Foundation for twelve years, where I led a longitudinal study of U.S. startups that were tracked over the 2004-2011 period. I have worked as a consultant on a number of projects for various government agencies, including: the Securities and Exchange Commission, the Minority Business Development Agency, the Small Business Administration, and the Chicago Transit Authority, as well as groups such as the World Bank.

I have a Ph.D. in economics from the University of North Carolina at Chapel Hill. My graduate curriculum included advanced courses in statistics and econometrics. My dissertation examined race, gender, and discrimination among U.S. employer businesses and used confidential microdata from the U.S Census Bureau. I have worked extensively with large and complex datasets including the Survey of Business Owners (Census), the Characteristics of Business Owners Survey (Census), the Longitudinal Business Database (Census), the Survey of Small Business Finances (Federal Reserve), and the Kauffman Firm Survey (Kauffman Foundation).

Much of my work has focused on entrepreneurship and entrepreneurial finance, and I have studied the particular roles of racial and gender gaps in business financing, racial and gender differences in entrepreneurial outcomes, and disparity studies on government contracting. I have participated in a number of committees and working groups, such the National Advisory Council for Minority Business Enterprise, the OECD Pilot Scoreboard on SME Financing, and the G20 Working Group on SME Financing. My CV is included as Appendix A and lists all of my

publications and work experience. I have not provided expert testimony in court cases before this; however some of my previous consulting engagements have involved disparity studies in the context of federal and state procurement and set asides for minority-owned businesses.

## IV.   Scope of Work

### A.   Questions Considered

I was retained by counsel for the Defendants, the Secretary of Agriculture and the FSA Administrator, to conduct research and analyze data regarding various USDA programs, including data regarding the operation of the Farm Loan Programs through the USDA's Farm Service Agency ("FSA") and its predecessor agency, the Farmers Home Administration ("FmHA"). FSA's Farm Loan Programs are designed to provide credit to family farmers who would not otherwise qualify for commercial loans. I was asked to evaluate the evidence of discrimination against minority farmers from the available reports, data, congressional testimony, lawsuits, and anecdotal evidence around these lending programs and opine on whether there are any lingering effects from this past discrimination that disadvantage individual groups of minority farmers.

### B.   Compensation

I am being compensated for my services at the rate of $300/hour, which is my standard rate. My rate for depositions is $400/hour. I have been supported in my work by Jonathan Zandberg, a post-doc researcher who I have worked with in the past. He recently received his Ph.D. in Finance from Boston College and is now an assistant professor at the University of Pennsylvania. His billing rate was $150/hour. I was also supported in my work by Robert Fairlie, a professor at the University of California at Santa Cruz. His billing rate was $350/hour.

### C.   Materials Relied Upon

In conducting my research and analysis, I relied upon a wide variety of data and other information sources. I performed an extensive review of government publications related to FSA's

7

Farm Loan Programs and other services, including audit reports from the GAO and the USDA OIG. I also reviewed farm characteristics from various years of the Census of Agriculture conducted by the USDA and demographic characteristics of the U.S. population from various years of the Decennial Census conducted by the U.S. Census Bureau. Where necessary, I requested and obtained additional data and reports from officials from the USDA. A true and correct list of all materials relied upon in arriving at my conclusions is attached as Appendix B.

## V.      Overview of FSA and its Loan Programs and Services

### A.      FSA Lending Programs

USDA has long directly issued loans and also guaranteed loans issued by commercial lenders.[1] Beginning in 1935, USDA provided financial support in the form of short-term loans and grants to shore up the struggling agricultural sector.[2] USDA's Farm Loan Programs are administered today by the FSA and, before 1994, by the FmHA. These programs' primary focus over the past several decades is in supporting those shut out of commercial credit markets.[3]

USDA lending programs account for just a small share of the total lending in the agricultural sector. USDA operates primarily as a lender of last resort, with the vast majority of its

---

[1] USDA is authorized to guarantee loans for various kinds of third-party lenders, including commercial, non-profit, or cooperative lenders. I use the term "commercial lender" to refer generally to any third-party lender.

[2] USDA, A Qualitative Study of Civil Rights Implications in Farm Loan Program Administration: Perceptions and Vulnerabilities at 9 (1998) ("FLP Qualitative Study"). Direct credit was available even earlier, through the Federal Land Banks. *See* Charles Dodson & Steven Koenig, *Evaluating the relative cost effectiveness of the Farm Service Agency's farm loan programs*, USDA FSA Report to Congress (August 2006) ("Dodson & Koenig 2006"), at 13, *available at* https://perma.cc/HNT2-BNCV.

[3] Dodson & Koenig 2006 at 13; *see* Consolidated Farm and Rural Development Act, Pub. L. No. 87-128, 75 Stat. 294, 307 (1961) (codified as amended in scattered sections of the U.S. Code).

loans available only to family farms that are unable to obtain credit elsewhere at reasonable rates and terms. As a share of total farm business debt, USDA direct loans increased from under 6% in 1977 to a peak of 17% in 1987, concurrent with broad disruption in credit and agriculture markets, before declining to their current levels.[4] Guaranteed loans, which have higher borrowing limits, have consistently grown as a proportion of total USDA-subsidized lending since the mid-1980s.[5] At the end of fiscal year 2019, FSA had a portfolio of $12 billion in direct loans to 87,000 borrowers and loan guarantees of $16 billion for 39,000 borrowers.[6] FSA direct loans were about 3% of the market for farm debt and FSA loan guarantees accounted for about another 5% of the market.[7]

There are two types of loans based on the entity that funds the loan—direct and guaranteed—and also several categories of loans based on the purpose for which the loan is made.[8] The two primary categories of loans are "farm ownership" loans, made to allow a farmer to purchase or improve farm land or buildings, and "operating" loans, made for continuing operations, including equipment and supply purchases, on an existing farm.[9] Many borrowers take

---

[4] Dodson & Koenig 2006 at 14.

[5] Dodson & Koenig 2006 at 15 *fig.* III-2; *id.* at 17.

[6] Cong. Rsch. Serv. ("CRS"), *Agricultural Credit: Institutions and Issues*, R-46768, at 1 (April 21, 2021).

[7] *Id.*

[8] In some materials I reviewed, these loan types are broken down further by the specific features of the loan, which I list here for clarity even before describing them: Regular Farm Ownership Loans; Farm Ownership Downpayment Loans; 7-Year Term Operating Loans; Annual (1-year) Operating Loans; Microloan Operating Loans; Youth Operating Loans; Farm Storage Facility Loans; Conservation Loans; and Soil and Water Loans.

[9] Dodson & Koenig 2006 at 18-19 & *fig.* III.-6; *see generally id.* App. B.

out multiple loans over the course of time. For example, a farmer might take out an ownership loan to purchase land, later take out one or more operating loans to buy equipment or supplies, and then take out an additional ownership loan to expand the farm. Additional loan categories include emergency loans for covering losses incurred during natural disasters, conservation loans, and farm storage facility loans.[10]

### 1. Loan application process

Both direct and guaranteed loans are reserved for farmers who cannot otherwise obtain credit in commercial markets on reasonable terms, and thus serve as "a safety net to family farmers and ranchers who otherwise would be unable to contribute to the farm sector."[11] These two different loan types are processed and administered differently. For guaranteed loans, USDA guarantees up to 95% of a commercial lender's losses in the event of default, but the loan is issued and serviced by the commercial lender.[12] The commercial lender processes the loan application, and USDA itself has no direct transactional relationship with the borrower but instead works with the commercial lender to process the loan guarantee.

---

[10] *See* USCCR, Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations, vol. III (June 12, 2003) ("USCCR 2003") at 35, https://perma.cc/MV89-VBMS. Some loans, which represent a very small share of total USDA loan programs, are available to farmers, without the same eligibility restrictions generally imposed for operating and ownership loans. This includes emergency loans, conservation loans, and farm storage facility loans. *See* CONACT § 304 (conservation loans); 7 C.F.R. pt. 1436 (farm storage facility loans) Emergency loans have their own distinct limitations. *See* 7 U.S.C. § 1961. Farm storage facility loans are a program of the Commodity Credit Corporation, not Farm Loan Programs, but the program is also administered by the FSA.

[11] USCCR 2003 at 35; *see also, e.g.*, Dodson & Koenig 2006 at 20; USCCR, *The Decline of Black Farming in America*, at 85 (1982) ("1982 Rep.") at 76, https://perma.cc/HNT2-BNCV ("lender of last resort"). Recall too that farm storage facility loans and soil and land/conservation loans are not so limited.

[12] Dodson & Koenig 2006 at 20.

Direct loans are generally available only to those who could not qualify even for a guaranteed loan. Direct loans are issued and serviced by USDA, and USDA bears the entire risk of default.[13] Unlike with guaranteed loans, for direct loans, the borrower must file the application directly with USDA.[14] USDA first determines whether the applicant is *eligible* for the loan; second, USDA decides whether to *approve* the loan.[15] Both loan eligibility and loan approval decisions are highly decentralized; the key decisions are made at one of hundreds of county-level offices.[16] Although there have been numerous changes in county office structure and in loan processing over the decades of USDA Farm Loan Programs, it has consistently been the case that "decisions regarding direct loans are made primarily by local staff."[17]

Eligibility criteria are set by statute and regulation, which have varied over the years.[18] Generally, to be eligible for either a direct or guaranteed loan, the applicant must (1) be a citizen or qualified noncitizen[19]; (2) have "training or farming experience" that is "sufficient to assure reasonable prospects of success"; (3) operate a "family farm"; and (4) be "unable to obtain

---

[13] *See id. at* 19.

[14] *Id.* at 19-20.

[15] FLP Qualitative Study at 17.

[16] 1982 Rep. at 71 (identifying, in 1982, "1,800 county offices located in 50 states"); Dodson & Koenig 2006 at 19 (identifying, in 2005, "2,351 county FSA offices" but observing that "less than half" of those offices had a farm credit specialist who could "provide full farm lending and servicing functions").

[17] Dodson & Koenig 2006 at 19; *see also* 1982 Rep. at 71-72 ("it is at the county level that most individual loans are approved or disapproved"). The most significant change occurred in 1995, when Congress shifted most responsibilities related to administering FSA Farm Loan Programs, including eligibility and approval determinations, from elected county committees to USDA employees in the local USDA county offices.

[18] *See* 7 U.S.C. § 1922(a)(1) (ownership loans); *id.* § 1941(a)(1) (operating loans).

[19] *See, e.g.*, 7 U.S.C. § 1996.

11

sufficient credit elsewhere."[20] Although these terms have been developed in regulatory language and internal guidance, they still leave substantial discretion to the local county-level official assessing the loan.[21]

Once deemed eligible, the decision whether to approve the loan again requires judgments from the relevant county-level officials.[22] An applicant will be approved for a loan only if the "farm operating plan reflects a feasible plan."[23] Whether a business plan is feasible is determined by the local officials, who assess the proposed plan in light of local conditions and their own experience and judgment; these officials are also available to provide guidance to the applicant and to assist them in improving their plan to obtain the loan.[24] In addition, county-level officials are involved in decisions whether the applicant has adequate security for the requested loan.[25]

### 2.   Loan servicing options

When a borrower under an FSA loan program is delinquent or distressed, he or she may, if eligible, receive relief in any of many forms from FSA (or, in the case of a guaranteed loan, from

---

[20] I draw the quoted terms from the current statutory language for farm ownership and farm operating loans. I understand these core terms have been modified slightly over the years without meaningful change. *Compare, e.g.* CONACT § 302 (farm ownership loans). In addition to minor changes in language, Congress also added restrictions related to an applicant's earlier loan history, including prior USDA loans. *See, e.g.,* 7 U.S.C. § 1925 (total indebtedness cap); *see also* 7 C.F.R. § 764.101 (listing additional eligibility requirements).

[21] *See, e.g.*, Report of William T. Bielby, *Keepseagle v. Vilsack*, 1:99-cv-3119-EGS, ECF No. 551-51 (Feb 20, 2009) ("Bielby 2009") ¶¶ 14-17; *see also* FLP Qualitative Study at 21-22.

[22] Statutory and regulatory deadlines for action, coupled with onerous paperwork requirements, created another obstacle for applicants to overcome. *See* FLP Qualitative Study at 18.

[23] 7 C.F.R. § 764.401(a)(1)(i); *see also id.* § 762.125(a)(2) (requirements for guaranteed loans).

[24] *See* Bielby 2009 ¶¶ 18-19.

[25] *See* Report of Lynn A. Hayes, *Keepseagle v. Vilsack*, 1:99-cv-3119-EGS, ECF No. 551-25 (Feb 20, 2009) ("Hayes 2009") at 18-24.

the commercial lender working with FSA). This relief is referred to generally as "loan servicing." Loan servicing options have changed significantly over the years,[26] and are now codified in statute or regulation.[27] At all times, however, the county-level officials have remained the primary officials responsible for determining eligibility for loan servicing.[28]

The goal of loan servicing is to preserve the lender's investment to the maximum extent possible.[29] In many cases, this can mean restructuring loan payments to preserve the farm as a going concern; in other cases, where the proposed plan even with restructuring is deemed not feasible, foreclosure is an option.[30] The options for loan servicing are many, and the selection can have wide ranging consequences.[31] For example:

- Rescheduling: for operating loans, lengthening the period of repayment, at the lower of current or original interest rates. Restrictions on this option varied with the specific loan type and changed over the past few decades.
- Re-amortization: for ownership loans, lengthening the period of repayment, at the lower of current or original interest rates. As with rescheduling, restrictions on this option varied with loan type and changed over the past few decades.
- Consolidation: the combination of multiple of related loan types, often used together with another servicing option.
- Limited Resource Program: a special reduced interest rate available to low-income farmers; could be used together with other loan servicing options to obtain an even lower interest rate.

---

[26] *See generally* FLP Qualitative Study at 10 (describing some changes).

[27] *See, e.g.*, 7 C.F.R. §§ 766.105 *et seq.*; *id.* § 762.143 (servicing distressed guaranteed loan accounts); *see* FLP Qualitative Study at 22 (noting comparatively recent limits on loan servicing discretion). Congress provided certain procedural rights, including requiring FSA to provide notice of all servicing options, in response to litigation in the 1980s.

[28] Bielby 2009 ¶¶ 20-21; *see* FSA Qualitative Study at 18 (explaining that servicing decisions in particular were ripe for subjective judgments)

[29] *See* 7 C.F.R. § 766.105(a) (USDA will "consider loan servicing options and combinations of options to maximize loan repayment and minimize losses"); *see also, e.g.*, 7 U.S.C. § 2001(a).

[30] *See id.*; *see also* Bielby 2009 ¶ 11.

[31] For a more detailed description of these servicing options, see Hayes 2009.

- Deferral: a delay in making a payment, with the loan's term potentially correspondingly extended. The number of deferrals a borrower could use changed over time.
- Debt Write-Down: reduction in principal and interests amounts. To qualify for this form of debt servicing—in addition to the ordinary requirements to obtain debt servicing—the borrower had to demonstrate a feasible business plan if the servicing options were applied. In addition, this option was only available if the net projected recovery exceeded the proceeds of foreclosure and liquidation.
- Foreclosure and liquidation: the lender forces a sale of the collateral for the creditors' benefit.

To qualify for any form of debt servicing, the borrower had to show an inability to pay beyond the borrower's control and that the borrower acted in good faith to make his payments. In assessing eligibility for servicing options, therefore, county officials were necessarily called to exercise subjective judgment on topics like plan feasibility and the "good faith" of the borrower.[32] As has been well-documented, and as discussed more below, this created opportunities for both intentional and unintentional discrimination against minority farmers. A lack of diversity in FSA staff for many decades, and especially on county committees, likely exacerbated these problems.[33] In response to indications that debt servicing options were being arbitrarily offered (or arbitrarily not offered), Congress specifically mandated that USDA provide information concerning available options and eligibility requirements to delinquent borrowers.[34]

---

[32] *See* 7 U.S.C. § 2001(b) (setting forth eligibility requirements).

[33] *See* Civil Rights at the USDA - A Report by the Civil Rights Action Team (CRAT) (1997) (CRAT Rep.) at 18, 20, https://perma.cc/5DNF-PFJY (1997 report indicating that, of the 101 county offices covering counties with the greatest concentration of minority farmers, fully one quarter had *no* minority employees, and scarcely a third of county committees in those counties had even one minority member); *see also* Jackson Lewis, LLC, "Civil Rights Assessment" Final Report (Mar. 31, 2011) ("JL Rep."), at 107, 163, https://perma.cc/8X6Q-GZ5V.

[34] *See* 7 U.S.C. § 1981d (enacted 1988).

B.    *Other Related USDA Programs*

In addition to the broader loan programs, USDA and FSA have implemented several related and adjacent programs to assist farmers. The most important programs, for purposes of my analysis, relate to government payments. USDA issues payments to farmers throughout the country through numerous programs. Two recent programs are especially relevant: (1) government payments through the Market Facilitation Program ("MFP"), and (2) government payments through the Coronavirus Food Assistance Program ("CFAP"). Under the MFP, USDA was authorized in 2018 and 2019 to distribute up to $25.1 billion to farmers who had grown specified crops that were affected by foreign tariffs.[35] Through CFAP, USDA provided up to $16 billion in direct support payments to farmers affected by market disruptions in 2020 from the coronavirus pandemic.[36]

I outline just a few of the other USDA programs below:

- **Outreach programs**: In 1990, Congress directed (in the "2501 program") that the Secretary support outreach programs that "encourage and assist" minority farmers through "education and training" and through "equitable participation in all agricultural programs."[37] The 2501 program authorizes grants to community organizations, schools, and other entities to improve participation for minority farmers (and veteran farmers) in USDA programs.[38]

- **Education programs**: The federal government provides substantial financial support to agriculture-focused schools.[39]

---

[35] *See* USDA, Market Facilitation Program, https://perma.cc/947S-7JCX (last visited on Oct. 28, 2021).

[36] *See USDA Announces [CFAP]*, USDA (Apr. 17, 2020), https://perma.cc/B7N9-PTRE.

[37] 7 U.S.C. § 2279(b)(2).

[38] *Id.* § 2279(c).

[39] *See, e.g.*, *id.* § 322.

- **Technical assistance**: In addition to formal training at agriculturally focused schools, USDA operates field training programs—often referred to as "extension" programs[40]— to bring new techniques and advice to working farmers.[41]

## VI.   There Is Substantial Evidence of Historical Discrimination Within USDA's Loan Programs

Congress's and the USDA's recognition of certain farmers as "socially disadvantaged" reflects the acknowledgment that government policies have served to the advantage of white (non-Hispanic, non-Latino) farmers.[42] The five racial and ethnic groups included in the category of "socially disadvantaged farmers and ranchers" are Black/African American, Asian, Native Hawaiian/Pacific Islander, American Indian/Alaskan Native (at times herein, "AI/AN"), and Hispanic/Latino farmers and ranchers. These groups are not mutually exclusive, as Hispanics can be of any race, including white, and an individual may identify as multiple different races.

I begin my analysis with a review of the numerous reports, audits, lawsuits, and other documents, the list of which may be found in Appendix B,[43] that provided evidence of past discrimination in USDA loan programs against each of the minority farmer groups. Where possible in my review, I highlight specific evidence and factors that have affected each socially disadvantaged group separately, although they have all suffered discrimination in USDA lending

---

[40] *See id.* § 3103(8) (defining "extension" to mean "the informal education programs conducted in the States in cooperation with the Department of Agriculture").

[41] *See, e.g., id.* § 341.

[42] Many materials use the term "socially disadvantaged farmers or ranchers," which is sometimes abbreviated "SDFR," and is sometimes abbreviated as "SDA farmer." Other materials use the abbreviation "SDG" to refer to "socially disadvantaged groups."

[43] Much of this was summarized in the congressional record as part of the deliberation of Section 1005 and the larger ARPA bill.

programs and continue to suffer the negative effects of that discrimination today.[44] The evidence shows that many of these policies have advantaged white farmers and perpetuated ongoing disparities between white and minority farmers.[45]

This discrimination has manifested itself in many ways, including: disparate treatment in 1) outreach and education about existing loan programs and eligibility; 2) assistance with loan applications; 3) processing time for applications; 4) loan application approvals; and 5) loan servicing. In addition, various reports indicate that minority farmers were given additional requirements, such as needing a joint signature of an FSA representative for withdrawing funds for expenses, which were not imposed on their white counterparts. But the story the evidence tells is clear: For decades, USDA discriminated against minority farmers in numerous ways in administering its loan programs, to the obvious and immediate detriment of those farmers. Although both USDA and Congress were aware of these ongoing problems and made major efforts to address them, it took many successive changes over many years to change the structure and culture of USDA to eliminate discriminatory practices.

These reports also document the follow-on effects of this discrimination. The principal purpose of the Farm Loan Programs is to provide credit to farmers otherwise excluded from private credit markets so that those farmers can invest in, grow, and improve their farms—up to the point where they can then "graduate" from the Farm Loan Programs and obtain credit in private markets. Thus, a major consequence of discrimination in lending programs by FmHA and FSA was that minority farmers who were already struggling to stay afloat were denied the very help they needed

---

[44] *See* CRS, *Garcia v. Vilsack*: A Policy and Legal Analysis of a USDA Discrimination Case at 2 (Feb. 22, 2013), https://perma.cc/WS9F-CADR ("Allegations of unlawful discrimination against minority farmers in the management of USDA programs have been long-standing and well-documented at USDA.").

[45] *See* USCCR 2003 (explaining that the FSA's relationship with farmers goes back to the 1930s).

to stop struggling, while white farmers were given that help. Minority farmers were thus caught in a feedback loop in which their lack of assets or creditworthiness drove them to FSA, which then denied them the relief they needed to increase their assets or improve their creditworthiness. The results of this feedback loop are unmistakable in the data: in 1920, minority farm owners made up 14.7% of all farm owners in the United States. By 1959, that number had dropped to 7.8%. By 1987, it had dropped further to just 2.1%.[46] It is only since 1997 that there are apparently any meaningful increases in the number and percentage of minority farm owners, although as of 2017, they still made up just 4.3% of all farm owners.

*1965 USCCR Report*

In 1965, the U.S. Commission on Civil Rights ("USCCR" or "Commission")[47] issued a seminal report in which it found discrimination at USDA in program delivery and employment. With respect to the FmHA, it found "a different kind of service to the two races," Black and white.[48] Based on "the untenable theory that Negro farmers should be served only by Negro staff," USDA programs "failed to reach the Negro rural residents most in need of them because of inadequate numbers of Negro staff."[49] Thus, white farmers, "[a]ided by Federal loans and technical advice, . . . increasingly diversified their crops and applied modern farming practices," while Black

---

[46] *See infra* Table 6; *see also* Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt., Org., & Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. (2008), ("2008 Senate Ag. Hr'g") at 23.

[47] The U.S. Commission on Civil Rights is a bipartisan agency established by Congress in 1957 to, among other things, investigate and report to Congress and the President on civil rights issues. *See* USCCR, Equal Opportunity in Farm Programs, An Appraisal of Services Rendered by Agencies of the USDA (1965) ("1965 Rep.") at vii, https://perma.cc/34HP-5V9P.

[48] *Id.* at 100.

[49] *Id.* at 101.

farmers were increasingly displaced.[50] Moreover, even when FmHA programs did reach Black farmers, the level of assistance provided to them was consistently inferior; for instance Black farmers would receive smaller loans and thus have fewer opportunities for capital investments.[51] At the same time, the Commission emphasized, USDA was "helping thousands of rural white families to achieve substantial gains in income, housing, and education," thus increasing the gap between white and Black rural residents.[52] Indeed, the Commission concluded that "[t]here is unmistakable evidence that racial discrimination has served to accelerate the displacement and impoverishment of the Negro farmer."

There is also clear statistical evidence of lending discrimination in this report. The Commission requested detailed data on loans to Black and white farmers over the period of July 1963 through May 1964 in 13 counties selected from a list of 71 counties with heavy concentration of Blacks in agriculture. They were able to analyze loans to Black and white farmers from the same economic classes as defined by net worth and their findings provide strong evidence of discrimination against Black farmers.

For instance, Black farmers were more likely to be in the lower net worth classes compared with white farmers, as Table 1 shows.

---

[50] *Id.* at 8-9.

[51] *Id.* at 99-100.

[52] *Id.* at 100.

Table 1

*Number of borrowers by race and economic class (net worth—figures rounded)*

|  | Negro | White |
|---|---|---|
| Class I (over $20,000) .............................. | 10 | 90 |
| Class II ($15–20,000) .............................. | 20 | 80 |
| Class III ($10–15,000) ............................ | 50 | 110 |
| Class IV ($6–10,000) ............................... | 130 | 110 |
| Class V ($3–6,000) ................................. | 270 | 90 |
| Class VI (less than $3,000) ......................... | 680 | 80 |
| Total ............................................ | 1,160 | 560 |

Yet the Commission found that, in each economic class, the average loan size for whites was larger than it was for Blacks. Moreover, the average loan size for poorer white farmers in classes III through V actually *increased* as net worth *decreased.* On the other hand, Black farmers were loaned lower amounts of funding as their level of net worth decreased. In fact, the disparity between whites and Blacks in the average size of loan *increased* as the borrowers got poorer, such that the average size of loans for whites was *four times the size* for Blacks in the poorest net worth categories. (*See* Figure 1 below.)



FIGURE 1. AVERAGE LOAN SIZE BY RACE AND ECONOMIC CLASS

20

The next figure shows the number of dollars loaned per $1,000 of net worth. For white borrowers, the loan-to-net-worth ratio increased from the richest net worth class to the poorest, with the white borrowers in the poorest class receiving loans proportionately five times as large as those in the richest class. For Blacks, there were only slight increases, which meant poor white borrowers received both absolutely and proportionately higher loans than poor Black borrowers.[53] So, for example, white farmers in class VI, which had net worth of $3,000 or less, were able to borrow upwards of $6,000, while a Black farmer with $3,000 in net worth was only able to borrow $1,800. This is strong evidence of discriminatory lending practices toward Black farmers that not only contributed to the decline in Black farms over time—as farmers were unable to obtain the necessary capital to survive—but also hampered their efforts to buy prime land, expand their farms, diversify their crops, cultivate crops with higher returns, or invest in needed machinery to improve productivity.



FIGURE 2. AVERAGE LOAN SIZE PER $1000 OF NET WORTH BY RACE AND ECONOMIC CLASS

---

[53] *Id.* at 71.

*1982 USCCR Report*

A subsequent USCCR report in 1982 also found that USDA's lending practices were actively contributing to the decline in minority farm ownership. The report detailed numerous complaints filed against the FmHA, alleging that Black farmers "[we]re subjected to disrespect, embarrassment, and humiliation by FmHA officials" and a range of discriminatory actions.[54] One such complaint alleged that FmHA discriminated against Black farmers in their loan applications by:

- Denying them the opportunity to submit loan applications;
- Awarding them loans in lower amounts than requested;
- Failing to give them the full loan amount actually awarded;
- Accelerating loan repayment schedules without explanation;
- Applying loan payments to the wrong accounts, so as to pay off low-interest rather than high-interest loans; and
- Contacting creditors and other businesses to inform them that no loans will be made to these black farmers, thereby preventing them from obtaining other credit, goods, and services needed to continue their farm operations.[55]

The complaint further alleged "a pattern and practice of Black farmers being foreclosed, liquidated, or being forced to sell their property by the county supervisor...."[56] A subsequent investigation by USDA's Office of Equal Opportunity confirmed that there were various equal opportunity violations of the type alleged above. And these types of complaints were common: at the time, FmHA "le[d] all USDA agencies in civil rights complaints."[57] Notably, however, the civil rights

---

[54] 1982 Rep.

[55] *Id.*

[56] *Id.* at 85-86.

[57] *Id.* at 166.

complaints process was largely "ineffective" and "untimely," which further contributed to minority farmers' lost revenues "and ultimately their farms."[58]

The report further documents that, despite Black farmers being disproportionately in need of assistance, they "received only a very small proportion, 2.5 percent, of the total dollar amount loaned through FmHA's farm credit programs in 1981."[59] In fact, the Commission reported that FmHA was actually manipulating data to prevent minority farmers from obtaining FmHA loans: FmHA had "twice … changed the data base … to determine the rate at which minorities [we]re receiving loans," thereby "narrow[ing] the data base of minority farmers considered eligible for FmHA services."[60]

Even loans specifically intended for minority and low income farmers were not reaching minority farmers. The FmHA had set aside 25% of farm ownership and operating loan program funds for "limited resource loans," which were to be provided under special terms and at reduced interest rates to farmers who would have difficulty repaying their loans at regular interest rates.[61] But while it would have been "expected that … black borrowers would receive limited resource loans at a disproportionately higher rate than white borrowers," "[t]he majority of blacks receiving farm operating loans did so at regular interest rates."[62] "In fact, in six States white borrowers were more likely than blacks to have received these low interest, limited resource loans."[63] The

---

[58] *Id.* at 173.

[59] *Id.* at 133.

[60] *Id.* at 96.

[61] *Id.* at 125.

[62] *Id.*

[63] *Id.* at 134.

provision of "low interest loans to well-established, predominantly white farmers, further compound[ed] the disadvantageous and noncompetitive position of black and small farmers."[64]

The Commission emphasized that these disparities were leading to a rapid loss of Black-owned farmland, expressing a sense of urgency over the possibility of the "extinction of black farms in this country" absent "immediate measures" to counter bias and historical discrimination.[65] There was strong evidence supporting the Commission's concern over the loss of Black farms. Indeed, the Commission found that between 1970 and 1980, Black-operated farms had declined "57 percent—a rate of loss 2 1/2 times that for white-operated farms"—and "almost 94 percent of the farms operated by blacks ha[d] been lost since 1920."[66] Based on the interviews it conducted and the findings and analysis it reviewed, the Commission concluded that the FmHA was "contribut[ing] to the problem rather than to its amelioration."[67]

*Litigation: 1997-2013*

A series of lawsuits brought by minority farmers provides further evidence of discrimination in USDA's Farm Loan Programs that has contributed to land loss over time and disparities in the present day. Beginning in 1997, African American, Native American and Hispanic farmers initiated actions, some of which were certified as class actions, alleging that USDA had systematically discriminated against them on the basis of race and ethnicity in the

---

[64] *Id.* at 183.

[65] *Id.* at 69.

[66] *Id.* at 176.

[67] *Id.* at 179.

administration of farm loans and other benefits.[68] In general, the minority borrowers in each of these actions alleged that (1) USDA willfully discriminated against them on the basis of their race when they sought to apply for farm program loans, loan servicing, and farm program benefits; and (2) when they filed administrative discrimination complaints with USDA to seek redress for that discrimination, USDA failed to adequately respond, instead delaying review, conducting meaningless investigations, or failing to take any investigative action whatsoever to resolve the complaints.[69] Specific allegations in the various court decisions and pleadings highlight the extent to which discrimination pervaded FmHA's administration of its loan programs.

In *Pigford I* and *Pigford II*, African American farmers recounted:

- Being denied loans even though they complied with the application requirements, rendering them unable to buy supplies, and causing them to lose farmland[70];

- Receiving conflicting information concerning the status of loan applications, or having to reapply due to FmHA denying that it had received submitted applications, which caused delayed loan approval and receipt of funds when planting season was over and the loan was "virtually useless"[71];

- Having loans placed in "supervised" bank accounts, which required obtaining the signature of a county supervisor before funds could be withdrawn, even though this requirement was not routinely imposed on white farmers[72];

---

[68] *Pigford v. Glickman* ("*Pigford I*"), Civ. No. 97-1978 (D.D.C.); *Keepseagle v. Glickman*, Civ. No. 99-03119 (D.D.C.); *Garcia v. Glickman*, Civ. No. 00-2445 (D.D.C.); and *In re Black Farmers Discrimination Litigation* ("*Pigford II*"), Misc. No. 08-mc-0511 (D.D.C.), respectively. An action brought by female farmers, which was later consolidated with *Garcia*, made similar allegations, but my review does not cover that lawsuit. *See Love v. Glickman*, Civ. No. 00-2502 (D.D.C.).

[69] *Pigford v. Glickman*, 185 F.R.D. 82, 86 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000), and *enforcement denied sub nom. Pigford v. Schafer*, 536 F. Supp. 2d 1 (D.D.C. 2008); *Pigford v. Vilsack*, No. 91-cv-1978, Monitor's Final Report 2, ECF No. 1812.

[70] *See Pigford*, 185 F.R.D. at 87.

