# Exhibit 9

P. Mot. for Summ. J./ARPA_WYNN2465

Court: S.D. Ill.  Case No. 3:21cv540-NJR

Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento CA 95814 – 916.419.7111

Agric Hum Values (2017) 34:631–643
DOI 10.1007/s10460-016-9756-6



# A new era of civil rights? Latino immigrant farmers and exclusion at the United States Department of Agriculture

Laura-Anne Minkoff-Zern[1] · Sea Sloat[2]

Accepted: 4 November 2016 / Published online: 10 November 2016
© Springer Science+Business Media Dordrecht 2016

**Abstract** In this article we investigate how Latino immigrant farmers in the Mid-Atlantic region of the United States navigate United States Department of Agriculture (USDA) programs, which necessitate standardizing farming practices and an acceptance of bureaucracy for participation. We show how Latino immigrant farmers' agrarian norms and practices are at odds with the state's requirement for agrarian standardization. This interview-based study builds on existing historical analyses of farmers of color in the United States, and the ways in which their farming practices and racialized identities are often unseen by and illegible to the state. This disjuncture leads to the increased racial exclusion of immigrant farmers from USDA opportunities. Such exclusions impede the transition to a "new era of civil rights," as has been proclaimed by USDA leadership. Although efforts to address institutionalized racism on a national level may be genuine, they have failed to acknowledge this schism between rural Latino immigrants and the state, thereby inhibiting a meaningful transition in the fields, and continuing a legacy of unequal access to agrarian opportunities for non-white immigrant farmers.

& Laura-Anne Minkoff-Zern
 [ HYPERLINK "mailto:lminkoff@syr.edu" \h ]

Sea Sloat [ HYPERLINK "mailto:ssloat@gmail.com" \h ]

[1] Department of Public Health, Food Studies, and Nutrition, David B. Falk College of Sport and Human Dynamics, Syracuse University, 544 White Hall, Syracuse, NY 13244, USA

[2] 3009 Abell Ave, Baltimore, MD 21218, USA

**Keywords** Immigrant farming · Race in agriculture · Latino farmers · United States Department of Agriculture (USDA)

## Introduction

Following a United States Department of Agriculture (USDA) staff member in her white sedan with government plates, we drove our own unmarked rental car through a winding country highway. We passed corn and soybean fields, farmhouses, and a small downtown with a few local businesses. We drove up a gravel driveway and parked behind the USDA car. Trailing the staff member, a white female soil conservationist, we walked unannounced onto a farm with a few acres of diverse vegetables, a farmhouse, a shed, and a hoop house. The hoop house had been financed through a grant from the USDA's National Resource Conservation Service (NRCS), giving the staff member rights to visit the property and inspect the structure and property randomly for the first 3 years, to validate that it is up to code and being used properly.

USDA staff in the Northern Neck of Virginia promotes the hoop house, or "high tunnel" installation program to local vegetable farmers. These tunnel-shaped greenhouses allow farmers to start their seeds and get their crops to

13

variety of loans, grants, and crop insurance programs, which vary year to year. Although the USDA targets historically discriminated against populations, including Latinos, as part of their Socially Disadvantaged Applicant Program for guaranteed, direct operating, and direct farm loans, not many Latino farmers take advantage of them.[ HYPERLINK \l "_bookmark0" ]

The farm we visited is owned and operated by a Mexican immigrant farmer, one of a small number of Latino farmers in Virginia who directly participates in a USDA funded program. Latino farmers have a low rate of inclusion in USDA programs nationally. In 2012, the census recorded 79,807 farm operators of Hispanic/Latino origin. One hundred and sixty-five Commodity Credit Corporation loans, 3244 Conservation Reserve, Wetland Reserve, Farmable Wetlands, or Conservation Reserve Enhancement program payments, and 13,276 other federal farm program payments were awarded to Latino operators. Respectively, that indicates a 0.2, 4, and 17% inclusion rate for each program. Comparatively, the census recorded 2,034,439 white farm operators in 2012. They participated in the same loan programs at a rate of 0.6, 14, and 34% (USDA [ HYPERLINK \l "_bookmark29" ]). From these numbers, Latino farmers uti- lized USDA loans and other direct assistance programs at about one-third to a half of the rate of white farmers. This is regardless of the fact that they are a growing presence among new farmers in the United States.

