## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| Matthew MORTON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Thomas J. VILSACK, in his official capacity as Secretary of Agriculture, *et al.* <br><br> Defendants. | Case No. 3:21-cv-00540-NJR |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Thomas J. Vilsack, in his official capacity as Secretary of Agriculture, and Zach Ducheneaux, in his official capacity as Administrator, Farm Services Agency, by counsel and pursuant to Fed. R. Civ. P. 56, for the reasons stated in the accompanying brief, move for summary judgment on the grounds that no dispute of material fact exists and Defendants are entitled to judgment as a matter of law on all claims.

Dated: March 1, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Kyla M. Snow*
KYLA M. SNOW (Ohio Bar No. 96662)
MICHAEL F. KNAPP (Cal. Bar No. 314104)
ALEXANDER V. SVERDLOV
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 514-3259
Fax: (202) 616-8470
Email: kyla.snow@usdoj.gov
*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

Matthew MORTON, *et al.*,

                    Plaintiffs,

            v.

Thomas J. VILSACK, in his official capacity as
Secretary of Agriculture, *et al.*

                    Defendants.

Case No. 3:21-cv-00540-NJR

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 1

    I.    Section 1005 of the American Rescue Plan Act ............................................. 1

    II.   USDA's Farm Service Agency ........................................................................ 3

    III.  Plaintiffs' Lawsuit and Related Section 1005 Challenges .............................. 4

LEGAL STANDARD .................................................................................................................. 5

ARGUMENT ............................................................................................................................... 5

    I.    Section 1005 is constitutional. ......................................................................... 5

        A.    The contours of review under strict scrutiny ..................................... 6

        B.    Section 1005 is supported by a compelling interest ........................... 8

            1.    The well-established evidence of historic discrimination in USDA loan programs ............................................................ 9

            2.    The persistent effects of past discrimination in USDA loan programs ........................................................................ 12

            3.    The failure of the Government's past efforts to remedy the lingering effects of discrimination at USDA ........................... 20

            4.    Plaintiffs fail to rebut Congress's strong basis in evidence ................ 22

        C.    Section 1005 is narrowly tailored to serve that interest ..................... 26

            1.    Debt relief is necessary to remedy the evident lingering effects of discrimination against minority farmers ..................... 26

            2.    Record evidence shows that other alternatives considered and implemented by USDA have been inadequate .......................... 29

            3.    Debt relief satisfies the remaining narrow tailoring criteria ................ 32

            4.    Plaintiff fail to rebut the Government's showing that Section 1005 is narrowly tailored ......................................................... 33

II.    If the court finds Section 1005 unconstitutional, the proper remedy is to extend its benefits, not to nullify the statute. ..................................................................37

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................................................... 6

*Adarand Constructors, Inc. v. Pena,*
  228 F.3d 1147 (10th Cir. 2000) ............................................................................ 7

*Aiken v. City of Memphis,*
  37 F.3d 1155 (6th Cir. 1994) ............................................................................... 22

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................................... 5

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ............................................................................................. 40

*Califano v. Goldfarb,*
  430 U.S. 199 (1977) ............................................................................................. 37

*Califano v. Westcott,*
  443 U.S. 76 (1979) ......................................................................................... 37, 38

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................................... 5

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ......................................................................................... 7, 34

*Concrete Works of Colo., Inc. v. City & Cnty. of Denver,*
  36 F.3d 1513 (10th Cir. 1994) ........................................................................... 6, 7

*Constructors, Inc. v. Slater,*
  228 F.3d 1147 (10th Cir. 2000) ............................................................................ 7

*Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia,*
  6 F.3d 990 (3d Cir. 1993) ..................................................................................... 7

*Dean v. City of Shreveport,*
  438 F.3d 448 (5th Cir. 2006) ............................................................................ 6, 7

*Dep't of Agric. v. Moreno,*
  413 U.S. 528 (1973) ............................................................................................. 37

*DynaLantic Corp. v. U.S. Dep't of Def.,*
  855 F. Supp. 2d 237 (D.D.C. 2012) .................................................................... 36

*Fisher v. Univ. of Tex. at Austin ("Fisher II"),*
  136 S. Ct. 2198 (2016) .............................................................................. 6, 7, 31

*Fisher v. Univ. of Tex. at Austin,*
  570 U.S. 297 (2013) .......................................................................................................... 31

*Fountain v. City of Waycross,*
  701 F. Supp. 1570 (S.D. Ga. 1988) .................................................................................. 19

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) .......................................................................................................... 37

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ............................................................................................... 7, 19, 31

*H.B. Rowe Co., Inc. v. Tippett,*
  615 F.3d 233 (4th Cir. 2010) .......................................................................................... 6, 24

*Higgins v. City of Vallejo,*
  823 F.2d 351 (9th Cir. 1987) ........................................................................................... 19

*Holman v. Vilsack,*
  No. 21-1085, 2021 WL 2877915 (W.D. Tenn. July 8, 2021) ...................................... 9

*In re Black Farmers Discrimination Litig.,*
  856 F. Supp. 2d 1 (D.D.C. 2011) .................................................................................... 11

*Jimenez v. Weinberger,*
  417 U.S. 628 (1974) .......................................................................................................... 37

*Levin v. Com. Energy Inc.,*
  560 U.S. 413 (2010) .......................................................................................................... 37

*Loc. 28 of Sheet Metal Workers Int'l Ass'n v. EEOC*
  478 U.S. 421 (1986) ............................................................................................. 22, 32, 33, 34

*Majeske v. City of Chicago,*
  218 F.3d 816 (7th Cir. 2000) .................................................................................. *passim*

*McKinney v. Cadleway Props., Inc.,*
  548 F.3d 496 (7th Cir. 2008) ............................................................................................. 5

*McNamara v. City of Chicago,*
  138 F.3d 1219 (7th Cir. 1998) .......................................................................................... 6

*Medicines Co. v. Mylan Inc.,*
  No. 11-CV-1285, 2014 WL 1227214 (N.D. Ill. Mar. 25, 2014) ............................... 24

*Midwest Fence Corp. v. U.S. Dep't of Transp.,*
  840 F.3d 932 (7th Cir. 2016) .................................................................................. *passim*

*Midwest Fence Corp. v. U.S. Dep't of Transp.,*
  84 F. Supp. 3d 705 (N.D. Ill. 2015) ................................................................................ 22

*Petit v. City of Chicago,*
  352 F.3d 1111 (7th Cir. 2003) ................................................................ 6, 28

*Ricci v. DeStefano,*
  557 U.S. 557 (2009) ........................................................................................ 7

*Rothe Dev. Corp. v. Dep't of Def.,*
  545 F.3d 1023 (Fed. Cir. 2008) .................................................................. 7, 24

*Rutherford v. City of Cleveland,*
  179 F. App'x 366 (6th Cir. 2006) ................................................................. 19

*Sessions v. Morales-Santana,*
  137 S. Ct. 1678 (2017) .............................................................................. 37, 40

*Stuart v. Roache,*
  951 F.2d 446 (1st Cir. 1991) ...................................................................... 19

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
  402 U.S. 1 (1971) ......................................................................................... 25

*United States v. Paradise,*
  480 U.S. 149 (1987) ............................................................................ *passim*

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ...................................................................................... 7

*Wygant v. Jackson Bd. Of Educ.,*
  476 U.S. 267 (1986) .......................................................................... 6, 8, 25, 26

*Wynn v. Vilsack,*
  545 F. Supp. 3d 1271 (M.D. Fla. 2021) ....................................... 9, 21, 35

## Statutes

7 U.S.C. § 2279 ............................................................................................ 2, 36

American Rescue Plan (ARPA), Pub. L. No. 117-2, 135 Stat. 4 (2021) ............ *passim*

## Rules

Fed. R. Civ. P. 23 ............................................................................................. 4

Fed. R. Civ. P. 56 ............................................................................................. 5

Fed. R. Evid. 702 ........................................................................................... 24

## Regulations

66 Fed. Reg. 21617 (Apr. 30, 2009) ................................................................ 3

74 Fed. Reg. 31567 (July 2, 2009) .................................................................. 3

75 Fed. Reg. 27165 (May 14, 2010) ................................................................ 3

86 Fed. Reg. 28329 (May 26, 2021) ("NOFA") ................................................................... 3

**Legislative Materials**

167 Cong. Rec. H762 (daily ed. Feb. 26, 2021), https://perma.cc/X3TK-44BW ........................ 1, 9, 13

167 Cong. Rec. S1219 (daily ed. March 5, 2021), https://perma.cc/7U6Z-6S7B ............................ *passim*

House Ag. Comm. Hr'g on USDA Oversight (July 22, 2015), https://perma.cc/2PJU-ZRLE .......... 15

Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcom. on Gov't Mgmt., Org.,
    and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. (2008),
    https://perma.cc/ZAK3-6PRC ................................................................................... 12

Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Subcomm.,
    Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Agric., 107th Cong. (2002)
    (2002 Hr'g), https://perma.cc/PN24-BXPP ....................................................... 11, 12, 21

H.R. Rep. No. 117-7 (2021), https://perma.cc/CH87-MWNL ................................................... 1, 8, 15, 38

Opening Stmt. of Sec'y of Agric. Thomas J. Vilsack before House Comm. on Agric.
    (Mar. 25, 2021), https://perma.cc/3LWV-4SMF ........................................................ 8

**Other Authorities**

*Brief for Appellant, Goldfarb,*
    *No. 75-699* (U.S.), 1976 WL 181385 ....................................................................... 39

Civil Rights at the USDA - A Report by the Civil Rights Action Team (CRAT) (1997)
    (CRAT Rpt.), https://perma.cc/5DNF-PFJY ................................................... 10, 21, 29

GAO-19-539, Agric. Lending: Info. on Credit & Outreach to [SDFRs] Is Limited (2019),
    https://perma.cc/5RD6-24VH ........................................................................... 14, 17

Jackson Lewis LLP, "Civil Rights Assessment" Final Report (Mar. 31, 2011) (JL Rpt,)
    https://perma.cc/8X6Q-GZ5V ........................................................................... 12, 29

U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in America* (1982),
    (1982 Rpt.), https://perma.cc/CFE9-ANJ3 ........................................................... 9, 10

USDA OIG, Minority Participation in FSA's Farm Loan Programs – Phase II (1997),
    https://perma.cc/YGY6-YE5X ............................................................................. 10

USDA, USCCR, Equal Opportunity in Farm Progs., An Appraisal of Servs. Rendered by
    Agencies of the (1965 Rpt.), https://perma.cc/34HP-5V9P ..................................... 9, 10

# INTRODUCTION

At the height of a global pandemic, with many Americans reeling from financial disruption, Congress enacted a broad economic relief program, the American Rescue Plan Act. Among its components, that act provided debt relief to certain minority farmers. Congress recognized that minority farmers were disproportionately likely to face foreclosure or other financial calamities, and that these conditions, among others, were attributable at least in part to prior discrimination by the government itself. Congress had a compelling interest, long recognized in Supreme Court precedent, in remedying the lingering effects of the government's own prior discriminatory acts. And the program Congress designed is narrowly tailored to advance that interest, providing one-time relief within the very programs where discrimination was most pernicious. The Court should reject the Plaintiffs' attempts to deny much-needed debt relief to minority farmers and should enter judgment for the Government. Alternatively, if the Court concludes that the provision is not constitutional, it should award the ordinary remedy for such a finding and expand the program to grant relief to Plaintiffs.

# BACKGROUND

## I.    Section 1005 of the American Rescue Plan Act

The American Rescue Plan Act (ARPA) provides widespread pandemic relief to the American people. *See* Pub. L. No. 117-2, 135 Stat. 4 (2021). The House Report shows that Congress was focused in particular on helping the "most vulnerable communities" who were "forced to bear the brunt of" the pandemic and resultant economic crisis "as underlying health and economic inequities gr[e]w worse." H.R. Rep. No. 117-7, at 2 (2021), https://perma.cc/CH87-MWNL. Among those whom Congress sought to aid were minority farmers, a group which had "received a disproportionately small share of the farm loans and payments administered by USDA as a result of . . . longstanding and widespread discrimination." *Id.* at 12.

