# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MATTHEW A. MORTON and
JOSHUA A. MORTON,

    Plaintiffs,

v.

THOMAS J. VILSACK, in his official
capacity as Secretary of Agriculture; ZACH
DUCHENEAUX, in his official capacity as
Administrator, Farm Service Agency,

    Defendants.

Case No. 3:21-cv-00540-NJR

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' CROSS MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

  I.  Section 1005 Does Not Serve a Compelling Interest ............................................... 2

    A.  The Government's Interest in Achieving Racial Parity Is Not Compelling
    Enough To Warrant the Race-Based Debt Relief in Section 1005 .............................. 4

    B.  Section 1005 Does Not Further an Interest in Remedying
    Past Discrimination ...................................................................................................... 6

    C.  Section 1005 Does Not Further an Interest in Remedying
    Present Discrimination ................................................................................................. 9

  II.  Section 1005 Is Not Narrowly Tailored ............................................................... 11

    A.  Section 1005's debt relief program lacks flexibility and is both
    over- and under-inclusive ............................................................................................ 12

    B.  Section 1005 lacks a close fit to the government's asserted interests ........................ 16

    C.  Race-neutral alternatives are adequate to remedy any compelling
    governmental interest .................................................................................................. 17

  III.  A Nationwide Injunction Is the Proper Remedy .................................................. 18

CONCLUSION ......................................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Billings v. Madison Metropolitan School Dist.*,
259 F.3d 807 (7th Cir. 2001) ....................................................................................11

*Builders Ass'n of Greater Chi. v. Cty. of Cook*,
256 F.3d 642 (7th Cir. 2003) ...............................................................................13, 14

*City of Richmond v. J.A. Croson Co.*,
489 U.S. 469 (1989)......................................................................................3, 4, 5, 6

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.*,
122 F.3d 895 (11th Cir. 1997) .....................................................................................2

*Faust v. Vilsack*,
519 F. Supp. 3d 470 (E.D. Wis. 2021).........................................................1, 16, 20

*Fisher v. Univ. of Tex. at Austin*,
136 S. Ct. 2198 (2016) (*Fisher II*) ................................................................3, 11, 18

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013) (*Fisher I*) ...............................................................................3, 5

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..................................................11, 14, 17

*Holman v. Vilsack*,
No. 21-1085-STA-jay, 2021 WL 2877915 (W.D. Tenn. July 8, 2021).......................1, 13, 15

*Majeske v. City of Chicago*,
218 F.3d 816 (7th Cir. 2000) ...............................................................................13, 16

*Midwest Fence Corp. v. U.S. Dep't of Transp.*,
840 F.3d 932 (7th Cir. 2016) ....................................................................8, 10, 14, 16

*Miller v. Johnson*, 515 U.S. 900 (1995).........................................................................5

*Miller v. Vilsack*,
No. 4:21-cv-00595-O, ECF No. 60 (N.D. Tex. July 1, 2021) ..................1, 5, 9, 16

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)....................................................................................3, 4, 18

*Petit v. City of Chicago*, 352 F.3d 1111 (7th Cir. 2003).................................................2

*Pigford v. Glickman*, 206 F.3d 1212 (D.C. Cir. 2000) ............................................9, 17

*Stuart v. Roache*, 951 F.2d 446 (1st Cir. 1991) ...........................................................4

*United States v. Paradise*, 480 U.S. 149 (1987) ........................................................16

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021)....................................................2, 4

*Wynn v. Vilsack*,
545 F. Supp. 3d 1271 (M.D. Fla. 2021)...............................1, 2, 7, 8, 12–15, 18, 19

## INTRODUCTION

There is good reason that Defendants' brief fails to mention a single case in recent memory that examines a law like Section 1005: None exists. No other government program in recent history distributes benefits and burdens by focusing so much on an individual's race. There is no dispute that throughout the United States, every minority farmer or rancher with an eligible farm loan is automatically entitled to debt relief. Every non-minority farmer or rancher, regardless of individual circumstances, is categorically excluded. It is thus no surprise that every court to consider Section 1005 has granted temporary relief enjoining Defendants from enforcing its race-based provisions. *See Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021); *Holman v. Vilsack*, No. 21-1085-STA-jay, 2021 WL 2877915 (W.D. Tenn. July 8, 2021); *Miller v. Vilsack*, No. 4:21-cv-00595-O, ECF No. 60 (N.D. Tex. July 1, 2021); *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021). The limited evidence that Defendants have offered since those decisions does not dictate a different result.

Defendants assert that Section 1005 remedies the lingering effects of past USDA discrimination. But a closer inspection reveals that this interest mirrors an interest in racial balancing, which the Supreme Court has already rejected as patently unconstitutional. The government may use race to redress racial discrimination against *individuals*, but Section 1005 uses race to provide debt relief to farmers merely because they "are members of" *groups* that have suffered discrimination. Defendants' Combined Brief in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Br.") at 5. Further, Defendants do not dispute that there have been substantial efforts to address USDA's decades-old discrimination or that USDA does not currently discriminate against minority farmers. Even so, they contend that crude, group-based statistical disparities in farm revenue, receipt of

agricultural subsidies, and other metrics justifies Section 1005's racial exclusion. *But see Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021) ("An observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way."). But Defendants cannot provide a persuasive explanation for why those disparities justify the debt relief provided by Section 1005. Nor can Defendants match the extraordinary scope of Section 1005's debt relief—120 percent to every minority farmer — with any of the disparities that they identify.