[71] *Id.*

[72] *Id.*

- Being promised a loan after developing a farm plan with FmHA, and investing in equipment in reliance on that promise, only to have the loan application rejected for no apparent reason.[73]

In *Keepseagle*, Native American farmers alleged that they routinely:

- Were not advised of the availability of USDA loans and loan servicing options;

- Were not provided loan applications upon request;

- Were not provided adequate technical assistance to enable them to complete the loan and loan servicing application process[74];

- Experienced "hostility by white County Committee members," including by committee members using racial slurs and other derogatory comments, when attempting to obtain FmHA assistance.[75]

And in *Garcia*, Hispanic farmers similarly complained of:

- Repeated refusals by FmHA to offer assistance;

- Arbitrary rejection of loan applications, even after working with FmHA to develop a farm plan;

- Delayed resolution or arbitrary denial of loan servicing requests, leading to lost profit or loss of farmland.[76]

Moreover, in all of the lawsuits, farmers told of a "functionally nonexistent" civil rights complaints process for redressing these harms,[77] in which some farmers' complaints were simply thrown "in the trash,"[78] and they recounted how FmHA's mistreatment had resulted in lost profits and farmland. Indeed, as the court found in the action brought by African American farmers,

---

[73] *Id.*

[74] *Keepseagle v. Veneman*, No. 1:99-cv-3119, Seventh Am. Compl. ¶ 52, ECF No. 460.

[75] *Keepseagle* Class Cert. Br. at 18, ECF No. 551-1.

[76] *Garcia v. Veneman*, No. 00-cv-2445, Third Am. Compl. ¶¶ 4, 18-24, ECF No. 144.

[77] *Id.* ¶¶ 7, 18-24; *Pigford*, 185 F.R.D. at 88; *Keepseagle v. Veneman*, No. Civ. A. 9903119EGS1712, 2001 WL 34676944, at *1 (D.D.C. Dec. 12, 2001).

[78] *Pigford v. Glickman*, 182 F.R.D. 341, 343-44 (D.D.C. 1998).

discrimination by FSA "deprived countless farmers of desperately needed credit and payments under various aid programs, with the result that many farmers suffered severe financial losses and even, in many cases, lost title to their land."[79]

As a result, USDA established a two-track administrative claims process for minority farmers to recover relief for the discrimination alleged in the complaints. The *Pigford I* settlement agreement set the basic framework that the rest of the cases adopted in large part. Under that framework, claimants who supported their discrimination allegations by "substantial evidence"[80] under "Track A" received a cash award of $50,000, debt relief for qualifying USDA farm program loans, and tax relief. Claimants who supported their allegations by a "preponderance of the evidence"[81]—a higher evidentiary bar—under "Track B" received actual damages and debt relief on qualifying USDA farm program loans. By the end of 2012, when the claims process was closed in *Pigford I* and *Pigford II*, a total of 34,059 African American claimants were awarded roughly $2.16 billion in combined cash payments, debt relief, and tax payments to the IRS.[82] As of the close of *Keepseagle* claims process in August 2013, a total of 3,601 claimants were awarded

---

[79] *In re Black Farmers Discrimination Litig.* ("*Pigford II*"), 856 F. Supp. 2d 1, 8 (D.D.C. 2011), *as amended* (Nov. 10, 2011).

[80] "Substantial evidence" was defined as "such relevant evidence as appears in the record before the Adjudicator that a reasonable person might accept as adequate to support a conclusion after taking into account other evidence that fairly detracts from that conclusion. Monitor's Final Report 27.

[81] A "preponderance of the evidence" was defined as "such relevant evidence as is necessary to prove that something is more likely true than not." *Id.*

[82] *Id.*

more than $227.5 million.[83] The deadline for filing *Garcia* claims was May 1, 2013, and more than 700 claimants were awarded more than $45 million.[84]

Although USDA has paid approximately $2.25 billion to claimants, the settlements and related claims processes did not provide complete relief. It has been reported that State taxes eroded recoveries, and the debt relief provided under the claims processes left some farmers with tax burdens they could not bear.[85] It is also worth noting that debt relief was an extremely minor portion of each of the claims processes. For instance, in *Pigford I*, fewer than 450 farmers received debt relief out of the 22,721 claimants found eligible to participate in the claims process.[86] And in *Pigford II*, fewer than 15 farmers received debt relief out of approximately 39,536 claimants found eligible to participate in the claims process.[87] Likewise, a very small percentage of Native American and Hispanic farmers eligible to participate in their respective claims processes received debt relief.

Additional investigations and reports between 1997 and 2011 documented the ongoing issues of discrimination in the provision of USDA loans and technical assistance during this period. Seminal among them were two reports commissioned by USDA—a 1997 report by the Civil Rights Actions Team ("CRAT") and a 2011 report by the law firm Jackson Lewis—and a 1997 audit performed by USDA's OIG.

---

[83] *Keepseagle v. Vilsack*, No. 99-cv-3119, Status Report II.A., ECF No. 646.

[84] USDA provided an excel sheet with the payments from *Garcia* broken out by Hispanics and women.

[85] *See* 167 Cong. Rec. S1264 (Mar. 5, 2021) (Stabenow).

[86] *Pigford I*, Monitor's Final Rep. at 1, 61 Table 12.

[87] *Pigford II*, Status Rep. of Class Counsel Regarding Projected Timeline for Completion of Claims Process at 3, ECF No. 367 (July 8, 2013).

*1997 CRAT Report*

The CRAT was a group of USDA leaders commissioned by the Secretary of Agriculture in response to the civil rights complaints against the Department to investigate issues related to discrimination at USDA and develop a report with recommended solutions.[88] The group hosted 12 "listening sessions" in early 1997 in 11 locations across the country to hear from USDA customers, in particular minority farmers interacting with FSA.[89] At the listening sessions, Black, Hispanic, Asian American, and American Indian farmers all "told stories of years of bias, hostility, greed, ruthlessness, rudeness, and indifference not only by USDA employees, but also by the local county committees that provide access to USDA's [FSA] programs."[90] According to one farmer, if county officials "don't like you, they won't give you the loan"[91]; as another put it, FSA would treat minority farmers "worse than I would treat a dog."[92]

The CRAT reported that, while details varied, the "general outlines" of minority farmers' stories "remained constant." Those stories hit on the following types of mistreatment:

- *Delayed approval of loan applications, leading to lost profits*: Minority farmers of limited resources recounted trying "to apply for a farm operating loan through the FSA county office well in advance of planting season," but having the review process delayed by FSA offices either claiming that no applications were available; providing no assistance in completing the applications; or stretching out application revisions over a period of months. The application would finally be approved after planting season had already passed, which would either leave the farmer unable to plant at all

---

[88] CRAT Rep. at 3.

[89] *Id.*

[90] *Id.*

[91] *Id.* at 6.

[92] *Id.* at 4.

or limit the farmer's ability to procure "supplies necessary for the best yields," thereby reducing the farmer's profit.[93]

- *Arbitrary reduction or denial of loans, leading to lost land*: Many farmers also had their FSA loan "arbitrarily reduced" or never come at all—"leaving the farmer without enough money to repay suppliers and any mortgage or equipment debts." Then, "because of the farmer's debt load," additional "operating and disaster loans [might] be denied," which would make it "impossible for the farmer to earn any money from the farm." This would result in the farmer being forced to sell the land or face foreclosure. In other instances, an FSA official might offer a lease and buy-back option but appraise the land at an inflated price, only to auction it off for half that price later— sometimes to friends or relatives of the FSA official.[94]

- *No recourse through civil rights complaints process*: Farmers also complained of an ineffective process for bringing civil rights complaints based on this inequitable treatment. Some observed that those who brought complaints were foreclosed on more quickly. Others reported that their complaints simply went unanswered. "In Tulsa, OK, an advocate representing black and American Indian farmers said" that they had "filed 72 civil rights complaints" and not one of them had "ever been answered."[95]

The Report also discussed studies requested by Congress and FSA that contained statistics showing lower participation and loan approval rates for minorities in most FSA programs. Although the variances in regional and state statistics showed no consistent picture, some states showed very wide disparities for approval rates and processing times between minorities and non-minorities. In Louisiana, for example, 67% of African American loans were approved, as compared to 83% of non-minority loans; in Alabama, 78% of African American loans were approved, as compared to 90% of non-minority loans.[96] And in states in the Southeast, data reflected consistently longer applications processing times for minorities; in some states loan

---

[93] *Id.* at 15.

[94] *Id.* at 16.

[95] *Id.* at 24.

[96] CRAT Rep. at 21.

processing took up to three times longer for African American loan applications.[97] A number of states in the Northwest showed similar disparities in loan processing between non-minorities and American Indians.[98] The CRAT Report further noted that the Congressional reports providing these statistics suggested that these disparities "may be partially accounted for by the smaller average size of minority- and female-operated farmers, their lower average crop yields, and their greater likelihood not to plant program crops, as well as less sophisticated technology, insufficient collateral, poor cash flow, and poor credit ratings."[99] But as representatives of minority groups emphasized, "previous discrimination in USDA programs has helped produce these very conditions now used to explain disparate treatment."[100]

At the end of its investigation, CRAT concluded that USDA had "done more to hurt than to help small and minority farmers."[101] The result was lower participation rates of minority farmers "in most FSA programs"[102] and the loss of significant amounts of land and potential farm income."[103]

*1997 OIG Audit*

In 1997, USDA OIG conducted an audit of loan programs and published its findings in a report entitled *Minority Participation in Farm Service Agency's Farm Loan Programs – Phase II.*

---

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.* at 6.

[102] *Id.* at 21.

[103] *Id.* at 30.

The audit looked at, among other things, loan servicing decisions made in 11 states and 33 counties in the decade following the enactment of the Agricultural Credit Act of 1987. Through that Act, Congress mandated that FSA "restructure delinquent farm program loans to the maximum extent possible to avoid losses and allow borrowers to continue their operations."[104] To that end, FSA was to modify "amounts, rates, and terms of delinquent loans, using any combination of primary loan-servicing."[105]

And yet, OIG's audit showed that FSA's loan-servicing decisions made from January 1, 1989, through March 3, 1997, disproportionately benefitted non-minority farmers.[106] This was so even though minority borrowers were experiencing higher rates of delinquency. A review of the status of 5,465 borrower accounts as of March 3, 1997, in the 33 loan service centers audited showed that 34% of the non-minority borrowers were delinquent while 46% of the minority borrowers were delinquent.[107]

OIG's audit specifically compared the rates at which minorities and non-minorities received two or more loan-servicing decisions during the applicable time period.[108] Of the 5,465 borrower accounts reviewed, 526 of them had received multiple loan-servicing decisions, including "loan rescheduling, loan consolidation, restructuring, and debt write-down."[109] OIG

---

[104] Minority Participation in Farm Service Agency's Farm Loan Programs, Evaluation Report No. 50801-3-Hq at 29.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 30.

[108] *Id.* at 29-30.

[109] *Id.* at 30.

found that "[n]on-minority borrowers received 449 (85 percent) of the multiple decisions, and minority borrowers received 77 (15 percent) of them."[110] That meant that "nonminorities, who had 34 percent of their accounts in the delinquent or may require attention categories, received 85 percent of the [Agency's] multiple servicing decisions while minorities, with 46 percent of their accounts in these categories, received only 15 percent of the . . . multiple decisions."[111]

Additionally, OIG noted a "lack of follow-up with borrowers who did not respond to notices concerning availability of [loan] servicing," which affected minorities and non-minorities differently. FSA "generally notified" borrowers "of the availability of loan servicing programs" but "did not actively recontact those borrowers who either did not respond or did not actively seek loan-servicing." OIG also observed that "certain minority borrowers who did not actively seek loan-servicing" from FSA "based their lack of response on negative experiences with FSA during the early stages of the implementation of [FSA's Primary Loan Service Programs]."[112]

Minority borrowers generally suffered more adverse consequences for failing to actively seek loan servicing or respond to FSA notices regarding loan servicing options. For instance, in one state reviewed, FSA "noted that two nonminority borrowers in one county did not respond to notifications of availability of Primary Loan Servicing Programs (PLSP) within the 60-day timeframe required by" FmHA's internal policies. But staff "did not initiate actions to accelerate these accounts, as required," and instead "rescheduled the borrowers' debts when they applied for

---

[110] *Id.*

[111] *Id.*

[112] *Id.* at 31.

new loans."[113] At the time of OIG's review, "each of the two accounts were on or ahead of schedule, and one of the two borrowers received two additional servicing decisions."[114] Two minority borrowers in the same county were treated differently. Like the two non-minority borrowers, they likewise failed to respond to FSA's notification regarding loan-servicing options within the 60-day time period required by FSA policies, but in contrast to the non-minority borrowers, FSA accelerated their accounts.[115]

*2011 Jackson Lewis Report*

Secretary Vilsack commissioned the firm Jackson Lewis LLP ("JL") to assess the "effectiveness" of USDA agencies "in reaching America's diverse population in a non-discriminatory manner."[116] The firm conducted an 18-month investigation and analysis of USDA delivery processes and practices, focused on four USDA agencies, one of which was the FSA.[117] At the conclusion of the investigation in 2011, the firm issued a 569-page "Civil Rights Assessment," where it detailed the "substantiated claims of denial of equal program access and continuing institutional discrimination" within USDA and FSA.[118]

The firm based its findings and conclusions on the substantial anecdotal and statistical evidence it collected. The anecdotal evidence depicted "a system where the deck was always stacked, not only against access to USDA programs, but also against [customers'] ultimate

---

[113] *Id.* at 31-32.

[114] *Id.*

[115] *Id.* at 32.

[116] JL Rep. at i.

[117] *See id.* at 569.

[118] *See id.* at iv, viii, 62.

success" due to their status as minorities.[119] The focus groups and community-based organizations representing SDGs[120] and participating in the JL investigation raised many of the same complaints already detailed in prior reports and lawsuits—specifically:

- FSA employees giving minority farmers "the runaround instead of trying to be helpful," treating them "like dirt," and blowing them "off like [they] were nothing or nobody," often to the point that the loan applicants "just gave up"[121];

- FSA giving conflicting information about application requirements—for instance, Hispanics and Latinos complained of "jump[ing] through all the hoops and dott[ing] all the I's," receiving assurances that "[e]verything's good," only to have the application rejected[122];

- FSA delaying the application process by telling applicants that their information "was incomplete" and requiring them to "come back with additional information," only to tell the applicant later that "there were no funds left"[123];

- FSA officials falsely asserting that a minority applicant lied on the application in order to deny the loan[124];

- FSA delaying disbursement of funds for approved loans "until the planting season was half-way finished," thereby "prevent[ing] the farmers from taking full advantage of the program's benefits and contribut[ing] to their losses."[125]

African American, Hispanics and Latinos, Asians, and Native Americans all complained of specific instances of mistreatment, explaining that:

- "African Americans [we]re denied loans at a higher rate than Whites," and receive[d] [loans] … in small amounts … or subject to dual signature requirements, whereas

---

[119] *Id.* at viii.

[120] The JL Report included women in its groups of SDGs, along with Hispanics/Latinos; Blacks/African Americans; Asians; American Indians/Alaskan Natives; and Native Hawaiians/Pacific Islanders. *See id.* at 66 n.33. USDA's interpretation of SDGs, consistent with the statutory definition, includes only racial and ethnic groups, and the JL Report contains many findings specific to the aforementioned racial and ethnic groups.

[121] *Id.* at 83, 112.

[122] *Id.* at 84.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 81-82.

Whites receive[d] all their funding up front and d[id] not have their funds supervised"[126];

- Hispanic and Latino farmers were "stereotyped as being farm workers, rather than owners," and were not provided materials in Spanish[127];

- Native Americans, African Americans, and Southeast Asian clients stated that they were "not always treated fairly by USDA," and did "not feel comfortable" when seeking assistance from USDA.[128]

The JL firm found that these substantiated claims of ongoing "unfair treatment and denial of program access" to SDGs "had a broad and longstanding negative impact on the size, profitability, sustainability, business prospects, successes, and failures of SDG farmers and ranchers—including the loss of scarce or irreplaceable farm lands."[129]

### Congressional Hearings

In addition to the reports discussed above, Congress has held numerous hearings concerning discrimination in USDA programs and the ongoing effects of that discrimination. I reviewed many of those hearing transcripts, which provide substantial additional anecdotal evidence of historical discrimination, and also of the lingering effects of that discrimination. I highlight just a few of those anecdotes here.

- An African American farmer testified that county-level officials delayed processing her and her husband's ownership loan application for five years, causing direct additional expenses.[130]

---

[126] *Id.*

[127] *Id.* at 86.

[128] *Id.* at 84, 86.

[129] *Id.* at 64, viii.

[130] Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Sub-comm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 107th Cong. 23, at 81-83 (2002) (2002 Civil Rights Hr'g).

- The same farmer testified that county-level officials delayed processing a later operating loan, preventing her and her husband from obtaining the necessary facilities to care for livestock, resulting in the death of 500 pigs.[131]

- Congress heard testimony that USDA took 25% longer to process loan applications from Hispanic farmers and approved them at lower rates.[132]

- A Hispanic farmer testified that she and her family were unable to obtain relief on their loan payments to USDA after a series of natural disasters because, they were told, they "were bad farmers." County-level officials than blocked her and her family from selling part of the farm to remain solvent, and then the same officials foreclosed, costing them their entire farm.[133]

- A Native American farmer testified to the difficulties he faced in obtaining FSA loans because of an inability or refusal to resolve questions about using land as collateral.[134]

Congress heard testimony that illustrated the enduring effects of historic discrimination on farm credit markets and the difficulties that smaller farms have in escaping economic insecurity.

- Witnesses testified that export markets favored "large scale" agriculture businesses, so that export growths were unlikely to substantially benefit minority farmers who generally have much smaller farms.[135]

- Witnesses testified that past discrimination discouraged minority farmers from seeking additional credit, even when they might have received it.[136]

- Witnesses testified that litigation settlements were inadequate and would not "improve [minority farmer's] chances of remaining on the land."[137]

---

[131] *Id.* at 83.

[132] *Id.* at 33-35, 46.

[133] *Id.* at 78, 149-50.

[134] *See* Hr'g on Management of Civil Rights at the USDA before House Sub-comm., Gov't Management, Organization, and Procurement, Comm. on Oversight and Gov't Reform, Serial No. 110-137 at 15-16 (May 14, 2006) (2006 Oversight Hr'g).

[135] 2015 House Ag. Hr'g at 49-50.

[136] 2002 Civil Rights Hr'g at 109 ("What has happened in this whole process is that there is an active discouragement of minority people from making an application in the first place. . . . [M]any of [the *Pigford* claimants] are people who attempted and tried to use the programs of the Agency and were turned down along the way.").

[137] 2015 House Ag. Hr'g. at 73; *see also id.* at 105-06.

_____

The aforementioned lawsuits, investigations, reports, and other materials contain qualitative evidence, including thousands of complaints by minority farmers of various forms of discrimination in USDA's loan programs, occurring as recently as 2010 when the JL Report was compiled. They also contain quantitative evidence showing statistical disparities in outreach and education about existing loan programs and eligibility; assistance with loan applications; processing time for applications; loan application approvals; and loan servicing.

More recent reporting, discussed below, confirms that many of these disparities persist. These disparities and other lingering effects are consistent with the well-documented and systemic discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination.

## VII.    Minority Farmers Continue to Suffer the Effects of Past Discrimination in USDA Loan Programs

### A.    The Evident Failure of Prior Efforts to Remediate Historic Discrimination in USDA Loan Programs and Its Effects

I am aware of numerous initiatives that Congress has enacted over the last several decades in recognition of USDA's discriminatory behavior towards minority farmers and the resulting detrimental effects. For instance, in Section 617 of the 1987 Agricultural Credit Act, Congress required the USDA to establish annual target participation rates to attempt to ensure that members of socially disadvantaged groups receive direct and guaranteed farm loans. That Act also required FSA to restructure delinquent farm program loans to the maximum extent possible to avoid losses and allow borrowers to continue their operations—including by modifying the amounts, rates, and terms of delinquent loans and using any combination of primary loan-servicing, such as

consolidation, rescheduling, re-amortization, reduction of interest rates, deferrals, and debt write-down.[138]

In the 1990 Farm Bill, Congress established the 2501 program to improve outreach and education to minority farmers and ultimately their participation in USDA programs.[139] And in Section 741 of the 1999 Agriculture, Rural Development, Food and Drug Administration and related Agencies Appropriations Act, Congress suspended the application of the then two-year statute of limitations regarding Equal Credit Opportunity Claims.[140] This allowed claimants in discrimination suits against USDA, including Black farmers in *Pigford v. Glickman*, Civ. No. 97-1978 (D.D.C.), Native American farmers in *Keepseagle v. Veneman*, No. 1:99-cv-3119 (D.D.C.), and Hispanic farmers in *Garcia v. Vilsack*, No. 1:00-cv-2445 (D.D.C.), to cite instances of discrimination dating back years and even decades in order to qualify for payments under the respective class action settlements and administrative claims processes.

In the 2002 Farm Bill, Congress established the Office of the Assistant Secretary for Civil Rights to attempt to address the well-documented civil rights issues at the USDA, including issues resolving civil rights complaints in a timely manner, and in the 2008 Farm Bill, Congress declared discrimination claims should be quickly resolved.[141] In the 2014 Farm Bill, Congress created the

---

[138] These provisions were further modified by the Food, Agriculture, Conservation, and Trade Act of 1990, and the Federal Agriculture Improvement and Reform Act of 1996.

[139] *See* S. 2830, 101st Cong., enacted at Pub. L. No. 101-624, 104 Stat. 3359 (1990); H.R. Stat. 2854, enacted at Pub. L. No. 104-127, 110 Stat. 888 (1996).

[140] H.R. 1906, 106th Cong., Pub. L. No. 106-78, 113 Stat. 1135 (1999).

[141] Farm Security & Rural Investment Act of 2002, H.R. 2646, 107th Congress, enacted at Pub. L. No. 107-171, 116 Stat. 134; Food Conservation & Energy Act of 2008, H.R. 6124, enacted at Pub. L. No. 110-246, 122 Stat. 1651.

Office of Tribal Relations under the Secretary of Agriculture to ensure that relevant programs and policies are efficient, easy to understand, accessible, and developed in consultation with the American Indian and Alaskan Native constituents they impact.[142] And in the 2018 Farm Bill, Congress permanently funded the 2501 program and required GAO to produce two reports concerning: 1) the ability of the Farm Credit System to meet the agricultural credit needs of Indian tribes and their members, and 2) credit service to socially disadvantaged farmers and ranchers. Both reports focused on how to better meet the needs of minority farmers.[143]

These efforts may have addressed some of the underlying problems of USDA discrimination against minority farmers and somewhat improved their situations with respect to certain metrics. It is apparent, however, that these and other efforts, including the payments made to minority farmers through the various claims processes, have not fully remedied the problematic effects of decades of USDA discrimination. This is evidenced by several metrics that continue to show that minority farmers suffer the lingering effects of past discrimination in USDA's loan programs.

> B.    *Existing Disparities Between Minority and Non-Minority Farmers*

As discussed more fully below, the lingering effects of past discrimination against minority farmers in USDA loan programs include the current (i) underrepresentation of minority groups in farming in the United States, (ii) smaller size and lower revenues of minority farms, and (iii) lower overall wealth of minority farmers. These disparities, in turn, have had cyclical effects, resulting in minority farmers becoming discouraged borrowers, experiencing higher rates of delinquency on

---

[142] Agricultural Act of 2014, H.R. 2642, 113th Cong., enacted at Pub. L. No. 113-79, 128 Stat. 649.

[143] Agricultural Improvement Act of 2018, H.R. 2, 116th Cong., enacted at Pub. L. No. 115-334, 132 Stat. 4490.

40

their loans and foreclosure on their farms, and having less access to government funds and private lending.

In my analysis below, I used data provided by USDA, as well as published data from the Census of Agriculture and the U.S. Census Bureau. The most recent Census of Agriculture was conducted in 2017. These data provide not only a basic benchmark to show how most minorities are underrepresented in farming, compared with whites, but also how the characteristics of minority farms contrasted with the characteristics of white farms reflect further disparities between the groups.[144]

### 1.    Underrepresentation of minority farmers

Because farmers turn to USDA as a "lender of last resort," discriminatory loan practices can force minorities out of farming altogether. The data show that minority farmers are underrepresented in farming today, meaning that they are a smaller share of the farming population than they are of the general population, the population in rural areas, and in the states where the majority of minority farmers are concentrated.[145]

### i.    Underrepresentation based on comparisons with the national population

While the demographics of the U.S. population have been changing over the last several decades, becoming more diverse as the share of minority groups has increased over time, there has not been a corresponding increase in the share of minority farmers. As shown in Figure 3 below,

---

[144] I use the term "Black farms" (or Hispanic farms, etc.) interchangeably with "farms with Black producers" (or farms with Hispanic producers, etc.).

[145] For example, Blacks are underrepresented in farming because they constitute more than 12% of the general population, and 8% of the rural population, but they make up only 1.43% of farm producers and 1.6% of farms nationwide have Black principal producers. Additionally, the proportion of Black producers in the five states where they are most heavily concentrated is lower than their corresponding share of that state's population.

in 1940, the U.S. population was mainly white (90%) and Black (10%), with less than a half of one percent being of some other race. By 2010, whites made up less than three quarters of the population, while minority populations steadily increased, with Blacks making up 12.6%; Asians, Pacific Islanders, and Native Hawaiians making up 5%; and Hispanics making up 16.3%. For more details, see Table 1 in Appendix C.



As Figure 4 below shows, the percentage of white farms in the first half of this century was nearly identical to their share of the overall population—approximately 89% in 1950.[146] But while the percentage of whites in the general population has been declining over the decades, the percentage of white farms has increased from 85.2% in 1920 to a high of 97.1% in 2002, before declining slightly over the last three censuses in 2007, 2012, and 2017, when they made up just

---

[146] More details can be found in Table 2 in Appendix C.

under 96% of all U.S. farms. Black farms, on the other hand, were 14.3% of farms in 1920, but less than 2% by 2017, dipping to a low of 1% of U.S. farms in the 1992 and 1995 censuses. While Census of Agriculture surveys did not report detailed racial and ethnic data until later years, we can see that minority farmers in the other categories increased their share of U.S. farms from a total 0.4% in 1920 to nearly 3% by 2017, but those increases lagged considerably in proportion to their increases in the overall U.S. population.



A more detailed breakout by race and ethnicity is available beginning in 1978. Table 2 shows that Black farmers' share of farms decreased over the 1978-1997 period before beginning to rise; but by 2017 they still had not reached the level they were at in 1978, which was itself substantially lower than their levels in all of the previous decades. And while the data show that Hispanics' share of farms apparently has increased the most over the 1978-2017 period, their

representation in farming still lags considerably behind their growing share of the U.S. population. In 2017, Hispanics made up about 17% of the population but less than 4% of farms. This is also shown in Figure 5 below. It should be noted, however, that beginning with the 2002 Census of Agriculture USDA began refining its data collection and reporting methodology in ways that may over-represent increases in the number of minority farms. Specifically, statistical adjustments to account for nonresponsive farmers, and more targeted outreach to improve counting of specific groups (especially minorities), led to more accurate counting of minority farmers, which may give the impression that there has been a greater increase in the number of minority farmers than has actually occurred.[147] Moreover, USDA only began producing statistics by farmer ethnicity in 1978.

Table 2. Number of Farms and Percentage of Farms by Race/Ethnicity, 1978-2017

**Number of Farms**

| | 1978 | 1982 | 1987 | 1992 | 1997 | 2002 | 2007 | 2012 | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| Hispanic | 17,572 | 16,183 | 17,476 | 20,956 | 27,717 | 50,592 | 55,570 | 67,000 | 77,416 |
| American Indian | 6,889 | 7,211 | 7,134 | 8,346 | 10,638 | 15,494 | 34,706 | 37,851 | 39,632 |
| Asian (or Pacific Islander)* | 7,942 | 8,000 | 7,900 | 8,096 | 8,731 | 8,375 | 11,214 | 13,669 | 13,904 |
| Black | 37,351 | 33,250 | 22,954 | 18,816 | 18,451 | 29,090 | 30,599 | 33,371 | 32,052 |
| Other* | 5,806 | 5,906 | 6,652 | 8,229 | 9,838 | | | | |
| Native Hawaiian/Pacific Islander* | | | | | | 983 | 1,356 | 1,468 | 2,092 |
| White | 2,199,787 | 2,186,609 | 2,043,119 | 1,881,813 | 1,864,201 | 2,067,379 | 2,114,325 | 2,012,652 | 1,955,737 |
| More than one race reported* | | | | | | 7,661 | 12,592 | 10,292 | 19,773 |
| Total | 2,257,775 | 2,240,976 | 2,087,759 | 1,925,300 | 1,911,859 | 2,128,982 | 2,204,792 | 2,109,303 | 2,042,220 |

**Share of Farms**

| | 1978 | 1982 | 1987 | 1992 | 1997 | 2002 | 2007 | 2012 | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| Hispanic | 0.8% | 0.7% | 0.8% | 1.1% | 1.4% | 2.4% | 2.5% | 3.2% | 3.8% |
| American Indian | 0.3% | 0.3% | 0.3% | 0.4% | 0.6% | 0.7% | 1.6% | 1.8% | 1.9% |
| Asian or Pacific Islander | 0.4% | 0.4% | 0.4% | 0.4% | 0.5% | 0.4% | 0.5% | 0.6% | 0.7% |
| Black | 1.7% | 1.5% | 1.1% | 1.0% | 1.0% | 1.4% | 1.4% | 1.6% | 1.6% |
| Other | 0.3% | 0.3% | 0.3% | 0.4% | 0.5% | | | | |
| Native Hawaiian/Pacific Islander | | | | | | 0.05% | 0.1% | 0.1% | 0.1% |
| White | 97.4% | 97.6% | 97.9% | 97.7% | 97.5% | 97.1% | 95.9% | 95.4% | 95.8% |
| More than one race reported | | | | | | 0.4% | 0.6% | 0.5% | 1.0% |

Source: U.S. Census of Agriculture 1978-2017
* Other is defined as follows: In 1978, 1982, 1987, 1992, and 1997 it indicates "All other races", which was a category that was "primarily limited to persons native to or of ancestry from Mexico, the Caribbean, and Central and South America". Beginning in 2002, NHPI were tabulated separately from Asians. Beginning in 2002 "More than one race reported" was tabulated and reported.  Uses data for any principal producer or equivalent metric.

---

[147] Nathan Rosenberg. 2017. "Farmers Who Don't Farm: The Curious Rise of the Zero-Sales Farmer." Journal of Agriculture, Food Systems, and Community Development, October, 1–9, 2017, https://perma.cc/AD8N-MX9M.

One can also see that even as the share of minority farms for some groups has risen over time (though, again, this is likely due in part to improved counting of minority groups since 2002), the gap in most minority groups' share of farms as compared to their percentage of the overall population is large—and growing. American Indians and Alaskan Natives are the one exception to this trend. But the apparent diminishing representation gap for this group is likely an artifact of another change in data collection methodology. The 2007 Census of Agriculture marked the first time the National Agricultural Statistics Service ("NASS") attempted to collect a census report from individual farm operators on American Indian reservations in all states. In all censuses prior to 2007, each reservation was counted as a single farm and tribal government officials and/or Bureau of Indian Affairs officials supplied counts of individual operators.[148]

*[Continued on next page]*

---

[148] *See* USDA, 2007 Census of Agriculture, https://perma.cc/GD57-RF7R at 3, Column: Every Voice Counts.



Figure 5. Share of U.S. Farms by Producer Race/Ethnicity (1978-2017)

Source: U.S. Census of Agriculture 1978-2017. Uses data from any principal producer or equivalent metric.