According to official USDA agricultural census data, the number of farms with principal operators of "Spanish, Hispanic, or Latino origin," grew from 50,592 in 2002 to 55,570 in 2007. In 2012, the number increased again, to 67,000 farms, a twenty-one percent increase over 5 years, Latinos making up three percent of all principle operators.[ HYPERLINK \l "_bookmark1" ] Of those 67,000 Latino farm operators, the vast majority

outreach to all groups deemed socially disadvantaged farmers in recent years, they also agreed that the farmers discussed in this study are still underrepresented in the census. Despite these issues, the census is still the best comprehensive national agricultural data we have to date and provides context for racial and ethnic shifts occurring in US agriculture.

---

[1] For more information on the Socially Disadvantaged Applicant Program, see [ HYPERLINK "http://www.fsa.usda.gov/FSA/webapp?area=home&subject=prod&topic=sfl" \h ] [ HYPERLINK "http://www.fsa.usda.gov/FSA/webapp?area=home&subject=prod&topic=sfl" \h ].

[2] These numbers do not tell us how many are first generation immigrants. The number of operators that were also owners before 2012 is not available. We would argue Latino immigrants are generally being undercounted in these numbers. Almost none of the farmers we interviewed had heard of the Agricultural Census. Many farm on rented land, often under informal agreements. Even those that own their land rarely live on the farm. Given their histories of immigration, many are resistant to filling out government paperwork. Additionally, Hispanic/Latino is considered an ethnicity, not a race, by the Census, and if they check this box they must also choose a race, such as White, Black, or Native American, none of which are representative of the farmers we interviewed. In discussions with Census of Agriculture Staff who outreach to Hispanic/Latino populations, it was confirmed that although they have increased

ARPA_WYNN_00002468

Case 3:21-cv-00540-NJR   Document 48-9   Filed 02/01/22   Page 4 of 8   Page ID #530

A new era of civil rights? Latino immigrant farmers and exclusion at the United States... 633

(64,439), were the primary farm business owners as well. Comparatively, Asian principle operators also grew 21% in that period, although they make up less than 1% of all farmers overall. Black principle operators grew 12%, still making up only one point four percent of all farmers nationally. In contrast, during the same period the population of white principle operators fell 5% and overall the number of farmers dropped four percent (USDA [ HYPERLINK \l "_bookmark29" ]). As many Latino farmers transition from working as laborers in others' fields to positions as farm owners and operators, they, along with other farmers of color, represent the new face of a flourishing generation of farmers.

In response to a number of civil rights lawsuits against the USDA on behalf of African American, Hispanic, Native American, and female farmers, US Secretary of Agriculture Tomas Vilsack ([ HYPERLINK \l "_bookmark32" ]) has proclaimed a ''new era of civil rights,'' for the agency.[ HYPERLINK \l "_bookmark2" ] Despite this procla- mation and the fact that their numbers are growing, immigrant farmers are still not extended the same oppor- tunities as other farmers, due to the fact that their practices are often incompatible with the standardization and bureaucracy required to be properly acknowledged and supervised by the USDA. Their direct market approach, planting of diverse crops, reliance on family labor, and lack of record keeping stand in contrast to the dominant model of US industrial agriculture.[ HYPERLINK \l "_bookmark3" ]

It is not simply the size or scale of their farms that bars them from accessing USDA resources, although that cer- tainly limits what is available to them. The farmers in this study have limited formal education, literacy, and English language skills, and are therefore exceptionally daunted by the paperwork necessary for government grant, loan, and insurance applications. Additionally, it is not routine for Latino immigrant farmers to record and track their own farming progress and decisions in writing. In contrast, their farming knowledge tends to be documented and dissemi- nated through word of mouth. As has been the case for other farmers who do not replicate state-sanctioned or dominant forms of farming, these practices and forms of agrarian knowledge sharing may be interpreted as unsci- entific, or ''illegible'' to the state, and therefore not deemed worthy of acknowledgement (Scott [ HYPERLINK \l "_bookmark44" ]), or in this case,

We are not claiming that family labor is inherently a better system or more equitable, only that it is evidence of a particular form of farming. Hiring family labor by no means ensures labor justice on the farm. In particular, family labor can reinforce patriarchal agrarian relations and patterns (See Feldman and Welsh [ HYPERLINK \l "_bookmark18" ]; Reed et al. [ HYPERLINK \l "_bookmark41" ]; Riley [ HYPERLINK \l "_bookmark42" ]).