During its deliberations, Congress considered evidence that chronicled a history of discrimination against minority farmers by the USDA officials who administer the Department's farm loan and other financial benefits programs. *See* 167 Cong. Rec. H762, H765-66 (daily ed. Feb. 26, 2021), https://perma.cc/X3TK-44BW (discussing evidence); 167 Cong. Rec. S1219, S1262-67 (daily

ed. March 5, 2021), https://perma.cc/7U6Z-6S7B (same). The evidence detailed how discrimination prevented minority farmers from participating in these USDA programs, which contributed to a considerable loss of minority-owned farmland over a sustained period of time. *See, e.g.*, *id.* at S1262-67. And the evidence illustrated how the effects of that discrimination linger today. *Id.* Various reports showed that minority farmers struggle to obtain credit and are at a significant financial disadvantage relative to non-minority farmers. *Id.* Current statistics further revealed to Congress that a disproportionately high number of minority farmers are in default and on the brink of losing their farms. *Id.* at S1265-66; *infra* Part I.B.

Congress concluded that minority farmers needed urgent relief to prevent a "wave of foreclosures" and to escape the cycle of debt that precludes them from fully participating in the farming economy. 167 Cong. Rec. S1266. Past remedial measures, Congress determined, had "fallen short." *Id.* at S1262. Even recent, robust agricultural relief efforts had largely failed to reach minority farmers and only exacerbated pre-existing disadvantages. *Id.* at S1264-65. Congress observed that minority farmers' lack of trust in USDA because of past experiences with discrimination added still another obstacle to overcoming existing barriers. *Id.* at S1264. At the same time, Congress found that the economic crisis caused by the pandemic, which disproportionately affected minorities, threatened to push many more minority farmers out of the business altogether. *Id.* at 1265-66.

In response to these findings, Congress included in ARPA a provision specifically addressed to the plight of minority farmers: § 1005. That section appropriates "such sums as may be necessary, to remain available until expended," to pay up to 120 percent of certain direct or guaranteed USDA farm loans held by a "socially disadvantaged farmer or rancher" (SDFR) and outstanding as of January 1, 2021. *See* ARPA § 1005. Congress defined SDFR by cross-reference to the definition in 7 U.S.C. § 2279(a), which provides that a SDFR is a "a farmer or rancher who is a member of" a group "whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities," *id.* § 2279(a)(5)-(6).

USDA has long interpreted "socially disadvantaged group[s]" to include the following five minority[1] groups: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Hispanics or Latinos; and Native Hawaiians or other Pacific Islanders. *See, e.g.,* 66 Fed. Reg. 21617-01 (Apr. 30, 2001); 74 Fed. Reg. 31567 (July 2, 2009); 75 Fed. Reg. 27165 (May 14, 2010). The Department carried that interpretation forward in implementing § 1005. *See* Notice of Funds Availability; ARPA 2021 § 1005 Loan Payment, 86 Fed. Reg. 28,329 (May 26, 2021) ("NOFA").[2]

Section 1005–eligible recipients need not affirmatively apply to receive relief, but they must formally respond to USDA's notification letter to accept and receive the payment. Expert Report of William D. Cobb ¶ 73 ("Cobb Rpt.") (attached as Exhibit A). USDA continues to identify and notify individuals who are eligible to receive debt payments under this NOFA, although USDA is not presently disbursing payments because of court orders in related litigation. *Id.* ¶ 76.

## II.    USDA's Farm Service Agency

The USDA's Farm Service Agency ("FSA")[3] administers the Department's farm loan and related agricultural benefit programs, including the loans that qualify for debt relief under § 1005. Cobb Rpt. ¶¶ 11-14. FSA makes credit available to farmers who cannot obtain credit on reasonable terms from commercial institutions by making loans directly to farmers, *id.* ¶¶ 15-16, or by guaranteeing commercial loans up to 95%, *id.* ¶¶ 15, 48. Farmers may use these loans for buying or improving farm property, operating their farms, or resuming operations after a disaster, among other things. *Id.* ¶¶ 13-14. In the past, county-level officials have administered farm loans in conjunction with FSA, although their role in FSA loan programs has changed over the years due to structural reforms at USDA, they presently play a more limited role with USDA farm lending programs. *See id.* ¶¶ 28, 40, 64. FSA also provides loan servicing, which allows borrowers who are unable to make scheduled loan payments to change their loan repayment schedule so that they may "maintain[] and

---

[1] Defendants use "minority farmers" or "SDFRs" to refer to farmers considered "socially disadvantaged" under § 1005 and "non-minority farmers" to refer to non-Hispanic white farmers.
[2] The NOFA also provided that the Secretary would consider other groups for inclusion in the definition of SDFR on a case-by-case basis in response to a written request. The Secretary has not yet made a determination on any such request.
[3] FSA's predecessor is the Farmers Home Administration ("FmHA" or "FHA").

continu[e] farm operations and" obtain future credit. *Id.* ¶ 12, 24.

## III.  Plaintiffs' Lawsuit and Related Section 1005 Challenges

Plaintiffs are self-identified white farmers who hold USDA farm loans that they allege would be eligible for debt relief under § 1005 but for the fact that Plaintiffs do not fall within one of the minority racial or ethnic groups considered "socially disadvantaged." Am. Compl. ¶¶ 3-4, ECF No. 29. They bring overlapping claims under the Constitution and the Administrative Procedure Act, alleging that § 1005 violates the equal protection component of the Fifth Amendment's Due Process Clause. *Id.* ¶¶ 53-64. As relief, they seek an injunction "prohibiting Defendants from enforcing the 'socially disadvantaged' provisions of Section 1005" and either "opening eligibility for loan assistance to all farmers or ranchers with qualifying farm loans" or preventing Defendants from distributing debt relief under § 1005 to any farmer or rancher. *Id.*, Prayer for Relief ¶¶ 1-3.

Plaintiffs' case is one of twelve similar equal protection challenges to § 1005 filed in jurisdictions around the country. *See Miller v. Vilsack*, 4:21-cv-595 (N.D. Tex.); *Faust v. Vilsack*, 1:21-cv-548 (E.D. Wis.); *Wynn v. Vilsack*, 3:21-cv-514 (M.D. Fla.); *Carpenter v. Vilsack*, 21-cv-103 (D. Wyo.); *Holman v. Vilsack*, 1:21-cv-1085 (W.D. Tenn.); *McKinney v. Vilsack*, 2:21-cv-212 (E.D. Tex.); *Joyner v. Vilsack*, 1:21-cv-1089 (W.D. Tenn.); *Dunlap v. Vilsack*, 2:21-cv-942 (D. Or.); *Rogers v. Vilsack*, 1:21-cv-1779 (D. Colo.); *Tiegs v. Vilsack*, 3:21-cv-147 (D.N.D.); *Nuest v. Vilsack*, 21-cv-1572 (D. Minn.). In three of the cases, courts have entered preliminary injunctions prohibiting USDA from disbursing any § 1005 funds. PI Order, *Wynn*, ECF No. 41; PI Order, *Holman*, ECF No. 41; Order on PI & Class Cert., *Miller*, ECF No. 60.[4]

On July 1, 2021, the court in *Miller*, the first-filed case, certified two classes under Federal Rule of Civil Procedure 23(b)(2). Order on PI & Class Cert., *Miller*, ECF No. 60. The classes include Plaintiffs in this case, and they similarly challenge § 1005 on equal protection grounds. *Id.* And similar to Plaintiffs here, the classes in *Miller* seek an injunction preventing the Government from implementing racial exclusions or preferences when administering § 1005. Third Am. Compl,

---

[4] The *Faust* court had also entered a temporary restraining order (TRO) that prohibited disbursement of § 1005 funds but dissolved the TRO after the *Wynn* court issued a preliminary injunction in *Wynn*. Order, *Faust*, ECF No. 49.

Demand for Relief ¶ 32, *Miller*, ECF No. 135. The Government moved to stay this case pending resolution of the *Miller* class action, but this Court denied that motion. The Court then entered a schedule to govern briefing on cross-motions for summary judgment, and Plaintiffs filed their motion for summary judgment on February 1, 2022. Pls.' Mot. for Summ. J., ECF No. 47 ("Pls.' Br.").

## LEGAL STANDARD

Defendants oppose Plaintiffs' motion for summary judgment and cross-move for summary judgment for Defendants. On cross-motions for summary judgment, each motion is treated separately under the standards applicable to each. *See McKinney v. Cadleway Props., Inc.,* 548 F.3d 496, 504 n.4 (7th Cir. 2008) (abrogated on other grounds). Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A material fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue exists, and summary judgment is inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Because § 1005 uses a race or ethnicity classification, it is subject to strict scrutiny and "the burden is initially on the government to justify its programs." *Midwest Fence Corp. v. U.S. Dep't of Transp.,* 840 F.3d 932, 952 (7th Cir. 2016). Once the government presents evidence to do so, the burden shifts to the Plaintiffs "to show a genuine issue of material fact as to whether the [government] defendants had a substantial basis in evidence for adopting their [remedial] programs." *Id.* But "[s]peculative criticism about potential problems will not carry that burden." *Id.*

## ARGUMENT

### I.    Section 1005 is constitutional.

Congress enacted § 1005 to serve a compelling interest: remedying the lingering effects of well-documented historical discrimination in administering USDA's farm loan programs. Section 1005 is narrowly tailored to advance that interest by providing one-time relief on FSA-administered debt to members of those groups who suffered because of USDA's prior discrimination. Under the applicable legal standards, § 1005 is consistent with the equal protection principles of the Fifth Amendment.

Plaintiffs fail to carry their burden of proving that the program is unconstitutional.

A.    *The contours of review under strict scrutiny*

The strict scrutiny analysis proceeds in two parts: first, whether the government's action is in service of a compelling interest, and, second, whether the action is narrowly tailored to serve that interest. *See, e.g.*, *Majeske v. City of Chicago*, 218 F.3d 816, 819 (7th Cir. 2000).

The Supreme Court has repeatedly affirmed, and "[i]t is well-settled law in this Circuit" that "a governmental agency has a compelling interest in remedying its previous discrimination and . . . may use racial preferencing to rectify that past conduct." *Majeske*, 218 F.3d at 820; *McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir. 1998) (similar); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) ("The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it."); *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 288 (1986) (opinion of O'Connor, J.) (similar); *United States v. Paradise*, 480 U.S. 149, 167 (1987) (similar).

Crucially, Congress's determination that a remedial measure is warranted to advance such a compelling interest is entitled to deference. *See, e.g.*, *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2003) (giving deference to police about need for diversity); *see also Fisher v. Univ. of Tex. at Austin* ("*Fisher II*"), 136 S. Ct. 2198, 2208 (2016) (reiterating that "some, but not complete, judicial deference is proper" with regard to government's compelling interest judgment) (citation omitted). The focus of the inquiry is whether there was sufficient evidence for *Congress* to conclude that a remedial measure was warranted. *Petit*, 352 F.3d at 1114; *see also Dean v. City of Shreveport*, 438 F.3d 448, 455 (5th Cir. 2006) (inquiry is limited to "a factual determination that there was a strong basis in evidence for the conclusion that remedial action was necessary"). The Court thus does not decide for itself whether a remedial program is warranted, but instead asks only whether there was "enough evidence" to support Congress's determination. *Majeske*, 218 F.3d at 820; *Midwest Fence*, 840 F.3d at 952-53 ("[A] 'state need not conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence for concluding that remedial action is necessary.'") (quoting *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010)); *see also Wygant*, 476 U.S. at 289-90 (opinion of O'Connor, J.); *Concrete*

*Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1522 (10th Cir. 1994) (holding that the Constitution "does not require a court to make an ultimate judicial finding of discrimination before a municipality may take affirmative steps to eradicate discrimination"); *cf. Ricci v. DeStefano*, 557 U.S. 557, 580-81 (2009) (same, under Title VII).

Although "[t]he Supreme Court has offered little guidance as to how much evidence of past discrimination is required," *Dean*, 438 F.3d at 454, it has made clear "that where gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination,'" *Midwest Fence*, 840 F.3d at 952–53 (quoting *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501 (1989)). And "the combination of anecdotal and statistical evidence is potent." *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003 (3d Cir. 1993) (citation omitted); *see also Midwest Fence*, 840 F.3d at 952–53 (statistical evidence bolstered by anecdotal evidence); *Majeske*, 218 F.3d at 822 ("We have previously held that this combination of persuasive statistical data and anecdotal evidence adequately establishes a compelling governmental interest"); *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1046 (Fed. Cir. 2008) ("[B]oth statistical and anecdotal evidence are appropriate in the strict scrutiny calculus." (citation omitted)).