Further, "little if anything about Section 1005 suggests that it is narrowly tailored." *Wynn*, 545 F. Supp. 3d at 1282. Perhaps most significantly, Defendants cannot point to a single program that employs racial classifications as mechanically as Section 1005. Of those farmers with eligible loans, every minority farmer in the United States is entitled to debt relief and every white farmer is excluded. To boot, there remains no serious doubt that Section 1005 is fatally overinclusive, fatally underinclusive, and given the number of obvious race-neutral alternatives available, that the government did not turn to race only as a "last resort." *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 926 (11th Cir. 1997). Just as every court to have considered a request for preliminary relief has granted it, this Court should grant a permanent injunction to prevent Defendants from enforcing the race-based provisions of Section 1005.

## I.    Section 1005 Does Not Serve a Compelling Interest

Section 1005 does not further any interest compelling enough to justify the use of racial classifications. Defendants claim that "Congress's determination that a remedial measure is warranted to advance such a compelling interest is entitled to deference." Defs.' Br. at 6. But the cases they invoke do not concern remedial measures at all. *See, e.g.*, *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2003) (evaluating the government's asserted interest in diversity); *see*

also *Fisher v. Univ. of Tex. at Austin* ("*Fisher II*"), 136 S. Ct. 2198, 2208 (2016) (same). In any event, deference "is fundamentally at odds with" the Supreme Court's "equal protection jurisprudence"—which "put[s] the burden on state actors to demonstrate that their race-based policies are justified." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 744 (2007) (plurality opinion); *see also City of Richmond v. J.A. Croson Co.*, 489 U.S. 469, 501 (1989) ("The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis.").

Defendants cannot meet this burden for three reasons. ***First***, Section 1005 rests on an "amorphous [ ] basis for imposing a racially classified remedy." *Croson*, 488 U.S. at 497 (plurality opinion). Defendants assert an interest in remedying "lingering effects of past discrimination against minority farmers in the administration of USDA loan programs," Defs.' Br. at 8, but they have failed to offer any benchmark for when that amorphous interest has been met. Instead, Defendants suggest that the goal which Section 1005 seeks to achieve is racial parity.[1] Yet racial balancing is "patently unconstitutional." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (*Fisher I*). ***Second***, Defendants do not dispute the vast efforts that have been taken to compensate farmers who have suffered alleged race- and sex-based discrimination by USDA. *See* Pls.' Mot. for Summ. J. at 5 (citing sources). Yet they have failed to meet their burden to provide evidence suggesting that further remedial measures—especially those as sweeping as contained in Section

---

[1] In resisting this characterization of the government's interest, Defendants improperly attempt to have it both ways. They say both that "statistical disparities are useful in measuring whether and to what extent minority farmers continue to experience the effects of discrimination" and that Section 1005 "is not intended to close the gaps in all observed disparities." Defs.' Br. at 25. But that approach would give Defendants free rein to continually distribute benefits and burdens on the basis of race.

1005—are needed. **Third**, Defendants concede that USDA does not currently discriminate against minority farmers and that there is no record of such discrimination for at least the last 11 years. Defs.' Br. at 19. Defendants instead base Section 1005 on the fact that payments from recent agricultural programs disproportionately went to white farmers. *Id.* at 16. Yet "[a]n observation that prior, race-neutral relief efforts failed to reach minorities" provides no basis for a program that distributes payments on the basis of race. *Vitolo*, 999 F.3d at 362.

### A. The Government's Interest in Achieving Racial Parity Is Not Compelling Enough To Warrant the Race-Based Debt Relief in Section 1005

Because the Constitution abhors distinctions based on race, the burden is on the government to make a showing that any such distinctions advance a compelling interest. The Supreme Court has recognized only two such interests: the educational benefits of diversity in higher education and remedying the government's intentional discrimination. *Parents Involved*, 551 U.S. at 720–22. When government seeks to employ racial distinctions, it must not only recite an interest, but identify that interest with specificity. *See Croson*, 488 U.S. at 504 (majority opinion). Defendants' vague recantation of an interest in remedying "lingering effects of past discrimination" does not approach the specificity required by the Equal Protection Clause. Defs.' Br. at 8.[2] Defendants suggest that this interest arises whenever there is evidence of decades-old past discrimination in conjunction with present statistical disparities. But an "amorphous claim

---

[2] Defendants' principal case in support of its interest in remedying the lingering effects of discrimination offers little support for their argument here. In *Stuart v. Roache*, 951 F.2d 446, 452 (1st Cir. 1991), the First Circuit observed that discrimination in hiring entry-level police officers was an "obvious reason" why there were few black sergeants in the police force years later. Defendants fail to make any similar showing that USDA's past discrimination, which had already been the focus of multiple remedial schemes, is the obvious root of the disparities that they identify.

that there has been past discrimination in a particular industry" is not enough. *Croson,* 488 U.S. at 499 .