Table 3A, which compares each minority group's shares of producers[149] to share of the population, shows that all of the minority groups except American Indians and Alaskan Natives are extremely underrepresented as farmers in the United States. There are far fewer farms and farmers from the other minority groups than would be expected given their shares in the general population. For instance, while Asians made up nearly 5% of the U.S. population in 2010, they were only 0.6% of producers in 2017. Hispanics, which made up 16.3% of the population in 2010,

---

[149] USDA distinguishes between farm "owners," which reflects a property law status, and "producers," who actually farm the land. The term "producer" may include the farm owner but also may include a non-owner manager or tenant. *See, e.g.*, 2017 Agriculture Census, Appendix B at 19, https://perma.cc/J3ZW-TPAG (defining "producer" as "a person who is involved in making decisions for the farm operation. Decisions may include decisions about such things as planting, harvesting, livestock management, and marketing"). Farms can have multiple producers. Beginning in 2017, data were collected for a maximum of four producers per farm. USDA previously used the term "primary operator," which was limited to one per farm.

represented just 3.3% of the producers in 2017. Blacks, who made up 12.2% of the population in 2010, were just 1.3% of the producers in 2017.

| Table 3A. Number of U.S. Producers by Race/Ethnicity, 2017 versus 2010 Population | | | |
|---|---|---|---|
| | Number | Share of Producers | Share of Population |
| American Indian/Alaska Native | 58,199 | 1.7% | 0.7% |
| Black or African American | 45,508 | 1.3% | 12.2% |
| Asian | 22,016 | 0.6% | 4.7% |
| Pacific Islander/Native Hawaiian | 3,018 | 0.1% | 0.2% |
| Hispanic | 112,451 | 3.3% | 16.3% |
| White | 3,244,344 | 95.4% | 72.4% |
| Non-minority (White Non-Hispanic) ** | 3,063,170 | 90.1% | 63.7% |
| Some other race (alone) | | | 0.2% |
| Two or More Races | 26,749 | 0.8% | 1.9% |
| Total | 3,399,834 | | 100% |
| Note: Hispanic producers may be of any race, but most Hispanics identify as white.  The population estimates represent shares of non-hispanics in the race categories. | | | |
| ** Note: Provided by a special tabulation from USDA. | | | |
| Source: 2017 U.S. Census of Agriculture. Uses data for any producer. | | | |

ii.   *Underrepresentation based on comparisons with the rural population*

Because minorities tend to account for a smaller proportion of rural populations, where the majority of farms—and especially large farms—are located, making comparisons only to nationwide population may not provide a complete picture. Figure 6[150] below shows that minorities tend to be more concentrated in urban areas. The concentration of minority populations in urban areas where farming is less prevalent might arguably skew the nationwide data such that it exaggerates underrepresentation. However, the fact that minority populations are less rural may itself be in part a consequence of unequal access to agricultural wealth caused by discrimination

---

[150] The chart below appears in the November 2018 ERS report, *Rural America at a Glance, 2018 Edition*, https://perma.cc/C24E-QTQ8.

in the farm loan sector, which discrimination may have driven minorities from farming in rural areas to more urban areas where the economy is less agriculturally driven.[151] Still, focusing only on rural population metrics is one way to control for any effects of uneven population distribution. One would expect that, absent the effects of discrimination pushing minorities out of the farming economy, the share of minority producers in rural areas would be on par with their share of the population in those areas. In fact, just as when considering the general nationwide population data, the rural population data show that minority farmers are also underrepresented in rural population areas nationwide.[152]

As shown in Table 3B and Figure 6 below, in 2017, non-Hispanic whites were estimated to account for nearly 80% of the rural population but 90% of producers. On the other hand, Hispanics made up 9% of the rural population but only 3.3% of producers, and Blacks made up 8% of the rural population but only 1.3% of producers. American Indians made up 2% of the rural

---

[151] This concept is sometime referred to as "survivorship bias," where the characteristics of a given sample are skewed by the absence of data from those who drop out of the sample before the measurement is taken. *See, e.g.*, Paul Nightingale, & Alex Coad, Muppets and gazelles: political and methodological biases in entrepreneurship research, *Industrial & Corporate Change*, *23*(1), 113-143 (2014), https://perma.cc/C6AY-57G8; Gavin Cassar, "The financing of business start-ups", *Journal of Business Venturing* 19.2 (2004): 261-283, https://perma.cc/FP3E-XCWK.

[152] Rural is defined here as nonmetropolitan (nonmetro) areas by the Office of Management and Budget (OMB) on the basis of counties or county-equivalent units (e.g., parishes, boroughs). Nonmetro counties are those outside the boundaries of metropolitan (metro) areas. In 2013, OMB defined metro areas as broad labor-market areas that include: 1) central counties with one or more urbanized areas; urbanized areas (described in the next section) are densely-settled urban entities with 50,000 or more people and 2) outlying counties that are economically tied to the core counties as measured by labor-force commuting. Outlying counties are included if 25 percent of workers living in the county commute to the central counties, or if 25 percent of the employment in the county consists of workers coming out from the central counties. (*See* ERS, What is Rural, https://perma.cc/V3FT-NMM9for more details).

population and under 2% of producers.[153] Finally, Asians and Pacific Islanders (included in the "Other" category) accounted for 1.1% of the rural population but only 0.7% of producers.[154]

| Table 3B. Number of U.S. Producers by Race/Ethnicity, 2017 versus 2010 Rural Population | | |
|---|---|---|
| | Share of Producers | Share of Rural Population |
| American Indian/Alaska Native | 1.7% | 2.0% |
| Black or African American | 1.3% | 8.0% |
| Asian/Pacific Islander/Native Hawaiian | 0.7% | 1.1% |
| Hispanic | 3.3% | 9.0% |
| White | 95.4% | |
| Non-minority (White Non-Hispanic) ** | 90.1% | 79.9% |
| Two or More Races | 0.8% | 0.5 |
| Note: Hispanic producers may be of any race, but most Hispanics identify as white. The population estimates represent shares of non-Hispanics in the race categories. | | |
| ** Note: Provided by a special tabulation from USDA. | | |
| Source: 2017 U.S. Census of Agriculture and USDA, ERS using data from US Census Bureau, Population Estimates Program. Uses data for any producer. | | |

*[Continued on next page]*

---

[153] American Indians were the only minority group more concentrated in rural areas (2% of the population) than urban (only 0.5% of the population).

[154] But relatively few Asians and Pacific Islanders were rural residents.

Figure 6



*iii.    Underrepresentation based on comparisons with state-level population data*

Another way to measure minority representation in farming is by using state-level data to compare the minority population and producer shares in the states where minority farmers are most heavily concentrated. One would expect that, absent discrimination and its lingering effects, minority farmers would be better represented in the states where they are principally located. In fact, the state-level data show the same pattern as the national-level data. Table 3C below compares each minority group's share of farms with their share of the population in the top five states where

each minority group's producers nationwide are primarily located.[155] As the data illustrate, each minority group's share of farms in these five states is much smaller than its share of the state population.

For example, while Hispanics made up 37.6% of the population of Texas, only 11.3% of the farms in Texas had a Hispanic principal producer. Similarly, in California, where Hispanics also made up 37.6% of the population, only 13.5% of farms had a Hispanic principal producer. And Hispanics made up more than 46% of the population of New Mexico but less than a third of New Mexican farms had a Hispanic principal producer.

The data show similar patterns across almost every minority group. American Indian/Alaskan Native farmers provide one exception to this pattern. In four of the five states where the majority of AI/AN farmers are located, they are actually overrepresented when compared to their share of each state's population.[156] However, other data show that AI/AN farmers are still at a disadvantage as compared to non-minority farmers in several other respects. For instance, as will be discussed below, AI/AN farms in the majority of these same states are substantially smaller in size than white farms (*See* Table 7), and the market value of production of AI/AN farms nationwide is, on average, only one-quarter that of white farms (*See* Table 4).

Additionally, while the share of Native Hawaiian/Pacific Islander farmers is relatively on par with their share of the state populations, other data discussed below show that Native Hawaiian/Pacific Islander farms are significantly smaller than white farms in terms of acreage in

---

[155] For example, for Black farmers, I looked at Texas, Mississippi, Alabama, Louisiana, and Georgia. Texas has more Black farmers than any other state; Mississippi has the second-greatest number of Black farmers, and so on. See Table 3 in Appendix C for a breakout of farms and acreage by race and ethnicity for each state and Table 4 in Appendix C for the top five states for each race and ethnic group and the shares of farmers that are located in each.

[156] However, this drops to three states when using rural populations as a benchmark (*See* Table 3D).

the same states. In Hawaii, white farms are more than twice as large as Native Hawaiian/Pacific Islander farms; in Florida, they are nearly seven times larger. (*See* Table 7.)

  For each state, I also looked at the proportion of the population that was white, and the proportion of farms that had white principal producers. The data for every state show white farmers dominating the farming industry—in Mississippi, for instance, whites make up less than 60% of the population but account for over 85% of the farms. In Hawaii, whites make up 25% of the population but account for 54% of the farms.

 *[Continued on next page]*

52

| Table 3C. Top Five States by % of Farms by Race/Ethnicity, 2017 and Shares of Population (2010) and Farms (2017) | | | |
|---|---|---|---|
| | Share of Farms that have a Hispanic, Latino, or Spanish Principal Producer | Share of Population that is Hispanic, Latino, or Spanish | Share of Farms that have a White Principal Producer | Share of Population that is White |
| United States | 3.8% | 17.3% | 95.8% | 72.4% |
| **States** | | | | |
| Texas | 11.3% | 37.6% | 95.5% | 70.4% |
| California | 13.5% | 37.6% | 92.5% | 57.6% |
| New Mexico | 32.8% | 46.3% | 76.0% | 68.4% |
| Florida | 10.2% | 22.5% | 94.1% | 75.0% |
| Colorado | 7.1% | 20.7% | 98.3% | 81.3% |
| | Share of Farms that have an American Indian or Alaskan Native Principal Producer | Share of Population that is American Indian or Alaskan Native | Share of Farms that have a White Principal Producer | Share of Population that is White |
| United States | 1.9% | 0.9% | 95.8% | 72.4% |
| **States** | | | | |
| Arizona | 60.6% | 4.6% | 38.8% | 73.0% |
| Oklahoma | 11.0% | 8.6% | 88.1% | 72.2% |
| New Mexico | 23.6% | 9.4% | 76.0% | 68.4% |
| Texas | 0.9% | 0.7% | 95.5% | 70.4% |
| Montana | 4.8% | 6.3% | 95.1% | 89.4% |
| | Share of Farms that have an Asian Principal Producer | Share of Population that is Asian | Share of Farms that have a White Principal Producer | Share of Population that is White |
| United States | 0.7% | 4.7% | 95.8% | 72.4% |
| **States** | | | | |
| California | 5.8% | 13.0% | 92.5% | 57.6% |
| Hawaii | 31.5% | 38.6% | 54.2% | 24.7% |
| Texas | 0.4% | 3.8% | 95.5% | 70.4% |
| Florida | 1.8% | 2.4% | 94.1% | 75.0% |
| Washington | 1.4% | 7.2% | 97.1% | 77.3% |
| | Share of Farms that have a Black or African American Principal Producer | Share of Population that is Black or African American | Share of Farms that have a White Principal Producer | Share of Population that is White |
| United States | 1.6% | 12.6% | 95.8% | 72.4% |
| **States** | | | | |
| Texas | 3.2% | 11.8% | 95.5% | 70.4% |
| Mississippi | 14.0% | 37.0% | 85.4% | 59.1% |
| Alabama | 7.2% | 26.2% | 91.0% | 68.5% |
| Louisiana | 8.0% | 32.0% | 90.9% | 62.6% |
| Georgia | 4.5% | 30.5% | 94.3% | 59.7% |
| | Share of Farms that have a Native Hawaiian or Other Pacific Islander Principal Producer | Share of Population that is Native Hawaiian or Other Pacific Islander | Share of Farms that have a White Principal Producer | Share of Population that is White |
| United States | 0.1% | 0.2% | 95.8% | 72.4% |
| **States** | | | | |
| Hawaii | 10.5% | 10.0% | 54.2% | 24.7% |
| California | 0.4% | 0.4% | 92.5% | 57.6% |
| Texas | 0.1% | 0.1% | 95.5% | 70.4% |
| Florida | 0.2% | 0.1% | 94.1% | 75.0% |
| Oregon | 0.2% | 0.3% | 97.8% | 83.6% |

Source: 2017 U.S. Census of Agriculture and 2010 Decennial Census.

If we again compare the share of farms that have producers of a given demographic with their corresponding shares of the rural population for the states with the vast majority of the

minority farms, we again see similar patterns of underrepresentation.[157] (Recall also that this analysis may overstate minority participation in agriculture because of survivorship bias—those who cannot overcome discrimination to succeed in farming may move away from rural areas to places where there are more available opportunities.) For example, as shown in Table 3D, Hispanics made up 31.6% of the rural population in Texas, but only 11.3% of the farms in Texas had a Hispanic principal producer. Blacks made up 7.8% and 38.7% of the rural populations in Texas and Mississippi respectively, but only 3.2% and 14% of the farms in those same states had a Black principal producer. Whites, on the other hand, made up 58.6% of the rural population in Texas, but 95.5% of the farms in Texas had a white principal producer. American Indians and Alaskan Natives and Asians are the only two groups whose proportion of statewide producers sometimes exceeded their proportion of the rural population.

*[Continued on next page]*

---

[157] The data for urban and rural populations by state come from the data download from the Atlas of Rural and Small-Town America, which do not break out Native Hawaiians and Other Pacific Islanders out separately. USDA-ERS, Atlas of Rural and Small-Town America, https://perma.cc/8S8S-ABFY.

| Table 3D. Top Five States by % of Farms by Producer Race/Ethnicity, 2017 and Shares of Rural Population (2010) and Farms (2017) | | | | |
|---|---|---|---|---|
| Top Three States | Share of Farms that have a Hispanic, Latino, or Spanish Principal Producer | Share of Rural Population that is Hispanic, Latino, or Spanish | Share of Farms that have a White Principal Producer | Share of Rural Population that is White |
| Texas | 11.3% | 31.6% | 95.5% | 58.6% |
| California | 13.5% | 15.7% | 92.5% | 75.2% |
| New Mexico | 32.8% | 44.1% | 76.0% | 40.4% |
| Florida | 10.2% | 13.7% | 94.1% | 68.9% |
| Colorado | 7.1% | 21.0% | 98.3% | 74.5% |
| | Share of Farms that have an American Indian or Alaskan Native Principal Producer | Share of Rural Population that is American Indian or Alaskan Native | Share of Farms that have a White Principal Producer | Share of Rural Population that is White |
| Arizona | 60.6% | 32.4% | 38.8% | 40.7% |
| Oklahoma | 11.0% | 12.3% | 88.1% | 71.2% |
| New Mexico | 23.6% | 11.6% | 76.0% | 40.4% |
| Texas | 0.9% | 0.4% | 95.5% | 58.6% |
| Montana | 4.8% | 7.6% | 95.1% | 87.1% |
| | Share of Farms that have an Asian Principal Producer | Share of Rural Population that is Asian | Share of Farms that have a White Principal Producer | Share of Rural Population that is White |
| California | 5.8% | 1.4% | 92.5% | 75.2% |
| Hawaii | 31.5% | 23.7% | 54.2% | 31.1% |
| Texas | 0.4% | 0.6% | 95.5% | 58.6% |
| Florida | 1.8% | 0.6% | 94.1% | 68.9% |
| Washington | 1.4% | 1.9% | 97.1% | 78.8% |
| | Share of Farms that have a Black or African American Principal Producer | Share of Rural Population that is Black or African American | Share of Farms that have a White Principal Producer | Share of Rural Population that is White |
| Texas | 3.2% | 7.8% | 95.5% | 58.6% |
| Mississippi | 14.0% | 38.7% | 85.4% | 57.1% |
| Alabama | 7.2% | 24.1% | 91.0% | 69.2% |
| Louisiana | 8.0% | 31.7% | 90.9% | 63.0% |
| Georgia | 4.5% | 25.6% | 94.3% | 66.3% |
| Source: 2017 U.S. Census of Agriculture, 2010 Decennial Census, Atlas of Small Town and Rural America (https://www.ers.usda.gov/data-products/atlas-of-rural-and-small-town-america/). | | | | |

In sum, the current reality of farming in the United States is that it is predominantly and disproportionately the occupation of whites. The data consistently show that minorities are underrepresented in farming. At both the national and state levels, minorities generally account for a smaller—and, in many cases, much smaller—share of farmers than they do of the population. And this is generally true when making comparisons based on both the general and rural populations.

2.   *Smaller farms and lower revenues of minority farms*

In addition to most minority groups currently being underrepresented in farming, most minority farms are also smaller on average, in terms of both acreage and revenue, when compared with white farms. This is a natural consequence of past discrimination in lending practices, which

hindered minority farmers seeking to expand or invest in their farms. Figure 7 below shows farm size by race and ethnicity. The data indicate that minority farmers tend to have a larger share of the farms that are less than 50 acres and with income less than $10,000. Indeed, the majority of all minority farms are less than 50 acres; but only approximately 40% of white farms are less than 50 acres.



Figure 7. Farm Size by Farmer Race/Ethnicity, 2017

Source: 2017 Census of Agriculture. Uses data for principal producers.

56

The next set of tables provides more detail. Table 4 specifies various farm characteristics, including acreage, value of production, industry sector, and revenues, as of 2017, by the race or ethnicity of the principal producers.[158] Table 5 shows the same characteristics by race or ethnicity of the principal producers in percentage breakdowns,[159] while Table 6 shows how farms with certain characteristics are distributed within racial or ethnic categories as of 2017.

   *[Continued on next page]*

---

[158] A principal producer may be any race and also of Hispanic/Latino origin; therefore, each of the racial groups listed in Table 4, and all the other tables below, includes farmers who belong to that racial group and also are of Hispanic or Latino origin. In addition, the tables separately include a column specific to Hispanic/Latino origin for purposes of highlighting the data pertaining to those farmers in particular. To prevent double-counting of Hispanics—once in the Hispanic/Latino column and again in the columns pertaining to each racial group—the totals listed in the far right column in each table do not include the data separately listed in the "Hispanic, Latino, or Spanish origin" column.

[159] Some of the totals listed in Table 5 may be greater than 100% because each farm has up to four principal producers. If a farm has multiple principal producers who do not all belong to the same racial group, that farm is counted once in each column corresponding to the racial groups to which the producers belong. For example, if a farm has two principal producers, one white and one Black, the farm is counted twice—once in the column for "white only" and once in the column for "Black or African American only"; but if a farm has two or more white producers, the farm is counted only once in the "white only" column. If a principal producer identifies with more than one race, the farm is counted in the last column entitled, "More than one race reported."

Table 4. Selected Farm Characteristics by Principal Producer Race/Ethnicity: 2017

| Characteristics | Hispanic, Latino, or Spanish origin | American Indian or Alaskan Native only | Asian only | Black or African American only | Native Hawaiian or Other Pacific Islander only | White only | More than one race reported | Total |
|---|---|---|---|---|---|---|---|---|
| **FARMS AND LAND IN FARMS** | | | | | | | | |
| Farms .................................number | 77,416 | 39,632 | 13,904 | 32,052 | 2,092 | 1,955,737 | 19,773 | 2,042,220 |
| Land in farms .........................acres | 26,041,600 | 51,095,994 | 1,831,229 | 3,862,936 | 426,068 | 843,497,615 | 6,712,435 | 900,217,576 |
| **FARMS BY SIZE** | | | | | | | | |
| 1 to 9 acres | 20,312 | 11,716 | 4,693 | 4,971 | 810 | 251,601 | 3,783 | 273,325 |
| 10 to 49 acres | 27,828 | 9,300 | 4,718 | 11,613 | 661 | 557,536 | 6,327 | 583,001 |
| 50 to 179 acres | 15,104 | 7,523 | 2,951 | 10,909 | 336 | 543,042 | 5,218 | 564,763 |
| 180 to 499 acres | 7,259 | 4,345 | 926 | 3,421 | 163 | 305,998 | 2,582 | 315,017 |
| 500 acres or more | 6,913 | 5,748 | 616 | 1,138 | 122 | 297,560 | 1,863 | 306,114 |
| **MARKET VALUE OF AGRICULTURAL PRODUCTS SOLD AND GOVERNMENT PAYMENTS (in $1000s)** | | | | | | | | |
| Total ($) | $ 14,600,970 | $ 2,137,232 | $ 6,659,080 | $ 987,475 | $ 414,300 | $ 388,248,112 | $ 1,696,604 | $ 397,466,269 |
| Market value of agricultural products sold ($) | $ 14,471,891 | $ 2,082,765 | $ 6,642,403 | $ 937,852 | $ 411,777 | $ 379,433,107 | $ 1,651,761 | $ 388,522,695 |
| Crops, including nursery and greenhouse crops | $ 9,237,329 | $ 751,356 | $ 3,628,008 | $ 516,021 | $ 217,192 | $ 189,187,769 | $ 913,865 | $ 193,546,699 |
| Livestock, poultry, and their products | $ 5,234,562 | $ 1,331,409 | $ 3,014,395 | $ 421,831 | $ 194,585 | $ 190,245,338 | $ 737,896 | $ 194,975,996 |
| Government payments ($) | $ 129,078 | $ 54,467 | $ 16,677 | $ 49,623 | $ 2,523 | $ 8,815,005 | $ 44,843 | $ 8,943,574 |
| **FARMS BY ECONOMIC CLASS** | | | | | | | | |
| Less than $2,500 | 36,885 | 22,941 | 3,627 | 14,102 | 802 | 647,756 | 8,154 | 688,834 |
| $2,500 to $4,999 | 8,718 | 3,802 | 1,079 | 4,331 | 225 | 201,905 | 2,284 | 211,272 |
| $5,000 to $9,999 | 8,571 | 4,007 | 1,431 | 4,770 | 280 | 223,989 | 2,508 | 234,209 |
| $10,000 to $24,999 | 7,721 | 3,698 | 1,775 | 4,700 | 275 | 242,335 | 2,727 | 252,619 |
| $25,000 to $49,999 | 4,184 | 1,873 | 1,134 | 1,953 | 187 | 149,973 | 1,405 | 155,061 |
| $50,000 or more | 11,337 | 3,311 | 4,858 | 2,196 | 323 | 489,779 | 2,695 | 500,225 |
| **PER FARM AVERAGE** | | | | | | | | |
| Market value of agricultural products sold ($) | $ 186,937 | $ 52,553 | $ 477,733 | $ 29,260 | $ 196,834 | $ 194,010 | $ 83,536 | $ 190,245 |
| Government payments ($) | $ 1,667 | $ 1,374 | $ 1,199 | $ 1,548 | $ 1,206 | $ 4,507 | $ 2,268 | $ 4,379 |
| Acres | 336 | 1289 | 132 | 121 | 204 | 431 | 339 | 441 |
| **PER ACRE AVERAGE ($)** | $ 556 | $ 41 | $ 3,627 | $ 243 | $ 966 | $ 450 | $ 246 | $ 432 |
| **FARMS BY NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM (NAICS)** | | | | | | | | |
| Oilseed and grain farming (1111) | 2,907 | 1,001 | 307 | 2,272 | 58 | 321,035 | 1,051 | 325,724 |
| Vegetable and melon farming (1112) | 2,475 | 1,354 | 1,913 | 2,123 | 180 | 39,669 | 718 | 45,957 |
| Fruit and tree nut farming (1113) | 10,251 | 1,088 | 4,708 | 875 | 404 | 88,960 | 1,553 | 97,588 |
| Greenhouse, nursery, and floriculture production (1114) | 2,664 | 336 | 1,460 | 392 | 178 | 43,277 | 617 | 46,260 |
| Other crop farming (1119) | 11,914 | 4,454 | 1,279 | 5,661 | 277 | 444,099 | 3,446 | 459,216 |
| Tobacco farming (11191) | 31 | 6 | 6 | 78 | 0 | 3,673 | 4 | 3,767 |
| Cotton farming (11192) | 286 | 43 | 13 | 126 | 5 | 8,631 | 36 | 8,854 |
| Sugarcane farming, hay farming, and all other crop farming (11193, 11194, 11199) | 11,597 | 4,405 | 1,260 | 5,457 | 272 | 431,795 | 3,406 | 446,595 |
| Beef cattle ranching and farming (112111) | 28,298 | 16,598 | 1,642 | 15,989 | 528 | 607,334 | 7,203 | 649,294 |
| Cattle feedlots (112112) | 141 | 54 | 8 | 13 | 3 | 13,296 | 41 | 13,415 |
| Dairy cattle and milk production (11212) | 598 | 101 | 24 | 64 | 12 | 37,517 | 133 | 37,851 |
| Hog and pig farming (1122) | 622 | 293 | 70 | 398 | 27 | 22,263 | 254 | 23,305 |
| Poultry and egg production (1123) | 1,714 | 609 | 1,279 | 402 | 45 | 42,030 | 572 | 44,937 |
| Sheep and goat farming (1124) | 6,877 | 7,856 | 529 | 1,224 | 160 | 83,343 | 1,290 | 94,402 |
| Aquaculture and other animal production (1125, 1129) | 8,955 | 5,888 | 685 | 2,639 | 220 | 212,914 | 2,895 | 225,241 |

Source: 2017 Census of Agriculture

With respect to **acreage**, Table 5 shows that most minority groups had a much smaller share of farm acreage than they had of farms nationwide in 2017.

- Whites had 95.8% of the farms and 93.7% of the acreage;

- Hispanics had 3.8% of farms but only 2.9% of the acreage;

- Asians had 0.7% of the farms but only 0.2% of the acreage;

- Blacks had 1.6% of the farms but only 0.4% of the acreage; and

-   Native Hawaiians and Pacific Islanders had 0.1% of the farms but only 0.05% of the acreage.

American Indians and Alaskan Natives were the exception, insofar as they had 1.9% of the farms and 5.7% of the acreage, but those numbers are misleading. Farms with AI/AN principal producers make up a disproportionate share (4.3%) of the smallest farms (those under 10 acres), but they also make up 1.9% of the large farms (those with 500 acres or more). All of the other minority groups have a much smaller share of the large farms (500 acres or more) compared with their share of farms overall. There are several explanations for the larger relative share of farms of 500 acres or more with AI/AN principal producers. First, data discussed further below indicate that some large farms concentrated in a small number of states are artificially driving up the average overall acreage for AI/AN farms nationwide. That table shows that in most of the states where the majority of AI/AN farmers are located, their farms are actually substantially smaller than the average size of white farms in that state. In Texas, for example, the average white farm is almost twice as large as the average AI/AN farm. Other data showed that even on reservations, AI/AN farms were smaller than farms with non-AI/AN farms on the same reservations.[160] In addition, American Indian farms are fairly concentrated in cattle ranching,[161] and thus a much larger percentage of the acreage of American Indian and Alaskan Native farms, as compared to farms held by other racial or ethnic groups, is dedicated to pasture (78% in 2017). Whites, for

---

[160] *See infra* Table 10.

[161] The vast majority of the acreage of American Indian farms is located on reservations (*see* Tables 4 and 8), which tend to be more rural and focused on agriculture. Terry L. Anderson & Dean Lueck, *Land Tenure and Agricultural Productivity on Indian Reservations*, The Journal of L. & Econs., 35(d), 427-454 (1992), https://perma.cc/777V-EBBN; USDA-NASS Montana Field Off., U.S. American Indian Agriculture at a Glance, https://perma.cc/HHB3-UFJ5, at 1.

example, had only 43% of their acreage in pastureland.[162] Notably, as discussed below, cattle ranching generally brings in less income than other types of agricultural production. Accordingly, despite their acreage, AI/AN farms are less profitable. And in fact, even on reservations, where the majority of farm acreage belongs to American Indian farmers, white farms account for a highly disproportionate share of agricultural products sold. (*See* Tables 4 and 10.)

*[Continued on next page]*

---

[162] USDA-NASS, 2017 Race/Ethnicity/Gender Profile from the 2017 Census of Agriculture (NASS), https://perma.cc/FPW3- VUMV.

Table 5. Share of Farms by Selected Farm Characteristics and Principal Producer Race/Ethnicity: 2017

| Characteristics | Hispanic, Latino, or Spanish origin | American Indian or Alaskan Native only | Asian only | Black or African American only | Native Hawaiian or Other Pacific Islander only | White only | More than one race reported | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Any principal producer reporting race as - | | | | |
| FARMS AND LAND IN FARMS | | | | | | | | |
| Farms ...................................................number | 3.8% | 1.9% | 0.7% | 1.6% | 0.1% | 95.8% | 1.0% | 101% |
| Land in farms ..........................................acres | 2.9% | 5.7% | 0.2% | 0.4% | 0.05% | 93.7% | 0.7% | 101% |
| FARMS BY SIZE | | | | | | | | |
| 1 to 9 acres | 7.4% | 4.3% | 1.7% | 1.8% | 0.3% | 92.1% | 1.4% | 102% |
| 10 to 49 acres | 4.8% | 1.6% | 0.8% | 2.0% | 0.1% | 95.6% | 1.1% | 101% |
| 50 to 179 acres | 2.7% | 1.3% | 0.5% | 1.9% | 0.1% | 96.2% | 0.9% | 101% |
| 180 to 499 acres | 2.3% | 1.4% | 0.3% | 1.1% | 0.1% | 97.1% | 0.8% | 101% |
| 500 acres or more | 2.3% | 1.9% | 0.2% | 0.4% | 0.0% | 97.2% | 0.6% | 100% |
| MARKET VALUE OF AGRICULTURAL PRODUCTS SOLD AND GOVERNMENT PAYMENTS | | | | | | | | |
| Total | 3.7% | 0.5% | 1.7% | 0.2% | 0.1% | 97.7% | 0.4% | 101% |
| Market value of agricultural products sold | 3.7% | 0.5% | 1.7% | 0.2% | 0.1% | 97.7% | 0.4% | 101% |
| Crops, including nursery and greenhouse crops | 4.8% | 0.4% | 1.9% | 0.3% | 0.1% | 97.7% | 0.5% | 101% |
| Livestock, poultry, and their products | 2.7% | 0.7% | 1.5% | 0.2% | 0.1% | 97.6% | 0.4% | 100% |
| Government payments | 1.4% | 0.6% | 0.2% | 0.6% | 0.03% | 98.6% | 0.5% | 100% |
| FARMS BY ECONOMIC CLASS | | | | | | | | |
| Less than $2,500 | 5.4% | 3.3% | 0.5% | 2.0% | 0.1% | 94.0% | 1.2% | 101% |
| $2,500 to $4,999 | 4.1% | 1.8% | 0.5% | 2.0% | 0.1% | 95.6% | 1.1% | 101% |
| $5,000 to $9,999 | 3.7% | 1.7% | 0.6% | 2.0% | 0.1% | 95.6% | 1.1% | 101% |
| $10,000 to $24,999 | 3.1% | 1.5% | 0.7% | 1.9% | 0.1% | 95.9% | 1.1% | 101% |
| $25,000 to $49,999 | 2.7% | 1.2% | 0.7% | 1.3% | 0.1% | 96.7% | 0.9% | 101% |
| $50,000 or more | 2.3% | 0.7% | 1.0% | 0.4% | 0.1% | 97.9% | 0.5% | 101% |
| FARMS BY NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM (NAICS) | | | | | | | | |
| Oilseed and grain farming (1111) | 0.9% | 0.3% | 0.1% | 0.7% | 0.0% | 98.6% | 0.3% | 100% |
| Vegetable and melon farming (1112) | 5.4% | 2.9% | 4.2% | 4.6% | 0.4% | 86.3% | 1.6% | 100% |
| Fruit and tree nut farming (1113) | 10.5% | 1.1% | 4.8% | 0.9% | 0.4% | 91.2% | 1.6% | 100% |
| Greenhouse, nursery, and floriculture production (1114) | 5.8% | 0.7% | 3.2% | 0.8% | 0.4% | 93.6% | 1.3% | 100% |
| Other crop farming (1119) | 2.6% | 1.0% | 0.3% | 1.2% | 0.1% | 96.7% | 0.8% | 100% |
| Tobacco farming (11191) | 0.8% | 0.2% | 0.2% | 2.1% | 0.0% | 97.5% | 0.1% | 100% |
| Cotton farming (11192) | 3.2% | 0.5% | 0.1% | 1.4% | 0.1% | 97.5% | 0.4% | 100% |
| Sugarcane farming, hay farming, and all other crop farming (11193, 11194, 11199) | 2.6% | 1.0% | 0.3% | 1.2% | 0.1% | 96.7% | 0.8% | 100% |
| Beef cattle ranching and farming (112111) | 4.4% | 2.6% | 0.3% | 2.5% | 0.1% | 93.5% | 1.1% | 100% |
| Cattle feedlots (112112) | 1.1% | 0.4% | 0.1% | 0.1% | 0.0% | 99.1% | 0.3% | 100% |
| Dairy cattle and milk production (11212) | 1.6% | 0.3% | 0.1% | 0.2% | 0.0% | 99.1% | 0.4% | 100% |
| Hog and pig farming (1122) | 2.7% | 1.3% | 0.3% | 1.7% | 0.1% | 95.5% | 1.1% | 100% |
| Poultry and egg production (1123) | 3.8% | 1.4% | 2.8% | 0.9% | 0.1% | 93.5% | 1.3% | 100% |
| Sheep and goat farming (1124) | 7.3% | 8.3% | 0.6% | 1.3% | 0.2% | 88.3% | 1.4% | 100% |
| Aquaculture and other animal production (1125, 1129) | 4.0% | 2.6% | 0.3% | 1.2% | 0.1% | 94.5% | 1.3% | 100% |
| Source: 2017 Census of Agriculture | | | | | | | | |

61

Only whites have a larger share of the large farms (500 acres or more) than they have of farms overall (97.2% versus 95.8% respectively). Whites are also the only group to have a smaller share of the smallest farms (under 10 acres) than their share of farms overall (92.1% versus 95.8% respectively). All of the minority groups have a greater share of the smallest farms (less than 10 acres) than their share of farms overall.

Table 6 shows the distribution of farms by certain characteristics within each race or ethnicity. For example, it indicates that 26.2% of farms that had one or more Hispanic producer were between 1 and 9 acres. This data, too, shows that minorities have a comparatively larger share of smaller farms and whites have a comparatively larger share of bigger farms. Only 12.9% of white farms were under 10 acres, in contrast with nearly 39% of Native Hawaiian/Pacific Islander farms, more than 33% of Asian farms, nearly 30% of AI/AN farms, and more than 26% of Hispanic farms. More than 15% of white farms were 500 acres or more, compared with just 8.9% of Hispanic farms, 14.5% of AI/AN farms, 4.4% of Asian farms, 3.6% of Black farms, and 5.8% of Native Hawaiian/Pacific Islander farms.