---

[3] Lawsuits include the *Pigford v. Glickman* and *Brewington v. Glickman* class action lawsuits for African American farmers, The *Keepseagle v. Vilsack* settlement for Native American farmers, and The Hispanic Farmers and Ranchers and Female Farmers and Ranchers claims processes. More information can be found at [ HYPERLINK "http://www.outreach.usda.gov/settlements.htm" \h ].

ARPA_WYNN_00002469

Case 3:21-cv-00540-NJR   Document 48-9   Filed 02/01/22   Page 5 of 8   Page ID #531

the land. There's no one paying us $8 an hour. There's no one paying us." As independent business owners, they are subject to the unpredictability of the market. As farmers, they are additionally vulnerable to uncertain weather and climate conditions. Overwhelmingly, though, the satisfaction that comes with making their own decisions keeps them farming, regardless of the struggles. As one farmer shared, "I feel happy that it's *my* business, that we can make our own decisions." Even in the most difficult times, the desire to maintain control over one's labor and growing practices transcends the daily obstacles of small-scale farming.

On their farms and in their businesses, farmers avoid cultivation systems imposed upon them by outsiders, be they wholesalers who would tell them what to plant and how much (in order to secure a market), or government officials whose programs require particular crops and techniques to qualify for assistance, as described in the cover crop and hoop house program below. All the farmers interviewed plant diverse fruits and vegetables, an important strategy for selling directly to customers at farmers' markets, their primary outlet for sales. Some noted they sold to their extended community as well, as part of a more informal market. Rarely did we hear of them selling to restaurants or local stores, as luxury crop buyers usually go with more socially connected and better-marketed white farmers, and contracts with large grocery chains go through a wholesale purchaser, requiring larger quantities than they grow. Generally, they are able to avoid selling through a middleman or outlets that would require reducing their diversity or standardizing their practices. Growing diverse crops is also often reflective of their previous farming experience in Mexico and Central America, although climates, markets, crop varieties, and other resource availability differs greatly.

One farmer, who grows a diversity of crops, from standard farmers' market produce like kale and heirloom tomatoes to less common products for the region, like peanuts and purple potatoes, told us that growing a variety of crops is an important strategy for attracting customers at the market,

> When you bring more to the market, more people come to buy... Because if I just bring melon, or I don't bring squash, people are only going to buy that, and that's it. But if I bring a little bit of everything, people will come buy one thing and then another... The more varieties you plant, the better. That's why we have a little bit of white potatoes, red, yellow, purple, and then white, purple, and red sweet potato. And then when they go to market and there are all the different colors, everything looks pretty. Red peppers, black peppers, purple peppers, green peppers, white, orange—all the colors.

Like many of the other farmers we interviewed, he also planted Latin American crop varieties, in addition to ones well known to American customers. They grow and sell herbs like *pápalo* and *chipilin*, *pipián* (a squash variety), *tomatillos*, and hot *chiles*, which are hard to find in many parts of the United States. They produce these for their own consumption, as well as for Latino customers, and the occasional US-born or white customers who know how to cook Latin American food or are adventurous chefs.

Yet their choice to cultivate diverse cropping systems, which work well for direct markets and reflect their own experience as farmers pre-immigration, are not supported by the USDA programs made available to them in their local offices. For example, the local office in the Northern Neck region offers a cover crop assistance program, subsidized through state funds. But as the staff from the local NRCS office told us, this program is not tailored to their needs as diversified fruit and vegetable farmers,

> I also offer this cover crop program for them. That program is through... it's a state program. But most of them- the cover crop has to stay on the land, between certain planting dates and certain dates that you have to destroy. And that date, the destroyer date is after. Because they start planting around February first: the beginning of February they start discing their land, preparing their land. And that cover crop has to stay on there until the middle of March. And that's not good for vegetable farmers at all because they need that time, they need that land. When it's ready to go, they're ready to go.

> So the cover crops work better for the grain farmers?

> Yes. I have offered several times. I go out there and just try to push the program. And they say no, it's just not good for them because of the rules and regulations of the cover crop program.