As to narrow tailoring, "[t]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (citation omitted). But "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Fisher II*, 136 S. Ct. at 2208 (quoting *Grutter*, 539 U.S. at 339); *cf. Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (holding that strict scrutiny requires that government regulation "be narrowly tailored, not that it be 'perfectly tailored.'" (citation omitted)). Although the narrow tailoring inquiry varies with context, some important factors are "the necessity for the relief and the efficacy of alternative remedies"; the "flexibility and duration of the relief"; and the "impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171; *see also Midwest Fence*, 840 F.3d at 953 (similar), *id.* at 942 (noting that "[t]he Tenth Circuit in *Adarand* [*Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000)], added to the mix the question of over- or under-inclusiveness.").

Once the government "has shown acceptable proof of a compelling interest in remedying past

discrimination and illustrated that its plan is narrowly tailored to achieve this goal," the burden shifts to the plaintiff to prove that the remedial "plan is unconstitutional." *Majeske*, 218 F.3d at 820; *see also Wygant*, 476 U.S. at 277-78.

       B.       *Section 1005 is supported by a compelling interest*

Congress enacted § 1005 to remedy the lingering effects of past discrimination against minority farmers[5] in the administration of USDA loan programs. 167 Cong. Rec. S1264-65 ("Congress includes the[] measures [in § 1005] to address the longstanding and widespread systemic discrimination within the USDA, [and] particularly within the loan programs, against [SDFRs]."); H.R. Rep. No. 117-7, at 12 ("Black farmers and other agricultural producers belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups."); Opening Stmt. of Sec'y of Agric. Thomas J. Vilsack before House Comm. on Agric. (Mar. 25, 2021), https://perma.cc/3LWV-4SMF, ("[Section 1005] provides debt relief for [SDFRs] to respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt.").

Congress's conclusion that such an interest existed here was amply supported by a "strong basis in evidence." *Midwest Fence*, 840 F.3d at 945. This evidence is detailed in the expert reports of Dr. Alicia Robb, *see* Expert Report of Alicia M. Robb, Ph.D., ECF No. 48-7 ("Robb Rpt."), and of William Cobb, Deputy Administrator for Farm Loan Programs for the FSA (attached as Exhibit A). The evidence shows the following. First, it is well documented that FSA itself historically engaged in discriminatory practices with devastating effects on minority farmers. Second, more recent analysis establishes that the effects of that past discrimination persist in the present day, in the form of smaller farms, lower capitalization, higher debt ratios, and greater financial instability, including higher rates of delinquency and foreclosure, for minority farmers. Third, past remedial efforts have failed to address these lingering effects and in some instances only exacerbated them. Finally, Plaintiffs fail to rebut any of the evidence supporting Congress's compelling interest.

---

[5] For ease of reference, Defendants use "farmers" to include "farmers and ranchers."

1.  *The well-established evidence of historic discrimination in USDA loan programs*

Congress emphasized that evidence of past discrimination in USDA farm loan and related agricultural financial assistance programs is "longstanding and well-documented," 167 Cong. Rec. H765. Indeed, other courts, reviewing the same evidence that was before Congress, have found that USDA's unfortunately "dark history of past discrimination against minority farmers" "is *undeniable*." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1279 (M.D. Fla. 2021) (emphasis added); *see also Holman v. Vilsack*, No. 21-1085, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) ("It is undisputed that the USDA has a sad history of discriminating against certain groups of farmers based on their race."). Even Plaintiffs do not dispute that USDA has discriminated against minority farmers in the past. *See generally* Pls.' Br. at 12-13 (contending only that past discrimination has been remedied).

The evidence illustrates that discrimination against each minority group "manifested in many ways throughout the loan cycle"—from outreach and education about loans, to assistance with loan applications, to processing and approval of applications, to loan servicing availability—and contributed to a substantial diminution in minority farms and generational wealth over decades. Robb Rpt. at 2. The evidence also shows that FSA consistently—and sometimes deliberately—ignored these complaints, which were widely known for decades. *Id.* at 26 (citing complaints of officials throwing claims in the trash, as documented in a 2011 report).

As early as 1965, the U.S. Commission on Civil Rights (USCCR) found that the Farmers Home Administration—FSA's predecessor—was discriminating against Black farmers by providing them inferior loans in terms of size, technical assistance, and the "purposes for which the loans [were] to be used." USCCR, Equal Opp'y in Farm Programs at 67-82 (1965), https://perma.cc/34HP-5V9P ("1965 Rpt.") (explaining that FmHA, which "play[ed] a vital role in helping [farmers] decide the uses for which [FmHA] funds would be put," gave poor non-minority farmers substantially more loans to "acquire or expand their farms," or improve "their financial position" in other ways, than it gave to minority farmers); *see also* USCCR, The Decline of Black Farming in Am., at 9, 167 (1982), https://perma.cc/CFE9-ANJ3 ("1982 Rpt."). By 1997, Black, Hispanic, Asian, and American Indian farmers were voicing complaints about repeated discriminatory actions by FSA in all areas of loan

administration. The Civil Rights Action Team (CRAT), commissioned by the Secretary of Agriculture, recounted their stories, which told how FSA: failed to provide assistance with loan applications; intentionally delayed the application and approval processes; arbitrarily reduced loan amounts; never provided a promised loan; failed to provide loan servicing options; and forced the sale of land or foreclosure, among other things. CRAT, Civil Rights at the USDA, at 15-16 (1997), https://perma.cc/5DNF-PFJY ("CRAT Rpt.").[6] The USDA's Office of Inspector General (OIG) similarly reported that FSA failed to provide minority farmers with loan servicing options at the same rate as non-minority farmers. USDA OIG, Minority Participation in FSA's Farm Loan Programs – Phase II, at 29 (1997), https://perma.cc/YGY6-YE5X (noting further that minority farmers failed to receive the full benefit of loan servicing even though FSA was congressionally *mandated* to "restructure delinquent farm program loans to the maximum extent possible"); *see also* Robb Rpt. at 29-34 (discussing the reports' findings).

The consequences of these actions were significant. Delayed, reduced, or never-provided loans prevented minority farmers from procuring necessary supplies in time for planting seasons or left them wholly unable to pay back debts for supplies and equipment. *See, e.g.*, Robb Rpt. at 2-5, 16-38, 84-85. And lack of technical assistance—a crucial component of FSA's loan programs—left minority farmers unable to "modify their practices [so] that their farms [could] become economically viable." 1965 Rpt. at 79. As a result, many minority farmers found it "impossible . . . to earn any money from the[ir] farm" and were forced to sell the land or face foreclosure. CRAT Rpt. at 16. Minority farmers lost "significant amounts of land and potential farm income." *Id.* at 30; 1982 Rpt. at 176, 179 (discrimination by FmHA contributing to the "tragic decline of black farms"); Robb Rpt. at 31-32.

A series of lawsuits brought by African American, Native American, and Hispanic farmers reiterated those same widespread complaints of discrimination against FSA.[7] Robb Rpt. at 24-26

---

[6] The CRAT reviewed civil rights complaints against USDA, held listening sessions with Black, Hispanic, Asian American and American Indian farmers, and produced a report that summarized its findings and recommended solutions. *Id.* at 3.

[7] *See Pigford v. Glickman* ("*Pigford I*"), Civ. No. 97-1978 (D.D.C.) (African Americans); *In re Black Farmers Discrimination Litigation* ("*Pigford II*"), Misc. No. 08-mc-0511 (D.D.C.) (same); *Keepseagle v. Glickman*, Civ. No. 99-03119 (D.D.C.) (Native Americans); *Garcia v. Glickman*, Civ. No. 00-2445 (D.D.C.) (Hispanics).

(discussing the lawsuits); Cobb Rpt. ¶¶ 31-37. In these lawsuits—*Pigford I* & *II*, *Keepseagle*, and *Garcia*—minority farmers alleged that FSA officials in the 1980s and 1990s refused to offer assistance with loan applications or treated minority farmers with hostility when they sought assistance; arbitrarily denied loan applications; administered loans late, after "planting season was over" and they were "virtually useless"; placed loans in "supervised" accounts requiring the signature of a (typically white) county supervisor before funds could be withdrawn; and failed to advise them of loan servicing options; among other things. *See* Robb Rpt. at 24-26; *see also In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 8 (D.D.C. 2011) (the allegations, "though broad in scope, were no exaggeration"). Because of the lawsuits, USDA created administrative claims processes whereby these minority farmers could recover limited debt relief or monetary damages for substantiated claims of discrimination.[8] Robb Rpt. at 27-28 (explaining the two-track claims process whereby claimants could show discrimination under a "substantial evidence" or a "preponderance of the evidence" standard); Cobb Rpt. ¶¶ 33-38 (discussing the claims process). In total, USDA paid approximately $2.25 billion in combined cash payments, debt relief, and tax payments for successful claimants.[9] Robb Rpt. at 27-28.

And yet subsequent congressional hearings and investigative reports showed Congress that the effects of discrimination persisted. Both during and after implementation of these settlements and claims processes, Congress heard directly from Black, Hispanic, and Native American farmers who told grueling accounts of their experiences with USDA. In one hearing, a Black farmer complained of county-level officials repeatedly delaying the processing and disbursement of multiple farm loans, including by denying access to application forms. As a consequence, she and her husband lost 500 piglets, who died because they were unable to purchase "an adequate facility" for their hogs "to deliver and care for their offspring."[10] Another Hispanic farmer told of being denied relief after a series of

---

[8] The claims processes were established by a settlement agreement in *Pigford I* and *II* and *Keepseagle*, and later through a voluntary alternative to litigation for Hispanics in *Garcia*. Cobb Rpt. ¶¶ 33-37.

[9] Debt relief constituted a very small proportion of these payments. Cobb Rpt. ¶ 38; *infra* Part I.B.3.

[10] Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Sub-comm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Agric., 107th Cong. 48-50 (2002), https://perma.cc/PN24-BXPP ("2002 Hr'g").

natural disasters because—according to county officials—she and her family "were bad farmers," which eventually led to foreclosure.[11] A Native American farmer testified to FSA's repeated refusal to offer the assistance necessary to complete loan applications.[12] Other minority farmers have shared that past discrimination discourages them from seeking USDA's help.[13] *See also* Robb Rpt. at 36-37 (discussing the hearings).

Around the same time, an outside firm contracted by USDA conducted a multi-year investigation and published a report in 2011 documenting ongoing problems with discrimination at the agency. It concluded that at USDA—and in FSA in particular—"the deck was always stacked" against minority farmers because discrimination had become ingrained in the agency's programs. Jackson Lewis LLP, Civil Rights Assessment, Final Report, at iii, viii (Mar. 31, 2011), https://perma.cc/8X6Q-GZ5V ("JL Rpt.").[14] The firm heard complaints from minority farmers that they were treated "like dirt" and unfairly denied the same loan assistance provided to non-minority farmers. *Id.* at 84. According to the Report, these actions "had a broad and longstanding negative impact on the size, profitability, sustainability, business prospects, successes, and failures of" those famers, and on many occasions led to "the loss of scarce or irreplaceable farm lands." *Id.* at 64; Robb Rpt. at 34-36.

2. *The persistent effects of past discrimination in USDA loan programs*

In January 2021, Congress determined that the "cumulative effect[s]" of past discrimination at USDA persisted and necessitated urgent relief. 167 Cong. Rec. S1265. Congress had a strong basis in evidence for that conclusion. The reports and statistical disparities considered by Congress, and further buttressed by the expert reports of Dr. Robb and Mr. Cobb, show how USDA's past discrimination has caused severe loss of land and of generational wealth, depriving minority farmers

---

[11] *Id.* at 86.
[12] Hr'g on Management of Civil Rights at the USDA before House Sub-comm., Gov't Management, Organization, and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 19 (2008), https://perma.cc/ZAK3-6PRC.
[13] *See, e.g.,* 2002 Hr'g at 66.
[14] The JL Report included women in its discussion of SDFRs, *id.* at 66 n.33, but the evidence here, and discussed by Congress, relates only to the minority racial groups included in that definition.

of the resources necessary to develop their farms and putting them disproportionately on the brink of foreclosure—and at an especially precarious time, in the midst of a pandemic.