Defendants' reliance on crude statistical disparities is even more troubling. It suggests that, far from a "one-time cost," Defs.' Br. at 39, race-based benefits will persist until there are equal outcomes between racial groups. For instance, Defendants reason that the government's substantial efforts to remedy discrimination have failed because "minority communities continue to be under-represented in certain USDA programs." *Id.* at 21 (citing Cobb Decl. ¶ 52). Defendants' expert similarly concludes that evidence of "lingering effects of past discrimination" is found in "(i) underrepresentation of minority groups in farming in the United States, (ii) smaller size and lower revenues of minority farms, and (iii) lower overall wealth of minority farmers." Robb Report at 40. Defendants' arguments underscore their misguided belief that government must distribute benefits and burdens on the basis of race until it achieves equal outcomes among groups. *See Miller v. Vilsack*, 21-cv-595, ECF No. 60 at 18. Yet the Supreme Court has made it clear that the principle of equal protection protects an individual's right to equal treatment, *see Miller v. Johnson*, 515 U.S. 900, 911 (1995), and the government's goal of racial balancing is "patently unconstitutional." *Fisher I*, 570 U.S. at 311. Defendants' insistence on racial parity also rests upon unsupported speculation about individual values, choices, and actions. Defendants' expert devotes several pages to her assertion that minority farmers are underrepresented when compared with the population as a whole. *See* Robb Report 41–55. Dr. Robb states that although "the share of minority groups has increased over time, there has not been a corresponding increase in the share of minority farmers." *Id.* at 41. And she sees the lingering effects of discrimination from data showing that while "Hispanics' share of farms apparently has increased the most over the 1978–2017 period, their representation in farming still lags considerably behind their growing share of

the U.S. population. In 2017, Hispanics made up about 17% of the population but less than 4% of farms." *Id.* at 43–44.[3] Yet Dr. Robb's comparison "rests upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Croson*, 488 U.S. at 507.[4] Defendants make no claim that individuals that choose a different profession are worse off than individuals who enter farming. And a society in which individuals enter professions of their choosing—even if it causes statistical disparities in racial groups represented within those professions—is one that is unconstrained by the evils of racial discrimination, not one that suffers from its lingering effects.

## B. Section 1005 Does Not Further an Interest in Remedying Past Discrimination

As Defendants' response confirms, Section 1005 does not address any current discrimination on the part of USDA. Defendants admit that there is no evidence of discrimination in the last 11 years, and that the government has already undertaken substantial efforts—including multi-billion-dollar payouts—to address alleged instances of past discrimination. *See* Defs' Br. at

---

[3] Defendants' own data shows that Hispanic farms quadrupled between 1978 and 2017, while the number of Asian (or Pacific Islander) farms nearly doubled and the number of American Indian farms grew nearly six-fold during the same time period. *See* Robb Report at 44, Table 2. The number of farms principally operated by an individual who is black as well as the number of farms principally operated by an individual who is white decreased during that time. *See id.* In light of these inconvenient facts for Section 1005, Dr. Robb posits that "improved counting of minority groups since 2002" and improved counting for American Indian farms in 2007 is the source of an unknown number of additional "minority farms." *Id.* at 45. Yet the number of American Indian farms more than doubled between 1978 and 2002, while the number of Hispanic farms nearly doubled between 1978 and 1997. *Id.* The number of farms principally operated by an individual who is white decreased in both of those time periods. *Id.*

[4] To be sure, Defendants' expert concludes that "historical discrimination in USDA loan programs *may* have caused minority farmers to become 'discouraged borrowers.'" Robb Report at 4 (emphasis added). *See also id.* at 88–90. Yet, as Plaintiffs' expert observed, Dr. Robb's theory is built on speculation. Bronars Report at ¶ 71. Dr. Robb consistently failed to (1) establish a causal link between her hypothesis and the data, and (2) show whether the statistical differences she observes are statistically significant. *Id.* ¶¶ 70–72.

19. Defendants instead point to an interest in remedying the lingering effects of that decades-old discrimination. As explained above, Defendants have not established this amorphous interest is sufficiently compelling to justify racial discrimination. But even assuming the existence of Defendants' asserted interest, Defendants have not met their burden to submit adequate evidence supporting it. *See Wynn*, 545 F. Supp. 3d at 1277 (noting that even where the nature of the interest offered by the government is accepted as compelling, courts must evaluate "the adequacy of the evidence of discrimination offered to show that interest").

Each one of the four courts that have considered a request for preliminary relief in a challenge to Section 1005 has held that the government failed to establish a compelling interest in remedying past discrimination. In *Wynn*, for example, the court noted that "the actual evidentiary support for the inadequacy of past remedial measures is limited and largely conclusory." *Wynn*, 545 F. Supp. 3d at 1279. Although the *Wynn* court permitted Defendants to attempt to establish a compelling interest on "a more fully developed record," *id.* at 1281 & n.9, Defendants have done nothing of the sort. Defendants rely almost exclusively on their expert's report and the declaration of a USDA employee as evidentiary support for their compelling interest. Defs.' Br. at 12–19. Yet that report—far from dictating a different result here—merely doubles down on arguments that courts have rejected at the preliminary stage. *See* Defs.' Opposition to Mot. for Prel. Inj. in *Wynn v. Vilsack*, No. 21-cv-514, ECF No. 22 at 6–13, 25–27 (M.D. Fla., Filed June 4, 2021) (contending that statistical disparities reveal the lingering effects of USDA discrimination, and that Section 1005 was enacted to remedy those effects).