 *[Continued on next page]*

Table 6. Distribution of Farms by Principal Producer Race/Ethnicity: 2017

| Characteristics | Hispanic, Latino, or Spanish origin | American Indian or Alaskan Native only | Asian only | Black or African American only | Native Hawaiian or Other Pacific Islander only | White only | More than one race reported |
|---|---|---|---|---|---|---|---|
| | | | Any principal producer reporting race as - | | | | |
| **FARMS BY SIZE** | | | | | | | |
| 1 to 9 acres | 26.2% | 29.6% | 33.8% | 15.5% | 38.7% | 12.9% | 19.1% |
| 10 to 49 acres | 35.9% | 23.5% | 33.9% | 36.2% | 31.6% | 28.5% | 32.0% |
| 50 to 179 acres | 19.5% | 19.0% | 21.2% | 34.0% | 16.1% | 27.8% | 26.4% |
| 180 to 499 acres | 9.4% | 11.0% | 6.7% | 10.7% | 7.8% | 15.6% | 13.1% |
| 500 acres or more | 8.9% | 14.5% | 4.4% | 3.6% | 5.8% | 15.2% | 9.4% |
| **MARKET VALUE OF AGRICULTURAL PRODUCTS SOLD AND GOVERNMENT PAYMENTS** | | | | | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Market value of agricultural products sold | 99.1% | 97.5% | 99.7% | 95.0% | 99.4% | 97.7% | 97.4% |
| Crops, including nursery and greenhouse crops | 63.3% | 35.2% | 54.5% | 52.3% | 52.4% | 48.7% | 53.9% |
| Livestock, poultry, and their products | 35.9% | 62.3% | 45.3% | 42.7% | 47.0% | 49.0% | 43.5% |
| Government payments | 0.9% | 2.5% | 0.3% | 5.0% | 0.6% | 2.3% | 2.6% |
| **FARMS BY ECONOMIC CLASS** | | | | | | | |
| Less than $2,500 | 47.6% | 57.9% | 26.1% | 44.0% | 38.3% | 33.1% | 41.2% |
| $2,500 to $4,999 | 11.3% | 9.6% | 7.8% | 13.5% | 10.8% | 10.3% | 11.6% |
| $5,000 to $9,999 | 11.1% | 10.1% | 10.3% | 14.9% | 13.4% | 11.5% | 12.7% |
| $10,000 to $24,999 | 10.0% | 9.3% | 12.8% | 14.7% | 13.1% | 12.4% | 13.8% |
| $25,000 to $49,999 | 5.4% | 4.7% | 8.2% | 6.1% | 8.9% | 7.7% | 7.1% |
| $50,000 or more | 14.6% | 8.4% | 34.9% | 6.9% | 15.4% | 25.0% | 13.6% |
| **FARMS BY NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM (NAICS)** | | | | | | | |
| Oilseed and grain farming (1111) | 3.8% | 2.5% | 2.2% | 7.1% | 2.8% | 16.4% | 5.3% |
| Vegetable and melon farming (1112) | 3.2% | 3.4% | 13.8% | 6.6% | 8.6% | 2.0% | 3.6% |
| Fruit and tree nut farming (1113) | 13.2% | 2.7% | 33.9% | 2.7% | 19.3% | 4.5% | 7.9% |
| Greenhouse, nursery, and floriculture production (1114) | 3.4% | 0.8% | 10.5% | 1.2% | 8.5% | 2.2% | 3.1% |
| Other crop farming (1119) | 15.4% | 11.2% | 9.2% | 17.7% | 13.2% | 22.7% | 17.4% |
| Tobacco farming (11191) | 0.04% | 0.02% | 0.04% | 0.2% | 0.0% | 0.2% | 0.02% |
| Cotton farming (11192) | 0.4% | 0.1% | 0.1% | 0.4% | 0.2% | 0.4% | 0.2% |
| Sugarcane farming, hay farming, and all other crop farming (11193, 11194, 11199) | 15.0% | 11.1% | 9.1% | 17.0% | 13.0% | 22.1% | 17.2% |
| Beef cattle ranching and farming (112111) | 36.6% | 41.9% | 11.8% | 49.9% | 25.2% | 31.1% | 36.4% |
| Cattle feedlots (112112) | 0.2% | 0.1% | 0.1% | 0.0% | 0.1% | 0.7% | 0.2% |
| Dairy cattle and milk production (11212) | 0.8% | 0.3% | 0.2% | 0.2% | 0.6% | 1.9% | 0.7% |
| Hog and pig farming (1122) | 0.8% | 0.7% | 0.5% | 1.2% | 1.3% | 1.1% | 1.3% |
| Poultry and egg production (1123) | 2.2% | 1.5% | 9.2% | 1.3% | 2.2% | 2.1% | 2.9% |
| Sheep and goat farming (1124) | 8.9% | 19.8% | 3.8% | 3.8% | 7.6% | 4.3% | 6.5% |
| Aquaculture and other animal production (1125, 1129) | 11.6% | 14.9% | 4.9% | 8.2% | 10.5% | 10.9% | 14.6% |

Source: 2017 Census of Agriculture

63

State-level data are consistent with the nationwide averages. Even in states with the highest percentage of minority farmers, minority farms tend to be smaller—and in some cases significantly smaller—on average than white farms. For instance, as Table 7 below illustrates, white farms are between 129% and 336% larger than Asian farms in the top five states where Asian principal producers are most heavily concentrated; and they are between 103% and 347% larger than Black farms in the five states where Black principal producers are most heavily concentrated. The only exceptions to this rule are American Indian/Alaskan Native farms in Arizona and Montana and Native Hawaiian/Pacific Islander farms in California. But even with these minor exceptions, the data continue to show that farmers in these racial groups are at a disadvantage relative to their non-minority peers. As to Native Hawaiians and Pacific Islander farmers, while their farms are slightly larger than white farms in California, in every other state where they are most heavily concentrated their farms are significantly smaller—they are less than one sixth the size of white farms in both Florida and Oregon.[163]

And, as discussed below, AI/AN farms are generally less lucrative than non-minority farms notwithstanding their average larger size[164]—indeed, the net cash income of AI/AN farms is the lowest of any group other than Blacks. Moreover, a 2019 GAO study concluded that while only a quarter of farms on 76 Indian reservations were operated by non-AI/AN farmers, those farms comprised nearly 40% of the total acreage and 90% of the revenues.[165]

---

[163] Moreover, given the very small number of Native Hawaiian or Pacific Islander farms—there are only 314 farms with Native Hawaiian or Pacific Islander producers in California—state averages can be easily skewed by even one or two outliers.

[164] Recall, though, that state-level data suggest that large farms in a small number of states are driving up the overall averages. (*See* Table 7 below and Table 5 in Appendix C.)

[165] *See infra* at pp. 70-71.

Table 7. Top Five States by % of Farms by Race/Ethnicity, 2017: Average Farm Size (acres)

| | Average farm size for Hispanic principal producers (acres) | Average farm size for white farmers (acres) | % difference |
|---|---|---|---|
| United States | 336 | 431 | 28% |
| **States** | | | |
| Texas | 252 | 528 | 110% |
| California | 225 | 360 | 60% |
| New Mexico | 654 | 1758 | 169% |
| Florida | 103 | 209 | 104% |
| Colorado | 368 | 807 | 119% |
| | Average farm size for American Indian or Alaskan Native principal producers (acres) | Average farm size for white farmers (acres) | % difference |
| United States | 1289 | 431 | -67% |
| **States** | | | |
| Arizona | 1740 | 854 | -51% |
| Oklahoma | 259 | 457 | 77% |
| New Mexico | 1237 | 1758 | 42% |
| Texas | 272 | 528 | 94% |
| Montana | 3533 | 2082 | -41% |
| | Average farm size for Asian principal producers (acres) | Average farm size for white farmers (acres) | % difference |
| United States | 132 | 431 | 227% |
| **States** | | | |
| California | 157 | 360 | 129% |
| Hawaii | 80 | 195 | 143% |
| Texas | 121 | 528 | 336% |
| Florida | 76 | 209 | 176% |
| Washington | 127 | 339 | 168% |
| | Average farm size for Black or African American principal producers (acres) | Average farm size for white farmers (acres) | % difference |
| United States | 121 | 431 | 258% |
| **States** | | | |
| Texas | 118 | 528 | 347% |
| Mississippi | 121 | 327 | 171% |
| Alabama | 109 | 221 | 103% |
| Louisiana | 90 | 311 | 244% |
| Georgia | 114 | 241 | 113% |
| | Average farm size for Native Hawaiian or Other Pacific Islander principal producers (acres) | Average farm size for white farmers (acres) | % difference |
| United States | 204 | 431 | 112% |
| **States** | | | |
| Hawaii | 90 | 195 | 117% |
| California | 573 | 360 | -37% |
| Texas | 121 | 528 | 337% |
| Florida | 27 | 209 | 678% |
| Oregon | 56 | 407 | 624% |

Source: 2017 U.S. Census of Agriculture and 2010 Decennial Census.

The data above likewise show that minority farmers tend to generate less income as compared to white farmers. In terms of the **market value of agricultural products sold**, white farms produced the vast majority, or 97.7%, of the market value of agriculture products sold (*See* Table 5). The share of market value of production by all of the minority groups except Asians was less than their corresponding share of farms. AI/AN farms produced only 0.5% of the market value of agricultural products sold, despite being 1.9% of farms. (*See id.*) And Blacks produced only 0.2% of the market value of agricultural products sold despite being 1.6% of farms. (*See id.*)

In terms of **government payments**, while white farms made up 95.8% of farms and generated 97.7% of the market value of agriculture products sold, they received 98.6% of government payments. (*See* Table 5.) By contrast, all of the minority groups of farmers received government payments that were well below their share of farms. Hispanics received 1.4%, American Indians/Alaskan Natives received 0.6%, Asians received 0.2%, Blacks received 0.6%, and Native Hawaiian and Pacific Islanders received less than 0.05%.

In terms of farms by **economic class**,[166] about 58% of American Indian farms, nearly 48% of Hispanic farms, 44% of Black farms, and 38% of Native Hawaiian and Pacific Islander farms generated less than $2,500 in revenue, compared with less than one-third of white farms. (*See* Table 6.) Indeed, Asians were the only minority group that generated higher revenues than white farmers, with about 43% of Asian farms generating more than $25,000. Thus, in terms of revenue, white farmers had greater per-farm revenues than all of the minority groups except Asians.

While American Indians/Alaskan Natives had the highest average farm size by acreage— at 1,374 acres, compared with 431 acres for whites—they averaged only $52,553 in market value

---

[166] The Agricultural Census defines "economic class" data as "the classification of farms by the sum of market value of agricultural products sold and Federal farm program payments." *See* 2017 Ag. Census appendix B, B-7.

of the agricultural products they sold, compared with $194,010 for white farmers. (*See* Table 4.) As mentioned above, a high proportion of American Indian farms are concentrated in cattle ranching, which is less profitable than other kinds of animal husbandry and crop farming.[167] The average income per acre for American Indian and Alaskan Native Farms was $41, compared to more than ten times that for white farmers ($450). (*See ibid*.) Tenure systems dating back to the Dawes Act of 1887 and the Indian Reorganization Act of 1934 have tended to increase the costs of land use for modern agriculture, making it difficult to move Indian land to higher valued alternative uses.[168]

One USDA study showed how having a large farm (as measured by acreage) does not guarantee having high sales. In that study, USDA found that less than half of farms with at least 2,000 acres of farmland also generated sales of at least $1 million, and many actually had sales of less than $10,000.[169] USDA noted that farmland in arid areas, with little vegetation and poor soil, is not suitable for cropping and will thus often be used for livestock grazing, which generates low sales per acre of land.[170] In contrast, USDA found that the acreage of harvested cropland is more closely tied to sales: nearly 80% of farms that harvested 2,000 acres of cropland also realized at least $1 million in Gross Cash Flow Income.[171] Given the high number of AI/AN farms devoted to cattle ranching, this suggests that their comparatively large acreage is concentrated in less

---

[167] *See* Table 6 in Appendix C for average income per farm by kind of farming, which shows substantially lower average revenues for cattle ranching, as compared with crops, dairy, and poultry operations.

[168] *See* Anderson & Lueck (1992).

[169] James MacDonald, Robert Hoppe, & Doris Newton, USDA, Three Decades of Consolidation in U.S. Agriculture, EIB-189 (March 2018), at 8, https://perma.cc/XZ6R-XZVN.

[170] *Id.*

[171] *Id.*

productive land or they have not had sufficient financial capital to transition to more profitable farming sectors.

**Net income** also varied dramatically by racial group, with Black farms and American Indian/Alaskan Native farms having the lowest net incomes at $3,509 and $8,577, respectively. (*See* Table 8.) White farmers received 97.9% of net cash farm income, even though they made up 96.6% of farms. Their share of the government payments (99%, or $8.85 billion, of the $8.94 billion) was higher than their shares of revenues, expenses, or net income.

Although farms with Asian producers have the highest net income, at $111,319, a closer look at the data shows that relatively small number of Asian farms drive up the overall average and thus skew the data. The majority of farms with Asian principal producers (57%) had revenues of less than $25,000 (*See* Table 6). The NASS report on race, ethnicity, and gender noted that there were 4,437 Asian farms generating $100,000 or more. Because there are so few Asian farms—only about 18,000 total, which is less than 1% of all farms—the few thousand of them that generate $100,000 or more in revenue drive up the overall average of this group.

*[Continued on next page]*

68

Table 8. Farms, Acreage, Income, and Expenses by Producer Race/Ethnicity (2017)

| | Hispanic, Latino, or Spanish origin | American Indian or Alaskan Native | Asian | Black or African American | Native Hawaiian or Other Pacific Islander | White | All |
|---|---|---|---|---|---|---|---|
| | Farms with one or more producers who are: | | | | | | |
| Number of farms | 86,278 | 60,083 | 18,338 | 35,470 | 4,341 | 1,973,006 | 2,042,220 |
| Land in farms (acres) | 32,079,910 | 58,749,543 | 2,931,365 | 4,673,140 | 1,043,936 | 849,816,725 | 900,217,576 |
| Average size of farm (acres) | 372 | 978 | 160 | 132 | 240 | 431 | 441 |
| **Total** | | | | | | | |
| Market value of products sold | $ 21,765,056,000 | $ 3,537,975,000 | $ 7,457,497,000 | $ 1,416,256,000 | $ 710,952,000 | $ 381,050,061,000 | $ 388,522,695,000 |
| Government payments | $ 158,488,000 | $ 102,783,000 | $ 27,272,000 | $ 58,807,000 | $ 7,470,000 | $ 8,851,913,000 | $ 8,943,574,000 |
| Farm-related income | $ 596,161,000 | $ 237,027,000 | $ 160,975,000 | $ 87,042,000 | $ 25,644,000 | $ 16,592,565,000 | $ 16,847,824,000 |
| Total farm production expenses | $ 18,617,667,000 | $ 3,362,431,000 | $ 5,604,383,000 | $ 1,437,647,000 | $ 636,119,000 | $ 320,456,555,000 | $ 326,390,640,000 |
| Net cash farm income | $ 3,902,039,000 | $ 515,355,000 | $ 2,041,362,000 | $ 124,459,000 | $ 107,947,000 | $ 86,037,984,000 | $ 87,923,453,000 |
| **Per farm average** | | | | | | | |
| Market value of products sold | $ 252,267 | $ 58,885 | $ 406,669 | $ 39,928 | $ 163,776 | $ 193,132 | $ 190,245 |
| Government payments (average per farm receiving) | $ 15,492 | $ 12,601 | $ 14,000 | $ 7,108 | $ 12,704 | $ 14,004 | $ 13,906 |
| Farm-related income | $ 27,656 | $ 20,309 | $ 29,722 | $ 9,872 | $ 21,696 | $ 21,530 | $ 21,478 |
| Total farm production expenses | $ 215,787 | $ 55,963 | $ 305,616 | $ 40,531 | $ 146,537 | $ 162,420 | $ 159,821 |
| Net cash farm income | $ 45,226 | $ 8,577 | $ 111,319 | $ 3,509 | $ 24,867 | $ 43,608 | $ 43,053 |
| **Percent of All** | | | | | | | |
| Number of farms | 4.2% | 2.9% | 0.9% | 1.7% | 0.2% | 96.6% | 102.4% |
| Land in farms (acres) | 3.6% | 6.5% | 0.3% | 0.5% | 0.1% | 94.4% | 101.9% |
| Market value of products sold | 5.6% | 0.9% | 1.9% | 0.4% | 0.2% | 98.1% | 101.5% |
| Government payments | 1.8% | 1.1% | 0.3% | 0.7% | 0.1% | 99.0% | 101.2% |
| Farm-related income | 3.5% | 1.4% | 1.0% | 0.5% | 0.2% | 98.5% | 101.5% |
| Total farm production expenses | 5.7% | 1.0% | 1.7% | 0.4% | 0.2% | 98.2% | 101.6% |
| Net cash farm income | 4.4% | 0.6% | 2.3% | 0.1% | 0.1% | 97.9% | 101.0% |

Source: Race, Ethnicity, Gender Profile, 2017, USDA. www.nass.usda.gov/AgCensus.
Uses data for any producer.

Some small farms, especially those under 10 acres or with less than $10,000 in revenue, may be better viewed as "hobby" farms—that is, farms that are operated not primarily as a business but at least in large part for recreational reasons. If "hobby" farms are unequally distributed among race and ethnicity groups, they might skew the data one way or another. But excluding these farms from the analysis only underscores white farmers' disproportionate dominance of the agricultural sector. Excluding farms under 10 acres, white principal farms make up 96.3% of farms, while Hispanic farms make up 3.2% of farms. American Indian/Alaskan Native farms and Black farms each make up just 1.5% of farms. Native Hawaiian/other Pacific Islander farms make up less than 0.1% of farms. (*See* Table 9). The pattern is similar when considering only farms with more than $10,000 in revenue. Farms with white principal producers made up 97.2% of farms with more than $10,000 in revenue. (*See* ibid.)

| Table 9. Selected Farm Characteristics by Principal Producer Race/Ethnicity: 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Any principal producer reporting race as - | | | | | | | |
| Characteristics | Hispanic, Latino, or Spanish origin | American Indian or Alaska Native only | Asian only | Black or African American only | Native Hawaiian or Other Pacific Islander only | White only | More than one race reported | Total |
| Number of farms | 77,416 | 39,632 | 13,904 | 32,052 | 2,092 | 1,955,737 | 19,773 | 2,042,220 |
| Share of all farms | 3.8% | 1.9% | 0.68% | 1.6% | 0.10% | 95.8% | 1.0% | 100% |
| Farms by Acreage | | | | | | | | |
| Share of farms with 10+ acres within group | 73.8% | 67.9% | 66.2% | 84.5% | 61.3% | 87.1% | 80.9% | 86.6% |
| Share of farms with 10+ acres | 3.2% | 1.5% | 0.52% | 1.5% | 0.07% | 96.3% | 0.9% | 100% |
| Share of farms with <10 acres | 7.4% | 4.3% | 1.72% | 1.8% | 0.30% | 92.1% | 1.4% | 100% |
| Farms by economic class | | | | | | | | |
| Share of farms with <$10K revenue within grou | 30.0% | 22.4% | 55.9% | 27.6% | 37.5% | 45.1% | 34.5% | 44.5% |
| Share of farms with $10K+ revenue | 2.6% | 1.0% | 0.86% | 1.0% | 0.09% | 97.2% | 0.8% | 100% |
| Share of farms with <$10K revenue | 4.8% | 2.7% | 0.54% | 2.0% | 0.12% | 94.7% | 1.1% | 100% |
| Source: 2017 Census of Agriculture | | | | | | | | |

To summarize the findings above, the nationwide data shows that, on average, farms held by minorities tend to be smaller, have lower revenues, and have lower net incomes than non-minority farms.

The GAO, also drawing on the 2017 Census of Agriculture, reached similar conclusions in its 2019 report on credit and outreach to SDFRs.[172] Looking at the aggregate, the GAO reported that "[o]n average, farms for which an SDFR was the primary producer (SDFR farms) were smaller and brought in less revenue than non-SDFR farms in 2017."[173] Although SDFR farms represented 30% of all farms, they operated only 21% of all farm land and accounted for only 13% of the market value of agricultural products sold in 2017.[174] The GAO further noted that "[a]bout 55

---

[172] As noted above, SDFR is short for socially disadvantaged farmer or rancher. In this GAO report, GAO included female farmers, in addition to minorities, within its definition of SDFR.

[173] GAO-19-539, Agric. Lending: Info. on Credit & Outreach to [SDFRs] Is Limited (2019), at 7, https://perma.cc/5RD6-24VH.

[174] *Id.*

percent of SDFR farms had fewer than 50 acres, and 88 percent had less than $50,000 in total sales and government payments."[175]

A 2019 GAO study that investigated the credit needs and barriers to lending on tribal lands found similar results with respect to Native Americans. Using data from the 2012 Census of Agriculture, GAO looked at 76 Indian reservations (containing 23,000 farms and ranches) by primary farm or ranch operator. It found that the 25% of those farms and ranches that were non-Indian operated made up 39% of the overall acreage and 90% of the overall market value of agricultural products sold. The average size of AI/AN farms on these 76 reservations was just under 1600 acres, whereas farms with non-AI/AN principal producers were, on average, over 3000 acres. The 75% of farms and ranches that were Indian-operated made up only 61% of the overall acreage and generated just 10% of the market value of agriculture products sold. (*See* Table 10.)[176]

| Table 10. Agricultural Activity on 76 Selected Indian Reservations, by Primary Farm Operator (2012) | | | | | | |
|---|---|---|---|---|---|---|
| | Total number of farms | Total Share of farms (%) | Total Acreage of farms | Total share of acreage of farms (%) | Total market value of agricultural products sold | Total share of market value of agricultural products sold (%) |
| Indian-operated | 17,948 | 75 | 28,560,057 | 61 | $ 361,145,000 | 10 |
| Non-Indian operated | 5,980 | 25 | 18,449,341 | 39 | $ 3,079,386,000 | 90 |
| Total | 23,800 | 100 | 47,009,398 | 100 | $ 3,440,531,000 | 100 |
| | | | | | | |
| Average farm size | Acres | Market Value | | | | |
| Indian-operated | 1,591 | $ 20,122 | | | | |
| Non-Indian operated | 3,085 | $ 514,947 | | | | |
| Total | 1,975 | $ 144,560 | | | | |
| Source: GAO-19-464, INDIAN ISSUES: Agricultural Credit Needs and Barriers to Lending on Tribal Lands, Table 2. | | | | | | |
| Primary farm operator is a term previously used by the USDA Census of Agriculture and is roughly equivalent to "principal producer." | | | | | | |

---

[175] *Id.* These numbers are greater than discussed elsewhere in the report because GAO's statistics and analysis included female farmers within its definition of SDFR.

[176] *See* GAO-19-464, Indian Issues: Agricultural Credit Needs and Barriers to Lending on Tribal Lands.

3.      *Lower net worth of minority farmers*

Additionally, as one would expect given that minority farms are on average smaller and bring in less farm revenue and income, the data also show that minority farmers have lower net worth overall. The USDA's Economic Research Service provided the two tables below, which show the overall farm and household characteristics of SDFRs[177] (*i.e.*, minorities) and non-SDFRs (*i.e.*, non-Hispanic whites) from the 2017-2019 Agricultural Resource Management Surveys. These tables illustrate that, overall, minorities have lower mean and median levels of net worth, acreage, value of production, farm income, farm assets, and debt-to-asset ratio (Table 11), as well as lower average and median household income and non-farm assets than non-SDFRs (Table 12).

 *[Continued on next page]*

---

[177] For these two tables, the term "SDFR" did not include women.

| Table 11. Average farm and household characteristics by SDFR status | Mean | |
|---|---|---|
| | Non-SDFR | SDFR |
| | (CV %) | |
| **Farm characteristics** | | |
| Farm net worth ($) | 1,058,970 | 802,657 |
| | (1.04) | (5.26) |
| Acres owned | 261 | 181 |
| | (2.46) | (7.52) |
| Acres operated | 413 | 306 |
| | (1.92) | (10.55) |
| Total value of production ($) | 173,612 | 162,817 |
| | (1.88) | (8.40) |
| Farm income to the household ($) | 21,265 | 13,851 |
| | (4.26) | (16.49) |
| Farm assets ($) | 1,163,613 | 877,111 |
| | (0.93) | (4.86) |
| Debt-to-asset ratio | 0.09 | 0.07 |
| | (3.05) | (11.13) |
| Total current and non-current liabilities ($) | 122,486 | 90,569 |
| | (1.55) | (6.99) |
| **Household characteristics** | | |
| Total household income[1] ($) | 116,782 | 103,400 |
| | (2.57) | (4.99) |
| Non-farm assets | 677,939 | 509,136 |
| | (2.53) | (3.94) |
| **Total number of farms** | 1,860,436 | 162,801 |

[1] Includes farm and non-farm sources.

Source: USDA, National Agricultural Statistics,Service and Economic Research Service, Agricultural Resource Management Survey 2017-2019

SDFR here indicates only racially and ethnically disadvantaged (minority farmers). It does not include white female farmers.

| Table 12. Median farm and household characteristics by SDFR status | Non-SDFR | SDFR |
|---|---|---|
| **Farm characteristics** | | |
| Farm net worth ($) | 464,414 | 298,252 |
| Acres owned | 67 | 27 |
| Acres operated | 85 | 40 |
| Total value of production | 7,140 | 2,625 |
| Farm income to the household ($) | -660 | -2,680 |
| Farm assets ($) | 510,100 | 313,499 |
| Debt-to-asset ratio | 0.00212 | 0.00208 |
| Total current and non-current liabilities ($) | 1,010 | 550 |
| **Household characteristics** | | |
| Total household income[1] ($) | 76,905 | 67,165 |
| Non-farm assets ($) | 366,701 | 312,081 |

[1] Includes farm and non-farm sources.

Source: USDA, National Agricultural Statistics,Service and Economic Research Service, Agricultural Resource Management Survey 2017-2019

SDFR here indicates only racially and ethnically disadvantaged (minority farmers). It does not include white female farmers.

### 4. *The differences between minority and non-minority farmers are not primarily attributable to race-neutral factors*

The above disparities are expected consequences of past discrimination in USDA farm loan programs, which, the evidence shows, has restricted minority farmers' access to the credit needed to sustain and develop their farms. And as shown by the state-specific data above, these disparities are not largely explainable by other race-neutral factors such as geography or agricultural product sold. A possible response to all of this is that the observed disparate outcomes between minorities and non-minorities are attributable to race-neutral characteristics of farmers, such as prior experience in farming or number of annual days devoted to farming versus other pursuits, that might influence their success in farming. But data across these and other demographic metrics, included in Table 13 below, show that minority and non-minority farmer characteristics are actually quite similar.

For instance, one possible explanation for the disparities we observe is that minority farmers might be disproportionately new entrants to the agricultural field as historic barriers to entry (including past USDA discrimination) are lifted, and that the more limited experience of these farmers leads to poorer outcomes. But the data show no clear delineation in new farmers between minorities in general versus white farmers. Black and AI/AN farmers are new or beginning farmers in roughly the same proportion as white farmers. Hispanic, Asian, and Native Hawaiian/Pacific Islander producers are new and beginning farmers at somewhat higher rates. But these comparatively high rates for new and beginning farmers are consistent with both historical discrimination and the present-day elimination of barriers to entry for minorities. If there is pent-up demand for entering the agricultural industry among minority groups that had been held back by historical discrimination, then we would expect a surge in new farmers from those groups when obstacles are removed. Moreover, even if the poorer outcomes for minorities could be explained

74

in part by a comparatively larger share of new and beginning farmers, it would still likely be an artifact of prior discrimination that prevented these groups from entering farming at comparable rates to white farmers in earlier eras. And because growing any business depends on compounding returns over time, the delayed entry into farming will put minorities in a worse position even if there is no current, ongoing discrimination by USDA.

Additionally, when we look at the share of new and beginning farmers compared with the share of all producers, we see that they are also quite similar. (*See* Table 14.) For instance, white farmers made up 94.8% of new and beginning farmers and 95.4% of farmers overall; Black farmers made up 1.4% of all new and beginning farmers and 1.3% of farmers overall; AI/AN farmers made up 1.7% of new and beginning farmers and 1.7% of farmers overall. While Hispanics and Asians are a slightly higher share of new and beginning farmers, their share is not so much higher as to explain significant disparities in other metrics such as farm revenues. Thus, the racial and ethnic differences we are seeing in terms of size, revenue, and net income are most likely not being driven by a disproportionately large influx of new and beginning farmers from the minority groups. In fact, previous research has shown that the share of farmers with less than five years of experience has fallen from 18% in 1978 to 13% in 2017.[178] Because the share of new and beginning farmers has been declining over time, their significance in driving overall averages has also been declining. And to the extent that differences in experience between minority groups and white farmers can explain differences in outcomes, any experience gap may well itself be a result of past discrimination.

---

[178] Rafter Ferguson, Losing Ground Farmland Consolidation and Threats to New and Black Farmers and the Future of Farming (2021), https://perma.cc/SL2C-MTCQ.

75

Another possible explanation for the observed disparities between minority and non-minority farmers is that minority farmers may be more likely to engage in farming as a secondary occupation or hobby, especially given the average smaller size of minority farms. But the data show otherwise. As Table 13 illustrates, American Indian and Alaskan Native, Asian, and Black producers were actually *more* likely to be engaged in farming as a primary occupation than whites. And Hispanic and Native Hawaiian/Pacific Islander producers were just slightly less likely to have farming as their primary occupation. Moreover, around 40% of farmers in any group worked 200+ days off the farm—and Black producers were the least likely to work that many days off the farm, with only 34.9% of Black farms having a producer engaged in extra-farm work for 200+ days out of the year. Indeed, recall from above that excluding from the analysis all farms under 10 acres or all farms with less than $10,000 in revenue did not eliminate disparities.

*[Continued on next page]*

76

Table 13: Additional Producer Characteristics, 2017

| | Farms with Hispanic Producers | Farms with American Indian/Alaska Native Producers | Farms with Asian Producers | Farms with Black Producers | Farms with Native Hawaiian/ Pacific Islander Producers | Farms with White Producers |
|---|---|---|---|---|---|---|
| **Sex** | | | | | | |
| Male | 65.1% | 56.2% | 55.2% | 70.9% | 57.4% | 64.0% |
| Female | 34.9% | 43.8% | 44.8% | 29.1% | 42.6% | 36.0% |
| **Age** | | | | | | |
| <35 | 9.4% | 9.5% | 9.4% | 5.4% | 11.0% | 8.4% |
| 35-64 | 64.4% | 58.8% | 64.8% | 6.0% | 60.4% | 57.7% |
| 65 and older | 26.4% | 31.7% | 25.8% | 43.4% | 28.6% | 33.9% |
| **Primary occupation** | | | | | | |
| Farming | 39.9% | 46.6% | 47.9% | 44.1% | 38.8% | 41.5% |
| Other | 60.1% | 53.4% | 52.1% | 55.9% | 61.2% | 58.5% |
| **Days worked off farm** | | | | | | |
| None | 30.7% | 36.6% | 31.7% | 39.7% | 28.3% | 38.6% |
| 1 to 199 | 27.9% | 24.6% | 30.0% | 25.4% | 28.5% | 21.0% |
| 200 + | 41.4% | 38.8% | 38.3% | 34.9% | 43.2% | 40.4% |
| **Other characteristics** | | | | | | |
| With military service | 10.7% | 11.0% | 6.6% | 19.3% | 13.2% | 10.8% |
| New and beginning farmers | 36.3% | 27.5% | 40.2% | 28.9% | 35.1% | 26.6% |
| *Average age (years)* | *55* | *56.6* | *54.9* | *60.8* | *54.9* | *57.5* |

Source: Census of Agriculture, 2017
Uses data for any producers.

Table 14. Share of New and Beginning Farmers versus All Producers by Race/Ethnicity, 2017

| | New and Beginning Farmers | Share | All Producers | Share |
|---|---|---|---|---|
| American Indian/Alaska Native | 15,347 | 1.7% | 58,199 | 1.7% |
| Black or African American | 12,884 | 1.4% | 45,508 | 1.3% |
| Asian | 8,683 | 1.0% | 22,016 | 0.6% |
| Pacific Islander/Native Hawaiian | 1,007 | 0.1% | 3,018 | 0.1% |
| Hispanic | 40,858 | 4.5% | 112,451 | 3.3% |
| White | 861,491 | 94.8% | 3,244,344 | 95.4% |
| Two or More Races | 8,141 | 0.9% | 26,749 | 0.8% |
| Total | 908,274 | 100.0% | 3,399,834 | 100% |

Source: 2017 U.S. Census of Agriculture
Uses data for any producer.