This example of poor seasonal fit with available NRCS programs could be equally true for any fruit or vegetable farmer in the region. Yet for Latino immigrant farmers, who have fewer farming options, due to their limited access to capital investment, land, and markets, this misalignment reinforces an existing inequality for already disenfranchised farmers.

In another example, in order to participate in the hoop house program, in addition to being subject to random visits, providing a detailed log of what is planted, how much was spent, and how much profit was made; farmers must also plant particular crops according to USDA

13

ARPA_WYNN_00002479

guidelines. Farmers must prepare and adhere to an operation and maintenance plan, which includes particular instructions as to proper irrigation and planting practices and erosion control. This plan has to be reviewed and approved by a NRCS official. While the few farmers who participate in the program did not express frustration at these requirements, others stayed away from government offices because they did not want to have to answer to outside authorities. One farmer who chose to participate in the hoop house program conveyed both gratitude and frustration,

> We were planting tomatoes, because they're very particular. They [the USDA] want certain stuff. You can't go ahead and do anything you want with them [the hoop houses]... And it's good help. I'm not saying it doesn't help, but we've managed to come so far on our own.

While the farmer expressed gratitude for the financial assistance, she also questioned if the planting restrictions are worth the support. The requirement for standardization feels like a relinquishment of some part of her agrarian autonomy, or the ability to make all farming decisions as she wishes. Even for those that succeed in securing state resources, they seem unsure about the decision to work within certain rules and regulations. However, most farmers never looked into USDA programs due to their suspicion of the government and government officials. This discomfort was compounded by their inability to navigate state bureaucracy. In the section below, we discuss the challenges they face as immigrants with limited English abilities and minimal formal education, contending with the paperwork of state-sponsored programs.

Paperwork and standardization

As can be expected from any government institution, the USDA requires extensive paperwork before, during, and after taking advantage of their loans, grants, or insurance options. When farmers were asked what they think the greatest challenge is for Latino farmers accessing USDA programs, most mentioned the paperwork. This discomfort stems from their general distrust of the US government, coupled with the fact that most Latino immigrant farmers have limited English skills, as well as reading and writing abilities, even in their native language. Although white farmers may also be resistant to paperwork and general bureaucracy, the fact that most farmers we interviewed did not have an education past middle school, means they are lacking the literacy skills necessary to fill out the required paperwork in any language. For many, this means they may never enter the door of the USDA to inquire about opportunities due to intimidation. For others, it may be the ultimate reason they stall in the process and fail to obtain the grant, loan, or insurance package.

Of all the farmers interviewed, only three had successfully used USDA programs- two had grants for hoop houses from the NRCS and one had crop insurance, secured through his local USDA Risk Management Agency office. One farmer also applied for a hoop house and been accepted into the program, but had yet to receive the funds. Local staff are aware of the Latino farmer presence in the area and lacking participation in programs. They discussed with us the ways they tried to conduct outreach, yet were very clear that without a Spanish speaker in the office, their abilities were limited. The local extension agent speaks minimal Spanish and helps Latino farmers access educational materials, but was unable to entice them to apply for USDA funds or programs. A local USDA staff member told us that there must be 10% participation in USDA programs in the region for bilingual forms to be made available. However, it is unlikely there will ever be more than 10% participation if the paperwork is not made available in Spanish in the first place. This catch-22 represents a structural problem within the USDA, which aggravates the already tenuous history of USDA discrimination.

Although some forms are available in Spanish online, finding them is difficult and availability is inconsistent. For example, selected forms for the FSA are available in Spanish on the USDA national site, but not on the Virginia or Maryland state sites specifically (although other states, such as Texas and New York have them on their state sites). For the FSA national site, one must go through an exhaustive search to find the translated forms. To find them, the user must go to the FSA main site, find the link to FSA "Fact Sheets" under the "Newsroom" link, which is listened under the "FSA Home" site. The whole search must be done in English. Then you have to choose from a drop down menu in English to get the translated links. Even then, only a small fraction of all available English forms are available translated. The NRCS national site is somewhat more user friendly for Spanish speakers, with a page specifically dedicated to the forms in Spanish, including Spanish instructions to access the forms.