To start, the evidence shows that past discriminatory practices have pushed many minorities out of farming altogether such that, today, minorities are substantially underrepresented in farming. Reports before Congress showed that even when minority farmers "did receive loans or payments, many of them were not provided timely or proper loan servicing options due to discrimination, which led to producers of color losing their land and operations." 167 Cong. Rec. H765. And Congress cited dire statistics revealing a significant decrease in Black farmers over the last century—down from 15% to 2% of all farmers nationwide. 167 Cong. Rec. S1265 ("Black farmers have lost between 15 and 20 million acres of land" over "the past century[.]"). Dr. Robb confirms that "[b]ecause farmers turn to USDA as a 'lender of last resort,' discriminatory loan practices can force minorities out of farming altogether." Robb Rpt. at 41. And she confirms that the statistics are grim across the board: All minority groups have substantially fewer farms[15] today than would be expected, especially given their increasing percentage of the population. *Id.* at 50-55 (analyzing data showing that, in rural Texas, for instance, Hispanics account for 31.6% of the population but only 11.3% of the farms; Blacks account for 7.8% of the population but only 3.2% of the farms; and non-minorities account for 58.6% of the population but 95.5% of the farms). By contrast, non-minority farmers—who historically received support from USDA—dominate the industry today, even while their population share is declining. *Id.*

This massive loss in minority farmland, reports explain, represents "hundreds of billions of dollars of generational wealth." 167 Cong. Rec. S1265; *id.* S1262 (discussing a Tufts University analysis estimating "the value of that lost [Black] farmland at more than $120 billion in lost opportunities"). Minority farmers who have remained in or later entered (or re-entered) the farming business are

---

[15] The USDA census data analyzed by Dr. Robb presents statistics about farm "producers," which is defined to include farm owners and others "involved in making decisions for the farm operation . . . about such things as planting, harvesting, livestock management, and marketing"). Robb Rpt. at 46 n.149 (quoting 2017 Ag. Census, App'x B at 19, https://perma.cc/J3ZW-TPAG). Throughout this brief, Defendants refer to "producers" as "farmers," and they use the terms "Black farms," "white farms," "Asian farms," etc., to refer to the farms with producers of that race/ethnicity.

experiencing the repercussions of those generational financial losses. As data analyzed by Dr. Robb illustrates, minority farms are generally smaller in size and bring in less income compared to non-minority farms. As to farm size, some disparities are particularly stark—in the states having the highest percentage of Asian and Black farmers, non-minority "farms are between 129% and 336% larger than Asian farms," on average, and "between 103% and 347% larger than Black farms." Robb Rpt. at 64 (explaining that American Indian/Alaskan Native and Native Hawaiian/Pacific Islander farms are also "significantly smaller" than non-minority farms in almost every state where farmers from these minority groups are most heavily concentrated). And as to income, all minority groups are at a marked disadvantage across virtually every income metric, including market value of production, government payments received, net farm income, per-acre market value of farms, and farmers' overall wealth. *Id.* at 66-70. These disparities are a "natural consequence of past discrimination in lending practices, which hindered minority farmers seeking to expand or invest in their farms." *Id.* at 55-56.

This evident diminution of minority farms, caused by discrimination, has persistent effects that threaten to keep minority farmers trapped in a cycle of debt and at a continued disadvantage in the future. *Id.* at 90-107. Congress observed several of these persistent effects, and the data analyzed by Dr. Robb confirms their existence.

First, because minority farmers have been inhibited in developing their farms over time, they have not been able to accumulate the wealth and collateral necessary to access private credit at the same rate as non-minorities. Multiple Government Accountability Office (GAO) reports before Congress explained that USDA discrimination has hindered minority farmers' ability to "expand operations and . . . purchase land and equipment that can later be used as collateral," and thereby frustrated those farmers' opportunities to obtain "subsequent and larger loans" from USDA and in the private credit market. GAO-19-539, *Agric. Lending: Info. on Credit & Outreach to [SDFRs] Is Limited*, at 29 (July 2019), https://perma.cc/5RD6-24VH; *see also* 167 Cong. Rec. S1265 (discussing 2008 and 2019 GAO reports "highlight[ing] [how] historic, systemic discrimination against [minority] farmers" made it more difficult for them to obtain farm loans); Robb Rpt. at 100-01 (explaining that collateral, farm size, and farm revenue each "affect a farmer's ability to obtain private credit," and that

discrimination at USDA has negatively affected minority farmers "with respect to all three factors, [and] consequently impeded [such farmers'] ability" to acquire private credit). This undermines minority farmers' efforts to realize a primary purpose of USDA's loan programs: to "graduate" from USDA direct loans to guaranteed loans and, eventually, non-USDA-backed private loans. Robb Rpt. at 100, 3; Cobb Rpt. ¶ 20.

Second, "because minority farmers generally have smaller farms," they tend to "receive a disproportionately small share of funds provided through USDA payment programs, many of which . . . are based on crop-acreage or are targeted to crops typically grown on large farms." Cobb Rpt. ¶ 52. The House Report accompanying ARPA states that "[t]he USDA spends billions of dollars annually to provide crucial support to American agricultural producers," but those "belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups." H.R. Rep. No. 117-7, at 12. Past congressional hearings had highlighted this issue to Congress with respect to certain USDA programs. *See, e.g.*, Hr'g on USDA Oversight, 114th Cong. 32-33, 49-50 (2015), https://perma.cc/2PJU-ZRLE (testimony from Secretary Vilsack that export markets favored "large scale" agriculture businesses, such that export growths were unlikely to substantially benefit minority farmers who generally have much smaller farms). In deliberations preceding ARPA's passage, Congress considered the issue again. A letter by a group of agriculture scholars, introduced into the ARPA congressional record, explains how the Government's pattern, through its payment programs, of "reward[ing] the largest farms the most" has naturally excluded minority farmers and caused them to "fall further behind." 167 Cong. Rec. S1266. Dr. Robb's analysis corroborates these findings, as the data in her report shows that each minority group has received less in government payments relative to their share of farms,[16] despite generally being in disproportionate need of assistance. Robb Rpt. at 95-99.

_____

[16] For some groups the difference is substantial: Hispanic farmers, for instance, have received only 1.4% of government payments even though they make up 3.8% of farms. For Native Hawaiian/Pacific Islander farms, the difference is marginal, but because they account for such a small share of farms (0.1% of farms nationwide), the comparison is less meaningful. *See* Robb Rpt. at 96.

In deliberations leading to § 1005's passage, evidence before Congress showed that this pattern was repeated through the Government's recent payment programs intended to assist farmers struggling because of trade tariffs or the pandemic. One report cited by Congress showed that 99% of Market Facilitation Program (MFP)[17] funds and 97% of Coronavirus Food Assistance Program (CFAP)[18] funds went to non-minority farmers. *See* 167 Cong. Rec. S1264-65.[19] The disproportionate allocation of MFP and CFAP funds was of particular concern to Congress when it was considering minority farmers' urgent need for relief. *Id.* And for good reason. As Dr. Robb explains, "the magnitude of these [recent] programs—more than $23 billion over two years under the MFP, and nearly $24 billion under the CFAP—compared to the total amount of minority farmers' direct and guaranteed loan balances—only about $4 billion"—would make the impact of their uneven distribution especially significant. Robb Rpt. at 97-98. This is especially true since those payments were distributed during a time of increased financial instability caused by a pandemic that Congress found was already having an outsized effect on minority farmers. 167 Cong. Rec. S1264-65.

Third, and as these recent payment programs highlighted, even where minority farmers stand to benefit from USDA assistance, the breakdown in the "relationships between [SDFRs] and" the Department resulting from the Department's history of discrimination may make it "more difficult or impossible" for minority famers "to participate in USDA programs." *Id.* at S1264 (citing statistics showing that the majority of Black farmers surveyed were unaware of recent relief programs, revealing the strained relationship between the agency and those farmers). A GAO report before Congress

---

[17] In 2018 and 2019, FSA was authorized to distribute up to $23.1 billion through MFP to producers affected by foreign retaliatory trade practices. "These were the largest payments made for USDA emergency assistance programs within the recent decade." Cobb Rpt. ¶ 59 n.7.

[18] CFAP was created in 2020 to assist agricultural producers impacted by the effects of COVID-19. https://perma.cc/B7N9-PTRE; Cobb Rpt. ¶ 59.

[19] Plaintiffs assert that these numbers may be inflated because some participants in the programs did not provide information about their race or ethnicity. Pls.' Br. at 14 n.7. But as Dr. Robb explains, various statistical estimates that account for the 5% and 7% of payees whose race is unknown in MFP and CFAP respectively still "indicate that the majority of payments went to white farmers." Robb Rpt. at 96-97 & n.206 (stating that the most plausible estimate indicates that more than 95% of CFAP and 98% of MFP payees were non-minority farmers, but that even a more conservative and implausible estimate shows roughly 94% of CFAP and 96% of MFP payees were non-minority farmers).

describes how "historical discrimination has led generations of SDFRs to distrust institutional lenders, making them less likely to apply for credit[]" or participate in other USDA assistance programs. GAO-19-539, at 29. USDA's experience supports this finding. *See* Cobb. Rpt. ¶¶ 55-57. As Mr. Cobb details, in interactions with community groups and potential customers "the agency regularly hears about lack of trust for the agency on the part of minority communities." *Id.* ¶ 56. In USDA's experience, that lack of trust makes minority farmers "more reluctant to engage with USDA and ask for farm loans in the first instance" and "erodes USDA's ability to effectively" advise minority applicants. *Id.* ¶ 57. Dr. Robb's analysis corroborates the agency's observations. She explains that it is frequently observed in the economic studies that "[p]ast personal experience, or expectations derived from the experience of others, can cause wide discouragement among particular groups." Robb Rpt. at 102-07. Data showing that minority farmers have lower USDA loan application submission rates and higher withdrawal rates relative to non-minority farmers indicates that minority farmers have "learned [to] distrust" USDA and fall in the category of "discouraged borrowers"—unlikely to seek out USDA assistance, even when they may well qualify for it, based on the expectation that they will be denied. *Id.* This distrust is both an effect of past discrimination and, as the statistics indicate, an additional hurdle to providing targeted relief that moves minority farmers out of the debt cycle. *Infra* Part I.C.

Finally, and most urgently, all of these disparities contribute to a situation where minority farmers are facing much higher rates of default and disproportionately on the brink of foreclosure relative to non-minority farmers. Statistics before Congress in 2021 put the gravity of the situation in full view: of those with FSA direct loans, 35% of Black farmers and 24% of Hispanic, Asian American, and Indigenous farmers were in default and "could soon lose their farms." 167 Cong. Rec. S1266; *id.* at S1264 (stating that minority farmers' loans are "more likely to be in default or in a precarious situation"). Moreover, as Dr. Robb's analysis shows, the very "minority farmers who would be eligible for debt relief under [§] 1005 have much higher levels of loan delinquency, bankruptcy, and foreclosure than non-minority farmers" with otherwise qualifying loans. Robb Rpt. at 91. Indeed, at the beginning of 2021, *nearly 30% of all minority borrowers*, but only 13.8% of non-minority borrowers, were not

current[20] on their USDA direct loans, *id.* at 92; and more than 10% of minority borrowers, but only 5% of non-minority borrowers, were not current on their USDA guaranteed loans. *Id.* at 93. The statistical disparities reflect the fact that minority farmers are "more vulnerable to adverse conditions, such as natural disasters, poor weather conditions, and economic downturns," because their "smaller and less profitable" farms leave them with "less wealth and income to draw from." *Id.* at 91. And the statistics reasonably convinced Congress that minority farmers were simply unable to survive the economic crisis precipitated by the pandemic and risked falling victim to "yet another wave of foreclosures and potential land loss[.]" 167 Cong. Rec. S1265-66.

All of the above provides a strong basis in evidence for Congress to conclude that minority farmers face persistent disadvantages and that such disadvantages are largely attributable to past discrimination by USDA. Dr. Robb's report reinforces that conclusion. She elucidates how "[m]inority farmers may be harmed for decades after a discriminatory act." Robb Rpt. at 3. In fact, the nature of past discrimination and the farming industry make it entirely *expected* that such discrimination would place minority farmers at a disadvantage in the farming industry today. *Id.* at 74. Farming is a capital-intensive business, "requir[ing] significant up-front investment in land, equipment, and supplies," and measuring returns over decades. *Id.* at 86-87. Yet, for decades, minority farmers suffered discrimination at all stages of the loan cycle, which deprived them of the resources necessary to invest in their businesses and build capital—often resulting in foreclosure or the forced sale of land. *Id.* at 82-85. This well-documented pattern, together with other evidence, is consistent with the statistical disparities apparent today. *Id.* at 5, 78, 85; *see also Midwest Fence*, 840 F.3d at 952 (the defendants' disparity studies reveal data that is "consistent with the anecdotal and less formal evidence defendants have offered"). And it is "reasonable to expect," as Congress did, that these discriminatory actions coming from the country's "lender of last resort" would result in just the types of disparities in farm size, revenue, and delinquency rates that exist today. Robb Rpt. at 86, 103.