Defendants' expert report also fails to fill critical gaps—both qualitative and quantitative—between Section 1005 and an interest in remedying past discrimination. For instance, Defendants have failed to connect Section 1005's debt relief to the concerns that they raise in support of the

need for remedial measures. As the *Wynn* court explained, Section 1005 "fails to provide any relief to those who suffered the brunt of the discrimination identified by the Government. It provides no remedy at all for [a minority farmer] who was unable to obtain a farm loan due to discriminatory practices or who no longer has qualifying farm loans as a result of prior discrimination." *Wynn*, 545 F. Supp. 3d at 1286. Nor does Section 1005 address any of the other problems that Defendants "raise[] in support of the need for remedial measures." *Id.*

Defendants all but concede that Section 1005's debt relief accomplishes its objectives, if at all, in a circuitous and overbroad way. For instance, Section 1005 attempts to increase "minority farmers' available capital to permit reinvestment in their farm operations"—regardless of whether they have suffered any discrimination or not. Robb Report at 5. Section 1005 also aims to "ensure that minority farmers, who have higher rates of delinquency and foreclosure, do not lose their farms during a time of national distress." *Id.* But even taking Defendants' questionable assertion of a remedial purpose at face value, USDA's own internal report from July 2021 shows that the vast majority of minority farmers are *not* delinquent on their direct loans. *Id.* at 95 & Figure 8. This underscores that Section 1005's distribution of debt relief to *every* minority farmer with eligible loans is far broader than any remedial interest that Defendants might have. In *Midwest Fence*, for example, the Court approved of a disadvantaged business (DBE) participation goal of 22.77%—a figure ascertained by an availability study that attempted to calculate the availability of disadvantaged businesses to perform public work. *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 949 (7th Cir. 2016). By contrast, Defendants provide no benchmark for the scope of the discrimination that Section 1005 purports to remedy. For good reason: Section 1005's

distribution of 120 percent in debt relief to every minority farmer with eligible loans dwarfs any plausible account of discrimination that Defendants could muster.[5]

### C.   Section 1005 Does Not Further an Interest in Remedying Present Discrimination

Defendants do not dispute what they stated just last year: "the USDA is not currently discriminating against any socially disadvantaged farmers or ranchers." *Miller*, No. 4:21-cv-595, ECF No. 60 at 16 (citing Inj. Hearing Trans.). And their response further disavows any serious contention that funds under recent USDA programs were distributed in a discriminatory manner. *See* Pls.' Mot. for Summ. J. at 14 (citing sources); Defs.' Br. at 15 (noting that "'because minority farmers generally have smaller farms,' they tend to 'receive a disproportionately small share of funds provided through USDA payment programs, many of which . . . are based on crop-acreage or are targeted to crops typically grown on large farms.'") (quoting Cobb Decl. ¶ 52).

Nonetheless, Defendants claim that "the smaller size of minority farms is itself likely due in no small part to the historical discrimination in USDA loan programs that ha[s] deprived minority farmers of necessary credit and services." Defs.' Br. at 22 (citing Robb Report at 89) (quotations omitted). Defendants' assertion is speculative at best. *See* Bronars Report at ¶ 51 (noting that the data suggests that, for most farms, individuals with greater off the farm earning opportunities invest in larger farms and that these patterns may have nothing to do with discriminatory behavior by the USDA); *id.* at ¶ 46 (data suggests that "significantly lower average

---

[5] Defendants acknowledge that billions of dollars have been paid through consent decrees and other means to remedy alleged past discrimination. *See* Pls.' Mot. for Summ. J. at 5 (citing sources). And Defendants concede that 370 farmers who have received payments pursuant to *Pigford* and other settlements are entitled to 120 percent in debt relief under Section 1005. *Id.*, Exh. 1, Defs.' Resp. to Interrog. 13. Yet in affirming the district court's approval of the consent decrees, the D.C. Circuit has noted that *Pigford* represented "an indisputably fair and reasonable resolution of the class complaint." *Pigford v. Glickman*, 206 F.3d 1212, 1219 (D.C. Cir. 2000).

off the farm earnings opportunities in rural and non-metropolitan areas for many minority workers, relative to white and Asian workers, is a potentially important reason why some minority farmers tend to operate smaller farms."). But even accepting Dr. Robb's thesis as a given, Defendants fail to explain how USDA programs that discriminate on the basis of farm size can justify a program that discriminates on the basis of race.

Defendants also take issue that "Plaintiffs' expert principally focuses on raising questions about the data in Dr. Robb's report." Defs.' Br. at 23 (internal quotations and brackets omitted). Yet that is attributable to the aggregate nature of Defendants' data. As Dr. Bronars' report shows, Dr. Robb's opinion hardly supplies "robust evidence" of a compelling interest in remedying past discrimination because she has failed to disaggregate the data to make the proper apples-to-apples comparisons between similarly situated farmers. Defendants attempt to excuse their expert's omission by pointing to *Midwest Fence*. Defs.' Br. at 18. But the government's study in that case controlled "for various independent variables such as age (as a proxy for experience), education, location, industry affiliation, and time." *Midwest Fence*, 840 F.3d at 951. By contrast, as Dr. Bronars noted, Dr. Robb failed to control for other factors such as differences in off the farm earnings between white and minority farmers.[6]

Defendants are further mistaken when they blame Dr. Bronars for "impos[ing] the unrealistic requirement that the Government propound evidence that every single member of a minority group has been discriminated against to establish the strong basis in evidence on which a