Other factors similarly do not provide a robust alternative explanation for the disparities observed. As discussed above, disparities were observed when considering only rural populations—every minority group had a smaller share of producers than their share of nationwide

77

rural population.[179] Even when confining the analysis to individual states, disparities were observed for most minority groups.[180] In Texas, for example, Hispanics make up nearly 40% of the statewide population, and over 30% of the rural population, but only 11.3% of Texas farms had a Hispanic principal producer. In Mississippi, Blacks make up nearly 40% of the rural population, but only 14% of the farms had Black principal producers. By contrast, whites make up less than 60% of the rural population in Texas, but over 95% of the farms in Texas have a white principal producer. And even within a single sector, like cattle ranching, disparities persist: The average revenues for most minority groups in the cattle ranching sector were lower—and sometimes substantially lower—than revenues for white cattle ranchers.[181]

C. *Existing Disparities are Consistent with the Expected Effects of Past Discrimination in USDA Loan Programs*

The disparities between minority and non-minority farmers today cannot be explained solely by differences in factors untainted by discrimination. These disparities are instead consistent with what one would expect given historical discrimination against minority farmers in USDA's loan programs and the nature of agricultural credit markets.

One recognized technique used in disparity studies to establish the linkage between statistical disparities and discrimination is to compare minority participation in a given activity, such as farming or a lending program, to a benchmark that expresses the level of participation that would reasonably have been expected absent discrimination.[182] As discussed above, and shown in

---

[179] *See supra* Section VII.B.1.ii.

[180] *See supra* Section VII.B.1.iii.

[181] *See infra* Section VII.C.

[182] This is often used to defend the use of set asides in government contracting for minority businesses owners. For a detailed discussion, *see* Jon Wainwright & Collette Holt, Transportation

Table 15 below, as of 2010, there were substantial disparities between the share of minorities in the general population and their corresponding shares of the 2017 farm producer population:

- Although Blacks comprised 12.2% of the population, they accounted for only 1.3% of producers;

- Although Hispanics comprised 16.3% of the population, they accounted for only 3.3% of producers;

- Although Asians comprised 4.7% of the population, they accounted for only 0.6% of producers;

- Although Native Hawaiian and Pacific Islanders comprised 0.2% of the population, they accounted only for 0.1% of producers.

- Non-minorities (white non-Hispanics) made up 63.7% of the population but accounted for 90.1% of producers.

| Table 15. Number of U.S. Producers by Race/Ethnicity, 2017 versus 2010 Population | | | |
|---|---|---|---|
| | Number | Share of Producers | Share of Population |
| American Indian/Alaska Native | 58,199 | 1.7% | 0.7% |
| Black or African American | 45,508 | 1.3% | 12.2% |
| Asian | 22,016 | 0.6% | 4.7% |
| Pacific Islander/Native Hawaiian | 3,018 | 0.1% | 0.2% |
| Hispanic | 112,451 | 3.3% | 16.3% |
| White | 3,244,344 | 95.4% | 72.4% |
| Non-minority (White Non-Hispanic) ** | 3,063,170 | 90.1% | 63.7% |
| Some other race (alone) | | | 0.2% |
| Two or More Races | 26,749 | 0.8% | 1.9% |
| Total | 3,399,834 | | 100% |
| Note: Hispanic producers may be of any race, but most Hispanics identify as white. The population estimates represent shares of non-hispanics in the race categories. | | | |
| ** Note: Provided by a special tabulation from USDA. | | | |
| Source: 2017 U.S. Census of Agriculture. Uses data for any producer. | | | |

These disparities are especially telling when considering that the proportion of minority farms in all but one group (American Indian/Alaskan Natives) has been decreasing while the proportion of

---

Research Board, *Guidelines for Conducting a Disparity & Availability Study for the Federal DBE Program*, Rep. 644 (2010), https://perma.cc/CFY4-AWA9.

minorities in the general population have been increasing (and, as discussed above, the increase in AI/AN farms is likely due, in part, to better census coverage). And, as shown above in Figure 6, American Indians/Alaskan Natives made up 2% of the rural population overall, so even this group was underrepresented in terms of their share of farms when compared to their share of the population in rural areas. Moreover, as discussed above, minority farms are generally smaller by acreage, by shares of the market value of products sold, and by net income, compared with non-minority farms.

In terms of the **market value of agricultural products sold**, most minority groups had an even smaller share of market value than they had of farms in 2017. (*See* Table 4.) For instance,

- Blacks had 1.6% of the farms but only 0.2% of the market value of agricultural products sold; and
- American Indians and Alaskan Natives had 1.9% of farms and only 0.5% of the market value of products sold.

In contrast, whites had 95.8% of farms and 97.7% of the market value of agricultural products sold. This was consistent across the different types of crops and animal products. As shown in the table below,[183] farms with white producers produced more than 96% of the market value of agriculture products sold except for two cases (fruits, tree nuts and berries (94.9%) and poultry and eggs (93.8%)) and had more than 95% of the farms except for three cases (vegetables, melons, potatoes, and sweet potatoes (92.2%); fruits, tree nuts, and berries (94.9%); and sheep, goats, wool, mohair, and milk (94.2%)). Farms with white producers also had the vast majority of livestock

---

[183] Some of the totals listed in Table 16 may be greater than 100% because each farm has up to four producers. If a farm has multiple producers who do not all belong to the same racial group, that farm is counted once in each column corresponding to the racial groups to which the producers belong. For example, if a farm has two producers, one white and one Black, the farm is counted twice—once in the column for "white only" and once in the column for "Black or African American only"; but if a farm has two or more white producers, the farm is counted only once in the "white only" column.

inventory. As of December 31, 2017, inventory on white farms constituted more than 95% of almost every type of livestock, with goats (94.5%) being the sole exception.

| Table 16. Shares of Market Value and Farms by Type of Agriculture Products Sold and Shares of Livestock, 2017 | Farms with Hispanic Producers | Farms with American Indian/Alaska Native Producers | Farms with Asian Producers | Farms with Black Producers | Farms with Native Hawaiian/ Pacific Islander Producers | Farms with White Producers | Total |
|---|---|---|---|---|---|---|---|
| **Share of Market Value of Agriculture Products Sold** | | | | | | | |
| **Crops** | **6.6%** | **0.7%** | **2.2%** | **0.4%** | **0.2%** | **98.2%** | **102%** |
| Grains, oilseeds, dry beans, dry peas | 1.2% | 0.5% | 0.2% | 0.3% | 0.0% | 99.6% | 101% |
| Tobacco | 0.7% | 0.3% | 0.1% | 1.1% | 0.0% | 98.9% | 100% |
| Cotton and cottonseed | 3.6% | 1.2% | 0.2% | 0.8% | 0.1% | 98.9% | 101% |
| Vegetables, melons, potatoes, sweet potatoes | 15.5% | 0.7% | 4.4% | 0.6% | 0.4% | 96.3% | 102% |
| Fruits, tree nuts, berries | 17.6% | 1.3% | 7.7% | 0.5% | 0.6% | 94.9% | 105% |
| Nursery, greenhouse, floriculture, sod | 14.5% | 0.7% | 6.0% | 0.7% | 0.6% | 96.6% | 104% |
| Cultivated Christmas trees, short rotation woody crops | 4.0% | 1.9% | 0.8% | 0.1% | 0.3% | 99.9% | 103% |
| Other crops and hay | 5.9% | 1.7% | 0.5% | 0.7% | 0.4% | 98.8% | 102% |
| **Livestock, poultry, and products** | **4.6%** | **1.1%** | **1.6%** | **0.3%** | **0.1%** | **97.9%** | **101%** |
| Poultry and eggs | 3.7% | 1.3% | 5.8% | 0.5% | 0.2% | 93.8% | 102% |
| Cattle and calves | 4.4% | 1.4% | 0.1% | 0.3% | 0.1% | 99.0% | 101% |
| Milk from cows | 8.0% | 0.5% | 0.2% | 0.1% | 0.2% | 99.7% | 101% |
| Hogs and pigs | 2.1% | 0.2% | 0.1% | 0.3% | 0.0% | 99.8% | 100% |
| Sheep, goats, wool, mohair, milk | 10.3% | 4.9% | 0.5% | 0.4% | 0.1% | 98.9% | 105% |
| Horses, ponies, mules, burros, donkeys | 5.0% | 2.1% | 0.6% | 0.5% | 0.2% | 99.0% | 102% |
| Aquaculture | 4.1% | 1.2% | 2.4% | 0.4% | 2.7% | 97.4% | 104% |
| Other animals and animal products | 3.8% | 1.3% | 3.0% | 0.5% | 0.6% | 99.1% | 105% |
| **All Market Value of Agriculture Products Sold** | **5.6%** | **0.9%** | **1.9%** | **0.4%** | **0.2%** | **98.1%** | **101%** |
| **Share of Farms by Type of Agriculture Products Sold** | | | | | | | |
| **Crops** | **3.4%** | **1.8%** | **1.2%** | **1.3%** | **0.2%** | **97.6%** | **102%** |
| Grains, oilseeds, dry beans, dry peas | 1.3% | 1.1% | 0.2% | 0.7% | 0.1% | 98.7% | 101% |
| Tobacco | 0.9% | 0.2% | 0.1% | 1.6% | 0.0% | 98.5% | 100% |
| Cotton and cottonseed | 3.4% | 0.9% | 0.2% | 1.7% | 0.1% | 98.2% | 101% |
| Vegetables, melons, potatoes, sweet potatoes | 5.6% | 3.5% | 3.8% | 3.9% | 0.5% | 92.2% | 104% |
| Fruits, tree nuts, berries | 11.1% | 2.5% | 5.4% | 1.4% | 0.9% | 94.9% | 105% |
| Nursery, greenhouse, floriculture, sod | 7.3% | 1.9% | 4.4% | 1.5% | 0.8% | 96.1% | 105% |
| Cultivated Christmas trees, short rotation woody crops | 2.9% | 1.2% | 1.0% | 0.6% | 0.2% | 99.4% | 102% |
| Other crops and hay | 2.8% | 2.0% | 0.4% | 1.2% | 0.1% | 98.3% | 102% |
| **Livestock, poultry, and products** | **4.1%** | **3.4%** | **0.6%** | **1.8%** | **0.2%** | **96.7%** | **103%** |
| Poultry and eggs | 5.3% | 3.2% | 1.6% | 1.3% | 0.3% | 97.7% | 104% |
| Cattle and calves | 3.5% | 2.9% | 0.3% | 2.0% | 0.1% | 97.0% | 102% |
| Milk from cows | 1.7% | 0.6% | 0.2% | 0.2% | 0.1% | 99.8% | 101% |
| Hogs and pigs | 3.8% | 2.8% | 0.7% | 1.9% | 0.3% | 97.6% | 103% |
| Sheep, goats, wool, mohair, milk | 6.7% | 6.8% | 0.8% | 1.4% | 0.4% | 94.2% | 103% |
| Horses, ponies, mules, burros, donkeys | 4.5% | 4.4% | 0.5% | 1.5% | 0.2% | 97.2% | 104% |
| Aquaculture | 4.5% | 2.2% | 2.2% | 1.4% | 0.5% | 97.4% | 104% |
| Other animals and animal products | 4.5% | 3.1% | 1.1% | 1.1% | 0.4% | 98.1% | 104% |
| **Total Number of Farms** | **4.2%** | **2.9%** | **0.9%** | **1.7%** | **0.2%** | **96.6%** | **102%** |
| | | | | | | | |
| **Livestock Inventory (Dec 31, 2017)** | | | | | | | |
| Broilers and other meat-type chickens | 3.8% | 2.0% | 9.2% | 0.7% | 0.1% | 97.6% | 110% |
| Cattle and calves | 4.0% | 2.0% | 0.2% | 0.7% | 0.1% | 98.5% | 102% |
| Goats | 8.8% | 5.4% | 1.1% | 1.7% | 0.4% | 94.8% | 103% |
| Hogs and pigs | 1.8% | 0.2% | 0.1% | 0.3% | 0.0% | 99.8% | 100% |
| Horses and ponies | 4.2% | 5.3% | 0.4% | 1.3% | 0.2% | 95.9% | 103% |
| Layers | 3.5% | 0.3% | 1.4% | 0.1% | 0.1% | 98.7% | 101% |
| Pullets | 2.7% | 0.5% | 0.8% | (D) | (D) | 99.3% | 101% |
| Sheep and lambs | 8.1% | 6.8% | 0.9% | 0.4% | 0.2% | 95.7% | 104% |
| Turkeys | 3.2% | 0.4% | 1.5% | (D) | (D) | 98.7% | 101% |
| | | | | | | | |
| Number of farms | 86,278 | 60,083 | 18,338 | 35,740 | 4,341 | 1,973,006 | 2,042,220 |

Source: 2017 Census of Agriculture. Uses data for any producer.
The totals column may not sum to 100% because producers can be of more than one race. The Hispanic column is not included in the total column because Hispanics can be of any race and are thus already counted in the race columns.

In terms of **Net Cash Farm** Income (*see* Table 8), whites received 97.97% of the Net Cash Farm Income even though they had just 95.8% of the farms. By contrast, Blacks had 1.6% of the farms but only 0.1% of the Net Cash Farm Income, and American Indians and Alaskan Natives had 1.9% of farms but only 0.6% of the Net Cash Farm Income.

In terms of the **per-acre market value of agricultural products sold**, white farmers averaged $450 per acre. (*See* Table 4.) AI/AN farmers averaged the lowest by far at $41/acre. And Black farmers averaged the second lowest at $243/acre. These metrics are especially notable because the 1974 Report on the Status of Minority Farms in the United States reported similar numbers for AI/AN farmers but found that Black farms actually had higher income from farm and farm-related sources per acre than white farmers at that time.

> The value of land and buildings per acre and the value of total assets per acre are both typically greater for black farms. By two measures of efficiency — net farm and farm-related income per acre and per dollar of asset — black farms are of equal or greater efficiency. However, overall, as well as in each tenure class, the average size of black farms in acres is considerably smaller than for all farms. While black operators appear to do well with the resources they control, the small quantity of resources controlled places a serious upper limit on farm income.[184]

Less than 10 years later, the 1982 Civil Rights Report about the decline in the number of Black farmers noted:

> The adverse conditions which historically affected black farmers still exist to some extent today. Most significant is the competitive disadvantage faced by black farmers due to the relatively small size of their landholdings. While the average commercial black-operated farm in the south is 128 acres, the average white-operated farm is more than three times that size—428 acres...Economies of scale, research and technology, tax benefits, government price and income supports, and commercial lending all militate against the survival of black-operated small farms.

---

[184] Allen R. Thompson & Michael Green, USDA, ESS Staff Report, NRED 80-4, The Status of Minority Farms in the United States, ("1974 Rep.") at 49.

> Disadvantageous economies of scale prevent black farmers from reaping the benefits of many technological advancements. The cost of basic equipment minimally necessary to run a commercial farm is much greater in proportion to the number of acres of land help by the average black farmer than it is for white farmers. Because of their small landholdings, black commercial farmers invest in less machinery and earn smaller profits per farm than do white farm operators.[185]

Thus, after less than a decade, the profitability of Black farms had diminished substantially. And this disparity persists into the present day.

Another example is comparing income across sector. Cattle farming and ranching was the predominant industry sector for all farmers in the U.S. for all groups except Asians, where it was the third most predominant industry. Although half of Black farms were in cattle ranching, their earnings ($14,213) were just a small fraction of the sales by white cattle ranches ($110,740). (*See* Table 17.) Similarly, American Indian/Alaskan Natives, Asians, and Native Hawaiian/Pacific Islander farms all had revenues that were less than half of the revenues of white farms.

| Table 17. Cattle Farming and Ranching, 2017 | | | | | | |
|---|---|---|---|---|---|---|
| | Farms with Hispanic Producers | Farms with American Indian/ Alaskan Native Producers | Farms with Asian Producers | Farms with Black Producers | Farms with Native Hawaiian/ Pacific Islander Producers | Farms with White Producers |
| Share of Farms | 36.6% | 41.9% | 11.8% | 49.9% | 25.2% | 31.1% |
| Ave Sales ($) | $ 135,675 | $ 53,017 | $ 46,068 | $ 14,213 | $ 47,196 | $ 110,740 |
| Source: Census of Agriculture, 2017. Uses data for any producer. | | | | | | |

The disparities between the size of the minority population and their relative shares of the farming market across a number of metrics are large. These outcomes can be influenced by multiple factors, but one way the linkage between statistical disparities and discrimination is

---

[185] 1982 Rep. at. 50-51. The 1982 report also noted that federally funded research resulted in technology that has been geared towards large scale farming and the economies of scale were not inherent in nature but a result of a bias towards large scale farming in federally funded research and development of technology. *Id.* at 51-52.

shown is through the introduction of anecdotal or qualitative evidence. If the thrust of the qualitative evidence is consistent with the statistical disparities observed, the case for the linkage is strengthened accordingly.

As set forth above, there are vast numbers of anecdotal accounts of discrimination against minority farmers in USDA loan programs, including thousands of civil rights complaints filed as part of lawsuits by Black, Native American, and Hispanic farmers, as well as administrative complaints at USDA. The disparities set forth above are consistent with the types of complaints that have been made, and they are consistent with some of the results that we see. For instance, at the same time minority farms were diminishing, leading to the underrepresentation of minority farmers in the United States today, hundreds, if not thousands, of complaints were made, including allegations that:

- USDA did not provide the same levels of outreach to minority farmers, such that minority farmers were not aware of existing loan programs and eligibility;
- When minority farmers did apply for USDA loans, USDA officials did not provide the same levels of assistance to minority farmers in completing their loan applications, at times withholding or providing false or misleading information to them;
- USDA denied minority farmers' loan applications at higher rates, arbitrarily, and sometimes without explanation;
- When minority farmers did obtain USDA loans, they were often in lower amounts, on less favorable terms, with additional requirements not imposed on white farmers, arbitrarily reduced, and so untimely as to be useless;
- USDA did not provide the same levels of education and technical assistance to minority farmers,[186] such that minority farmers did not diversify their crops, invest in technologies that could increase productivity, or adopt mechanization at the same rates as non-minority farmers;
- USDA did not inform minority farmers of loan servicing options or provide the same levels of loan servicing to minority farmers, at times even accelerating minority

---

[186] For instance, reporting indicates that there was a lack of assistance for farm business planning; a lack of targeted training on farm business management and credit acquisition issues; and that the Agricultural Extension Service was funded through land-grant universities and not Historically Black Colleges and Universities or Tribal Colleges.

84

farmers' loan repayment schedules, with the result that minority farms were more often subject to foreclosure.

Discriminatory actions like these deprived generations of minority farmers of needed credit, payments, and technical assistance and are entirely consistent with the results we see today, namely that minority farmers are disadvantaged in terms of acreage, revenue, net income, and other metrics vis-à-vis non-minority farmers and are a smaller (and in the case of Black farmers, dramatically smaller) proportion of the U.S. farming population today.

Numerous reports over the years provide supportive evidence. As discussed above, the evidence compiled and reviewed by Jackson Lewis in 2011 "substantiated claims [by focus group participants and community based organizations] of denial of equal program access and continuing institutional discrimination,"[187] which it said had "a broad and longstanding negative impact on … SDGs—including the loss of scarce or irreplaceable farm lands."[188] As just one example, the report explained that because of delays in the distribution of USDA funds, farmers often did not receive approved funds until after the planting season was half-finished, thus contributing to their losses.[189] Given their historic lack of access to USDA funds and services, minority farmers' corresponding lower farm incomes and wealth levels understandably hampered their ability to weather financial hardships, leading to the diminution of minority farms. And discriminatory actions, such as accelerating the payment schedules of minority farmers and failing to provide them with information and services about loan servicing options led to disproportionate numbers of minorities losing their farms to foreclosure.

---

[187] JL Rep. at viii.

[188] *Id.* at 64.

[189] *Id.* at 81-82.

Another way that the linkage between statistical disparities and discrimination can be shown is to consider the size of the observed disparities.[190] The larger the disparity, the less likely it is that non-discriminatory factors account for the entire difference. As discussed above, there are significant disparities between the acreage of minority farms and non-minority farms; between the market value of products sold by minority farmers and non-minority farmers; and between the net income of minority farmers and non-minority farmers. These large disparities, across several relevant metrics, strongly suggest that discrimination in agricultural lending markets, including by USDA, is a primary explanation.

A further reason to attribute the disadvantaged position of minority farmers today to prior discrimination in USDA's loan programs is to consider the longevity and timing of the discriminatory conduct. As discussed, there have been complaints of discrimination against minorities in USDA lending programs since the inception of those programs. As early as 1965, the USCCR reported wide-ranging complaints of discrimination, and in 2011, Jackson Lewis reported many of the same issues, concluding that discrimination in FSA lending was systematic and ingrained. In light of the longstanding discrimination against minority farmers in USDA loan programs, over at least a fifty-year period and documented as late as 2011, it is reasonable to expect that minority farmers would continue to suffer the lingering effects of that discrimination only

---

[190] *See, e.g.*, Justus Veenman, "Measuring labor market discrimination: An overview of methods and their characteristics," *American Behavioral Scientist* 53.12: 1806-1823 (2010), https://perma.cc/36X8-E24N; George R. La Noue, "Standards for the second generation of Croson-inspired disparity studies." *The Urban Lawyer*: 485-540 (1994), https://perma.cc/JB83-44VF; The Equal Opportunity Commission Uniform Guidelines (29 C.F.R. § 1607(D)) provide a threshold of 80% (or the four-fifths rule), which that guides Federal enforcement agencies in carrying out their obligations in promoting equal employment opportunity.

about a decade later.[191] This is especially true in light of the capital-intensive nature of agriculture, which requires significant up-front investment in land, equipment, and supplies, with returns measured in decades.

Once a disparity has been shown, one common way to rebut the implication that the disparity is a result of discrimination would be to show that any disparities substantially shrink in size, statistical significance, or both once other factors that are unlikely to be correlated with discrimination have been accounted for. But other factors that one might expect to negate the disparities above do not do so. For instance, the diminution of minority farms is not due to a shrinking minority population. Instead, minority farms have mostly been vanishing, not increasing, with consistent *increases* in minority populations. At the same time, the share of acreage attributed to minority farms has been stagnant: About 94% of farm acreage has been farmed by white farmers consistently over the 1978-2017 period even though the white population share has been decreasing over the same period. (*See* Table 3 in Appendix C.) Even compared to their proportion of the rural population or to the population of the states in which they are most heavily concentrated, minority producers are underrepresented (in some areas, significantly underrepresented). Moreover, a relative lack of experience among minority farmers cannot account for their diminished revenue or smaller size farms, as the proportion of new farmers in several

---

[191] *See, e.g.*, Peter A. Morrison, "'Lingering effects' of discrimination: tracing persistence over time in local populations", *Population Research and Policy Review,* 25.2 (2006): 127-139, https://perma.cc/5KD6-KG27; Jeremy R. Porter, "Plantation economics, violence, and social well-being: The lingering effects of racialized group oppression on contemporary human development in the American South," *Journal of Human Development and Capabilities* 12.3 (2011): 339-366, https://perma.cc/EZ5M-HDYV; Lindsey M. Burke & Jude Schwalbach, "Housing Redlining and Its Lingering Effects on Education Opportunity, Backgrounder. No. 3594," *Heritage Foundation* (2021), https://perma.cc/8FXN-XL49.

minority groups is roughly equivalent to the proportion of new white farmers and, in any event, a comparative lack of experience is not an independent factor but instead one expected effect of a lengthy period of exclusion from farming. And time spent working off the farm does not explain those same disparities, as minority farmers, in many instances, spend less time off the farm than non-minority producers—and, as compared to whites, most minority groups have a higher percentage of producers engaged in farming as their primary occupation.[192]

Nor is it likely that minority underrepresentation is simply the result of minorities choosing not to enter or stay in the business of farming, or not to expand farming operations, for reasons unrelated to discrimination. Rather, there is substantial evidence that historical discrimination in USDA loan programs has caused minority farmers to become "discouraged borrowers" who may be less likely to seek future USDA assistance precisely because of past USDA discrimination and a resultant lack of trust. Data provided by USDA on loan applications and application withdrawal rates, which are discussed in greater detail below, show that minority groups had much lower than expected loan application rates and higher loan application withdrawal rates than did white farmers—in other words, minority farmers were less likely to apply for USDA loans in the first place and their loan applications were more likely to be withdrawn if they did apply. This provides evidence that minority farmers expect unfair treatment by USDA and are more likely to be discouraged borrowers.

Furthermore, other factors are themselves strongly correlated with other effects of discrimination. For instance, many government programs tend to favor large farms, such as

---

[192] *See* Table 13 and accompanying text above (discussing various farmer characteristics by race/ethnicity).

programs for certain crops that are economically feasible only at large scale.[193] Large farms are disproportionately farmed by whites, who therefore receive a disproportionate share of the benefits of those programs. As discussed above, however, the smaller size of minority farms in terms of acreage and revenue is likely due in no small part to historical discrimination in USDA loan programs that have deprived minority farmers of necessary credit and services.[194] That, in turn, has impeded minority farmers' ability to access the credit and collateral necessary to expand their farms, leaving them smaller and less profitable.

Another point to consider is the effect of various countermeasures taken over the years that would be expected to offset the discriminatory conduct and its effects and improve the relative position of minority farmers. But as discussed, although Congress and USDA have made various efforts over the years to remedy the problem of USDA discrimination, and the situation of some minority farmers may have improved, the data show disparities—some of them quite significant— that persist today. These ongoing disparities confirm that past efforts to remedy discriminatory effects and improve minority farmers' position have been inadequate. Many such efforts have aimed at increasing minority participation in USDA loan programs while failing to address borrower discouragement and lack of trust among minority farmers due to historic discrimination in USDA loan programs.

Perhaps the most well-known remedial effort relates to payments to minority farmers made as a result of litigation based on race discrimination. As explained elsewhere, though, those

---

[193] *See* USDA, National Commission on Small Farms, A Time to Act, at 10-11 (Jan. 1998) https://perma.cc/NZY6-PPFW.

[194] It also caused farmers to lose their land (and stop farming) and prohibit potential farmers from buying or starting a farm in the first place.

payments were inadequate for numerous reasons; and they provide no remedy to minority farmers who have encountered discrimination after the late 1990s, and who necessarily were not beneficiaries of those payment,[195] or to minority farmers not directly discriminated against but nonetheless experiencing the lingering effects of longstanding discrimination in USDA loan programs. In addition, one factor correlating the current adversities faced by minority farmers and discrimination in USDA lending is the historical lack of an effective and timely process for resolving the various complaints of discrimination in USDA's loan programs; resolution often came too late to fully redress compound effects of earlier discrimination. In a similar manner, remedial efforts taken to-date have failed to address the cyclical effects of discrimination that have largely hampered minority farmers' ability to accrue the capital necessary to maintain or expand their farming operations at the same rate as non-minority farmers.

### D.   Cyclical Effects of Past Discrimination in USDA Loan Programs

The negative effects of past discrimination in USDA's loan programs themselves have follow-on effects that make it more difficult for minority farmers to flourish today. In part because of USDA's discrimination, minority farmers have lower farm incomes and wealth levels, which in turn leads to higher rates of default and foreclosure and less access to other government funds, as well as private lending. In these areas, even where there is not ongoing intentional discrimination against minority farmers, the negative effects of prior discrimination in USDA loan programs continue to inhibit them. Minority farmers, given their experiences of prior discrimination in USDA loan programs, may have developed distrust of USDA and continue to expect unfair treatment, which makes them more likely to be discouraged borrowers. Thus, in addition to the

---

[195] The *Pigford* litigation covered Black farmers who encountered discrimination in USDA loan or other credit programs between 1981 and 1996; the *Keepseagle* litigation covered the years between 1981 and 1999; and the *Garcia* litigation covered the years between 1981 and 2000.

more direct long-term consequences inherent to the denial of needed credit—such as the inability to make timely investments to grow one's business—there are indirect effects that reverberate across decades. The existence of these causal mechanisms, and their documented effects, provide a sound basis to conclude that existing disparities are the result of historic discrimination.

1.   *Higher rates of delinquency, default, and foreclosure among minority farmers*

Because minority farms are smaller and less profitable, and minority farmers have corresponding less wealth and income to draw from, they are more vulnerable to adverse conditions, such as natural disasters, poor weather conditions, and economic downturns. They are less able to weather these negative shocks, which results in their having higher rates of delinquency on their loans and foreclosure on their farms. And due to the lack of trust and relationships with USDA officials as a result of longstanding USDA discrimination, they are less likely to seek and obtain access to loan servicing options to avoid default and foreclosure even when they are aware of servicing options.[196]

The USDA data shows that the minority farmers who would be eligible for debt relief under Section 1005 have much higher levels of loan delinquency, bankruptcy, and foreclosure than non-minority farmers. Table 12 below is based on USDA data and shows the minority borrowers and direct and guaranteed loans eligible for debt relief under Section 1005, as well as the corresponding

---

[196] *See, e.g.*, GAO-19-539 at 29. As will be discussed below, the small business financing literature has consistently shown that minority business owners are more likely to be discouraged borrowers than white business owners. Research using a number of different data sources on small business financing all show a greater proportion of minority business owners being discouraged borrowers than white business owners. That includes data from the Survey of Small Business Finances by the Federal Reserve Board of Governors, various years of the Small Business Credit Survey by various banks in the Federal Reserve System, and the Kauffman Firm Survey, which tracked firms over 2004-2011 period, by the Kauffman Foundation. Joseph Farhat & Alicia Robb, *Applied Survey Data Analysis Using Stata: The Kauffman Firm Survey Data, (2014)*, https://perma.cc/9KBU-HUG7.

breakout for non-minority borrowers in terms of the number of borrowers, loans that were current versus not current as of January 1, 2021, and the status of non-current loans (*e.g.*, foreclosure, bankruptcy, delinquent). In terms of both borrowers and loans, the data shows that minority farmers have higher rates of delinquency, bankruptcy, and foreclosure.

| Table 18. Farm Loan Programs Direct and Guaranteed Loans Unpaid Debt Balances of Minority and Non-Minority Borrowers | | | | |
|---|---|---|---|---|
| | Minority | | Non-Minority | |
| Direct Loans - Borrowers **Current** on All Debt - As of January 1, 2021 | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Nbr of Borrowers | Nbr of Loans |
| Current | 11,609 | 19,955 | 63,360 | 98,084 |
| Direct Loans - Borrowers **Not Current** on All Debt - As of January 1, 2021 | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Nbr of Borrowers | Nbr of Loans |
| Currently Not Collectible | 755 | 1,494 | 1,371 | 2,803 |
| Foreclosure | 373 | 1,073 | 181 | 654 |
| Bankruptcy | 325 | 998 | 900 | 2,257 |
| Litigation | 67 | 212 | 286 | 687 |
| Delinquent | 3,408 | 7,928 | 7,441 | 15,353 |
| Contingent Liability | 2 | 2 | 3 | 3 |
| Sub-Total | 4,930 | 11,707 | 10,182 | 21,757 |
| **Total** | **16,539** | **31,662** | **73,542** | **119,841** |
| **% Not Current** | **29.8%** | **37.0%** | **13.8%** | **18.2%** |
| Guaranteed Loans - Borrowers **Current** on All Debt - As of December 31, 2020 | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Nbr of Borrowers | Total Nbr of Loans |
| Current | 2,313 | 3,442 | 35,446 | 51,830 |
| Guaranteed Loans - Borrowers **Not Current** on All Debt - As of December 31, 2020 | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Nbr of Borrowers | Total Nbr of Loans |
| Liquidation/Foreclosure | 37 | 69 | 191 | 339 |
| Bankruptcy | 17 | 28 | 194 | 362 |
| Delinquent | 211 | 309 | 1534 | 2433 |
| Sub-Total | 265 | 406 | 1,919 | 3,134 |
| **Total** | **2,578** | **3,848** | **37,365** | **54,964** |
| **% Not Current** | **10.3%** | **10.6%** | **5.1%** | **5.7%** |
| Grand Total (DL+GL) | 19,117 | 35,510 | 110,907 | 174,805 |
| - Race and Ethnic designations of borrowers is as of July 14, 2021. | | | | |
| - Some borrowers have both Direct and Guaranteed Loans. | | | | |
| - Guaranteed Loan unpaid balances are estimated as of December 31, 2020, the most recent semi-annual data available from lenders. | | | | |
| - Direct Loans category Contingent Liability represents equity recapture on borrowers' future commodity sales. | | | | |
| Source: USDA | | | | |

In terms of **direct loans**, Table 18 shows that 29.8% of minority borrowers were not current on their loans as of January 1, 2021, versus 13.8% of non-minority borrowers. This means that 37% of all direct loans held by minority borrowers were not current, while only 18.2% of direct

loans held by non-SDA borrowers were not current. For the minorities' direct loans that were not current, more than two-thirds were classified as delinquent, 18% were in foreclosure or bankruptcy, and another 13% were classified as "Not Collectable," meaning that there were no underlying assets or collateral to collect on the loan.[197]

In terms of **guaranteed loans**, 10.3% of minority borrowers were not current on their loans as of December 31, 2020, versus 5.1% of non-minority borrowers. In terms of loans (as opposed to borrowers), 10.6% of all guaranteed loans held by minority borrowers were not current, while only 5.7% of guaranteed loans held by white borrowers were not current. Thus, minority borrowers and minorities' loans were much more often not current on their direct and guaranteed loans covered by Section 1005 than their white counterparts.