Without Spanish-speaking outreach abilities, most farmers never hear about the programs available. When asked about the USDA, most farmers interviewed were unaware of opportunities accessible to them. USDA FSA loans are designed for farmers who struggle with traditional bank loans and are meant to be a farmers' first line of credit. Although many farmers interviewed told us they were unable to get access to credit from regular banks, they were unaware that USDA loan programs existed for these

Case 3:21-cv-00540-NJR   Document 48-9   Filed 02/01/22   Page 7 of 8   Page ID #533

A new era of civil rights? Latino immigrant farmers and exclusion at the United States…                                                                    641

reasons specifically. One farmer relayed this lack of awareness,

> The truth is that I don't know what they [the USDA] have… We were told that in Warsaw [Virginia], in the department of environment, where the applications are, that one can fill something out so that they can give you a big greenhouse. However, I only learned about this year. I just didn't know.

Even those who speak nearly perfect English still find the forms intimidating. One immigrant farmer, who has obtained US citizenship, told us,

> I tried in the past to get a small operating loan. And I didn't feel confident enough to fill out the application by myself because there were a lot of questions I didn't know.

Since attempting to apply for her first USDA loan, as described above, she has since applied for another loan that she successfully secured with the assistance of the local FSA staff. Yet, the level of confidence needed to walk into a government office where a huge stack of paperwork awaits is unrealistic for most, especially when understood in context of the tense relationship between most rural Latino immigrants and the state, given their histories of immigration. As noted in the methods section, although most of the farmer participants in this study are documented, many of them got their legal paperwork after crossing the border illegally in the early 1980s. They are all part of a local immigrant community, which includes both documented and undocumented individuals.

Another farmer, who has 60 acres in production, a large vegetable farm for the region, was the only farmer interviewed who had crop insurance. He told us that it took three trips to the offices to get the proper paperwork filled out. He does not read nor write in English or Spanish and found the process intimidating and frustrating, as well as time consuming, beyond what he felt he could afford as the owner and manager of a family-run farm.

The fact that paperwork, and the related language barrier, is the greatest impediment to aid for immigrant farmers is well understood by USDA staff in these counties. One local USDA staff member explains,

> Most of our [Latino] producers- used to have some come in the office. They don't come in anymore. I think it's English. Because we had one that couldn't speak English, and he would always bring his son in here. And then the forms. We have some forms that are in Spanish, but most of our forms aren't. I think it's…where they're used to dealing with more cash than a lot of paperwork. I think they find the paperwork a little overwhelming.

In addition to noting that the written forms themselves are a technical challenge, she highlights that immigrant farmers are not accustomed to operating in bureaucratic environments. Even if the forms were in Spanish, their limited formal education makes the process of filling out paperwork extremely daunting. They are not accustomed to excessive paperwork from their experience as farmers in Mexico, or as farmworkers in the United States.

Even after the initial application for participation in a program is filed, there can be a large amount of follow up paperwork over a long period of time. For example, to participate in the hoop house program, one farmer told us, "What you have to do is keep a log of how much you spent, what you're getting out of it, and your profit out of it. So that's something that we had to do." Another farmer who participated in the program said, "They were very strict and limited to certain stuff [we could plant]… It's very complicated paperwork." They were both grateful for the program support, but expressed that the paperwork was an extra burden on top of their already busy schedules. Those that did use USDA programs also noted that their children, who are often born and educated in the US, were typically responsible for filing this paperwork. They were most comfortable with the language and the formalities of crop documentation, which their parents struggle to navigate. For those farmers without grown or teenaged children to help with the paperwork, participation in such programs was an even greater barrier.

A former staff member at the USDA's Socially Disadvantaged Farmer and Rancher Program at the federal level expressed that although the administration was making attempts to be more inclusive of immigrants and other farmers of color, the changes being made are equivalent to offering "coffee and donuts," rather than addressing uneven access at the local level. She stated that the outreach to socially disadvantaged farmers such as Latino and Black farmers, as a result of the discrimination claims, does not provide the technical assistance that farmers really need,

> 'Here have a cookie and some coffee, honest we'll give you a loan.' But then they leave. And actually, 'No honest, we won't give you a loan,' because nobody actually stopped eating the donut and the coffee and figured out how to get financed, because that would be hard work…'Here's information about the USDA. Hey, by the way, the USDA doesn't discriminate anymore. And we really hope that when you come to our office you'll meet someone that looks like you and treats you with respect, and if they don't, here's your civil rights.' But not, 'So let's sit down with your tax return now.'