---

[20] For purposes of Dr. Robb's analysis, a borrower may be "not current" on their loan for a variety of reasons, including because the borrower is delinquent or in bankruptcy or foreclosure proceedings, or because the loan is not collectible or is the subject of litigation or a contingent liability. *Id.* at 92.

To be sure, other non-discriminatory factors may contribute to some degree to the disparities between minority and nonminority farmers. However, given that minority farmers generally and often significantly "lag behind their white counterparts" in virtually every relevant metric—including "acreage, market value of production, government payments, net farm income, per-acre market value, and overall wealth"—it is unlikely that these across-the-board disadvantages are explainable primarily by factors untainted by discrimination. Robb Rpt. at 3-4, 74-90. And considering the length and timing of the documented discrimination—occurring "over at least a fifty-year period," and "as late as 2011,"—it should be unsurprising "that minority farmers would continue to suffer the lingering effects of that discrimination only about a decade later." *Id.* at 86-87.

Many courts have also recognized that the effects of "discrimination may linger for many years," *Stuart v. Roache*, 951 F.2d 446, 452 (1st Cir. 1991), and that remedial action to root out the "vestiges of racial discrimination" may be warranted well beyond the point when "the *practice* of discrimination has halted," *Rutherford v. City of Cleveland*, 179 F. App'x 366, 377 (6th Cir. 2006) (concluding that statistical disparities showed that the effects of discrimination occurring in the 1970s and 1980s "had not been sufficiently relieved by 1992"); *Paradise*, 480 U.S. at 168-69 (approving a measure designed to remedy "the department's failure after almost twelve years to eradicate the continuing effects of its own discrimination") (citation omitted); *Roache*, 951 F.2d at 448, 452-53 (finding a compelling interest in remedying the effects of discrimination occurring ten years prior); *Higgins v. City of Vallejo*, 823 F.2d 351, 358 (9th Cir. 1987) (affirming a city's 1982 affirmative action hiring program based on evidence of discrimination before 1973); *Fountain v. City of Waycross*, 701 F. Supp. 1570, 1577 (S.D. Ga. 1988) (finding that "a temporal gap of eight years" between evidence of discrimination and a remedial program was "[was] not so great as to neutralize the fact of past discrimination" and a need for a remedy, particularly where minorities remained "statistically underrepresented" in the relevant field); *cf. Grutter*, 539 U.S. at 343 (acknowledging that attaining the compelling interest of student diversity takes time). Here, Congress found that the effects of past discrimination at USDA have indeed lingered for many years and still place minority farmers at a disadvantage today. That conclusion is strongly supported by the evidence.

3. *The failure of the Government's past efforts to remedy the lingering effects of discrimination at USDA*

Section 1005 was far from Congress's first effort to address USDA's past discrimination and its lingering effects. Those efforts began in the 1980s and included: (1) in 1987, establishing annual target participation rates for minority farmers in direct and guaranteed loan programs; (2) in 1990, creating the "2501 Program" designed to improve outreach and technical assistance to minority farmers; (3) in 1998, suspending statutes of limitations for certain discrimination claims to allow additional farmers to participate in the administrative claims processes being implemented by USDA; (4) in 2002, changing the structure of USDA's civil rights complaints processes; (5) in 2008, providing additional funds to administer settlements of *Pigford* cases; (6) in 2014 creating a permanent Office of Tribal Relations under the Secretary of Agriculture; (7) and in 2018, permanently funding the 2501 Program to provide continued outreach to minority farmers. 167 Cong. Rec. S1263-64; *see also* Robb Rpt. at 38-40 (summarizing these efforts). USDA, too, tried many times to target discrimination in its loan programs. As explained below, *infra* Part I.C.2., the agency created special outreach and assistance programs targeted to SDFRs, set target participation rates for SDFRs, and provided incentives to commercial lenders to make farm loans to SDFRs, among other things. Cobb Rpt. ¶¶ 39-51 (detailing the extensive efforts USDA has made to remedy the lingering effects of its past discrimination).

But these efforts, Congress concluded, had "not done enough." 167 Cong. Rec. S1264. Minority farmers had not escaped the cycle of debt caused by past discrimination that made them "more likely to be in default or in a precarious situation" and inhibited their ability to participate fully in the agricultural economy. *Id.* And Dr. Robb confirms that past efforts "have not fully remedied the problematic effects of decades of USDA discrimination," as is reflected by minority farmers' continued disadvantaged position. Robb Rpt. at 40. Congress even found that some of its past efforts—in particular MFP and CFAP—only perpetuated the effects of discrimination and further underscored the necessity of a more targeted, race-conscious remedy. *See id.* at 97; *supra* Part I.B. Congress also recognized a breakdown in USDA's relationship with minority communities as a consequence of discrimination, which further undermined its efforts to assist them. 167 Cong. Rec. S1264; *see also* Cobb Rpt. ¶¶ 55-57 (discussing the ways in which the lack of trust between USDA and

the minority communities, a product of past discrimination, affects USDA's work).

Plaintiffs disagree with this conclusion, insisting that the very fact that Congress took measures in the past to address USDA discrimination necessarily obviates any need for any further remedial effort. Pls.' Br. at 13. But the mere existence of past efforts does not prove their success. On the contrary, the evidence establishes that the past efforts Plaintiffs point to (and other efforts outlined below, *infra* Part I.C.2.) have failed. *See* Cobb Rpt. ¶ 52 (noting that "despite USDA's various efforts to remedy the lingering effects of historical discrimination through various race-neutral initiatives, minority communities continue to be under-represented in certain USDA programs").

For instance, Plaintiffs observe that USDA has made payments to minority farmers under the administrative claims processes established through *Pigford* and related lawsuits, Pls.' Br. at 13, but as Congress heard in testimony and as the data unambiguously shows, many such payments did not reach victims of discrimination or eliminate the lingering effects of discrimination on those farmers who did receive them. *See* 2002 Hr'g at 7 (decrying the ineffectiveness of the *Pigford* settlements to "set[] things right for black farmers and their families"); *id.* at 73-115 (testimony from minority farmers about the failure of *Pigford* claims processes to affect change); Robb Rpt. at 38-40 (discussing the relatively small number of claimants who received debt relief and citing reports of heavy tax burdens resulting from some relief awarded); Cobb Rpt. ¶ 38 ("[T]he total debt relief provided in these processes was generally concentrated to a very small portion of the classes," and even fewer of them "received complete debt forgiveness"). Thus, "while the claims processes provided valuable relief to many claimants, those claimants who had outstanding debts generally still had debts with USDA after the claims programs concluded," and many SDFRs "were still not in a position to pay their debts[.]" Cobb Rpt. ¶ 38.

Additionally, Plaintiffs contend that USDA implemented various reforms in response to recommendations from the CRAT, *see* Pls.' Br. at 6 (referencing a congressional hearing discussing recommendations from the CRAT), but they fail to explain how those changes eradicated the effects of discrimination. Again, the evidence shows the contrary. *See* Cobb Rpt. ¶ 52. Moreover, many reforms suggested by the CRAT were unconnected to the agency's administration of farm loans through FSA—the relevant agency here. *See* CRAT Rpt. at 58-92.

As the *Wynn* court acknowledged at the preliminary injunction stage of that case, "[o]n a more fully developed record, the Government may be able to establish that despite past remedial efforts the harm caused by the disgraceful history of discrimination by the USDA in farm loans and programs is ongoing or that the Government is in some way a participant in perpetuating that discrimination such that further narrowly tailored affirmative relief is warranted." 545 F. Supp. 3d at 1281 n.9. The Government has established just that. Plaintiffs' general observations that USDA has made attempts at past remedies do not overcome that showing. In the end, all that they show is that the Government has first engaged in efforts to remedy discrimination through more modest or race-neutral means; and only after those efforts failed did Congress adopt the debt-relief remedy authorized by § 1005. *Cf. Loc. 28 of Sheet Metal Workers Int'l Ass'n v. EEOC*, 478 U.S. 421, 481 (1986) (affirming district court's conclusion that, despite defendants' attempts at alternative remedies in the past, "stronger measures were necessary" to address the effects of long-standing discrimination in the organization).

    *4. Plaintiffs fail to rebut Congress's strong basis in evidence*

Plaintiffs fail to rebut the substantial evidence supporting Congress's compelling interest. "To successfully rebut the Government's evidence, [Plaintiffs] must introduce 'credible, particularized evidence' of [their] own." *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 84 F. Supp. 3d 705, 721 (N.D. Ill. 2015), *aff'd*, 840 F.3d 932 (7th Cir. 2016) (citation omitted); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1163 (6th Cir. 1994) (plaintiffs must offer "evidence to rebut the inference of discrimination that arises from the[] statistics"). Instead of complying with that requirement, they offer only generalized critiques of the Government's strong evidence.

As an initial matter, Plaintiffs contend that disproportionate funding in programs like MFP and CFAP was not caused by intentional discrimination but may have resulted from other factors such as farm size. Pls.' Br. at 14. But as explained above, and as further detailed by Dr. Robb, minority farmers have largely been left out of these programs because USDA payments tend to favor larger farms; and "the smaller size of minority farms" is itself "likely due in no small part to the historical discrimination in USDA loan programs that ha[s] deprived minority farmers of necessary credit and services." Robb Rpt. at 89; *see also* Cobb Rpt. ¶¶ 53 (noting that minority farmers "have not had the

same access to credit to increase the size of their operations" and have "less generational wealth"). Thus, Congress had a strong basis for concluding that the general failure of government payment programs to reach minority farmers is a byproduct of past USDA discrimination causing a diminution in minority farms. *Id.* at 88-89, 95-99; *supra* Part I.B.2.

Otherwise, Plaintiffs point to their expert's assertions that the statistical disparities analyzed by Dr. Robb can all be "chalked up to race-neutral factors" such as type of crop grown or other hypotheticals, Pls.' Br. at 14-15, but those assertions lack an evidentiary basis. Plaintiffs' expert principally focuses on "rais[ing] questions" about the data in Dr. Robb's report, Bronars Rpt. at 15, ECF 49-1, but he conducts little "substantive analysis of his own" to satisfy Plaintiffs' burden to rebut the Government's robust evidence supporting its compelling interest. *Midwest Fence*, 840 F.3d at 951. For instance, Plaintiffs' expert asserts that it is "not possible" to know the extent to which discrimination or race-neutral factors have impacted various statistical disparities without doing further analyses, *see, e.g.*, Bronars Rpt. ¶¶ 5, 37; but he fails to perform the very analyses that he believes may cast doubt on Dr. Robb's conclusions. Such "speculative critiques do not raise a genuine issue of fact as to whether the [Government] had a substantial basis in evidence to believe that action was needed to remedy discrimination." *Midwest Fence*, 840 F.3d at 952 (finding that the plaintiff's expert report, which merely pointed out ways in which the data was "unclear" or did not account for alternative explanations, did not create a genuine issue of fact as to whether the defendants had a strong basis in evidence).

What is more, contrary to Plaintiffs' blanket assertions otherwise, Dr. Robb did in fact account for the race-neutral factors raised by Plaintiffs' expert and rejected them as the primary driver of evident disparities between minority and non-minority farmers. *See* Robb Rpt. at 74-90. For instance, Plaintiffs' expert posits that disparities may be due to a disproportionately large number of minority farmers being new or beginning farmers who, presumably, have less experience or work more days off the farm. Pls.' Br. at 14. But as Dr. Robb explains, the data shows no significant difference across racial groups between the share of new and beginning farmers as compared to share of total producer population. Robb Rpt. at 74-75. Nor is there any meaningful difference in days worked off the farm

between the various racial groups. *Id.* at 76-77 (noting that non-minorities are actually more likely than most minority groups to spend 200 or more days on non-farm work); *id.* (finding that non-minorities are more likely to engage in farming as a secondary occupation or hobby than almost every minority group). Thus, Dr. Robb found that the disparities "are most likely not being driven by a disproportionately large influx of new and beginning farmers from the minority groups" as Plaintiffs' expert suggests. *Id.* And yet, as her report elaborates, even assuming that "poorer outcomes for minorities could be explained in part by a comparatively larger share of new and beginning farmers," that itself would likely "be an artifact of prior discrimination" delaying minorities' entry into the farming business and putting them "in a worse position" than they would be in absent discrimination. *Id. Cf. Midwest Fence*, 840 F.3d at 952 ("[W]e recognize that a minority-owned firm's capacity and qualifications may themselves be affected by discrimination." (quoting *Rothe*, 545 F.3d at 1045)).