---

[6] Defendants are mistaken when they assert that "Dr. Robb did in fact account for the race-neutral factors raised by Plaintiffs' expert and rejected them as the primary driver of evident disparities between minority and non-minority farmers." Defs.' Br. at 23. For instance, Defendants claim that there is no meaningful difference in days worked off the farm between minority and non-minority groups. *Id.* at 23–24. But that is unresponsive to Dr. Bronars' critique that Dr. Robb neglected to examine of differences in off the farm earning opportunities. Pls.' Mot. for Summ. J. at 15.

remedy must be predicated." Defs.' Br. at 24. On the contrary, Dr. Bronars simply points out that a substantial portion of the disparities observed by Defendants can be attributable to race-neutral factors such as "a farm's location, the types of commodities being produced, a farmer's agricultural experience, and the amount of time the farmer spends working off the farm." Bronars Report at ¶ 19. In all events, the burden is on Defendants to produce sufficient evidence to justify the breadth of Section 1005, which provides debt relief to every minority farmer with an eligible loan in the United States. Defendants can point to no other program as sweeping as this one and have failed to come remotely close to producing the substantial evidence that would be required to justify it.

## II.    Section 1005 Is Not Narrowly Tailored

Perhaps the most grievous flaw in Section 1005 is its failure to narrowly tailor relief to the government's asserted interests. Defendants' response only confirms that Section 1005 bears none of the hallmarks of a narrowly tailored program. Section 1005 uses race in a mechanical manner—as the sole criterion for determining whether a farmer is eligible for debt relief or not.

Along similar lines, Section 1005's race-based remedy is both over- and under-inclusive—both gratuitously benefitting individuals on account of their race and leaving out individuals who may need debt relief the most. Finally, the government failed to engage in "serious, good faith consideration of workable race-neutral alternatives," *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003), and cannot meet its "burden of proving a 'nonracial approach' would not promote its interests . . . 'about as well.'" *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 312). The government receives "[n]o deference" in this inquiry. *Id.* To the contrary, courts apply "beady-eyed review" to race-based classifications because such classifications "threaten to stigmatize individuals by reason of their membership in a racial group and . . . incite racial hostility." *Billings v. Madison Metropolitan School Dist.*, 259 F.3d 807, 815 (7th Cir. 2001) (quotations omitted).

### A.    Section 1005's debt relief program lacks flexibility and is both over- and under-inclusive

Section 1005 provides a blanket 120% loan payoff to all self-identified minority farmers, regardless of individual situation, and excludes all white farmers because of their race. It paints with an extraordinarily broad brush, lumping all non-white farmers in one group and all white farmers in the other.[7] *See* Pls.' Mot. for Summ. J. at 21. In determining who is eligible for its windfall, Section 1005 does not consider whether a farmer was wrongly denied loans or otherwise discriminated against by USDA, has already been compensated for past discrimination, or was even in the business of farming while USDA was discriminating based on race. *See* Defs.' First RFA Resp. 1, 2, 5, 10, ECF No. 48-3. Thus, a thriving Asian-American farmer who began farming in 2020 and suffered no discrimination qualifies under Section 1005 just as readily as a struggling long-time Black farmer who endured severe racial discrimination at the hands of USDA officials. Nor does eligibility under Section 1005 depend on loan size, farm size or location, whether the farmer is current on loan payments, or whether the farmer needs financial assistance. *See id.* at 16, 17; Defs.' Second RFA Resp. 22 (admitting that Section 1005 applies even to "loans with outstanding balances of greater than $1 million"); *see also Wynn*, 545 F. Supp. 3d at 1283 (a minority farmer qualifies even if he "is having the most profitable year ever and not remotely in danger of foreclosure").

Indeed, Section 1005 asks only a single question: did the borrower check any box on Form AD-2047 other than (or in addition to) "White" and "Not Hispanic or Latino"? If so, then he fully qualifies for Section 1005's benefit, no other questions asked.[8] This blanket approach "is the

---

[7] Defendants' motion suffers from the same flaw, repeatedly treating minority farmers as a monolithic group that is poor, unsuccessful in farming, and distrusting of USDA.

[8] Even if just one co-borrower on a loan identifies as a race other than white, that is sufficient for debt relief under Section 1005. *See* Defs.' Second RFA Resp. 25–26.

antithesis of flexibility," *Wynn*, 545 F. Supp. 3d at 1282. And rather than discriminating "as little as possible," *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000) (quotation omitted), it amounts to "gratuitous discrimination" against white farmers based on their race. *Builders Ass'n of Greater Chi. v. Cty. of Cook*, 256 F.3d 642, 646 (7th Cir. 2003).[9]

Likewise, a minority farmer who never qualified for a loan, fully paid off her loan, or suffered foreclosure prior to January 1, 2021, gets nothing under Section 1005. *See* Defs.' Br. at 17 (asserting "minority farmers have lower USDA loan application submission rates and higher withdrawal rates"). And even for those who do qualify, the size of relief offered is tied not to financial need, but to whatever the outstanding loan balance happened to be as of the cutoff date. Section 1005 is thus not a carefully considered "infusion of capital to minority farmers" who have suffered from discrimination, *see* Defs.' Br. at 27, but an arbitrary payout to those minority farmers with outstanding FSA loan balances on the cutoff date.