In fact, while minority farmers made up 18.4% of all direct loan borrowers, they made up nearly one-third of the borrowers who were not current on their direct loans and 35% of the direct loans that were not current. (*See* Table 13.) They also made up two-thirds of the direct loan borrowers who were in foreclosure. Minority farmers made up just 6.5% of the guaranteed borrowers, but more than 12% of the guaranteed borrowers that were delinquent on their loans and more than 16% of the guaranteed borrowers in liquidation or foreclosure.

---

[197] For loan servicing purposes, a "delinquent borrower" is "a borrower who has failed to make all scheduled payments by the due date." *See* 7 C.F.R. § 761.2(b) (definition of "delinquent borrower"). If a delinquent borrower is unable to restructure or buyout the debt under Farm Loan Programs' primary loan servicing options, or fails to request loan serving, FSA is required to proceed with foreclosure.

| Table 19. Farm Loan Programs Direct and Guaranteed Loans Unpaid Debt Balances of Minority Borrowers | | | | | | |
|---|---|---|---|---|---|---|
| Direct Loans - Borrowers **Current** on All Debt - As of January 1, 2021 | | | | Minority Share | | |
| Category | Nbr of Borrowers | Nbr of Loans | Total P&I | of Borrowers | of Loans | Total P&I |
| Current | 11,609 | 19,955 | $1,738,425,084 | 15.5% | 16.9% | 15.1% |
| Direct Loans - Borrowers **Not Current** on All Debt - As of January 1, 2021 | | | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Total P&I | | | |
| Currently Not Collectible | 755 | 1,494 | $54,614,022 | 35.5% | 34.8% | 32.5% |
| Foreclosure | 373 | 1,073 | $105,624,587 | 67.3% | 62.1% | 72.4% |
| Bankruptcy | 325 | 998 | $63,116,829 | 26.5% | 30.7% | 27.3% |
| Litigation | 67 | 212 | $11,007,720 | 19.0% | 23.6% | 21.7% |
| Delinquent | 3,408 | 7,928 | $571,384,683 | 31.4% | 34.1% | 34.7% |
| Contingent Liability | 2 | 2 | $22,250 | 40.0% | 40.0% | 19.6% |
| **Sub-Total Not Current** | **4,930** | **11,707** | **$805,770,091** | **32.6%** | **35.0%** | **35.9%** |
| Total | 16,539 | 31,662 | $2,544,195,175 | 18.4% | 20.9% | 18.5% |
| **% Not Current** | **29.8%** | **37.0%** | **31.7%** | | | |
| Guaranteed Loans - Borrowers **Current** on All Debt - As of December 31, 2020 | | | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Total P&I | | | |
| Current | 2,313 | 3,442 | $1,345,773,614 | 6.1% | 6.2% | 7.2% |
| Guaranteed Loans - Borrowers **Not Current** on All Debt - As of December 31, 2020 | | | | | | |
| Category | Nbr of Borrowers | Nbr of Loans | Total P&I | | | |
| Liquidation/Foreclosure | 37 | 69 | $22,027,000 | **16.2%** | **16.9%** | **15.9%** |
| Bankruptcy | 17 | 28 | $11,060,405 | **8.1%** | **7.2%** | **7.2%** |
| Delinquent | 211 | 309 | $72,725,968 | **12.1%** | **11.3%** | **11.9%** |
| **Sub-Total Not Current** | **265** | **406** | **$105,813,373** | **12.1%** | **11.5%** | **11.7%** |
| Total | 2,578 | 3,848 | $1,451,586,987 | 6.5% | 6.5% | 7.4% |
| **% Not Current** | **10.3%** | **10.6%** | **7.3%** | | | |
| Grand Total (DL+GL) | 19,117 | 35,510 | $ 3,995,782,162 | 14.7% | 16.9% | 12.0% |
| - Race and Ethnic designations of borrowers is as of July 14, 2021. | | | | | | |
| - Some borrowers have both Direct and Guaranteed Loans. | | | | | | |
| - Guaranteed Loan unpaid balances are estimated as of December 31, 2020, the most recent semi-annual data available from lenders. | | | | | | |
| - Direct Loans category Contingent Liability represents equity recapture on borrowers' future commodity sales. | | | | | | |
| Source: USDA | | | | | | |

In terms of **loans** (as opposed to borrowers), the data shows that minorities' loans were much more often delinquent, in foreclosure, or in bankruptcy than non-minorities' loans as of January 1, 2021. (*See* Table 19.) While minority farmers held 20.9% of direct loans, they held only 16.9% of direct loans that were current, and 35% of direct loans that were not current. Minorities' loans made up 62.1% of the direct loans in foreclosure, more than 30% of the direct loans in bankruptcy, and nearly 35% of the direct loans designated as not collectible. The pattern was similar for guaranteed loans. Minority farmers held 6.5% of guaranteed loans, but only 6.2% of guaranteed loans that were current, 11.5% of guaranteed loans that were not, and 16.9% of guaranteed loans in liquidation or foreclosure.

Direct loan data from a July 23, 2021, USDA Internal Report on Farm Loan Programs on delinquency rates also shows that minority farmers in each racial or ethnic category have higher delinquency rates for direct loans than white farmers.[198] Hispanic borrowers had the highest delinquency rate of direct loans (22%),[199] followed by Blacks (20%), American Indians and Alaskan Natives (10%), and then Asians (9%). White borrowers had the lowest delinquency rate.

Figure 8: Delinquency Rates for Direct Loans by Race/Ethnicity



Source: USDA Internal Report on Farm Loan Programs (2021)

2.      *Less access to government payments by minority farmers*

Given that minority farmers are in an economically disadvantaged position vis-à-vis white farmers, one would expect to see government payments going disproportionately to minority farmers. Instead, we see the opposite. As was shown in Table 4, in 2017, white farmers received nearly all (98.6%) of **government payments**, while farmers in each of the minority groups received less in government payments than their corresponding share of farms.

---

[198] This report used direct closed data from 2020 and 2021 and loan application data from 2016-2021.

[199] Without Puerto Rico ("PR") included in the average, the Hispanic delinquency rate went down to 16% (PR is 99% Hispanic, and the delinquency rate is 70%).

- Hispanic farmers received 1.4% of government payments, even though they made up 3.8% of farms;

- American Indian and Alaskan Native farmers received 0.6% of government payments, even though they made up 1.9% of farms;

- Asian farmers received 0.2% of government payments, even though they made up 0.7% of farms;

- Black farmers received 0.6% of government payments, even though they made up 1.6% of farms; and

- Native Hawaiian and other Pacific Islander farmers received less than 0.1% of government payments, even though they made up 0.1% of farms.

The disproportionate allocation of government payments to white farmers was repeated recently through the Market Facilitation Program ("MFP")[200] and the Coronavirus Food Assistance Program ("CFAP").[201] A 2021 report to Congress, comparing transfers and subsidies to minority and non-minority producers, indicated that minority status was unknown for more than 5% of payees[202] and 7% of payments.[203]

---

[200] In 2018 and 2019, the FSA was authorized to distribute up to $25.1 billion through the MFP to assist producers directly affected by retaliatory tariffs by China. *See* USDA, Market Facilitation Program, https://perma.cc/947S-7JCX.

[201] CFAP was created in 2020 in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to assist producers who faced market disruptions due to COVID-19. It consisted of $16 billion in direct support to producers and $3 billion to buy agricultural products and redistribute them to Americans in need. *See USDA Announces [CFAP]*, USDA (Apr. 17, 2021), https://perma.cc/B7N9-PTRE.

[202] Many producers received separate payments under both phases of MFP and CFAP, so the total number of payees in Tables 20 and 21 below include those who received multiple payments over each year of the programs.

[203] *See* Report to Congress: A Comparison of Transfers and Subsidies to Minority and Non-Minority Producers Associated with Key Farm and Conservation Programs (Aug. 5, 2021). The report was produced in response to a request from Congress that USDA provide to the House Committee on Appropriations "a report on the distribution of farm subsidies, low-interest loans, and cost-share conservation programs and its impact on minority-owned farms." *See id.* at 2; *id.* at 2; Agriculture, Rural Development, Food & Drug Administration, & Related Agencies Appropriations Bill, 2020, H. Rep. 116-107 (2019).

However, two rough estimates indicate that the majority of payments went to white farmers even accounting for the unknowns. For the first estimate, I considered only those payment recipients whose minority and non-minority status was known.[204] For the second estimate, I allocated the unknown shares of payees and payments in the same proportions as the original shares.[205] Both estimates indicate that more than 95% of CFAP payees and more than 98% of MFP payees were white farmers and that a similar proportion of payments went to white farmers.[206]

Reporting indicates that these disparities are attributable to the fact that agricultural funding tends to favor large farms.[207] Thus, although likely not intentional, the disproportionate allocation of these funds from recent programs to non-minority farmers exacerbates the disparities discussed above. And given the magnitude of these programs—more than $23 billion over two years under the MFP, and nearly $24 billion under the CFAP—compared to the total amount of minority

---

[204] In other words, I determined the total number of known minority and non-minority payees by subtracting the unknown payees from the total number of payees. I then divided the total number of known non-minority payees by the total number of known minority and non-minority payees (*e.g.*, for MFP non-minority payees: 1,165,038 / (1,248,692 − 66,189); and for CFAP non-minority payees: 1,413,221 / (1,545,390 − 71,347)).

[205] To the known minority and non-minority payee totals, I added the unknown payees in the same proportion as the known payee percentages calculated above. I then divided each of the estimated totals of non-minority and minority payees by the total number of payees (*e.g.*, for MFP non-minority payees: 1,165,038 + (.933 x 66,189) / 1,248,692; and for CFAP non-minority payees: 1,413,221 + (.914 x 71,347) / 1,545,390).

[206] A third estimate, assigning the unknown shares a somewhat implausible 50/50 minority/non-minority status, shows similarly disproportionate payments—94% of CFAP payments and 96% of MFP payments—went to white farmers.

[207] *See* USDA, National Commission on Small Farms, A Time to Act, at 10-11 (Jan. 1998).

farmers' direct and guaranteed loan balances—only about $4 billion (*see* Table 18)—one can expect the impact of these disparate payments to be significant.[208]

| Table 20. Market Facilitation Program (MFP) Data, Program Years 2018-2019 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Non-Minorities | | Minorities | | Minority Status Unknown | | Total | |
| 2018 | Payees | Payments | Payees | Payments | Payees | Payments | Payees | Payments |
| Number | 552,828 | 7,941,683,376 | 7,191 | 64,897,740 | 30,651 | 619,175,657 | 590,670 | 8,625,756,773 |
| Percentage | 93.6% | 92.1% | 1.2% | 0.8% | 5.2% | 7.2% | 100% | 100% |
| 2019 | | | | | | | | |
| Number | 612,210 | 13,153,507,091 | 10,274 | 168,101,106 | 35,538 | 1,176,855,183 | 658,022 | 14,498,463,380 |
| Percentage | 93.0% | 90.7% | 1.6% | 1.2% | 5.4% | 8.1% | 100% | 100% |
| Total | | | | | | | | |
| Number | 1,165,038 | 21,095,190,467 | 17,465 | 232,998,846 | 66,189 | 1,796,030,840 | 1,248,692 | 23,124,220,153 |
| Percentage | 93.3% | 91.2% | 1.4% | 1.0% | 5.3% | 7.8% | 100% | 100% |
| | | | | | | | | |
| Total ( % of known) | 98.52% | 98.91% | 1.48% | 1.09% | | | 100% | 100% |
| Total (allocating unknown w/same share as the original shares) | 98.25% | 98.31% | 1.47% | 1.09% | | | 99.7% | 99.4% |
| Total (allocating unknown 50/50 to minorities and non-minorities) | 95.95% | 95.11% | 4.05% | 4.89% | | | 100.0% | 100.0% |
| Source: Report to Congress: A Comparison of Transfers and Subsidies to Minority and Non-Minority Producers Associated with Key Farm and Conservation Programs, August 2021, Table 5 and author's calculations. | | | | | | | | |

[Continued on next page]

---

[208] Also, as Table 6 shows, each minority group except for Hispanics received a lower average amount of general government payments according to the 2017 Census of Agriculture. Indeed, despite their disproportionate need, the average amount of government payments received by Black farmers ($7,108) was only half of that received by white farmers ($14,004), while American Indian and Alaskan Native, Asian, and Native Hawaiian and other Pacific Islander farmers all had lower than average government payments than white farmers.

Table 21. Coronavirus Food Assistance Program (CFAP) Data, through January 27, 2021

|  | Non-Minorities | | Minorities | | Minority Status Unknown | | Total | |
|---|---|---|---|---|---|---|---|---|
|  | Payees | Payments | Payees | Payments | Payees | Payments | Payees | Payments |
| CFAP 1 | 595,302 | 9,047,821,024 | 28,962 | 375,755,073 | 27,609 | 1,172,717,079 | 651,873 | 10,596,293,176 |
| CFAP 2 | 817,919 | 11,442,486,251 | 31,860 | 348,928,936 | 43,738 | 1,539,200,507 | 893,517 | 13,330,615,694 |
| Total | 1,413,221 | 20,490,307,275 | 60,822 | 724,684,009 | 71,347 | 2,711,917,586 | 1,545,390 | 23,926,908,870 |
| % |  |  |  |  |  |  |  |  |
| CFAP 1 | 91.3% | 85.4% | 4.4% | 3.5% | 4.24% | 11.1% | 100% | 100% |
| CFAP 2 | 91.5% | 85.8% | 3.6% | 2.6% | 4.90% | 11.5% | 100% | 100% |
| Total | 91.4% | 85.6% | 3.9% | 3.03% | 4.62% | 11.3% | 100% | 100% |
| Total (% of known) | 95.9% | 96.6% | 4.1% | 3.42% |  |  | 100% | 100% |
| Total (allocating unknown w/same share as the original shares) | 95.7% | 95.3% | 4.1% | 3.37% |  |  | 99.79% | 98.72% |
| Total (allocating unknown 50/50 to minority/non-minority) | 93.8% | 91.3% | 6.2% | 8.7% |  |  | 100% | 100% |

Source: Report to Congress: A Comparison of Transfers and Subsidies to Minority and Non-Minority Producers Associated with Key Farm and Conservation Programs, August 2021, Table 6 and author's calculations.

*3.     Less access to private credit by minority farmers*

The historic inability of minority farmers to obtain FSA funds and services on par with white farmers also inhibits them from obtaining access to private credit today. In the Agriculture Improvement Act of 2018, Congress asked GAO to study agricultural credit services provided to SDFRs.[209] Based on numerous interviews, as well as its review of statutes, regulations, government and academic literature, and data from multiple sources, GAO reported in 2019 that SDFRs "received proportionately fewer loans and less agricultural credit overall than non-

---

[209] *See* Pub. L. No. 115-334, § 5416, 132 Stat. 4490, 4725 (2018). As used in this discussion, SDFR includes both minority and women farmers.

SDFRs."[210] And it explained how "historical discrimination in agricultural lending adversely affects SDFRs' current ability to obtain private credit in several ways."[211]

First, "SDFRs who were unfairly denied USDA loans and other program benefits in the past have not been able to develop their farms in the same ways as farmers and ranchers who did receive loans."[212] Indeed, as discussed above, discrimination in USDA's loan programs not only impeded minority farmers from "expand[ing] [their] operations and … purchas[ing] land and equipment that c[ould] later be used as collateral,"[213] it also actively contributed to the diminution of minority farm lands. Consistent with the data and conclusions above, GAO thus reported that in 2017, "[o]n average," SDFR farms continued to be "smaller and br[ing] in less revenue than non-SDFR farms."[214]

All three factors—collateral, farm size, and farm revenue—affect a farmer's ability to obtain private credit.[215] As the GAO explained, "[m]any long-term agricultural loans require the borrower to pledge land as collateral to secure the transaction."[216] It is both easier and less risky to lend to larger farms.[217] And "farm revenue is critical to demonstrating a borrower's capacity to

---

[210] GAO-19-539 at 16.

[211] *Id.* at 29.

[212] *Id.*

[213] *Id.*

[214] *Id.* at 17.

[215] *See id.* at 24-27.

[216] *Id.* at 27.

[217] *See id.* at 24. As the GAO report explained, lenders have several incentives to lend to larger farms, including that (i) operators of smaller farms typically need smaller loans, and making many small loans is more time- and resource-intensive than making fewer, larger loans, (ii) large farms often produce major commodities such as corn, soybeans, and beef cattle, while small farms often produce specialty crops, and underwriting loans to large farms that produce major commodities is

100

repay an agricultural loan."[218] Minority farmers' unequal access to USDA funds and technical assistance historically, which negatively affected them with respect to all three factors, has consequently impeded their ability "to get subsequent and larger loans"—or even private loans at all.[219]

Second, "historical exclusion from credit markets and farm programs has limited SDFRs' familiarity with lending standards and resulted in less formal recordkeeping, which impairs their ability to obtain private-sector credit."[220] And third, "historical discrimination has led generations of SDFRs to distrust institutional lenders, making them less likely to apply for credit."[221] In all of these ways, historic discrimination in USDA's loan programs is impeding SDFRs from accessing private credit today.

A 2021 GAO report likewise noted that the fact that minority farmers are more likely to operate smaller, lower-revenue farms contributes to racial disparities in access to private capital and commercial loans by minority farmers.[222]

---

easier and less risky because more data are available on the market for those products, and (iii) programs such as crop insurance, which mitigate repayment risk, are geared toward large, major-commodity farmers, such that lenders are more likely to approve a loan or provide more favorable terms, such as lower interest rates.

[218] *Id.* at 25.

[219] *Id.* at 29.

[220] *Id.*

[221] *Id.*

[222] *See* GAO-21-399T, Stmt. on the Record to the Subcomm. on Oversight & Investigations, Comm. on Fin. Servs. of the House of Representatives, *Financial Services: Fair Lending, Access, and Retirement Security*, (Feb. 2021), https://perma.cc/P6R9-6UQG.

4.    *Borrower discouragement and distrust of USDA*

Additional data provided by USDA strongly suggest that a history of discrimination in the agency's farm loan programs has fostered distrust among minority borrowers and discouraged them from seeking farm loans from USDA. In other words, another cyclical effect of historic discrimination at USDA is that minority farmers have become "discouraged borrowers."

Substantial economic literature has described the prevalence of "discouraged borrowers." Discouraged borrowers are those who need credit, and would likely obtain credit if sought, but do not pursue credit opportunities because of the expectation of being denied.[223] In small business finance literature it has also been observed that Black businesses apply for loans less often than white businesses largely because they expect to be denied credit, even when they have a good credit history and even in settings where strong local banks favor new business development.[224] There is evidence of this in other areas of the economy as well, such as a lower level of

---

[223] *See, e.g.,* Mark Freel, Sara Carter, Stephen Tagg, & Colin Mason, Small Business Economics, The Latent Demand for Bank Debt: Characterizing "Discouraged Borrowers," 38 399-412 (2012), https://link.springer.com/content/pdf/10.1007/s11187-010-9283-6.pdf; Timothy Bates & Alicia Robb, Economic Development Quarterly, Impacts of Owner Race and Geographic Context on Access to Small-Business Financing (2015), https://perma.cc/8XXF-Z74N.

[224] David Blanchflower, Phillip Levine, and David Zimmerman, "Discrimination in the small business credit market," Review of Economics and Statistics, November, 85(4), pp. 930-943 (2003), https://perma.cc/C3GQ-DNRQ; Cavalluzzo, Ken and John Wolken, "Small Business Loan Turndowns, Personal Wealth and Discrimination," Journal of Business, 78(6): 2153-2177 (2005), https://www.jstor.org/stable/pdf/10.1086/497045.pdf?refreqid=excelsior%3A41a388781bd663cb4608712d7aa94987; Rebel A. Cole, Credit Scores and Credit Market Outcomes: Evidence from the Survey of Small Business Finances and the Kauffman Firm Survey (2014); U.S. Small Business Administration Report, Washington, D.C.; Robert Fairlie, Alicia Robb, and David Robinson, "Black and White: Access to Capital Among Minority-Owned Startups," Management Science (2020), https://doi.org/10.1287/mnsc.2021.3998; Alicia Robb, Brett Barkley, and Mels de Zeeuw **"**Mind the Gap: How Do Credit Market Experiences and Borrowing Patterns Differ for Minority-Owned Firms?" (2018), https://perma.cc/4LQE-KLZT.

participation in government assistance programs by minorities.[225] Past personal experience, or expectations derived from the experience of others, can cause wide discouragement among particular groups. Thus, although the data cannot establish the specific reason for an application's withdrawal, certain trends in the data—including lower application submission rates and higher application withdrawal rates—may support the conclusion that there are large numbers of discouraged borrowers, especially when considered alongside other anecdotal and statistical evidence of past discrimination.

To assess whether minorities are discouraged borrowers when it comes to USDA farm loan programs, I received direct loan application data from USDA for the years 2000-2020. I used these data to calculate the share of application submission and withdrawal rates for the various racial and ethnic groups of applicants, which can be found in the tables and figures below. The data provided by USDA, together with the documented history of discrimination against minority groups, strongly suggest that at least some minority farmers are discouraged borrowers who either do not apply for credit when needed or whose applications are withdrawn on the assumption that their applications will be denied.

First, looking to application rates among the various racial groups, the data show a lower share of applicants by minority farmers than would be expected given their historical disadvantage in credit markets and USDA's position as the lender of last resort. Almost every minority group constituted well below 10% of USDA loan applicants. American Indians/Alaskan Natives are the highest percentage of minority applicants, but they are still an exceedingly small share of applicants overall, hovering around the 10% range. White farmers, on the other hand, made up

---

[225] Elira Kuka & Bryan Stuart, Nat'l Bureau of Economic Rsch., Racial Inequality in Unemployment Insurance Receipt and Take-Up, https://www.nber.org/system/files/working_papers/w29595/w29595.pdf

around 90% of the loan applicants over the period from 2000-2020. More detail can be found at Table 7 in Appendix C.



Additionally, the data generally show higher application withdrawal rates among minorities as compared to white farmers. Overall, Blacks, Asians, and Hispanics had much higher rates of loan application withdrawals, compared with white farmers. Applications from American Indians and Alaskan Natives were withdrawn at higher rates than white farmers in every year over the period 2003-2011, although their withdrawal rates apparently decline after that year. There were so few Native Hawaiian and Pacific Islander applicants that there was no clear pattern that emerged over the period; in some years their withdrawal rate exceeded that of whites, while in other years it did not. More detail can be found at Table 8 in Appendix C.



The difference in application withdrawal rates between minorities and non-minorities is not likely explained by race-neutral factors such as low credit score. USDA provided me with additional data in the form of a credit risk assessment number for applicants for direct loans. The credit risk assessment is a number that takes on a value from 1 (being the lowest, or best, credit risk) to 4 (being the highest, or worst, credit risk). Table 22 presents the credit risk assessment of applicants by race and ethnicity and the outcome of their loan application (approved, withdrawn, or rejected). It shows that the applicants whose applications were withdrawn generally did not have the worst credit assessments. To help understand differences that might drive different outcomes, I compared credit risk assessments by outcome within each group.

In general, withdrawn applications had credit assessments that fell somewhere in between the credit assessments of approved and rejected applications.[226] This provides evidence that at least some minority borrowers' applications were likely withdrawn because they expected their applications to be denied due to distrust fostered by historic discrimination at USDA and not due to having poor credit.

| Table 22. Credit Risk Assessment by Race/Ethnicity (2000-2020) | | | | | | |
|---|---|---|---|---|---|---|
| | White | Black/ African American | Asian | American Indian/ Alaskan Native | Hawaiian/ Pacific Islanders | Hispanic |
| All Applications | 2.63 | 2.94 | 2.63 | 2.76 | 2.76 | 2.52 |
| Standard Error | 0.904 | 0.867 | 0.906 | 0.867 | 0.901 | 0.932 |
| Sample Size | 180856 | 7345 | 1206 | 17226 | 440 | 6321 |
| | | | | | | |
| Approved | 2.62 | 2.91 | 2.60 | 2.75 | 2.80 | 2.51 |
| Standard Error | 0.9 | 0.868 | 0.893 | 0.864 | 0.896 | 0.918 |
| Sample Size | 150244 | 5333 | 930 | 14298 | 373 | 4675 |
| | | | | | | |
| Withdrawn | 2.66 | 2.98 | 2.71 | 2.83 | 2.55 | 2.50 |
| Standard Error | 0.917 | 0.855 | 0.951 | 0.872 | 0.921 | 0.952 |
| Sample Size | 24573 | 1395 | 219 | 2387 | 58 | 1262 |
| | | | | | | |
| Rejected | 2.80 | 3.03 | 2.80 | 2.76 | 2.56 | 2.65 |
| Standard Error | 0.922 | 0.878 | 0.903 | 0.903 | 0.882 | 1.033 |
| Sample Size | 5990 | 614 | 56 | 537 | 9 | 383 |
| | | | | | | |
| Diff b/n approved and withdrawn | -0.041 | -0.064 | -0.110 | -0.080 | 0.244 | 0.008 |
| As a % of Approved Credit Score | -1.6% | -2.2% | -4.2% | -2.9% | 8.7% | 0.3% |
| | | | | | | |
| Diff b/n rejected and withdrawn | 0.136 | 0.056 | 0.096 | -0.068 | 0.004 | 0.147 |
| As a % of Rejected Credit Score | 4.9% | 1.8% | 3.4% | -2.5% | 0.2% | 5.6% |
| Source: USDA Direct Loan Application Data 2000-2020 | | | | | | |

Instead, other evidence supports the conclusion that minorities have lower application submission rates and higher withdrawal rates because lack of trust and borrower discouragement

---

[226] There are two exceptions. First, for Native Hawaiian/Pacific Islander farmers, the mean credit risk assessment for both withdrawn and rejected applications and was actually *better* than for approved applications. However, the sample size for this group was very small. Second, for AI/AN farmers, the mean credit risk assessment for withdrawn applications was worse than both rejected and approved applications.

due to past discrimination in USDA farm loan programs. As mentioned earlier in the report, there are myriad anecdotal accounts of discrimination against minority farmers in USDA loan programs, including allegations that USDA officials did not provide the same levels of assistance to minority farmers in completing their loan applications, including:

- USDA denying minority farmers' loan applications at higher rates, arbitrarily, and sometimes without explanation;
- Minority farmers receiving USDA loans that were smaller, on less favorable terms, arriving too late to be useful for that year's operations, and/or with additional requirements not imposed on white farmers,
- Minority farmers receiving USDA loans and then having their loans arbitrarily reduced;
- USDA not informing minority farmers of loan servicing options or providing the same levels of loan servicing to minority farmers

It is likely that these discriminatory actions over generations created a lack of trust in USDA by minority farmers. Indeed, multiple reports, including a 2019 GAO report, have noted that "historical discrimination has led generations of SDFRs to distrust institutional lenders, making them less likely to apply for credit."[227] This type of "learned distrust" of USDA loan programs is another cyclical effect of prior discrimination at USDA that keeps minorities from seeking needed credit that may allow them the same opportunities as white farmers to enter into the business of farming and expand their farming operations.[228]

---

[227] GAO-19-539 at 29.

[228] Cocciarelli, S., Knox, R., Melone, B., Robinson, A., Larson, R., Godfrey-Smith, H. (2015). The CDFI-Farmer of Color Capital Access National Project. MSU Center for Regional Food Systems. https://www.canr.msu.edu/foodsystems/uploads/files/cdfi-foc_capital_access_final_report_formatted.pdf.

## VIII.   Conclusion

The fact that USDA has discriminated against minority farmers and ranchers in USDA farm loan programs has been demonstrated through ample evidence in numerous reports issued by the U.S. Commission on Civil Rights, the GAO, and the USDA OIG; as well other reports funded by the USDA itself, including the CRAT and Jackson Lewis reports; and in numerous lawsuits that have been settled and awarded damages to thousands of minority farmers to the tune of several billion dollars.

We see the lingering effects of this discrimination in the data from the most recent Census of Agriculture, which shows that minorities are underrepresented in farming and that, when they do farm, minority farms are generally smaller and less profitable than white farms along a number of metrics: acreage, market value of production sold, net income, and per-acre productivity. In turn, without the requisite collateral and creditworthiness, minority farmers have higher rates of delinquency and foreclosure, have more difficulty obtaining government funding as well as private credit, and are more likely to be discouraged borrowers. These adverse consequences are the direct result of the disadvantaged economic position of minority farmers. And that position is due in no small part to decades of discrimination in the lending programs that were supposed to aid and support them.

The debt relief provided in Section 1005 addresses those effects, including by increasing minority farmers' available capital to permit reinvestment in their farm operations, helping to ensure that minority farmers who have higher rates of delinquency and foreclosure do not lose their farms during a time of national distress, and focusing targeted relief on those groups that have been disproportionately left out of previous government funding. While this relief may not fully remedy the effects of USDA's past discrimination against minority farmers, it is an important step towards leveling the playing field for minority farmers going forward, and an intervention is

108

necessary to ensure that they do not continue to suffer the cyclical effects of prior discrimination in USDA's loan programs.

Dated: January 7, 2022

 /s/ *Alicia M. Robb*

Alicia M. Robb, PhD

**List of Appendices**

    A.  CV of Alicia Robb

    B.  List of materials reviewed

    C.  Additional Tables

    D.  List of Tables and Figures

Appendix A: CV of Alicia Robb

# Alicia M. Robb
*alicia@nextwaveimpact.com * skype: aliciamrobb * twitter: @aliciarobb*

## Education:

**Ph.D. in Economics;** University of North Carolina at Chapel Hill
  Dissertation: "The Role of Race, Gender, and Discrimination in Business Survival"
  Fields: Econometrics and Economic Development

**M.S. in Economics;** University of North Carolina at Chapel Hill
  Thesis: "The Financial Systems Approach to Microfinance"

**B.A. in Economics;** Summa cum laude, St. Mary's University, San Antonio, TX

## Experience:

**Next Wave Impact**
**Founder and CEO: 2015-present**
Designed and launched a learning by doing angel training program and investment fund in the United States in 2015-2016, bringing together nearly 100 women to make 10 seed stage investments over 12 months. Recruited investment team of nine women for the fund who were successful experienced angel investors that drove deal flow, lead due diligence, and recommended investments, as well as mentored 90 other women that were new and emerging angel investors who made up the rest of the fund members. Coordinated the education and training materials for the programs that became part of the public domain and freely available to everyone. Brought investment opportunities to the fund and helped to coordinate syndication with other angel groups. Supported similar efforts for a Europe program in 2015-2016. In 2017 launched a second fund focused on US impact companies following the same model: 99 women, 25 minorities, with an investment committee of 10. Completed investments in an initial portfolio of 15 companies, all led by women and people of color. www.nextwaveimpact.com. As part of Next Wave Impact, conduct angel investor training and investor readiness training workshops around the globe.

**Principal, Marin Economic Consulting/Robb Consulting; 2003-present**
Small business and economic research; data analyses; report writing and review. Current and past clients include: Reveal Global Consulting, Facebook, United States Census Bureau, National Women's Business Council, Securities and Exchange Commission, Department of Justice, World Bank, Small Business Administration, United Nations Conference on Trade and Development, Minority Business Development Agency, Startup Genome, City of Chicago, Chicago Transit Authority, Wayne State University, Kauffman Foundation, Sage Foundation, Foundation for Sustainable Development, Rogers Family Coffee Company, Equator Coffees and Teas, and Beacon Economics.

**Ewing Marion Kauffman Foundation**
**Senior Fellow: January 2013-December 2016**
**Senior Research Fellow: 2008-2013**
**Principal Investigator-Kauffman Firm Survey: 2006-2016**
Principal Investigator for the Kauffman Firm Survey; Research on firm dynamics, entrepreneurial finance, and entrepreneurship by minorities and women; Organize conferences on entrepreneurship and entrepreneurial finance; Provide research support for entrepreneurship initiatives of the Foundation; Present research and data at academic conferences, workshops, and trainings.

**Visiting Scholar: University of Colorado Boulder, 2014-present; Federal Reserve Bank of Atlanta, 2011-2013 & 2017-2019; University of California, Berkeley, 2013-2017; Basque Institute for Competitiveness, San Sebastian, 2012-2014; University of California, Santa Cruz: 2004-2014**
Research topics including entrepreneurial finance, crowdfunding, women's entrepreneurship, minority entrepreneurship, firm performance, discrimination in lending, federal procurement, community development, and intergenerational links in self-employment.  Write journal articles, book chapters, books, and reports.

**Founder and Executive Director, Foundation for Sustainable Development; 1995-2006**
Directed a non-profit 501(c)(3) organization that supports sustainable development initiatives in Latin America, Africa, and Asia; developed and coordinated international programs for university students and professionals; developed and managed budget; managed eleven staff and seven fellows in the United States and abroad; managed international grant programs and fundraising efforts; wrote grant proposals and reported on program activities.

**Adjunct Professor, University of San Francisco, St. Mary's College and St. Mary's University; 2003-2007**
Taught three week graduate and undergraduate travel courses in economic development during summer break and January term. Taught undergraduate courses in economic development, the global economy, and contemporary issues in economics.