In her view, despite the genuine intention of creating more inclusive programs at the federal level, in effect, the USDA's claims of making institutional change to combat historic discrimination are merely rhetoric. She argues that to improve opportunities for disadvantaged farmers, they need technical assistance. In our research, we found that sufficient technical assistance would include linguistic training for local staff and outreach and continued support for farmers with discrepancies in language and literacy.

Lengthy paperwork, required initially when a farmer applies for USDA assistance and throughout the process of utilizing the loan or program, proves to be a barrier to Latino immigrant farmers in accessing state support. Language barriers and uneven formal educational experience aggravate their general wariness of government authority even further. When immigrant farmers cannot speak the language and do not feel confident with the procedures required of them to access programs, this can be interpreted as a problem of legibility. Furthermore, their own agricultural practices and ways of sharing knowledge are not easily recorded in USDA forms. Their planting schedules and cultivation cycles tend to not fit the standardized format the state paperwork requires. It is a lack of translation, both linguistic and cultural, that function to keep Latino immigrant farmers away from USDA offices. It is only by recognizing these disjunctures that the USDA can truly move forward and into a new more inclusive era.

## Towards a new era of inclusion

Under Vilsack's guidance, the USDA has taken several steps working towards a new vision of equality at the federal level. Since 2009, they have provided civil rights trainings to employees, established the Office of Advocacy and Outreach to aid beginning and socially disadvantaged farmers, and claim to be working towards resolving civil rights lawsuits inherited from previous administrations. The department has also vowed to be an equal opportunity employer and create a workforce, which ''represents the full diversity of America'' (USDA [ HYPERLINK \l "_bookmark30" ]).

Unfortunately, in our work we have found that despite claims of increased racial equality from the federal offices of the USDA, little on the ground change is being made in local and regional offices to directly help Latino immigrants overcome obstacles in order to transition from the role of farmworker to farmer in the United States. The processes of monitoring and standardization, as currently required by USDA programs, exacerbate the racial exclusion of immigrant farmers from state programs, and ultimately, from the advantages other farmers receive. This uneven rural development must be understood in context of the historical relationship between Latino immigrants and the state as well as through the lived experiences of those struggling within a system where their practices are not deemed readable. Today's Latino immigrant farmers follow this pattern of racialized others being left out of system where some practices are deemed legible, and therefore legitimate, and others are not.

As previously mentioned, programs that are developed for the specific needs of diversified fruit and vegetable, or specialty crop growers, already exist within the USDA. There are also microloan programs available through the FSA, which are also designed for ''nontraditional'' farmers and require less paperwork, and could be greatly helpful for Latino immigrants as they transition to farm ownership. Additionally, an office of Minority and Socially Disadvantaged Farmers Assistance (MSDA) has been established within the FSA with the express purpose of assisting farmers such as those who participated in this study. These programs are a great start to making government-supported programs available to immigrant growers. Regrettably, due to social divides and language and educational barriers, these programs are unknown to those most in need of assistance.

Of course, some paperwork and state monitoring are necessary for programs to function and for farmers to be held accountable. We do not suggest that these procedures can or should be simply abolished. Rather, these processes must be streamlined to take account of differences in growing practices, linguistic and literacy capabilities, and the need for farmers to maintain autonomy on multiple levels, if they are to build the trust that is so sorely lacking. Programs should be amended to account for differential growing seasons for diverse crops. Technologies such as camera phones could be better utilized for documentation purposes, in contrast to lengthy written paperwork; an idea suggested to us by an extension worker in New York. In all our discussions with USDA and other outreach staff there was an interest in these changes being made to accommodate ''non-traditional'' farmers in the US.

We do not claim that the USDA is the only institutional boundary for Latino immigrant farmers, nor the only place improvements can and should be made. Immigrant farmers struggle with access to capital, outreach and access to markets, general business skills, and many other management practices. But the USDA is the only state institution that claims to provide economic opportunities for rural communities and agricultural producers of the United States. While there are many entrepreneurial and non-profit ventures that focus on advancement for and training of small farmers, farmers of color, and immigrant farmers, they are often working on shoestring budgets, with varying levels of accountability to their clients, and have limited access to resources and markets themselves. The USDA