Other criticisms raised by Plaintiffs' expert turn on a mistaken understanding of the Government's burden to show a strong basis in evidence. Specifically, their expert contends throughout his report that some data "suggests that not *all* minority farmers were still suffering economic harm in the past decade due to past discrimination by the USDA." Bronars Rpt. ¶ 31 (emphasis added); *see also id.* ¶ 33 (asserting that more data would be of "interest to an investigation of whether past discrimination has impacted *all* minority farmers" (emphasis added)). But no court has ever imposed the unrealistic requirement that the Government propound evidence that every single member of a minority group has been discriminated against to establish the strong basis in evidence on which a remedy must be predicated. Because this critique by Plaintiffs' expert applies an incorrect—and implausible—legal standard, it is "legally flawed" and should be disregarded. *Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1227214, at *5 (N.D. Ill. Mar. 25, 2014) (striking an expert's opinion that "fail[ed] to comply with the [relevant] law" as unhelpful to the trier of fact under Rule 702). The statistics and anecdotal evidence may not "conclusively prove" that the disadvantages faced by minority farmers are the result of past discrimination, but it need not do so to establish a strong basis for the necessity of a remedial measure. *Midwest Fence*, 840 F.3d at 945 (quoting *H.B. Rowe*, 615 F.3d at 241). The current disparities are at the very least "consistent with" past discrimination,

and Plaintiffs do not show otherwise. *Id.* (rejecting the plaintiff's argument that "nothing proves that the disparities [the expert] relied upon were caused by discrimination").

In a final effort to undermine the Government's evidence, Plaintiffs insinuate that any reliance on statistical disparities to assess the effects of past discrimination is unlawful. Pulling statements from the Robb Report out of context, Plaintiffs contend that the Government's reliance on statistics here shows that its interest is achieving "racial parity" based on a broad concern with disparities stemming from discrimination society-wide. Pls.' Br. at 16-17. Yet Plaintiffs ignore the Seventh Circuit's repeated holding "that [the] combination of persuasive statistical data and anecdotal evidence adequately establishes a compelling governmental interest that justifies an affirmative action plan[.]" *Majeske*, 218 F.3d at 822. In any event, Plaintiffs misunderstand the record, the role of current statistical disparities, and the nature of the relief provided through § 1005.

The record makes clear that Congress's intention was to remedy the effects of clearly identified, well-documented, and repeated discriminatory actions by FSA officials in the administration of USDA's loan programs, not society more broadly. *Cf. Wygant*, 476 U.S. at 288 (opinion of O'Connor, J.) (explaining that a governmental unit's efforts to remedy "societal discrimination" are those that seek to remedy "discrimination not traceable to its own actions"). As explained, various studies, anecdotes, and other evidence establish a pattern of discrimination occurring at all phases of the loan cycle; and the current statistical disparities reveal that minority farmers continue to suffer the fallout of decades-long government discrimination that deprived them of the same opportunities that non-minority farmers had to develop their farms and build credit. The current statistical disparities are useful for measuring whether and to what extent minority farmers continue to experience the effects of discrimination in USDA loan programs—that is, they provide a helpful "starting point in the process of shaping a remedy[.]" *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25 (1971). But the remedy Congress ultimately adopted is not designed to close the gaps in all observed disparities; and it bears no resemblance to the long-term diversity programs whose successes are measured in fixed quotas aimed at achieving "racial balance," as Plaintiffs assert. Instead, § 1005 is a one-time remedy to give relief to minority farmers, who are disproportionately in need and

yet have largely failed to benefit from past government payments—and at a critical point in time, when the economic crisis caused by the pandemic put them disproportionately at risk of losing their farms. As Congress put it, this debt relief is an important step to prevent "yet another wave of foreclosures and potential land loss," and to "begin to turn the page on th[e] shameful history of discrimination" at USDA. 167 Cong. Rec. 1266.

*      *      *

In sum, there is a strong basis for Congress's conclusion that historic discrimination in USDA's loan and other financial assistance programs left minority farmers in a dire financial situation necessitating urgent, race-conscious relief in the midst of the economic crisis caused by the pandemic.

C.    *Section 1005 is narrowly tailored to serve that interest*

Targeting debt relief to minority farmers is a narrowly tailored means to further the Government's compelling interest in remedying the lingering effects of historic discrimination in USDA loan programs. "Narrow tailoring requires 'a close match between the evil against which the remedy is directed and the terms of the remedy.'" *Midwest Fence*, 840 F.3d at 942 (citation omitted). A race-conscious remedial "plan is narrowly tailored if, as a practical matter, it discriminates against [excluded groups] as little as possible consistent with effective remediation." *Majeske*, 218 F.3d at 820 (citation omitted). Various factors bear on the analysis, including: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief"; "the impact of the relief on the rights of third parties," *Paradise*, 480 U.S. at 171, and over- or under-inclusiveness, *Midwest Fence*, 840 F.3d at 942. Contrary to what Plaintiffs assert, Pls. Br. at 18-24, these factors collectively show that USDA's provision of debt relief to minority farmers is narrowly tailored.

1.    *Debt relief is necessary to remedy the evident lingering effects of discrimination against minority farmers*

The need for a particular remedy overlaps with the compelling interest inquiry. *See Midwest Fence*, 840 F.3d at 954 ("The necessity of relief overlaps our analysis of [the government's] strong basis in evidence for believing [its] programs were needed to remedy lingering effects of discrimination."); *Majeske*, 218 F.3d at 824 ("[T]he necessity for this affirmative action was firmly rooted in both the anecdotal and statistical evidence adduced at trial" and the inadequacy of alternative measures).

26

Here, the extensive evidence of the economic damage that USDA's long history of race discrimination wrought on minority farmers firmly establishes the need for § 1005's financial remedy. As detailed above, minority farmers continue to suffer the economic aftershocks of the long history of USDA denying them equal access to financing and other support programs. *See* Cobb Rpt. ¶¶ 52-59. Without the assistance available to other communities, minority farmers have failed to accrue capital at the same rates as their non-minority counterparts. *See id.* ¶ 53. They have been left operating smaller and less profitable farms, experiencing disproportionate rates of default and foreclosure, and have had less access to commercial credit. *Id.*; *see also* Robb Rpt. at 55-73, 80-83, 91-101. In other words, because of the lack of historical access to USDA programs, minority farmers have been less able to expand their operations, pay their debts, and achieve wealth. Cobb Rpt. ¶ 53. And these disadvantages are self-reinforcing: because they had been excluded from programs that would assist them in growing their operations, minority farmers have been less likely to benefit from the recent large agricultural subsidies, which overwhelmingly benefitted farmers with greater capital. *Id.* ¶ 59; *see also* Robb Rpt. at 95-99. As Mr. Cobb explains, a directed infusion of capital to minority farmers is both necessary and the most effective way to help them escape the cyclical effects of discrimination, which are likely to continue unabated absent intervention. Cobb Rpt. ¶¶ 82-83, 85 (noting that "[d]irect financial assistance through debt payment frees up funds for expansion of operations that many socially disadvantaged farmers could not achieve in prior years" despite other USDA efforts).

Additionally, § 1005's directed infusion of capital to minority farmers is necessary to address minority racial groups' lack of trust in USDA—a distinct lingering effect that also interferes with USDA's efforts to remedy the economic damage wrought by its past discrimination. *Id.* ¶ 86, 89. As Mr. Cobb details in his expert report, the long history of discrimination by USDA is well known within minority communities, and has a significant impact on how those communities perceive current USDA programs and efforts to assist them. *Id.* ¶¶ 55, 57. In meetings with individual farmers, community groups, and non-profits, USDA has consistently heard about a lack of trust on the part of minority farmers about USDA's intentions. *Id.* ¶ 56. This lack of trust is not only damaging to USDA's reputation, but it also tends to compound the damage from USDA's prior discriminatory treatment

by making minority farmers as a group less likely to engage with USDA, to learn about programs that could benefit them, and to take advantage of those programs. *See id.* ¶¶ 57, 58; *see also* Robb Rpt. at 102-07. Because those programs are specifically designed to assist farmers who are ineligible for or may have a hard time obtaining commercial credit, USDA's inability to overcome the justified distrust by minority communities means that even farmers who have never personally experienced discrimination may nonetheless experience economic injury attributable to past discrimination by USDA. *See* Cobb. Rpt. ¶¶ 11-12 (discussing general purpose of FSA loans); *see also* 167 Cong. Rec. at S1264 (noting that the "diminished relationships between [SDFRs] and USDA as a result of both latent barriers and historic discrimination" is reflected in surveys indicating that "73 percent of Black farmers" lacked awareness of the agency's recent aid programs). Section 1005 remedies this injury by signaling to minority communities that USDA is committed to repairing the damage of the past and assisting them financially today. Cobb Rpt. ¶¶ 86-87.

USDA's experience following the enactment of § 1005 confirms that the legislation is particularly well-suited to this remedial purpose. Following the passage of the legislation, community organizations that work with minority farmers and partner with USDA reported that their members viewed the provision as signaling a new era for the agency and were more interested in forging a new working relationship. *See id.* ¶ 89. And "more minority farmers came forward to update their data with FSA," which they had not done following the enactment of other subsidy programs out of reported "concern that they would not be treated fairly by FSA." *Id.* ¶ 88. Based on his "extensive experience with farm loan programs," Mr. Cobb anticipates that implementation of § 1005 "would give individuals a sense that FSA is acknowledging past issues and [would] demonstrate that FSA is committed to working with minority communities," thus making those communities more likely to engage with FSA. *Id.* ¶ 90. And such engagement would, in turn, enable "USDA to extend the reach of its other financial programs," making those programs more effective at serving minority communities in the future. *Id.*; *cf. Petit*, 352 F.3d at 1115 (recognizing that earning the "trust of the community" can be an important component of a remedial program because trust helps a government entity perform its mission more "effective[ly]").

The discrimination faced by minority farmers has been documented in various reports, lawsuits, and congressional hearings over decades. *See, e.g.*, CRAT Rpt. (reporting anecdotes and other evidence of discrimination by FSA against Black, Hispanic, Native American, and Asian farmers); JL Rpt. at 81-86 (same); Robb Rpt. at 16-38 (discussing the reports); Cobb Rpt. at ¶¶ 25-38 (same); *supra* Part I.B.1. Data analyzed by Dr. Robb further shows how, currently, Black, Hispanic, Native American, Asian, and Native Hawaiian/Pacific Islander farmers all generally have smaller farms, bring in less revenue, have less capital, receive fewer government payments, and face higher rates of foreclosure. Robb Rpt. at 41-91, 91-107. Because § 1005 is available to these specific groups, who are "actually disadvantaged" by past USDA discrimination, *Midwest Fence*, 840 F.3d at 946, it is narrowly tailored to remedying the lingering effects of that discrimination.

2. *Record evidence shows that other alternatives considered and implemented by USDA have been inadequate*

Crucially, the evidence available to Congress and USDA shows that § 1005 is uniquely able to remedy the lingering effects of prior discrimination, including by injecting needed capital into struggling minority farms and rebuilding trust between USDA and these communities. Indeed, USDA's experience demonstrates that § 1005 is necessary precisely *because* the other alternatives that USDA has attempted over the years have come up short.

To start, the evidence in this case unambiguously demonstrates that the most direct efforts to compensate victims of discriminatory practices—the *Pigford* and *Keepseagle* settlements and related claims processes—did not reach all victims and did not eliminate the broader lingering effects of the agency's practices. *Supra* Part I.B.3; Cobb Rpt. ¶ 38. The available statistical and anecdotal evidence also firmly establishes that minority farmers as a group continue to suffer from having had inadequate access to and support from the Department's programs. *See, e.g.*, Robb Rpt. at 91-108; Cobb Rpt. ¶¶ 53-57; 167 Cong. Rec. at S1264 (noting that settlements "have not provided the relief necessary for [] farmers of color to participate fully in the American agricultural economy").

Since the implementation of these settlements, USDA has undertaken many measures to remedy those lingering economic effects and rebuild trust with minority communities. Cobb. Rpt. ¶¶ 39-51 (detailing USDA's extensive efforts to remedy lingering effects of past discrimination).