As Plaintiffs' summary judgment motion explained, Pls.' Mot. for Summ. J. at 19–22, these features of Section 1005 cause it to "simultaneously . . . be both overinclusive and underinclusive." *Wynn*, 545 F. Supp. 3d at 1285; *see also Holman*, at *9 (same). It is over-inclusive because all minority farmers are eligible, regardless of whether they were personally discriminated against or suffer "lingering effects" of racial discrimination.[10] *See also* Defs.' First RFA Resp. 3 (admitting that not every minority farmer has suffered from racial discrimination by USDA). And Section 1005 provides race-based debt relief for members of groups for which the record of discrimination

---

[9] Defendants claim that Section 1005 does not "burden non-minority farmers" because they can still participate in other USDA programs, Defs.' Br. at 32–33, but the fact that Section 1005 does not bar struggling white farmers from receiving FSA loans makes it no less unjust to exclude them from a debt relief program intended to help the economically disadvantaged.

[10] Defendants fail to explain how a farmer can suffer "lingering effects" of discrimination that was directed at other farmers who happen to be of the same race.

is extraordinarily thin.[11] *See Wynn*, 545 F. Supp. 3d at 1285; *see also Builders Ass'n*, 256 F.3d at 646 (A government "that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks and Asian–Americans and women."). Yet at the same time, Section 1005 is under-inclusive because it "fails to provide any relief to those who suffered the brunt of the discrimination": i.e., minority farmers who either did not obtain loans or lost their farms due to USDA discrimination. *Wynn*, 545 F. Supp. 3d at 1286; *see also* Defs.' Br. at 13 ("[P]ast discriminatory practices have pushed many minorities out of farming altogether . . . ."); *id.* at 17 (asserting that "minority farmers have lower USDA loan application submission rates and higher withdrawal rates relative to non-minority farmers").

None of Defendants' responses hold water. First, they argue that over-inclusiveness is not a concern because "a race-conscious remedy may provide benefits on a group-wide basis." Defs. Br. at 34 (citing cases). But the touchstone of narrow tailoring is "individualized consideration," *Grutter*, 539 U.S. at 334, and over-inclusiveness is fatal to any race-based program, *Midwest Fence*, 840 F.3d at 942. The fact that a race-based remedy can sometimes extend beyond the precise individuals discriminated against does not excuse the dramatic overbreadth of Section 1005, which forbids any individualized consideration and lumps together all minority farmers, the majority of whom were not discriminated against in FSA lending and hundreds of whom already received compensation for such discrimination. *See* Pls.' Mot. for Summ. J. at 20–21.

Second, Defendants apparently concede that Section 1005 is under-inclusive, but argue that does not matter because "remedial action need not address every conceivable instance or effect

---

[11] Defendants claim that the *Wynn* Court stated that evidence of discrimination against Asians, Native Hawaiians, and Pacific Islanders appeared to be thin because "it did not have the benefit of the Government's expert report or declaration." Defs.' Br. 35 & n.23. But Defendants' expert verifies that "in terms of revenue, white farmers had greater per-farm revenues than all of the minority groups *except* Asians." Robb Report at 66 (emphasis added).

of race discrimination to be narrowly tailored." Defs.' Br. at 36. But the problem with Section 1005 is not that it leaves some instances of historical discrimination unaddressed, but that it affirmatively *excludes* the very persons "who suffered the brunt of the discrimination" that Section 1005 purports to remedy. *Wynn*, 545 F. Supp. 3d at 1286.[12]

Third, Defendants claim that Section 1005 is narrowly tailored because it is a "one-time occurrence." Defs.' Br. at 32 (quoting *United States v. Paradise*, 480 U.S. 149, 178 (1987)); *but see* Robb Report at 5 (contending that Section 1005 "may not fully remedy the effects of USDA's past discrimination against minority farmers"). But as discussed above, Section 1005's arbitrary provision of debt relief based on loan balances on a single day actually cuts against it being narrowly tailored. And although a one-time debt relief program may be "narrower" than an ongoing or repeated benefit, the question is not just one of narrowness in the abstract, but of whether the program is narrowly *tailored* to an interest in remedying discrimination. Section 1005 is not. Additionally, Defendants do not claim that Section 1005 will resolve its purported interest in remedying discrimination; to the contrary, they view it as one "step" in achieving their objectives. Defs.' Br. at 26. There is no reason to believe that, if upheld, Section 1005 would be the end of race-based preferences for minority farmers.

Every court to consider the issue has agreed that Section 1005 is not narrowly tailored, and Defendants do not even respond to those decisions. *See Wynn*, 545 F. Supp. at 1282–83; *Holman*,

---

[12] Defendants attempt to salvage Section 1005 by recharacterizing their interest as one in "revers[ing] the lingering effects of discrimination experienced by minority farmers *currently engaged in the business of farming*." Defs.' Br. at 36 (emphasis added). But they offer no coherent rationale for limiting the government's interest in that way, nor for the further limitation to farmers who had outstanding loan balances as of January 1, 2021. Defendants also note that a separate statute, Section 1006, allows for assistance to former farm loan borrowers, Defs.' Br. at 36 n.27, but Plaintiffs have not challenged that statute and it does not cure Section 1005's lack of narrow tailoring.