**Economist, Division of Research and Statistics, Board of Governors of the Federal Reserve System; 2000-2003**
Worked on all aspects of the Survey of Small Business Finances, a survey conducted by the Board every five years, including: survey development, data evaluation, research, and presentations to the Board of Governors and Board staff, as well as at academic conferences; researched issues related to small business finances, women- and minority-owned businesses, entrepreneurship, and microfinance; prepared briefings, presentations, and content for governors' speeches.

**Adjunct Professor, George Washington University; 2002**
Taught Survey of Economic Development (Econ250), a graduate economics class joint with the Elliot School of International Affairs/Economic Department.

**Economist, Office of Economic Research, U.S. SBA; 1998- 2000**
Researched issues related to small business. Prepared written reports, presented at academic conferences, answered questions from the public, Congress, and media. Research included: small business' contribution to net job growth, women and minority-owned businesses, and the role of race and gender in firm survival.

**Research Assistant/Instructor/Teaching Assistant, UNC, Chapel Hill; 1995-1998**
Assisted professors with research and administration, including web design and maintenance; Instructed summer class in Principles of Economics; Assisted professors with semester classes in Principles of Economics, taught recitation classes, graded homework, quizzes, and exams.

**Consultant, World Bank; Nicaragua; Summer 1997**
Adapted and translated microfinance sustainability manual and software for Latin American market; field-tested manual and software with microfinance organizations in Nicaragua; provided technical assistance.

**iv.      ILAS/Tinker Foundation Research Grant; Nicaragua; Summer 1997**
Researched informal credit markets, NGO loan funds, and the financial sustainability of microfinance programs in Nicaragua; surveyed many microcredit programs; interviewed loan fund managers; analyzed loan portfolios; estimated credit risks; provided technical assistance.

**v.      ILAS/Tinker Foundation Research Grant; Honduras; Summer 1996**
Researched informal credit markets and NGO loan funds in Honduras; surveyed microcredit programs; interviewed loan fund managers; provided technical assistance.

**Project Director**, **Farmer to Farmer/Partners of the Americas; Nicaragua; Summer 1995**
Designed and implemented a Women in Development project funded by USAID; Provided technical assistance to a women's cooperative in rural Nicaragua in order to improve the efficiency of their herb production, marketing, and distribution methods.

**Staff Economist**, **Christensen Associates; Madison, WI; 1994-1995**
Estimated price indices, inflation factors, costs, and volumes for various projects; conducted productivity studies; calculated annual and quarterly data; performed regression analyses; managed databases.

# Publications and Working Papers

## Books

Coleman, Susan and Alicia Robb (2016). The Next Wave: Financing Women's Growth-Oriented Firms (Stanford University Press).

Robb, Alicia, Alexandria Valerio, and Brent Barton, eds. (2014). Entrepreneurship Education and Training: Insights from Ghana, Kenya, and Mozambique. (World Bank Publications).

Valerio, Alexandria, Brent Parton, and Alicia Robb (2014). Entrepreneurship Education and Training Programs around the World: Dimensions for Success (World Bank Publications).

Farhat, Joseph and Alicia Robb (2014). Applied Survey Data Analysis Using Stata: The Kauffman Firm Survey Data. Available at SSRN: http://ssrn.com/

Coleman, Susan and Alicia Robb (2012). A Rising Tide: Financing Strategies for Women-Owned Firms (Stanford University Press).

Fairlie, Robert and Alicia Robb (2008). Race, Families and Business Success: African-American, Asian-, and White-Owned Businesses (Cambridge: M.I.T. Press) (Choice, Outstanding Economic Title, 2009)

## Articles

Hadar Gafni, Dan Marom, Alicia Robb, Orly Sade, Gender Dynamics in Crowdfunding (Kickstarter):
    Evidence on Entrepreneurs, Backers, and Taste-Based Discrimination, *Review of Finance*,
    December 2020. https://doi.org/10.1093/rof/rfaa041

Fairlie, Robert W. and Robb, Alicia and Robinson, David T., Black and White: Access to Capital
    Among Minority-Owned Startups. Management Science, Published online in Articles in Advance 29 Nov
    2020.

Robb, Alicia, and David T. Robinson. "Testing for racial bias in business credit scores." *Small
    Business Economics*: Volume 50, Issue 3, pp 429-443, March 2018.

Farhat, Joseph, Sharon Matusik, Alicia Robb, and David T. Robinson. "New directions in
    entrepreneurship research with the Kauffman Firm Survey." *Small Business Economics,* Volume 50, Issue
    3, pp 521-532, March 2018.

Farhat, Joseph, and Alicia Robb. "Analyzing complex survey data: the Kauffman Firm Survey." *Small
    Business Economics.* Volume 50, Issue 3, pp 657-670, March 2018

Coleman, Susan, and Alicia Robb, "Linking Women's Growth-Oriented Entrepreneurship Policy and
    Practice:  Results from the Rising Tide Angel Training Program." *Venture Capital: An International
    Journal of Entrepreneurial Finance,* Volume 20, Issue 2, April 2018.

Coleman, Susan, and Alicia Robb. "Minding the Gap: Women and Angel Investing" *European Business
    Review*, 73-77, March-April, 2017.

Bates, Timothy, and Alicia Robb. "Impacts of Owner Race and Geographic Context on Access to Small

Business Financing," *Economic Development Quarterly.* Vol. 30(2) 159-170. May 2016.

Mollick, Ethan, and Alicia Robb. "Democratizing Innovation and Capital Access: The Role of Crowdfunding." *California Management Review*, Vol. 58, No. 2.  February 2016.

Bates, Timothy and Alicia Robb. "Has the Community Reinvestment Act increased loan availability among small businesses operating in minority neighbourhoods?." *Urban Studies* (2014).

Robb, Alicia and Robert Seamans, "The Role of R&D in Entrepreneurial Finance and Performance," *Advances in Strategic Management,* Volume 31, 341-373 (2014).

Bates, Timothy and Alicia Robb, "Small-Business Viability in America's Urban Minority Communities", *Urban Studies*, Vol. 51(13) 2844–2862 (2014).

Robb, Alicia and David Robinson, "The Capital Structure Decisions of New Firms." *Review of Financial Studies,* Vol 27, No 1 (2014).

Bates, Timothy and Alicia Robb, "Greater Access to Capital is Needed to Unleash the Local Economic Development Potential of Minority-Owned Businesses", *Economic Development Quarterly.*  Volume 27, Issue 3, August 2013, pp. 250–259.

Robb, Alicia and John Watson, "Gender Differences in Firm Performance: Evidence from New Ventures in the United States,"  *Journal of Business Venturing.* Volume 27, Issue 5, September 2012, 544–558.

Coleman, Susan and Alicia Robb, "Unlocking Innovation in Women-Owned Firms: Strategies for Educating the Next Generation of Women Entrepreneurs," *Journal of Women's Entrepreneurship and Education* (2012, No. 1-2, 99-125)

Coleman, Susan and Alicia Robb, "Capital structure theory and new technology firms: is there a match?", *Management Research Review*, Vol. 35 Issue 2, 2012.

Coleman, Susan and Alicia Robb, "Financing Strategies of New Technology-Based Firms," *Review of Economics & Finance*. May 2011.

Coleman, Susan and Alicia Robb, "Financing Strategies of New Technology-Based Firms: A Comparison of Women-and Men-Owned Firms," *Journal of Technology Management and Innovation*, Volume 5, Issue 1, 2010.

Doms, Mark, Ethan Lewis, and Alicia Robb, "Local Labor Market Education, New Business Characteristics, and Firm Performance," *Journal of Urban Economics,* Volume 67 (2010) 61–77.

Robb, Alicia M. and John Watson. "Comparing the Performance of Female- and Male-Controlled SMEs: Evidence from the United States and Australia." *Frontiers of Entrepreneurship Research* 30, no. 8 (2010).

Coleman, Susan and Alicia Robb, "Sources of Financing for New Women-Owned Firms: Evidence from the Kauffman Firm Survey," *Small Business Economics*, Volume 33 (4), December 2009.

Fairlie, Robert and Alicia Robb, "Why do Female-Owned Businesses have Lower Survival Rates, Profits, Employment, and Sales, than Male-Owned Businesses?," *Small Business* Economics, Volume 33 (4), December 2009.

Robb, Alicia M. "Race, Ethnicity, and Gender: An Investigation of New Firm Performance." *Frontiers of Entrepreneurship Research* 28, no. 9 (2008): article 3.

Bates, Timothy and Alicia Robb, "Crime's Impact on the Survival Prospects of Young Urban Small Businesses", *Economic Development Quarterly,* August, 2008.

Robb, Alicia and Robert Fairlie, "Determinants of Business Success: An Examination of Asian-Owned Businesses in the United States," *Journal of Population Economics*, 2008.

114

Bates, Timothy and Alicia Robb, "Analysis of Young Neighborhood Firms Serving Urban Minority Clients," *Journal of Economics and Business*, Volume 60, Issues 1-2, January/February 2008.

Robb, Alicia and Robert Fairlie, "Access to Financial Capital among U.S. Businesses: The Case of African American Firms," *Annals of the American Academy of Political and Social Science*, Volume 613, September 2007.

Fairlie, Robert and Alicia Robb, "Why Are Black-Owned Businesses Less Successful than White-Owned Businesses:  The Role of Families, Inheritances, and Business Human Capital," *Journal of Labor Economics*, Volume 25, Number 2, April 2007.

Fairlie, Robert and Alicia Robb, "Families, Human Capital, and Small Businesses: Evidence from the Characteristics of Business Owners Survey" *Industrial and Labor Relations Review*, Volume 60, Number 2, January 2007.  (Emerald Citation of Excellence Award 2011)

Robb, Alicia, "Entrepreneurship: A Path for Economic Advancement for Women and Minorities?," *Journal of Developmental Entrepreneurship,* Volume 7, Number 4, December 2002.

Robb, Alicia, "Small Business Financing: Differences between Young and Old Firms," *Journal of Entrepreneurial Finance and Business Ventures,* Volume 1, Issue 2, December 2002.

Bitler, Marianne, Alicia Robb, and John Wolken. "Financial Services Used by Small Businesses: Evidence from the 1998 Survey of Small Business Finances" *Federal Reserve Bulletin*, Vol. 87, April 2001.

## Book chapters

Coleman, Susan and Alicia Robb, "Reducing the gender gap in angel investing: the Rising Tide Program" in Albert N. Link (ed), Gender and Entrepreneurial Activity, Cheltenham, UK and Northampton, MA, USA. Edward Elgar Publishing (2017).

Coleman, Susan and Alicia Robb, "Financing High-Growth Women-Owned Enterprises: Evidence from the United States" in Díaz-García, C. Brush, C., Gatewood, E. and Welter, F. (eds), Women's Entrepreneurship in Global and Local Contexts, Cheltenham, UK and Northampton, MA, USA. Edward Elgar Publishing (2016).

Coleman, Susan and Alicia Robb, "Gender Differences in Innovation among US Entrepreneurs," in Lewis, Hendry, Gatewood, and Watson, editors, Women's Entrepreneurship in the 21st Century: An International Multi-Level Research Analysis. Edward Elgar Publishing (2014).

Coleman, Susan and Alicia Robb, "Gender Differences in Firm Performance: the Role of Financial Capital, Motivations, and Expectations," in Jennings and Hughes, editors, Women's Entrepreneurship. Edward Elgar Publishing (2011).

Coleman, Susan and Alicia Robb, "Financing by Women-Owned Firms," in Douglas Cumming (editor), the *Oxford Handbook of Entrepreneurial Finance.* Oxford University Press (2011).

Fairlie, Robert and Alicia Robb, "Financial Capital among Minority-Owned Businesses," in Douglas Cumming (editor), the *Oxford Handbook of Entrepreneurial Finance* (2011).

Coleman, Susan and Alicia Robb, "Sources of Financing for New Technology Firms: Evidence from the Kauffman Firm Survey," in G. Calcagnini, I. Favaretto (eds.), The Economics of Small Businesses: An International Perspective:  Springer (2011).

Reynolds, Paul and Alicia Robb, "The PSED II and the Kauffman Firm Survey," in Paul Reynolds and Richard Curtin, editors, New Firm Creation in the United States: Initial Explorations with the PSED II Data Set (2009).

Bates, Timothy and Alicia Robb, "Crime's Impact on the Viability of Young Urban Small Businesses" in Reengineering Community Development for the 21st Century (2008).

Bates, Timothy and Alicia Robb. "Revitalizing Inner-City Minority Communities by Creating and Expanding Small Businesses," in Enterprise and Deprivation: Small Business, Social Exclusion, and Sustainable Communities", ed. Alan Southern. London: Routledge (2008).

Fairlie, Robert and Alicia Robb. "Families, Human Capital, and Small Business: Evidence from the Characteristics of Business Owners Survey," in Entrepreneurship and Human Capital, ed. Mirjam van Praag, Amsterdam: Amsterdam Center for Entrepreneurship. (2006).

Robb, Alicia, "New Data for Dynamic Analysis: The Longitudinal Establishment and Enterprise Microdata (LEEM)," in Jerome Katz, ed., Advances in Entrepreneurship, Firm Emergence and Growth, Volume 4. Greenwich CT: JAI Press. (2000).

## Reports and Working papers
Robb, A., Barkley, B. and de Zeeuw, M, 2018. "Mind the Gap: How Do Credit Market Experiences and Borrowing Patterns Differ for Minority-Owned Firms?" Federal Reserve Bank of Atlanta.

Robb, Alicia and John Wolken, "Firm, Owner, and Financing Characteristics: Differences between Female- and Male-owned Small Businesses" Federal Reserve Working Paper Series: 2002-18.

Acs, Zoltan, Catherine Armington, and Alicia Robb, 1999, "Measuring Job Flow Dynamics in the U.S. Economy," Center for Economic Studies, U.S. Bureau of the Census, CES Discussion Paper 99-1.

Headd, Brian, and Alicia Robb, "Characteristics of Small Business Owners and Employees," in the State of Small Business 1999, Office of Advocacy, U.S. Small Business Administration.

Robb, Alicia, 1999. "Minorities in Business," Office of Advocacy, U.S. SBA, Washington, D.C.

Alicia Robb, "New Data for Analysis of Small Business Job Creation," in the State of Small Business 1998, U.S. Small Business Administration, Office of Advocacy.

Robb, Alicia, 1998. "Women in Business," Office of Advocacy, U.S. SBA, Washington, D.C.

# Other Activities:
Board of Directors, Kachuwa Impact Fund (2020-present)
Board of Directors, Deming Center Venture Fund (2015-present)
Board of Directors, Next Wave Foundation (2017-present)
Committee Member, Angel Capital Association Summit, Impact Track Lead (2018-present)
Advisory Board, Good Food Institute (2016-2021)
National Advisory Council for Global Entrepreneurship Week (2013-2017)
Visiting Scholar, University of California, Berkeley (2013-2017)
Visiting Scholar, University of Colorado, Boulder (2014-present)
Visiting Scholar, Federal Reserve Bank of Atlanta (2010- 2013; 2017-2019)
National Advisory Council for Minority Business Enterprise (2011-2014)
Member, OECD Pilot Scoreboard on SME Financing (2009-2011)
Member, G20 Working Group on SME Financing (2009-2011)

Reviewer for journals such as *Management Science*, *Journal of Labor Economics, Journal of Business Venturing, Entrepreneurship Theory & Practice*, *Small Business Economics, and Journal of Economics and Management Strategy, Economics of Innovation and New Technology*, and Expert Reviewer of proposals for groups such as the National Science Foundation and the Center for Economic Studies, U.S. Census Bureau.

Work cited in publications such as the *Economist, Wall Street Journal, New York Times*, Inc. Magazine, *Washington Post, Business Week, CNNMoney.com, Forbes, Boston Globe, Christian Science Monitor, Independent Banker, and Huffington Post.*

**Appendix B: Reports, Audits, and Other Documents that were reviewed**

A.  Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture: U.S. Commission on Civil Rights, 1965

B.  Civil Rights Under Federal Programs: An Analysis of Title IV of the Civil Rights Act of 1964, A Report of the U.S. Commission on Civil Rights, 1968

C.  Federal Civil Rights Enforcement Effort, US Commission on Civil Rights, 1970

D.  The Decline of Black Farming in America: A Report of the United States Commission on Civil Rights, February 1982

E.  Information on Agricultural Credit Provided to Indians on 14 Reservations, GAO, 1987

F.  Hearing on the Decline of Minority Farmers in the US, Committee on Government Operations, US House of Representatives, 1990

G.  1997 Report: Civil Rights at the United States Department of Agriculture, A Report by the Civil Rights Action Team (CRAT Report), February 1997.

H.  Evaluation Report on Civil Rights Issues — Phase I, Report No. 50801-2-Hq(1), dated February 27, 1997

I.  Minority Participation in Farm Service Agency's Farm Loan Programs — Phase II, Report No. 50801-3-Hq, dated September 29, 1997.

J.  Implementation of OIG's Recommendations — Department's Civil Rights Complaint System and the Direct Farm Loan Program: Evaluation Report No. 50801-5-Hq March 1998

K.  A Qualitative Study of Civil Rights Implications in Farm Loan Program Administration: Perceptions and Vulnerabilities, 1998.

L.  "Civil Rights at the United States Department of Agriculture: One Year of Change" Prepared by the Civil Rights Implementation Team (CRIT): CRIT Report (March, 1998)

M.  1998 USDA National Commission on Small Farms

N.  Lawsuits dealing with USDA discrimination against minority farmers (Pigford, Pigford II, Keepseagle, and Garcia)

O.  Audit Report No. 60801-03-Hq, Office of Civil Rights Management of EEO complaints, issued March 2000

P.  Audit Report: Office of Civil Rights Status of the Implementation of Recommendations Made in Prior Evaluations of Program Complaints. Audit Report No. 60801-4-Hq, March 2000

Q.  Dispossession (Book)

R.  2005 OIG Audit: Audit Report: Minority Participation in Farm Service Agency's Programs, Report No. 03601-11-AT, November 2005

S.  Farm Service Agency Direct Loan Program Effectiveness Study, University of Arkansas, June 2005

117

T.      Lending on Native American Lands: A Guide for Rural Development Staff (June 2006)

U.      USDA OIG Northeast Region, Audit Report, "Review of the U.S. Department of Agriculture's Accountability for Actions Taken on Civil Rights Complaints," (May 2007)

V.      Recommendations and Options to Address Management Deficiencies in the Office of the Assistant Secretary for Civil Rights, October 2008, GAO-09-62

W.      Management of Civil Rights Efforts Continues to Be Deficient Despite Years of Attention. May 2008, GAO-08-755T

X.      Hearing Before The Subcommittee on Government Management, Organization, & Procurement of the Committee on Oversight & Government Reform House of Representatives 110th Congress Second Session May 14, 2008 Serial No. 110–137

Y.      USDA OIG Southwest Region, Audit Report, "Farm Service Agency, Socially Disadvantaged Borrower Foreclosures—Farm Program Loans" (June 2009)

Z.      Jackson-Lewis—Independent Assessment of the Delivery of Technical and Financial Assistance, Contract AG-3142-C-09-0049, Civil Rights Assessment, March 31, 2011

AA.     Garcia v. Vilsack: A Policy and Legal Analysis of a USDA Discrimination Case, February 2013.

BB.     2019 GAO Report: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited, July, 2019, GAO-19-539

CC.     INDIAN ISSUES Agricultural Credit Needs and Barriers to Lending on Tribal Lands. May 2019, GAO-19-464

DD.     Report to Congress: A Comparison of Transfers and Subsidies to Minority and Non-Minority Producers Associated with Key Farm and Conservation Programs, August 2021

EE.     Congressional Record, March 5, 2021, Testimony for Section 1005, 167 Cong. Rec. S1264

FF.     Decennial Census conducted by the U.S. Census Bureau (1920-2020)

GG.     Census of Agriculture conducted by the USDA (1920-2017)

HH.     Allen R. Thompson & Michael Green, USDA, ESS Staff Report, NRED 80-4, The Status of Minority Farms in the United States, ("1974 Rep.")

II.      Charles Dodson & Steven Koenig, *Evaluating the relative cost effectiveness of the Farm Service Agency's farm loan programs*, USDA FSA Report to Congress (August 2006) ("Dodson & Koenig 2006"),  *available at* https://perma.cc/HNT2-BNCV

JJ.     Cong. Rsch. Serv. ("CRS"), *Agricultural Credit: Institutions and Issues*, R-46768 (April 21, 2021)

KK.     GAO-21-399T, Stmt. On the Record to the Subcomm. On Oversight & Investigations,

LL.     Comm. On Fin. Servs. Of the House of Representatives, *Financial Services: Fair Lending, Access, and Retirement Security*, (Feb. 2021), https://perma.cc/P6R9-6UQG

MM.     House Ag. Comm. Hr'g on USDA Oversight (July 22, 2015)

NN.   Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. On Gov't Mgmt., Org., & Procurement, Comm. On Oversight and Gov't Reform, 110th Cong. (2008), ("2008 Senate Ag. Hr'g")

OO.   Hr'g on the USDA's Civil Rights Prog. For Farm Prog. Participants before House Sub-comm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 107th Cong. 23, (2002) (2002 Civil Rights Hr'g)

PP.   James MacDonald, Robert Hoppe, & Doris Newton, USDA, Three Decades of Consolidation in U.S. Agriculture, EIB-189 (March 2018), https://perma.cc/XZ6R-XZVN

QQ.   Jon Wainwright & Collette Holt, Transportation Research Board, *Guidelines for Conducting a Disparity & Availability Study for the Federal DBE Program*, Rep. 644 (2010), https://perma.cc/CFY4-AWA9

RR.   Kauffman Firm Survey, which tracked firms over 2004-2011 period, by the Kauffman Foundation. Joseph Farhat & Alicia Robb, Applied Survey Data Analysis Using Stata: The Kauffman Firm Survey Data, (2014), https://perma.cc/9KBU-HUG7

SS.   Mark Freel, Sara Carter, Stephen Tagg, & Colin Mason, Small Business Economics, The Latent Demand for Bank Debt: Characterizing "Disorganized Borrowers," 38 399-412 (2012), https://link.springer.com/content/pdf/10.1007/s11187-010-9283-6.pdf

TT.   Report of Lynn A. Hayes, *Keepseagle v. Vilsack*, 1:99-cv-3119-EGS, ECF No. 551-25 (Feb 20, 2009)

UU.   Report of William T. Bielby, *Keepseagle v. Vilsack*, 1:99-cv-3119-EGS, ECF No. 551-51 (Feb 20, 2009)

VV.   Timothy Bates & Alicia Robb, Economic Development Quarterly, Impacts of Owner Race and Geographic Context on Access to Small-Business Financing (2015), https://perma.cc/8XXF-Z74N

WW.   USCCR, Ten-Year Check-Up: Have Federal Agencies Responded to Civil Right Recommendations, vol. III (June 12, 2003) ("USCCR 2003")

XX.   USDA, 2007 Census of Agriculture, https://perma.cc/GD57-RF7R at 3, Column: Every Voice Counts

YY.   *USDA Announces [CFAP]*, USDA (Apr. 17, 2020), https://perma.cc/B7N9-PTRE

ZZ.   USDA, Market Facilitation Program, https://perma.cc/947S-7JCX

AAA.   USDA-NASS, 2017 Race/Ethnicity/Gender Profile from the 2017 Census of Agriculture (NASS), https://perma.cc/FPW3-VUMV

BBB.   USDA-NASS Montana Field Off., U.S. American Indian Agriculture at a Glance, https://perma.cc/HHB3-UFJ5

CCC.   USDA, National Commission on Small Farms, A Time to Act (Jan. 1998) https://perma.cc/NZY6-PPFW

DDD.   USDA Direct Loan Data (2000-2010)

EEE.   Nathan Rosenberg, "Farmers Who Don't Farm: The Curious Rise of the Zero-Sales Farmer," Journal of Agriculture, Food Systems, and Community Development, October, 1–9, 2017, https://perma.cc/AD8N-MX9M

FFF.   ERS report, *Rural America at a Glance, 2018 Edition*, https://perma.cc/C24E-QTQ8

GGG.   ERS, What is Rural,  https://perma.cc/V3FT-NMM9

HHH.   Elira Kuka & Bryan Stuart, Nat'l Bureau of Economic Rsch., Racial Inequality in Unemployment Insurance Receipt and Take-Up: https://www.nber.org/system/files/working_papers/w29595/w29595.pdf

III.   Susan Cocciarelli, Reggie Knox, Brett Melone, Ali Robinson, Rick Larson, Helen Godfrey-Smith, The CDFI-Farmer of Color Capital Access National Project. MSU Center for Regional Food Systems., (2015), https://perma.cc/46T5-YZF5

JJJ.   Paul Nightingale, & Alex Coad, Muppets and gazelles: political and methodological biases in entrepreneurship research, *Industrial & Corporate Change*, *23*(1), 113-143 (2014), https://perma.cc/C6AY-57G8

KKK.   Gavin Cassar, "The financing of business start-ups," *Journal of Business Venturing* 19.2 (2004): 261-283, https://perma.cc/FP3E-XCWK

LLL.   Rebel A. Cole, Credit Scores and Credit Market Outcomes: Evidence from the Survey of Small Business (2014), https://perma.cc/A4PZ-5L6X.

MMM.  Peter A. Morrison, "'Lingering effects' of discrimination: tracing persistence over time in local populations," *Population Research and Policy Review,* 25.2 (2006): 127-139, https://perma.cc/5KD6-KG27

NNN.   Jeremy R. Porter, "Plantation economics, violence, and social well-being: The lingering effects of racialized group oppression on contemporary human development in the American South," *Journal of Human Development and Capabilities* 12.3 (2011): 339-366, https://perma.cc/EZ5M-HDYV

OOO.   USDA-ERS, Atlas of Rural and Small-Town America, https://perma.cc/8S8S-ABFY

PPP.   Terry L. Anderson & Dean Lueck,  *Land Tenure and Agricultural Productivity on Indian Reservations*, The Journal of L. & Econs., 35(d), 427-454 (1992), https://perma.cc/777V-EBBN

QQQ.   Rafter Ferguson, Losing Ground Farmland Consolidation and Threats to New and Black Farmers and the Future of Farming (2021), https://perma.cc/SL2C-MTCQ

RRR.   Veenman, Justus. "Measuring labor market discrimination: An overview of methods and their characteristics." *American Behavioral Scientist* 53.12 (2010): 1806-1823

SSS.   La Noue, George R. "Standards for the second generation of Croson-inspired disparity studies." *The Urban Lawyer* (1994): 485-540

TTT.   The Equal Opportunity Commission Uniform Guidelines (29 CFR 1607(D): www.law.cornell.edu/cfr/text/29/1607.4)

UUU.   Lindsey M. Burke & Jude Schwalbach, "Housing Redlining and Its Lingering Effects on Education Opportunity, Backgrounder. No. 3594," *Heritage Foundation* (2021), https://perma.cc/8FXN-XL49

VVV. GAO-21-399T, Stmt. on the Record to the Subcomm. on Oversight & Investigations, Comm. on Fin. Servs. of the House of Representatives, *Financial Services: Fair Lending, Access, and Retirement Security*, (Feb. 2021), https://perma.cc/P6R9-6UQG

WWW. David Blanchflower, Phillip Levine, and David Zimmerman, "Discrimination in the small business credit market," Review of Economics and Statistics, November, 85(4), pp. 930-943 (2003), https://perma.cc/C3GQ-DNRQ

XXX. Ken Cavalluzzo and John Wolken," Small Business Loan Turndowns, Personal Wealth and Discrimination," Journal of Business, 78(6): 2153-2177 (2005), https://www.jstor.org/stable/pdf/10.1086/497045.pdf?refreqid=excelsior%3A41a388781bd663cb4608712d7aa94987

YYY. Robert Fairlie, Alicia Robb, and David Robinson, "Black and White: Access to Capital Among Minority-Owned Startups," Management Science (2020), https://doi.org/10.1287/mnsc.2021.3998

ZZZ. Alicia Robb, Brett Barkley, and Mels de Zeeuw "Mind the Gap: How Do Credit Market Experiences and Borrowing Patterns Differ for Minority-Owned Firms?" (2018), https://perma.cc/4LQE-KLZT

AAAA. Agriculture, Rural Development, Food & Drug Administration, & Related Agencies Appropriations Bill, 2020**,** H. Rep. 116-107 (2019)

BBBB. USDA, Internal Report of Farm Loan Programs

CCCC. USDA-NASS, Agricultural Resource Management Survey 2017-2019

## Appendix C: Additional Tables

Table 1. Population by Race and Ethnicity (1940-2020)

| | White | Black or African America n | America n Indian/ Alaska Native | Asian, Native Hawaiian / Pacific Islander | Some Other Race | Two or more races | Hispanic | Total |
|---|---|---|---|---|---|---|---|---|
| 1940 | 89.8 | 9.8 | | | 0.4 | | | 100.0 |
| 1950 | 89.5 | 10.0 | | | 0.5 | | | 100.0 |
| 1960 | 88.6 | 10.5 | | | 0.9 | | | 100.0 |
| 1970 | 87.5 | 11.1 | | | 1.4 | | | 100.0 |
| 1980 | 83.0 | 11.7 | 0.7 | 1.5 | 3.0 | | 6.4 | 99.9 |
| 1990 | 80.3 | 12.1 | | 2.9 | 3.9 | | 9.0 | 99.2 |
| 2000 | 75.1 | 12.3 | 0.9 | 3.8 | 5.5 | 2.4 | 12.5 | 100.0 |
| 2010 | 72.4 | 12.6 | 0.9 | 5.0 | 6.2 | 2.9 | 16.3 | 100.0 |

Source: U.S. Census Bureau, Decennial Census of Population, 1940-2010

Table 2. Share of U.S. Farms Owned by Whites, Blacks and Other Race (Census of Agriculture 1920-2017)

| | White | Black | Other | Total | | White | Black | Other |
|---|---|---|---|---|---|---|---|---|
| 1920 | 5,499,707 | 925,710 | 28,574 | 6,453,991 | | 85.2% | 14.3% | 0.4% |
| 1930 | 5,373,703 | 882,852 | 38,548 | 6,295,103 | | 85.4% | 14.0% | 0.6% |
| 1940 | 5,378,913 | 681,790 | 41,714 | 6,102,417 | | 88.1% | 11.2% | 0.7% |
| 1950 | 4,802,520 | 559,980 | 25,937 | 5,388,437 | | 89.1% | 10.4% | 0.5% |
| 1959 | 3,419,672 | 272,541 | 18,290 | 3,710,503 | | 92.2% | 7.3% | 0.5% |
| 1964 | 2,957,905 | 184,004 | 15,948 | 3,157,857 | | 93.7% | 5.8% | 0.5% |
| 1969 | 2,626,403 | 87,393 | 16,454 | 2,730,250 | | 96.2% | 3.2% | 0.6% |
| 1978 | 2,199,787 | 37,351 | 20,637 | 2,257,775 | | 97.4% | 1.7% | 0.9% |
| 1982 | 2,186,609 | 33,250 | 21,117 | 2,240,976 | | 97.6% | 1.5% | 0.9% |
| 1987 | 2,043,119 | 22,954 | 21,686 | 2,087,759 | | 97.9% | 1.1% | 1.0% |
| 1992 | 1,881,813 | 18,816 | 24,671 | 1,925,300 | | 97.7% | 1.0% | 1.3% |
| 1997 | 1,864,201 | 18,451 | 29,207 | 1,911,859 | | 97.5% | 1.0% | 1.5% |
| 2002 | 2,067,379 | 29,090 | 32,513 | 2,128,982 | | 97.1% | 1.4% | 1.5% |
| 2007 | 2,114,325 | 30,599 | 59,868 | 2,204,792 | | 95.9% | 1.4% | 2.7% |
| 2012 | 2,012,652 | 33,371 | 63,280 | 2,109,303 | | 95.4% | 1.6% | 3.0% |
| 2017 | 1,955,737 | 32,052 | 54,431 | 2,042,220 | | 95.8% | 1.6% | 2.7% |