Among other things, USDA has streamlined its regulations and taken steps to standardize loan servicing to ensure equal treatment of all applicants by removing county committees from the loan-making decision process. *See id.* ¶¶ 40, 41, 44. Further, FSA has created numerous specialized programs to expand access to credit. These include the microloan program, which is "designed to meet the needs of small and beginning farmers, or for non-traditional and specialty operations by easing some of the requirements and requiring less paperwork," *id.* ¶ 46, and "the down payment program[,] [which] assists socially disadvantaged and beginning farmers in purchasing a farm" by, among other things, providing guarantees to commercial lenders, *id.* ¶ 49; *see also id.* ¶¶ 50-51 (discussing other programs such as the "Land Contract Guarantee Program [] designed to assist beginning or socially disadvantaged farmers and ranchers to obtain farmland"). For loans to socially disadvantaged farmers and ranchers, FSA also guarantees up to 95% of a commercial lender's losses in the event of default to incentive lenders to provide loans to those borrowers. *Id.* ¶ 48.

To expand the reach of these and other programs, FSA has created a specialized outreach office whose mission is "to address systemic deficiencies in the delivery of USDA programs and services to minority and socially disadvantaged farmers and ranchers," and has established outreach coordinators in every state and each of FSA's 2,124 county offices nationwide.[21] *Id.* ¶¶ 42, 45. FSA has further sought to connect with historically underserved groups through the 2501 Program, established by Congress in 1990 and permanently funded in 2018, which provides grants for "higher education institutions and nonprofit and community-based organization to extend USDA's engagement efforts" to socially-disadvantaged communities. *Id.* ¶ 43. These grants fund "projects that include conferences, workshops, and demonstrations on various farming techniques, farm financial planning," and "connect[s] underserved farmers and ranchers to USDA local officials to increase awareness of USDA's programs and services." *Id.* Just last year, USDA invested $4.7 million to establish partnerships with organizations to assist with outreach and education about FSA programs.[22]

These efforts have achieved some, but only limited, success. For example, after its initial

---

[21] *See* https://perma.cc/788X-THEK.
[22] *See* https://perma.cc/Q5WK-WNW4.

implementation of CFAP, USDA learned that only approximately one percent of applicants were
minority farmers, despite those farmers' great need for pandemic assistance. *See* Cobb Rpt. ¶ 59. In
response, USDA reopened CFAP in March of 2021 to reach a greater share of farming operations
and used existing cooperative agreements to advertise the program and provide technical assistance.
*Id.* ¶ 60 (noting that the agency committed more than $2 million to those partnerships). In the second
round of the program, minority farmers constituted 16% of applicants, demonstrating that they were
both eligible for and capable of participating given the appropriate opportunity. *Id.*

But CFAP was a unique program and "it is not possible to similarly address past inequities in
farm loan programs that have had longstanding lingering effects through incentive programs and
increased outreach alone." *Id.* As both Dr. Robb and Mr. Cobb detail in their reports, the damaging
residual effects of the Department's discrimination persist. Despite the direct loans and financial
guarantees and incentives that USDA provides to commercial lenders, minority farmers continue to
be demonstrably less likely to benefit from commercial credit or from USDA programs—and are
more likely to default on loans and face foreclosure when they do. *See* Robb Rpt. 91-95, 99-101; Cobb.
Rpt. ¶ 53. And, as Congress found and as Mr. Cobb details, community organizations continue to
report that minority farmers lack trust in USDA. Cobb. Rpt. ¶¶ 55-58.

The long history of only partially-successful efforts on the part of USDA thus confirms that
the relief provided by § 1005 was necessary. The government need not demonstrate that it exhausted
"every conceivable race-neutral alternative" before implementing race-conscious measures. *Grutter*,
539 U.S. at 339. Where, as here, a "serious, good faith consideration of workable race-neutral
alternatives" reveals that those "available, workable race-neutral alternatives do not suffice," resort to
a race-based classification is appropriate. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312-13 (2013)
(internal quotes and citations omitted). Strict scrutiny does not restrict the Government to ineffectual
measures. *Fisher II*, 136 S. Ct. at 2214 (rejecting the plaintiff's proposed alternatives as not "available"
or "workable" means of achieving university's compelling interest). Unlike past measures, § 1005
swiftly and efficiently provides the financial assistance necessary for minority farmers to remain
current with their loans, avoid foreclosure, and build the capital required to remain in the business of

farming, while also improving the efficacy and reach of USDA's other programs by increasing trust between the agency and the minority communities—all of which was necessary to address the acute needs of minority farmers on the cusp of foreclosure in the midst of a once-in-a-lifetime pandemic. Under these unique circumstances, the need for targeted debt-relief offered by § 1005 is firmly rooted in the record before Congress, and the most effective way of achieving Congress's compelling interest of remedying the lingering—yet still very present—effects of USDA's past discrimination.

> 3.  *Debt relief satisfies the remaining narrow tailoring criteria*

The remaining factors courts typically consider in the narrow tailoring analysis underscore § 1005's "close match" to the lingering effects of discrimination that it is designed to remedy. *Midwest Fence*, 840 F.3d at 942 (considering flexibility, over- and under-inclusiveness, and burden on non-benefitted parties, in addition to the necessity of relief).

To start, the debt relief is temporary. It authorizes debt relief as "a one-time occurrence," *Paradise*, 480 U.S. at 178, extended only to SDFRs with qualifying loans as of January 1, 2021. And that relief "evaporate[s] . . . upon implementation," *id.*, meaning that all regular repayment obligations continue to apply to all loans administered after that date. The brief existence of § 1005 debt relief ensures that it endures no longer than necessary to serve its purposes and "is not a disguised means to achieve racial balance." *Id.* Additionally, § 1005 is not under- or over-inclusive. As discussed above, it is targeted specifically to the racial and ethnic groups that were victims of discrimination by USDA and that continue to suffer the lingering effects of such discrimination both on an individual and on a community level. *Supra* Part I.B.1. A narrower provision of relief would not achieve those interests.

Nor does § 1005 burden non-minority farmers. *Paradise*, 480 U.S. at 182 ("[T]he temporary and extremely limited nature of the requirement substantially limits any potential burden on white applicants for promotion."). Concern about burden is triggered when favoring one group will exclude another from opportunities it would otherwise have. Thus, in the case of an affirmative action program, when there are a limited number of contracts or promotions, the opportunity given to one person prevents another from competing for it. *See id.* Here, administering debt relief to minority farmers does not burden non-minority farmers "directly, if at all," *Sheet Metal Workers*, 478 U.S. at 488

(Powell, J., concurring), because it does not affect non-minority farmers' ability to continue participating in USDA loan and other assistance programs in any way. Non-minority farmers, including Plaintiffs, will remain in the same position before and after the administration of debt relief to others. Indeed, Plaintiffs have received a variety of agricultural subsidies from USDA, including MFP payments, since at least 2003—in the amount of more than $13,000 each. *See* https://perma.cc/7LT6-ANND; https://perma.cc/BD9A-S5AL. Section 1005 does not affect any of those subsidy programs or remove a pre-existing benefit from Plaintiffs for which they are otherwise eligible. It simply extends relief to minority farmers who have long been denied the same government-conferred benefits that non-minority farmers have enjoyed in the past. *Supra* Part I.B.2; *see* Robb Rpt. at 95-99. Section 1005 thus imposes no burden on non-minority farmers, much less an impermissible one. *Cf. Sheet Metal Workers*, 478 U.S. at 481 (finding 29.3% nonwhite union membership goal permissible because it had "only a marginal impact on the interests of white workers" where whites were "denied certain benefits available to their nonwhite counterparts" but still constituted "a majority of those entering the union"); *Majeske*, 218 F.3d at 824 (finding that promotional preferences for black and Hispanic officers that precluded some white officers from receiving a promotion were permissible because white officers were not precluded "from receiving a future promotion"). Plaintiffs have not argued otherwise.

4. *Plaintiffs fail to rebut the Government's showing that Section 1005 is narrowly tailored*

Plaintiffs "bear[] the ultimate burden of proving that the" Government's remedial program fails to satisfy the narrow tailoring criteria. *Majeske*, 218 F.3d at 820; *Wygant*, 467 U.S. at 293 (opinion of O'Connor, J.) ("[Plaintiffs] bear the ultimate burden of persuading the court . . . that the plan instituted on the basis of this evidence was not sufficiently 'narrowly tailored.'"). They fail to carry that burden here.

Plaintiffs' chief criticism of § 1005 is without merit because it is founded on a fundamental misunderstanding of equal protection jurisprudence. Specifically, Plaintiffs complain that § 1005 is inflexible and under-inclusive because it offers relief to all members of the specified minority groups without any individualized consideration whether those members have personally experienced

33

discrimination or its lingering effects. Pls.' Br. at 18-20. But precedent is clear that a race-conscious remedy may provide benefits on a group-wide basis, regardless of whether each individual member of the group has suffered discrimination. *See, e.g.*, *Sheet Metal Workers*, 478 U.S. at 482 (upholding order "benefitting individuals who are not the actual victims of discrimination"); *Wygant*, 476 U.S. at 287 (opinion of O'Connor, J.) ("[I]t is agreed [by the full Court] that a plan need not be limited to the remedying of *specific instances* of identified discrimination for it to be deemed sufficiently 'narrowly tailored[]' . . . to the correction of prior discrimination by the state actor." (citation omitted) (emphasis added)); *Croson*, 488 U.S. at 509 (noting that, in some cases, "some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion"); *see also Majeske*, 218 F.3d at 823 (affirming the constitutionality of a race-conscious remedial promotion plan that benefited all black and Hispanic detectives even though evidence showed that some black and Hispanic detectives suffered no discrimination in the past). Of course, a contrary holding would render irrelevant the entire strict scrutiny analysis, which is triggered by the use of race-based measures that, by their very nature, apply on a group-wide basis. *See Croson*, 488 U.S. at 493-94. Plaintiffs apparently disagree with this settled law, but they cannot dispute that the Supreme Court and Seventh Circuit have both held that the Government may act to remedy the persistent effects of past racial discrimination even where that remedy benefits individuals who have not personally experienced racial discrimination.[23] And that is especially true where the record establishes that provision of benefits to a previously disadvantaged group is necessary to rebuild trust with that group as a whole.

Plaintiffs raise various other objections to § 1005 as over-inclusive, but these are likewise lacking in merit. For instance, Plaintiffs assert that § 1005 is over-inclusive because a small number of minority farmers who qualify for debt relief—370 out of more than 18,000 eligible § 1005 beneficiaries, Cobb Rpt. ¶ 79; Defs.' Suppl. Resp. to Pls.' First Set of Interrogs. at 17 (Interrog. No. 13), ECF No. 48-1 at 15—also received a payment from USDA upon showing through a settlement claims

---

[23] The same is true for Plaintiffs' objection that new and beginning minority farmers stand to benefit from § 1005 even if they may not have personally suffered discrimination. Pls.' Br. at 14-15. Again, a robust body of evidence shows that minority groups as a whole are suffering the lingering effects of discrimination, and the Government's remedy may benefit the groups as a whole.

process that they "actually suffered the well-documented historic discrimination" at USDA. Pls.' Br. at 20 (quoting *Wynn*, 545 F. Supp. 3d at 1285). Plaintiffs believe § 1005 simply duplicates the relief these farmers already received, but Plaintiffs fail to undermine the evidentiary showing that past payments under *Pigford* and related claims processes did not adequately remedy the effects of discrimination.[24] *Supra* Part I.B.3; I.C.2. Moreover, this relatively small number of § 1005 beneficiaries were provided relief for discrimination occurring before the mid-1990s, but the evidence shows that USDA continued discriminating against minority farmers well beyond that time period—and that the deleterious effects of that discrimination lasted far beyond those discriminatory acts as well. *Id.*

Relatedly, Plaintiffs criticize the evidentiary basis for including certain racial groups within the definition of SDFR for purposes of § 1005. They assert that the debt relief is over-inclusive because it extends to racial groups that may have experienced less discrimination or that might be less disadvantaged than others. Pls.' Br. at 21 (arguing that discrimination by the USDA against some minority groups is thin). Singling out Asian farmers, Plaintiffs assert that at least some of farmers from that racial group earn greater revenue than at least some white farmers. *Id.* But Plaintiffs ignore other metrics showing that Asian farmers generally lag behind non-minority farmers in many other, important respects. *See* Robb Rpt. at 46 (Asian farmers make up a disproportionately small percentage of farmers); *id.* at 64 (Asian farms are substantially smaller than non-minority farms even in the states where Asian farmers are most heavily concentrated); *id.* at 66 (Asian farmers receive a disproportionately small percentage of government payments).[25] These statistical disparities exist alongside extensive anecdotes detailing discrimination from Asian farmers, *see, e.g.*, *id.* at 34-36. In any event, Congress's provision of debt relief to each minority group disadvantaged by past discrimination at USDA is not over-inclusive simply because the evidence of discrimination is stronger as to some

---

[24] Plaintiffs also contend that § 1005 debt relief might exceed payments made to some *Pigford* claimants, but no principle of law caps a congressional remedy for discrimination at amounts paid in the past.