2021 WL 2877915, at *8–*10; *Faust*, 519 F. Supp. 3d at 476; *Miller*, No. 21-cv-595, ECF No. 60 at 18–19. It is also telling that Defendants cannot point to any analogous program that has ever been upheld as narrowly tailored. Section 1005 is unprecedented, and the cases Defendants rely on to justify the program are distinguishable. In *Majeske*, the court upheld the race-based promotion of 18 black and 4 Hispanic police officers where a jury approved the program after hearing evidence that Chicago's past discrimination had excluded nearly 200 minority officers and where "all 22 white officers who were affected by the out-of-rank promotions were later promoted to detective and received back pay." 218 F.3d at 824. In *Midwest Fence*, the court approved a race-conscious federal contracting program that "requires states to meet as much as possible of their . . . goals through race- and gender-neutral means," "allow[s] for significant and ongoing flexibility," and "ultimately require[s] individualized determinations." 840 F.3d at 942–45. And in *Paradise*, the Supreme Court approved a court-ordered race-conscious promotion program for Alabama state troopers that was "flexible in application," only applied if the state "fails to implement a promotion procedure that does not have an adverse impact on blacks," and was within the district court's discretion to "properly balance[ ] the individual and collective interests at stake." 480 U.S. at 177, 185. None of these decisions even come close to justifying Section 1005.

**B.     Section 1005 lacks a close fit to the government's asserted interests**

The government's asserted interest in defending Section 1005 is remedying "lingering effects of historic discrimination in USDA loan programs." Defs.' Br. at 26. But Section 1005 bears little relation to that purported interest. Instead, it plainly entitles an individual to debt relief even if all agree that person has not ever suffered from discrimination or any of its effects. Defendants' expert adds that minority farmers "generally have smaller farms, bring in less revenue, have less capital, receive fewer government payments, and face higher rates of foreclosure" than white farmers. *Id.* at 29. Yet Section 1005 distributes debt relief *without considering* any of those

factors (farm size, revenue, capital, receipt of government payments, or risk of foreclosure) and is thus not narrowly tailored.

Defendants' asserted interest in remedying "minority racial groups' lack of trust in USDA" fares no better. Defs.' Br. at 27. No court has ever accepted "building trust" as an interest compelling enough to support racial discrimination, but even if it were, Defendants have failed to tie that goal to Section 1005's debt relief. Defendants cannot plausibly explain how a one-time *congressionally* mandated extinguishment of government farm loans for minority farmers would engender trust in the *agency* that originated or guaranteed the loans. Defendants claim that Section 1005 sends a "signal[ ]" to minority farmers "that FSA is acknowledging past issues and . . . is committed to working with minority communities." Defs.' Br. at 28. But there is no reason to believe that Congress' decision to enact Section 1005 would translate into increased trust in FSA or USDA officials. Instead, such trust should be built on a steady foundation of education, outreach, and even-handed administration of farm programs without preferences based on arbitrary considerations like race.

### C. Race-neutral alternatives are adequate to remedy any compelling governmental interest

The narrow tailoring analysis requires the government to engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow it to achieve its asserted interest. *Grutter*, 539 U.S. at 339. Here, there is no evidence that Congress considered any race-neutral alternatives as part of ARPA before jumping straight to a broad race-based debt relief program. Defendants claim that past efforts to remedy USDA's discrimination prove that nothing short of a race-based financial giveaway will suffice. Defs.' Br. at 29–32. But their argument highlights the lack of narrow tailoring in Section 1005. For example, Defendants claim that prior settlements such as *Pigford* "did not reach all victims [of USDA discrimination]." Defs.' Br. at 29.

But by design, Section 1005 will also not "reach all victims" of prior racial discrimination—at best, it reaches only those prior victims who also were still in the business of farming and had current farm loans as of January 1, 2021, and only to the extent of 120% of the outstanding balance of those loans as of that date—while at the same time extending debt relief to many minority farmers who were not victims of USDA discrimination. The government's brief also shows the efficacy of race-neutral alternatives such as providing advertising and technical assistance, which helped dramatically boost minority farmer participation in a pandemic relief program from one percent to sixteen percent. *See* Defs.' Br. at 31.[13] More fundamentally, even if the USDA's prior actions have not resolved all the "lingering effects" of USDA's discrimination, that alone does not justify race-based measures where race-neutral ones would promote the government's interests "about as well and at tolerable administrative expense." *Fisher II*, 136 S. Ct. at 2208 (quotation omitted). *See* Pls.' Mot. for Summ. J. at 22–25 (listing available race-neutral alternatives, including relief for farmers who are facing foreclosure or assistance for those with small farms). The government admits that it did not consider those obvious alternatives. *See* Pls.' Mot. for Summ. J., Exh. 3, Defs.' First RFA Resp. 15. Because the government resorted to racial classifications as an "expedient approach," *Wynn*, 545 F. Supp. 3d at 1288, and not as a "last resort," *Parents Involved*, 551 U.S. at 735 (quotation omitted), Section 1005 is not narrowly tailored.

## III.     A Nationwide Injunction Is the Proper Remedy

The better remedy in this case is to enjoin Defendants from making any payments pursuant to Section 1005 rather than to extend debt relief to all farmers and ranchers with eligible loans.