Source: Census of Agriculture, 1920-2017

| State | Hispanic or Latino | Black or African American alone | American Indian and Alaska Native alone | Asian alone | Native Hawaiian and Other Pacific Islander alone | Some Other Race alone | Two or More Races | White alone |
|---|---|---|---|---|---|---|---|---|
| Alabama | 3.9% | 26.2% | 0.6% | 1.1% | 0.1% | 2.0% | 1.5% | 68.5% |
| Alaska | 5.5% | 3.3% | 14.8% | 5.4% | 1.0% | 1.6% | 7.3% | 66.7% |
| Arizona | 29.6% | 4.1% | 4.6% | 2.8% | 0.2% | 11.9% | 3.4% | 73.0% |
| Arkansas | 6.4% | 15.4% | 0.8% | 1.2% | 0.2% | 3.4% | 2.0% | 77.0% |
| California | 37.6% | 6.2% | 1.0% | 13.0% | 0.4% | 17.0% | 4.9% | 57.6% |
| Colorado | 20.7% | 4.0% | 1.1% | 2.8% | 0.1% | 7.2% | 3.4% | 81.3% |
| Connecticut | 13.4% | 10.1% | 0.3% | 3.8% | 0.0% | 5.6% | 2.6% | 77.6% |
| Delaware | 8.2% | 21.4% | 0.5% | 3.2% | 0.0% | 3.4% | 2.7% | 68.9% |
| District of Columbia | 9.1% | 50.7% | 0.3% | 3.5% | 0.1% | 4.1% | 2.9% | 38.5% |
| Florida | 22.5% | 16.0% | 0.4% | 2.4% | 0.1% | 3.6% | 2.5% | 75.0% |
| Georgia | 8.8% | 30.5% | 0.3% | 3.2% | 0.1% | 4.0% | 2.1% | 59.7% |
| Hawaii | 8.9% | 1.6% | 0.3% | 38.6% | 10.0% | 1.2% | 23.6% | 24.7% |
| Idaho | 11.2% | 0.6% | 1.4% | 1.2% | 0.1% | 5.1% | 2.5% | 89.1% |
| Illinois | 15.8% | 14.5% | 0.3% | 4.6% | 0.0% | 6.7% | 2.3% | 71.5% |
| Indiana | 6.0% | 9.1% | 0.3% | 1.6% | 0.0% | 2.7% | 2.0% | 84.3% |
| Iowa | 5.0% | 2.9% | 0.4% | 1.7% | 0.1% | 1.8% | 1.8% | 91.3% |
| Kansas | 10.5% | 5.9% | 1.0% | 2.4% | 0.1% | 3.9% | 3.0% | 83.8% |
| Kentucky | 3.1% | 7.8% | 0.2% | 1.1% | 0.1% | 1.3% | 1.7% | 87.8% |
| Louisiana | 4.2% | 32.0% | 0.7% | 1.5% | 0.0% | 1.5% | 1.6% | 62.6% |
| Maine | 1.3% | 1.2% | 0.6% | 1.0% | 0.0% | 0.3% | 1.6% | 95.2% |
| Maryland | 8.2% | 29.4% | 0.4% | 5.5% | 0.1% | 3.6% | 2.9% | 58.2% |
| Massachusetts | 9.6% | 6.6% | 0.3% | 5.3% | 0.0% | 4.7% | 2.6% | 80.4% |
| Michigan | 4.4% | 14.2% | 0.6% | 2.4% | 0.0% | 1.5% | 2.3% | 78.9% |
| Minnesota | 4.7% | 5.2% | 1.1% | 4.0% | 0.0% | 1.9% | 2.4% | 85.3% |
| Mississippi | 2.7% | 37.0% | 0.5% | 0.9% | 0.0% | 1.3% | 1.1% | 59.1% |
| Missouri | 3.5% | 11.6% | 0.5% | 1.6% | 0.1% | 1.3% | 2.1% | 82.8% |
| Montana | 2.9% | 0.4% | 6.3% | 0.6% | 0.1% | 0.6% | 2.5% | 89.4% |
| Nebraska | 9.2% | 4.5% | 1.0% | 1.8% | 0.1% | 4.3% | 2.2% | 86.1% |
| Nevada | 26.5% | 8.1% | 1.2% | 7.2% | 0.6% | 12.0% | 4.7% | 66.2% |
| New Hampshire | 2.8% | 1.1% | 0.2% | 2.2% | 0.0% | 0.9% | 1.6% | 93.9% |
| New Jersey | 17.7% | 13.7% | 0.3% | 8.3% | 0.0% | 6.4% | 2.7% | 68.6% |
| New Mexico | 46.3% | 2.1% | 9.4% | 1.4% | 0.1% | 15.0% | 3.7% | 68.4% |
| New York | 17.6% | 15.9% | 0.6% | 7.3% | 0.0% | 7.4% | 3.0% | 65.7% |
| North Carolina | 8.4% | 21.5% | 1.3% | 2.2% | 0.1% | 4.3% | 2.2% | 68.5% |
| North Dakota | 2.0% | 1.2% | 5.4% | 1.0% | 0.0% | 0.5% | 1.8% | 90.0% |
| Ohio | 3.1% | 12.2% | 0.2% | 1.7% | 0.0% | 1.1% | 2.1% | 82.7% |
| Oklahoma | 8.9% | 7.4% | 8.6% | 1.7% | 0.1% | 4.1% | 5.9% | 72.2% |
| Oregon | 11.7% | 1.8% | 1.4% | 3.7% | 0.3% | 5.3% | 3.8% | 83.6% |
| Pennsylvania | 5.7% | 10.8% | 0.2% | 2.7% | 0.0% | 2.4% | 1.9% | 81.9% |
| Rhode Island | 12.4% | 5.7% | 0.6% | 2.9% | 0.1% | 6.0% | 3.3% | 81.4% |
| South Carolina | 5.1% | 27.9% | 0.4% | 1.3% | 0.1% | 2.5% | 1.7% | 66.2% |
| South Dakota | 2.7% | 1.3% | 8.8% | 0.9% | 0.0% | 0.9% | 2.1% | 85.9% |
| Tennessee | 4.6% | 16.7% | 0.3% | 1.4% | 0.1% | 2.2% | 1.7% | 77.6% |
| Texas | 37.6% | 11.8% | 0.7% | 3.8% | 0.1% | 10.5% | 2.7% | 70.4% |
| Utah | 13.0% | 1.1% | 1.2% | 2.0% | 0.9% | 6.0% | 2.7% | 86.1% |
| Vermont | 1.5% | 1.0% | 0.4% | 1.3% | 0.0% | 0.3% | 1.7% | 95.3% |
| Virginia | 7.9% | 19.4% | 0.4% | 5.5% | 0.1% | 3.2% | 2.9% | 68.6% |
| Washington | 11.2% | 3.6% | 1.5% | 7.2% | 0.6% | 5.2% | 4.7% | 77.3% |
| West Virginia | 1.2% | 3.4% | 0.2% | 0.7% | 0.0% | 0.3% | 1.5% | 93.9% |
| Wisconsin | 5.9% | 6.3% | 1.0% | 2.3% | 0.0% | 2.4% | 1.8% | 86.2% |
| Wyoming | 8.9% | 0.8% | 2.4% | 0.8% | 0.1% | 3.0% | 2.2% | 90.7% |
| Puerto Rico | 99.0% | 12.4% | 0.5% | 0.2% | 0.0% | 7.8% | 3.3% | 75.8% |
| Total | 17.3% | 12.6% | 0.9% | 4.7% | 0.2% | 6.2% | 2.9% | 72.4% |

Table 3. Population Shares (Row) by State, Race, and Ethnicity, 2010

Source: 2010 Decennial Census.

| Table 4. Top Five States by % of Farms by Race/Ethnicity, 2017 | | |
|---|---|---|
|  | Farms | Land in farms (acres) |
|  | Farms with a Hispanic, Latino, or Spanish principal producer | |
| United States | 77,416 | 26,041,600 |
| **States** |  |  |
| Texas | 36.4% | 27.2% |
| California | 12.3% | 8.2% |
| New Mexico | 10.6% | 20.6% |
| Florida | 6.3% | 1.9% |
| Colorado | 3.6% | 3.9% |
| Total for top five states: | 69.1% | 61.9% |
|  | Farms with an American Indian or Alaskan Native principal producer | |
| United States | 39,632 | 51,095,994 |
| **States** |  |  |
| Arizona | 29.2% | 39.4% |
| Oklahoma | 21.8% | 4.4% |
| New Mexico | 14.9% | 14.3% |
| Texas | 5.6% | 1.2% |
| Montana | 3.3% | 9.1% |
| Total for top five states: | 74.7% | 68.3% |
|  | Farms with an Asian principal producer | |
| United States | 13,904 | 1,831,229 |
| **States** |  |  |
| California | 29.3% | 34.9% |
| Hawaii | 16.6% | 10.1% |
| Texas | 7.7% | 7.1% |
| Florida | 6.3% | 3.6% |
| Washington | 3.5% | 3.4% |
| Total for top five states: | 63.4% | 59.1% |
|  | Farms with a Black or African American principal producer | |
| United States | 32,052 | 3,862,936 |
| **States** |  |  |
| Texas | 25.0% | 24.5% |
| Mississippi | 15.2% | 15.2% |
| Alabama | 9.1% | 8.2% |
| Louisiana | 6.8% | 5.1% |
| Georgia | 6.0% | 5.7% |
| Total for top five states: | 62.1% | 58.7% |
|  | Farms with a Native Hawaiian or Other Pacific Islander principal producer | |
| United States | 2,092 | 426,068 |
| **States** |  |  |
| Hawaii | 36.9% | 16.3% |
| California | 14.6% | 41.1% |
| Texas | 6.1% | 3.6% |
| Florida | 3.8% | 0.5% |
| Oregon | 3.2% | 0.9% |
| Total for top five states: | 64.6% | 62.4% |
|  | Farms with a white principal producer | |
| United States | 1,955,737 | 843,497,615 |
| **States** |  |  |
| Texas | 12.1% | 14.9% |
| Missouri | 4.8% | 3.3% |
| Iowa | 4.4% | 3.6% |
| Ohio | 4.0% | 1.7% |
| Kentucky | 3.8% | 1.5% |
| Total for top five states: | 29.1% | 24.9% |

Source: 2017 U.S. Census of Agriculture

Table 5. Distribution of farms and acreage by State, Race, and Ethnicity, 2017

| Geographic area | Farms with an Hispanic, Latino, or Spanish principal producer | | Farms with an American Indian or Alaska Native principal producer | | Farms with an Asian principal producer | | Farms with a Black or African American principal producer | | Farms with a Native Hawaiian or Other Pacific Islander principal producer | | Farms with a White principal producer | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Farms | Land in farms (acres) | Farms | Land in farms (acres) | Farms | Land in farms (acres) | Farms | Land in farms (acres) | Farms | Land in farms (acres) | Farms | Land in farms (acres) |
| United States | 3.8% | 2.9% | 1.9% | 5.7% | 0.7% | 0.2% | 1.6% | 0.4% | 0.1% | 0.0% | 95.8% | 93.7% |
| **States** | | | | | | | | | | | | |
| Alabama | 1.0% | 0.8% | 1.4% | 0.8% | 0.2% | 0.1% | 7.2% | 3.7% | 0.0% | 0.0% | 91.0% | 95.2% |
| Alaska | 2.5% | 0.2% | 4.4% | 37.9% | 0.6% | 0.0% | 0.5% | (D) | 0.0% | 0.0% | 95.4% | 62.3% |
| Arizona | 5.2% | 5.2% | 60.6% | 77.0% | 0.4% | 0.1% | 0.2% | 0.0% | 0.2% | 0.0% | 38.8% | 24.2% |
| Arkansas | 1.8% | 1.0% | 1.0% | 0.6% | 0.8% | 0.2% | 2.4% | 1.1% | 0.0% | 0.0% | 95.6% | 97.5% |
| California | 13.5% | 8.7% | 1.5% | 1.5% | 5.8% | 2.6% | 0.4% | 0.3% | 0.4% | 0.7% | 92.5% | 95.8% |
| Colorado | 7.1% | 3.2% | 1.0% | 2.9% | 0.6% | 0.2% | 0.2% | 0.0% | 0.1% | 0.1% | 98.3% | 96.9% |
| Connecticut | 1.8% | 0.8% | 0.2% | 0.2% | 0.5% | 0.2% | 0.3% | 0.1% | 0.0% | (D) | 99.0% | 99.6% |
| Delaware | 1.3% | 0.4% | 0.0% | (D) | 1.4% | 0.2% | 0.8% | 0.2% | 0.0% | 0.0% | 97.7% | 99.2% |
| Florida | 10.2% | 5.1% | 0.9% | 1.7% | 1.8% | 0.7% | 3.2% | 0.9% | 0.2% | 0.0% | 94.1% | 96.1% |
| Georgia | 1.6% | 1.0% | 0.4% | 0.3% | 0.6% | 0.2% | 4.5% | 2.2% | 0.0% | 0.0% | 94.3% | 97.1% |
| Hawaii | 7.6% | 4.3% | 0.5% | 0.3% | 31.5% | 16.3% | 0.3% | 0.0% | 10.5% | 6.1% | 54.2% | 68.1% |
| Idaho | 3.5% | 3.2% | 0.7% | 3.5% | 0.3% | 0.3% | 0.0% | 0.0% | 0.1% | 0.0% | 98.9% | 96.6% |
| Illinois | 0.9% | 0.7% | 0.1% | 0.0% | 0.1% | 0.1% | 0.2% | 0.1% | 0.0% | 0.0% | 99.4% | 99.7% |
| Indiana | 1.0% | 0.7% | 0.2% | 0.1% | 0.1% | 0.0% | 0.2% | 0.1% | 0.0% | 0.0% | 99.5% | 99.8% |
| Iowa | 0.6% | 0.6% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 99.8% | 99.9% |
| Kansas | 1.6% | 1.1% | 0.7% | 0.4% | 0.1% | 0.1% | 0.3% | 0.1% | 0.0% | 0.0% | 98.9% | 99.3% |
| Kentucky | 0.7% | 0.4% | 0.2% | 0.1% | 0.1% | 0.1% | 0.5% | 0.3% | 0.0% | 0.0% | 99.0% | 99.4% |
| Louisiana | 2.4% | 2.0% | 0.7% | 0.5% | 0.2% | 0.1% | 8.0% | 2.5% | 0.1% | 0.0% | 90.9% | 96.8% |
| Maine | 1.3% | 0.6% | 0.3% | (D) | 0.4% | 0.1% | 1.7% | (D) | 0.1% | 0.0% | 97.7% | 99.4% |
| Maryland | 1.6% | 0.5% | 0.3% | (D) | 1.3% | 0.3% | 1.4% | 0.4% | 0.1% | (D) | 96.7% | 99.2% |
| Massachusetts | 2.0% | 1.8% | 0.2% | (D) | 0.8% | 0.4% | 1.8% | 0.1% | 0.1% | 0.0% | 96.9% | 99.3% |
| Michigan | 1.5% | 0.7% | 0.5% | 0.4% | 0.2% | 0.1% | 0.5% | 0.1% | 0.0% | 0.0% | 98.7% | 99.3% |
| Minnesota | 0.7% | 0.9% | 0.2% | 0.2% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 99.4% | 99.6% |
| Mississippi | 1.2% | 1.0% | 0.3% | 0.2% | 0.2% | 0.1% | 14.0% | 5.7% | 0.1% | 0.1% | 85.4% | 93.8% |
| Missouri | 1.1% | 0.7% | 0.6% | 0.3% | 0.3% | 0.1% | 0.2% | 0.1% | 0.0% | 0.0% | 98.8% | 99.3% |
| Montana | 1.2% | 1.7% | 4.8% | 8.0% | 0.2% | 0.2% | 0.1% | 0.1% | 0.1% | 0.0% | 95.1% | 92.1% |
| Nebraska | 0.8% | 1.0% | 0.1% | 0.2% | 0.1% | 0.0% | 0.0% | (D) | 0.0% | 0.0% | 99.7% | 99.6% |
| Nevada | 6.0% | 3.7% | 6.2% | 22.2% | 0.5% | 0.1% | 0.3% | 0.1% | 0.0% | 0.0% | 93.6% | 78.1% |
| New Hampshire | 1.1% | 0.7% | 0.3% | (D) | 0.3% | 0.0% | 0.9% | 0.0% | 0.0% | 0.0% | 98.2% | 99.5% |
| New Jersey | 3.3% | 2.1% | 0.2% | 0.2% | 1.5% | 1.7% | 0.6% | 0.1% | 0.0% | (D) | 97.8% | 98.1% |
| New Mexico | 32.8% | 13.2% | 23.6% | 18.0% | 0.3% | 0.1% | 0.2% | 0.1% | 0.1% | 0.0% | 76.0% | 82.3% |
| New York | 1.2% | 0.8% | 0.3% | 0.3% | 0.3% | 0.2% | 0.2% | 0.1% | 0.0% | 0.0% | 99.1% | 99.5% |
| North Carolina | 1.2% | 0.9% | 1.2% | 1.0% | 0.6% | 0.2% | 3.1% | 2.0% | 0.0% | 0.0% | 95.2% | 96.8% |
| North Dakota | 0.7% | 0.5% | 0.9% | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | (D) | 99.0% | 99.1% |
| Ohio | 0.9% | 0.6% | 0.2% | 0.1% | 0.2% | 0.1% | 0.2% | 0.1% | 0.0% | 0.0% | 99.3% | 99.7% |
| Oklahoma | 2.5% | 1.6% | 11.0% | 6.5% | 0.4% | 0.1% | 1.6% | 0.8% | 0.1% | 0.0% | 88.1% | 92.5% |
| Oregon | 3.9% | 1.4% | 1.3% | 4.1% | 1.2% | 0.3% | 0.1% | 0.1% | 0.2% | 0.0% | 97.8% | 93.9% |
| Pennsylvania | 1.0% | 0.6% | 0.2% | 0.2% | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 99.4% | 99.6% |
| Rhode Island | 0.8% | 0.6% | 0.0% | 0.0% | 0.9% | 0.5% | 1.2% | (D) | 0.0% | 0.0% | 98.5% | 100.0% |
| South Carolina | 1.4% | 0.8% | 0.5% | 0.2% | 0.3% | 0.2% | 7.3% | 4.0% | 0.1% | 0.0% | 91.8% | 95.6% |
| South Dakota | 0.7% | 0.8% | 2.5% | 7.8% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | (D) | 97.7% | 92.7% |
| Tennessee | 1.3% | 0.7% | 0.4% | 0.3% | 0.2% | 0.1% | 1.4% | 1.0% | 0.0% | 0.1% | 98.0% | 98.5% |
| Texas | 11.3% | 5.6% | 0.9% | 0.5% | 0.4% | 0.1% | 3.2% | 0.7% | 0.1% | 0.0% | 95.5% | 98.6% |
| Utah | 2.3% | 1.6% | 3.9% | 37.0% | 0.4% | 0.2% | 0.0% | 0.0% | 0.1% | 0.0% | 95.8% | 63.0% |
| Vermont | 1.4% | 1.2% | 0.3% | 0.2% | 0.1% | 0.0% | 0.2% | 0.3% | 0.0% | 0.0% | 99.2% | 99.0% |
| Virginia | 1.4% | 1.3% | 0.3% | 0.2% | 0.4% | 0.2% | 2.9% | 1.8% | 0.1% | 0.0% | 96.4% | 97.8% |
| Washington | 5.4% | 10.9% | 1.2% | 19.2% | 1.4% | 0.4% | 0.2% | 0.0% | 0.2% | 0.0% | 97.1% | 80.3% |
| West Virginia | 1.2% | 1.2% | 0.2% | 0.2% | 0.2% | 0.1% | 0.1% | 0.0% | 0.0% | (D) | 99.2% | 99.3% |
| Wisconsin | 0.7% | 0.5% | 0.2% | 0.2% | 0.5% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 99.4% | 99.8% |
| Wyoming | 2.6% | 2.2% | 1.3% | 1.7% | 0.1% | 0.0% | 0.1% | (D) | 0.0% | (D) | 98.5% | 98.2% |

Source: 2017 U.S. Census of Agriculture

Table 6. Average Income by Farm by Farming Activity and Race/Ethnicity (2017)

| | AIAN | | Asian | | Black | | NHPI | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of farms | Ave $ | % of farms | Ave $ | % of farms | Ave $ | % of farms | Ave $ | % of farms | Ave $ | % of farms | Ave $ |
| All | | $ 58,885 | | $ 406,669 | | $ 39,928 | | $ 163,776 | | $ 252,267 | | $ 193,132 |
| Crops | 29.8% | $ 79,956 | 63.8% | $ 367,152 | 35.9% | $ 67,297 | 48.4% | $ 207,320 | 40.4% | $ 367,165 | 50.3% | $ 191,478 |
| Livestock, poultry, and products | 55.3% | $ 63,389 | 14.5% | $1,082,108 | 51.4% | $ 30,660 | 42.8% | $ 148,288 | 46.7% | $ 222,956 | 48.4% | $ 200,023 |
| Cattle and calves | 34.6% | $ 53,017 | 13.1% | $ 46,068 | 39.8% | $ 14,213 | 23.3% | $ 47,196 | 28.9% | $ 135,675 | 35.0% | $ 110,740 |
| Milk from cows | 0.4% | $ 790,752 | 0.3% | $1,001,825 | 0.2% | $ 389,065 | 0.8% | $2,497,273 | 0.8% | $4,158,111 | 2.0% | $ 909,724 |
| Poultry and Eggs | 8.8% | $ 122,049 | 14.5% | $1,082,108 | 6.0% | $ 112,053 | 11.4% | $ 169,395 | 10.2% | $ 207,894 | 8.1% | $ 287,933 |

Source: Race, Ethnicity, Gender Profile, 2017, USDA. www.nass.usda.gov/AgCensus.

Table 7. Number of Loan Applications by Year, Race, and Ethnicity (2000-2020)

| | Number | | | | | | | % Share | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | White | Black/ African American | Asian | American Indian/ Alaskan Native | Hawaiian/ Pacific Islanders | Hispanic | Total | White | Black/ African American | Asian | American Indian/ Alaskan Native | Hawaiian/ Pacific Islanders | Hispanic |
| 2000 | 24548 | 1472 | 162 | 1015 | 43 | 693 | 26972 | 91.0% | 5.5% | 0.6% | 3.8% | 0.2% | 2.6% |
| 2001 | 25010 | 1432 | 185 | 1059 | 40 | 682 | 27460 | 91.1% | 5.2% | 0.7% | 3.9% | 0.1% | 2.5% |
| 2002 | 23903 | 1247 | 150 | 1145 | 50 | 714 | 26284 | 90.9% | 4.7% | 0.6% | 4.4% | 0.2% | 2.7% |
| 2003 | 23611 | 1277 | 119 | 1288 | 57 | 706 | 26157 | 90.3% | 4.9% | 0.5% | 4.9% | 0.2% | 2.7% |
| 2004 | 20148 | 1161 | 167 | 1163 | 280 | 804 | 22758 | 88.5% | 5.1% | 0.7% | 5.1% | 1.2% | 3.5% |
| 2005 | 21654 | 1420 | 175 | 1416 | 70 | 753 | 24526 | 88.3% | 5.8% | 0.7% | 5.8% | 0.3% | 3.1% |
| 2006 | 24840 | 954 | 197 | 1391 | 83 | 681 | 27213 | 91.3% | 3.5% | 0.7% | 5.1% | 0.3% | 2.5% |
| 2007 | 24611 | 874 | 218 | 1319 | 107 | 709 | 26843 | 91.7% | 3.3% | 0.8% | 4.9% | 0.4% | 2.6% |
| 2008 | 26667 | 1028 | 262 | 1729 | 89 | 1026 | 29466 | 90.5% | 3.5% | 0.9% | 5.9% | 0.3% | 3.5% |
| 2009 | 36240 | 1134 | 314 | 2240 | 92 | 1284 | 39650 | 91.4% | 2.9% | 0.8% | 5.6% | 0.2% | 3.2% |
| 2010 | 36077 | 1115 | 277 | 2442 | 92 | 1395 | 39592 | 91.1% | 2.8% | 0.7% | 6.2% | 0.2% | 3.5% |
| 2011 | 31542 | 1128 | 300 | 2472 | 118 | 1350 | 35131 | 89.8% | 3.2% | 0.9% | 7.0% | 0.3% | 3.8% |
| 2012 | 34506 | 1223 | 300 | 3086 | 78 | 1572 | 38585 | 89.4% | 3.2% | 0.8% | 8.0% | 0.2% | 4.1% |
| 2013 | 32116 | 1733 | 305 | 3203 | 109 | 1688 | 36813 | 87.2% | 4.7% | 0.8% | 8.7% | 0.3% | 4.6% |
| 2014 | 34006 | 1886 | 276 | 3644 | 127 | 1830 | 39174 | 86.8% | 4.8% | 0.7% | 9.3% | 0.3% | 4.7% |
| 2015 | 39728 | 2051 | 327 | 4250 | 134 | 2301 | 45612 | 87.1% | 4.5% | 0.7% | 9.3% | 0.3% | 5.0% |
| 2016 | 39254 | 1844 | 396 | 4479 | 123 | 2206 | 45183 | 86.9% | 4.1% | 0.9% | 9.9% | 0.3% | 4.9% |
| 2017 | 37292 | 1542 | 360 | 4126 | 145 | 2160 | 42599 | 87.5% | 3.6% | 0.8% | 9.7% | 0.3% | 5.1% |
| 2018 | 34905 | 1305 | 365 | 3765 | 156 | 1914 | 39724 | 87.9% | 3.3% | 0.9% | 9.5% | 0.4% | 4.8% |
| 2019 | 35254 | 1204 | 321 | 4122 | 144 | 1799 | 40118 | 87.9% | 3.0% | 0.8% | 10.3% | 0.4% | 4.5% |
| 2020 | 37787 | 1406 | 416 | 3895 | 144 | 1779 | 42918 | 88.0% | 3.3% | 1.0% | 9.1% | 0.3% | 4.1% |
| Total | 643699 | 28436 | 5592 | 53249 | 2281 | 28046 | 722778 | 89.1% | 3.9% | 0.8% | 7.4% | 0.3% | 3.9% |

Source: Direct Loan data provided by USDA

| | | | | | | | Table 8. Application Withdrawal Rates by Race, Ethnicity, and Year (2000-2020) | Difference between Whites and Minorities | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black/African American | Asian | American Indian/Alaskan Native | Hawaiian/Pacific Islanders | Hispanic | Black/African American | Asian | American Indian/Alaskan Native | Hawaiian/Pacific Islanders | Hispanic |
| 2000 | 17.6% | 29.5% | 23.0% | 17.3% | 41.9% | 29.6% | 11.9% | 5.4% | -0.3% | 24.3% | 12.0% |
| 2001 | 19.7% | 30.0% | 24.3% | 19.0% | 25.0% | 37.0% | 10.3% | 4.6% | -0.7% | 5.3% | 17.3% |
| 2002 | 20.0% | 32.5% | 36.7% | 18.4% | 30.0% | 28.2% | 12.5% | 16.7% | -1.6% | 10.0% | 8.2% |
| 2003 | 19.4% | 34.1% | 31.1% | 22.8% | 17.5% | 33.3% | 14.7% | 11.7% | 3.4% | -1.9% | 13.9% |
| 2004 | 19.2% | 37.0% | 31.1% | 22.0% | 3.9% | 32.0% | 17.8% | 11.9% | 2.8% | -15.3% | 12.8% |
| 2005 | 18.3% | 45.7% | 23.4% | 20.7% | 21.4% | 36.1% | 27.4% | 5.1% | 2.4% | 3.1% | 17.8% |
| 2006 | 18.7% | 31.9% | 35.0% | 21.4% | 18.1% | 31.1% | 13.2% | 16.3% | 2.7% | -0.6% | 12.4% |
| 2007 | 19.3% | 31.3% | 31.7% | 21.8% | 15.9% | 29.9% | 12.0% | 12.4% | 2.5% | -3.4% | 10.6% |
| 2008 | 20.3% | 33.5% | 32.4% | 20.5% | 20.2% | 29.4% | 13.2% | 12.1% | 0.2% | -0.1% | 9.1% |
| 2009 | 21.2% | 31.0% | 31.5% | 23.0% | 13.0% | 28.4% | 9.8% | 10.3% | 1.8% | -8.2% | 7.2% |
| 2010 | 20.4% | 30.1% | 30.0% | 20.9% | 13.0% | 28.5% | 9.7% | 9.6% | 0.5% | -7.4% | 8.1% |
| 2011 | 20.4% | 29.3% | 31.3% | 21.8% | 21.2% | 27.0% | 8.9% | 10.9% | 1.4% | 0.8% | 6.6% |
| 2012 | 20.1% | 28.7% | 34.3% | 20.7% | 16.7% | 25.1% | 8.6% | 14.2% | 0.6% | -3.4% | 5.0% |
| 2013 | 19.5% | 27.6% | 30.8% | 18.8% | 17.4% | 25.5% | 8.1% | 11.3% | -0.7% | -2.1% | 6.0% |
| 2014 | 18.9% | 30.1% | 26.4% | 15.9% | 14.2% | 26.6% | 11.2% | 7.5% | -3.0% | -4.7% | 7.7% |
| 2015 | 19.1% | 30.2% | 30.3% | 16.5% | 17.2% | 24.3% | 11.1% | 11.2% | -2.6% | -1.9% | 5.2% |
| 2016 | 21.1% | 33.4% | 29.8% | 18.9% | 18.7% | 24.7% | 12.3% | 8.7% | -2.2% | -2.4% | 3.6% |
| 2017 | 20.6% | 34.2% | 28.3% | 18.3% | 21.4% | 25.7% | 13.6% | 7.7% | -2.3% | 0.8% | 5.1% |
| 2018 | 20.8% | 34.6% | 31.8% | 17.4% | 23.1% | 25.5% | 13.8% | 11.0% | -3.4% | 2.3% | 4.7% |
| 2019 | 20.8% | 33.8% | 25.5% | 18.2% | 19.4% | 24.8% | 13.0% | 4.7% | -2.6% | -1.4% | 4.0% |
| 2020 | 21.7% | 42.9% | 37.5% | 17.5% | 28.2% | 30.5% | 21.2% | 15.8% | -4.2% | 6.5% | 8.8% |

Source: Direct Loan data provided by USDA

127

**Appendix D: List of Tables and Figures**

<u>List of Tables</u>

Table 1. Number of Borrowers by Race and Economic Class
Table 2. Number of Farms and Percentage of Farms by Race/Ethnicity, 1978-2017
Table 3A. Number of U.S. Producers by Race/Ethnicity, 2017 versus 2010 Population
Table 3B. Number of U.S. Producers by Race/Ethnicity, 2017 versus 2010 Rural Population
Table 3C. Top Five States by % of Farms by Race/Ethnicity, 2017 and Shares of Population (2010) and Farms (2017)
Table 3D. Top Five States by % of Farms by Race/Ethnicity, 2017 and Shares of Rural Population (2010) and Farms (2017)
Table 4. Selected Farm Characteristics by Principal Producer Race/Ethnicity, 2017
Table 5. Share of Farms by Selected Farm Characteristics and Principal Producer Race/Ethnicity, 2017
Table 6. Distribution of Farms by Principal Producer Race/Ethnicity, 2017
Table 7. Top Five States by % of Farms by Race/Ethnicity, 2017: Average Farm Size (acres)
Table 8. Farms, Acreage, Income, and Expenses by Producer Race/Ethnicity, 2017
Table 9. Selected Farm Characteristics by Principal Producer Race/Ethnicity, 2017
Table 10. Agricultural Activity on 76 Selected Indian Reservations, by Primary Farm or Ranch Operator (2012)
Table 11. Average farm and household characteristics by SDFR status
Table 12. Median farm and household characteristics by SDFR status
Table 13. Additional Producer Characteristics, 2017
Table 14. Share of New and Beginning Farmers versus All Producers by Race/Ethnicity, 2017
Table 15. Number of U.S. Producers by Race/Ethnicity (2017) versus 2010 Population
Table 16. Shares of Market Value and Farms by Type of Agriculture Products Sold and Shares of Livestock, 2017
Table 17. Cattle Farming and Ranching, 2017
Table 18. Farms Loan Programs Direct and Guaranteed Loans with Unpaid Debt Balances of Minority Borrowers
Table 19. Farm Loan Programs Direct and Guaranteed Loans with Unpaid Debt Balances of Minority and Non-Minority Borrowers
Table 20. Market Facilitation Program Data, Program Years 2018-2019
Table 21. Coronavirus Food Assistance Program Data, through January 27, 2021
Table 22. Credit Risk Assessment by Race/Ethnicity (2000-2020)

<u>List of Figures</u>

Figure 1. Average Loan Size by Race and Economic Class
Figure 2. Average Loan Size Per $1000 of Net Worth by Race and Economic Class
Figure 3. Share of US Population by Race and Ethnicity (1940-2010)
Figure 4. Farms by Producer Race (1920-2017)
Figure 5. Share of U.S. Farms by Producer Race/Ethnicity (1978-2017)
Figure 6. Percent of Rural and Urban Populations by Race/Ethnicity, 2017
Figure 7. Farm Size by Race/Ethnicity, 2017

Figure 8. Delinquency Rates for Direct Loans by Race/Ethnicity
Figure 9. Share of Loan Applications by Race/Ethnicity (2000-2020)
Figure 10. Share of Loan Applications Withdrawn by Race/Ethnicity (2000-2020)

<u>List of Tables in Appendix C</u>

Table 1. Population by Race and Ethnicity (1940-2020)
Table 2. Share of U.S. Farms Owned by Whites, Blacks and Other Race (1920-2017)
Table 3. Population Shares by State, Race, and Ethnicity, 2010
Table 4. Top Five States by % of Farms by Race/Ethnicity, 2017
Table 5. Distribution of Farms and Acreage by State, Race, and Ethnicity, 2017
Table 6. Average Farm Income by Type of Farming and Race/Ethnicity, 2017
Table 7. Number and Share of Loan Applications by Year, Race, and Ethnicity (2000-2020)
Table 8. Application Withdrawal Rates by Year, Race, and Ethnicity (2000-2020)