[25] Plaintiff cites the *Wynn* court's conclusion that the evidence of discrimination against Asians, Native Hawaiians, and Pacific Islanders appeared to be thin, but the court was reviewing an incomplete record at the PI stage and did not have the benefit of the Government's expert report or declaration. *See Wynn*, 545 F. Supp. 2d at 1281 n.9 ("[T]he Court recognizes that this record – consisting only of a complaint and briefing and evidence pertinent to the Motion for Preliminary Injunction – is limited.").

groups than others. *See Midwest Fence*, 840 F.3d at 945 (rejecting contention that a plan was not narrowly tailored because it benefitted each racial group equally even though the evidence "reflect[ed] some variation in the extent of disadvantage"). Congress has a strong basis in evidence to conclude that each group suffered discrimination at the hands of USDA. *See* Robb Rpt. at 16-17 (setting forth the evidence before Congress showing that each minority group has "suffered discrimination in USDA lending programs and continue[s] to suffer the negative effects of that discrimination today").

Plaintiffs further argue that § 1005 is not only over-inclusive but also under-inclusive, because it provides no relief for minority farmers who were unable to obtain a farm loan or who no longer have a farm loan because of discrimination at USDA. Pls.' Br. at 22.[26] But a remedial action need not address every conceivable instance or effect of race discrimination to be narrowly tailored.[27] More fundamentally, though, this argument is based on a misunderstanding of § 1005's remedial purpose.

The debt relief authorized by § 1005 is designed to reverse the lingering effects of discrimination experienced by minority farmers currently engaged in the business of farming. Those farmers, the evidence shows, generally operate smaller and less profitable farms, face disproportionately higher risks of default and foreclosure, are routinely excluded from USDA financial benefits programs, and face disproportionate hurdles to graduating from USDA programs to other forms of commercial credit. *Supra* Part I.B.2.; *see also* Robb Rpt. at 99-101; Cobb Rpt. ¶ 53. On top of these disadvantages, minority farmers' distrust of USDA because of past discrimination creates another barrier that keeps both current and prospective minority farmers from participating in USDA

---

[26] Plaintiffs' passing contention that Section 1005 is under-inclusive because the definition of SDFR does not include women, Pls.' Br. at 22 n.8, is "puzzl[ing]," *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 287 (D.D.C. 2012).Section 1005 is designed to remedy the lingering effects of "racial or ethnic prejudice," not gender discrimination, *see* ARPA § 1005 (incorporating the definition of SDFR in 7 U.S.C. § 2279(a)). Regardless, female farmers may still benefit from Section 1005 if they belong to a minority group recognized as SDFR for purposes of that program. *See DynaLantic Corp.*, 855 F. Supp. 2d at 287.

[27] Section 1006 of ARPA (which is not a subject of this lawsuit) authorizes USDA to "provide financial assistance to socially disadvantaged farmers, ranchers, or forest landowners that are *former* farm loan borrowers that suffered related adverse actions or past discrimination or bias in [USDA] programs, as determined by the Secretary." ARPA § 1006 (emphasis added).Thus, former borrowers who no longer have loans because of discrimination may receive assistance through this alternative avenue.

programs even when they qualify. Section 1005 is narrowly tailored to remedying all of these lingering effects. It provides the funds necessary for minority farmers to pay off their debts and not only to keep their farms but also to grow and develop them in ways that past discrimination has prevented. And it sends a strong signal to all current and prospective minority farmers that USDA is committed to supporting minority farmers despite its historical discriminatory actions.

## II.    If the Court finds Section 1005 unconstitutional, the proper remedy is to extend its benefits, not to nullify the statute.

For the reasons given above, the Court should reject Plaintiffs' claims and enter judgment for Defendants. However, should the Court conclude that § 1005 violates Plaintiffs' equal protection rights, the Court will face a question of remedy. As Plaintiffs recognize, there are two options available to redress a plaintiff's claim of an equal protection violation. A court can either extend the benefits to the excluded plaintiffs or deny the benefits to all. Here, if the Court concludes that § 1005 is unconstitutional, the Court should enter the same relief that courts ordinarily enter to remedy an equal protection violation: extension of the benefits to those excluded under the challenged provision. Such a remedy better comports with Congress's evident intent and awards the Plaintiffs in this action a material benefit without depriving nonparties of the benefits Congress intended for them.

In cases "involving equal protection challenges to underinclusive federal benefits statutes," the Supreme Court has explained, the "proper course" is ordinarily to extend benefits to the excluded claimant. *Califano v. Westcott*, 443 U.S. 76, 89 (1979); *see also Califano v. Goldfarb*, 430 U.S. 199 (1977) (extending survivors' benefits); *Jimenez v. Weinberger*, 417 U.S. 628 (1974) (extending disability benefits); *Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) (extending food stamps); *Frontiero v. Richardson*, 411 U.S. 677 (1973) (extending military spousal benefits). Whether to extend the benefits or nullify the statute requires a judgment about which remedy "Congress likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 (2017) (quoting *Levin v. Com. Energy Inc.*, 560 U.S. 413, 427 (2010)). This is necessarily a speculative inquiry, although the answer will draw on Congress's intent in passing the statute that is challenged. *See id.* at 1699 ("The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand.").

Here, extending the benefits to the Plaintiffs—who are non-minority farmers—is the proper course. To do otherwise "would impose hardship on beneficiaries whom Congress plainly meant to protect." *Westcott*, 443 U.S. at 90. Congress enacted § 1005 as part of a broad economic stimulus package. It did so against a backdrop of threatened foreclosures and farm failures for many minority farmers, and it made an unlimited appropriation to provide those farmers with needed relief. *See, e.g.*, H.R. Rep. No. 117-7, 2 (2021) (focusing on the "most vulnerable communities . . . forced to bear the brunt of" the pandemic and resultant economic crisis "as underlying health and economic inequities grew worse"); *id.* at 23 (observing that minority farmers "received a disproportionately small share of the farm loans and payments administered by USDA as a result of . . . longstanding and widespread discrimination"). Congress observed that decades of discrimination had deprived many minority farmers of the capital necessary to survive and to thrive in the farming sector, and that as a result minority farms were failing at high rates. 167 Cong. Rec. S1264-66 (stating that SDFRs have "proportionately less agricultural credit than" non-SDFRs and were more likely to be in default and facing foreclosure). A court order that eliminated benefits for all farmers would deny relief to those that Congress determined urgently needed it.

Four aspects of the statutory scheme further indicate that Congress would have preferred to extend benefits to non-minority farmers such as Plaintiffs rather than to deny them to everyone. First, Congress made an unlimited appropriation for the § 1005 program, *see* § 1005(a)(1), indicating that it intended to pursue the program without regard to final cost. To be sure, Congress anticipated the program would cost a certain amount, but it nonetheless enacted an unlimited appropriation to ensure that minority farmers would obtain relief even if the cost exceeded Congress's estimate.

Second, an overarching purpose of ARPA as a whole was to provide economic support across the U.S. economy and to stimulate economic growth. H.R. Rep. 117-7 No.1, at 2 (2021) ("Our nation is struggling to endure the unrelenting devastation spawned by the pandemic and corresponding economic fallout."); *id.* at 3 ("This ambitious $1.9 trillion plan provides the resources needed to change the direction of the pandemic and spur an inclusive and strong economic recovery."). Nullifying § 1005 would be inconsistent with that purpose, denying economic support that Congress thought

important to its overall scheme. Expanding the program to include Plaintiffs, by contrast, would be wholly consistent with that broader purpose by providing additional economic support to an important sector of the economy.

Third, and relatedly, the vast majority of loans covered by § 1005 are only available to individuals who are unable to obtain a loan without an FSA guarantee on reasonable terms in the private market.[28] Thus, USDA has already determined that almost all borrowers who would benefit from the extension of the program face some difficulty in accessing capital. This provides at least some basis to think that holders of these loans generally are more at risk of foreclosure or failure than are farmers without such loans, and that Congress therefore would have wanted to provide relief to additional individuals who hold these kinds of loans rather than to none.

Fourth, the cost of extending the program even to include *all* non-Hispanic white farmers is quite small in comparison to the overall cost of the bill that includes it. Expanding the program is estimated to cost approximately $36 billion,[29] but the overall cost of ARPA exceeds $1.9 *trillion*. Moreover, such costs are on the same order of magnitude as costs of remedies that the Supreme Court has previously endorsed. In *Califano v. Goldfarb*, for example, the Solicitor General estimated that expanding the program would cost $447 million, just for the first year. *See* Brief for Appellant, *Goldfarb*, No. 75-699 (U.S.), 1976 WL 181385, at *39. Adjusted for inflation, that remedy—which the Supreme Court endorsed 40 years ago—would cost over $2 billion *per year*. Because the § 1005 program is limited to loans held as of a specified date, it will be a one-time cost, not a recurring one.

Plaintiffs are mistaken to suggest that expanding § 1005 would make the exception the rule. Section 1005 is a one-time program that is tied to loans held as of a certain date. The ordinary rule—repayment of loans subject to the robust statutory and regulatory scheme—will continue in force for

---

[28] Farm Storage Facility Loans are generally available to any farmer, but account for less than 4% of the total value of loans potentially covered by Section 1005. *See* Defs.' Suppl. Resp. to Pls.' First Set of Interogs. at 17 (Interog. No. 17), ECF No. 48-1 at 18.

[29] As Plaintiffs know, the estimate offered by the district court in *Faust* is inaccurate. *See* Defs.' Suppl. Resp. to Pls.' First Set of Interogs. at 17 (Interog. No. 17), ECF No. 48-1 at 18 (loans held by non-Hispanic white farmers total $30,226,629,606.42). Section 1005 provides for relief "up to 120%" of the outstanding debt—which would equate to $36,271,955,527.20.

all new loans and for all loans outside the scope of § 1005. Nor would such relief raise issues of sovereign immunity; courts have entered such relief for decades, including, and especially, in "cases involving federal financial assistance benefits." *Morales-Santana*, 137 S. Ct. at 1699. The relief ordered in such cases is not to pay money damages, but to evaluate eligibility for government benefits without regard to the suspect classification. Such relief does not implicate the general limits on awarding money damages against the government. *Cf. Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (explaining that suit seeking payment under a statutory scheme is not a suit seeking money damages).

Such remedies also do not implicate the Appropriations Clause, just as the remedies endorsed by the Supreme Court in the *Wescott* line of cases did not. An order prohibiting USDA from considering race or ethnicity in awarding relief under § 1005 would not enlarge the amount appropriated for § 1005 because Congress appropriated an unlimited amount of funds.

Ultimately, the question which relief is appropriate turns on which remedy "Congress likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Morales-Santana*, 137 S. Ct. at 1701. Here, all the available evidence indicates that Congress would rather have expanded the program to provide relief to additional farmers than abandon the program entirely and deny relief to those it determined to be urgently in need of it. Should the Court conclude that § 1005 violates Plaintiffs' equal protection rights, it should redress that wrong by extending the program's benefits to Plaintiffs without regard to race or ethnicity.

## CONCLUSION

For the reasons given above, the Court should enter judgment for Defendants or, if the Court concludes § 1005 is unconstitutional, order that its benefits be extended to Plaintiffs without regard to race or ethnicity.

Dated: March 1, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/ Kyla M. Snow
KYLA M. SNOW (Ohio Bar No. 96662)
MICHAEL F. KNAPP (Cal. Bar No. 314104)
ALEXANDER V. SVERDLOV
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 514-3259
Fax: (202) 616-8470
Email: kyla.snow@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2022, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: March 1, 2022                    _/s/ Kyla M. Snow_____
                                        Kyla M. Snow