---

[13] Although Defendants repeatedly refer to the COVID-19 pandemic and its supposed disproportionate effect on minorities, *see, e.g.*, Defs.' Br. at 16, they do not claim pandemic relief as a compelling interest that justifies Section 1005, which operates without regard to any pandemic effects. *See* Defs.' First RFA Resp. 11, 14.

The parties agree that the remedy turns on what Congress would have done "had it been apprised of the constitutional infirmity." Defs.' Br. at 37 (quoting *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 (2017)). Yet Defendants offers scarce support—in text, legislative history, or anything of the sort—for their argument that Congress would have remedied Section 1005's infirmity with a ten-fold extension of payments under Section 1005. *See* Defs.' Br. at 38–39. For instance, Defendants state that Congress enacted Section 1005 "against a backdrop of threatened foreclosures and farm failures for many minority farmers, and it made an unlimited appropriation to provide those farmers with needed relief." *Id.* at 38. But they fail to explain why Congress would have wanted to expand the program to give debt relief to all farmers instead of going back to the drawing board to provide targeted relief to those who were actually threatened with foreclosures.

Defendants further speculate that Congress would have wanted to extend the benefits of Section 1005 because it made an "unlimited appropriation" and aimed to "stimulate economic growth." *Id.* But the appropriation set forth by Congress was aimed at benefitting "socially disadvantaged" farmers and says nothing about how much Congress would have intended to pay all farmers.[14] Defendants' argument that the American Rescue Plan Act was intended to stimulate economic growth is even less persuasive. The general purpose of the statute as a whole cannot control over the plain text of the specific statute, which instructs USDA to provide debt relief only to socially disadvantaged farmers. The fact that "the vast majority of loans covered by § 1005 are only available to individuals who are unable to obtain a loan without an FSA guarantee on reasonable terms in the private market" is another point *against* Defendants' proposed remedy. *Id.*

---

[14] And because this Court cannot rewrite the statute for Congress, Defendants' reading would require the Court not just to extend eligibility to Plaintiffs but to issue money payments to them. As the *Wynn* court held, this would be barred by sovereign immunity. At a minimum, the constitutional issues raised by the extension of benefits to all farmers is another point in favor of enjoining USDA from making payments pursuant to Section 1005.

at 39. Congress was presumably perfectly aware of this fact when it enacted Section 1005. Yet it nonetheless decided to limit debt relief to a small subset of those individuals.

Defendants admit that expanding the program to include all farmers would cost around 36 billion dollars. *Id.*; *see also id.* at 16 (estimating the amount of payments under Section 1005, as written, to be around 4 billion dollars). Defendants' proposed rewriting of Section 1005 would be substantially more expensive than two recent programs targeted at agricultural producers. Defs.' Br. at 16 (estimating that the programs involved expenditures of between 23 and 24 million dollars). And because the vast majority of farmers with loans eligible for forgiveness under a race-blind Section 1005 are white, Defendants' remedy would suffer from the very same purported problems they complain about with those other agricultural programs. *Id.* at 16 (asserting that "[t]he disproportionate allocation of MFP and CFAP funds was of particular concern to Congress when it was considering minority farmers' urgent need for relief."). In all, there is no basis to believe that Congress would have elected to hamper its ability to provide relief to farmers that it considered most disadvantaged on grounds other than race. An injunction preventing USDA from distributing payments pursuant to Section 1005 is the remedy most in line with congressional intent.[15]

## CONCLUSION

Plaintiffs' Motion for Summary Judgment should be granted.

---

[15] Defendants do not dispute that nationwide relief is proper. They also assert that relief should be limited to the plaintiffs but fail to advance any argument supporting that contention. They have therefore forfeited any argument on that front. In any event, as a federal court in Wisconsin explained, "[i]f the USDA forgave Plaintiffs' loans, it would be required to forgive every farmer's loan, since the only criteria for loan forgiveness is the applicant's race." *Faust*, 519 F. Supp. 3d at 478.

DATED: March 15, 2022.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

<table>
<tr><td></td><td>s/ Wencong Fa</td></tr>
<tr><td>Glenn E. Roper</td><td>Wencong Fa</td></tr>
<tr><td>Colo. Bar No. 38723</td><td>Cal. Bar No. 301679*</td></tr>
<tr><td>Lead Counsel</td><td>Christopher M. Kieser</td></tr>
<tr><td>1745 Shea Center Dr., Suite 400</td><td>Cal. Bar No. 298486*</td></tr>
<tr><td>Highlands Ranch, CO 80129</td><td>555 Capitol Mall, Suite 1290</td></tr>
<tr><td>Telephone: (916) 419-7111</td><td>Sacramento, CA 95814</td></tr>
<tr><td>Facsimile: (916) 419-7747</td><td>Telephone: (916) 419-7111</td></tr>
<tr><td>Email:  GERoper@pacificlegal.org</td><td>Facsimile: (916) 419-7747</td></tr>
<tr><td>Service: IncomingLit@pacificlegal.org</td><td>Email:  WFa@pacificlegal.org</td></tr>
<tr><td></td><td>Email:  CKieser@pacificlegal.org</td></tr>
</table>

*Attorneys for Plaintiffs*
*\* Pro Hac Vice*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2022, I caused the foregoing to be filed with the Court's

CM/ECF system, which will send notification of said filing to all counsel of record.

s/ Wencong Fa
Wencong Fa