**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MATTHEW MORTON, and JOSHUA MORTON, | |
|         Plaintiffs, | |
|     v. | Case No. 3:21-cv-00540-NJR |
| THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator, Farm Service Agency, | |
|         Defendants. | |

**BRIEF OF *AMICI CURIAE***
**THE NATIONAL BLACK FARMERS ASSOCIATION, AND**
**THE ASSOCIATION OF AMERICAN INDIAN FARMERS IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ................................................................................ 1

INTRODUCTION ....................................................................................................... 2

LEGAL STANDARD.................................................................................................. 3

ARGUMENT ............................................................................................................... 5

    I.     The Government has a Compelling Interest in Remedying USDA's Past and Present Discrimination. ................................................................................................... 5

       1.     The Government's prior remedies grossly failed to adequately relieve the harm of past discrimination against socially disadvantaged farmers. ................................. 6

           *a.*    *The Pigford Cases* ................................................................................ 7
           *b.*    *Keepseagle v. Vilsack*.......................................................................... 9

       2.     The Government must mitigate present discrimination by USDA against socially disadvantaged farmers...................................................................................... 11

       3.     The Government needs to act now for socially disadvantaged farmers because of the compounded effects of discrimination and the pandemic.................................... 13

    II.    Section 1005 is Narrowly Tailored to Redress Racial Discrimination Against Socially Disadvantaged Farmers........................................................................................ 14

       1.     Congress had limited race-neutral or otherwise feasible alternatives to achieve its compelling interests for Section 1005.................................................................. 15

       2.     Section 1005 is not over or under-inclusive. ............................................. 17

    III.   *Amici* and the Government's Interest Diverge on Remedy........................................... 20

CONCLUSION.......................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)..............................................3, 6, 10 ,13

*City of Richmond v. J.A. Croson Co*., 488 U.S. 469 (1989) ..................................................4, 5, 12

*Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993).................2, 4

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006).........................................................4, 12

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty*., 122 F.3d 895 (11th Cir. 1997)...................................................................................................................................4

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..........................................................................3, 4, 15

*In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011)..............................8

*Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017) .............................................................10

*Majeske v. City of Chicago*, 218 F.3d 816 (7th Cir. 2000) .........................................................4, 7

*Midwest Fence Corp. v. U. S. Dep't of Transp.*, 840 F.3d 932 (7th Cir. 2016).................... *passim*

*Peightal v. Metro. Dade Cty.*, 26 F.3d 1545 (11th Cir. 1994) ...................................................4, 17

*Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) ..................................................................7, 8

*United States v. Paradise*, 480 U.S. 149 (1987) .............................................................4, 11, 15 17

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) ........................................................................19

*Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021) .................................................... *passim*

## STATUTES

7 U.S.C. § 2297 .............................................................................................................................9

**LEGISLATIVE MATERIALS**

Cong. Research Serv., *The Pigford Cases: USDA Settlement of Discrimination Suits by Black Farmers* (May 29, 2013) ..........................................................................8

A Hr'g to Review the State of Black Farmers in the U.S. before the H. Comm. On Agric., 117th Cong. (Mar. 25, 2021) ................................................................... *passim*

Hr'g on Mgmt. of Civil Rights at the USDA before the H. Subcomm. on Gov't Mgmt., Org., & Procurement, Comm. on Oversight & Gov't Reform, 110th Cong. 137 (May 14, 2008) ................................................................................................11

Hr'g on USDA Civil Rights before the S. Comm. on Agric., Nutrition, and Forestry, 106th Cong. (Sep. 12, 2000) (Statement, John Boyd) .................................................2

**OTHER AUTHORITIES**

A. Folley & M. Johnson, *Black Farmers Facing 'Extinction' Fight for $5B in Promised Aid*, The Hill (Aug. 12, 2021) .....................................................................6

A. Formuzis, *Black Farmers and EWG Urge Congress to Increase Farm Subsidy Transparency*, Envir'l Working Grp (Mar. 22, 2017) .....................................12

A. Schechinger, *Under Trump, Farm Subsidies Soared and the Rich Got Richer /Biden and Congress Must Reform a Wasteful and Unfair System*, Envir'l Working Grp. (Feb. 24, 2021), https://www.ewg.org/interactive-maps/2021-farm-subsidies-ballooned-under-trump/ .............................................................................13

C. Dominguez, *USDA Establishes Trial Food Sovereignty Initiative for Federal Lands*, Indian Country Today (Nov. 16, 2021), https://indiancountrytoday.com/news/usda-protecting-empowering-indigenous-food-ways ...........................................10

C. Duster & J. Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as They Face Disparities Across the Board*, CNN (Dec. 15, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html .........................................................................................11

*Chairwoman Stabenow Statement on S. Passage of the American Rescue Plan Act*, US S. Comm. on Agric., Nutrition, & Forestry (Marc. 6, 2021), https://www.agriculture.senate.gov/newsroom/dem/press/release/chairwoman-stabenow-statement-on-senate-passage-of-the-american-rescue-plan-act ........................14

iii

E. Bilecky, *Assessing the Impacts of USDA Civil Rights Settlements: Pigford in Advocacy & Context* (2019) (Master's Project, Duke University).......................................................8

J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Envir'l Working Group (Feb. 18, 2021), https://www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers ............16

*The John Boyd Story*, Nat'l Black Farmers Ass'n (Feb. 8, 2018), https://www.nationalblackfarmersassociation.org/single-post/2018/02/08/the-john-boyd-story ..........................................................................................................................2

K. Cook, Envir'l Working Grp., *Short Crop: How a Widening Farm Subsidy Gap is Leaving Black Farmers Further Behind* (July 2007).........................................................12

*Keepseagle v. Vilsack*. No. 99-cv-3119 (D.D.C. Nov. 1, 2010), ECF No. 576-1 ...........................9

L. Stern, *Small Farmers, Big Stakes*, Field Work (May 5, 2021), https://www.fieldworktalk.org/episode/2021/05/05/small-farmers-big-stakes ................14

M. Jalonick, *American Indian Groups Argue Over Settlement Money*, KSL.com (Dec. 2, 2014) ...................................................................................................................................9

M. Martin, Nat'l Pub. Radio, *Will Settlement Bring Black Farmers Dignity?* (Oct. 4, 2013), https://www.npr.org/templates/story/story.php?storyId=229199014.......................7

Nat'l Black Agric. All., *Draft Recommendations to be Presented at the Fairness Hr'g*, Envir'l Working Group.....................................................................................................8

Nat'l Black Farmers Ass'n, *Black Farmer Takes Action in Fight Over Stalled $4 Billion Relief Funding, Calls Boycott*, PR Newswire (Feb. 10, 2022), https://www.prnewswire.com/news-releases/black-farmer-takes-action-in-fight-over-stalled-4-billion-relief-funding-calls-boycott-301480035.html ...............................16

N. Rosenberg & B. Stucki, *How USDA Distorted Data to Conceal Decades of Discrimination Against Black Farmers*, The Counter (June 26, 2019), https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/.................................................................................................................12

Off. of Inspector Gen., USDA Oversight of Civil Rights Complaints (2021).............................12

P. Gaines, *USDA Issued Billions in Subsidies This Year. Black Farmers Are Still Waiting for Their Share*, NBC News (Oct. 28, 2020),

https://www.nbcnews.com/news/nbcblk/usda-issued-billions-subsidies-year-black-farmers-are-still-waiting-n1245090 ................................................................................6

*Pigford v. Vilsack*, Case 1:97-cv-01978-PLF, Dkt. No. 1812 (Mar. 31, 2012) ..............................8

S. Suwell, *There Were Nearly a Million Black Farmers in 1920. Why Have They Disappeared?*, The Guardian (Apr. 29, 2019), https://www.theguardian.com/environment/2019/apr/29/why-have-americas-black-farmers-disappeared ........................................................................................................7

USDA Minority Farmers, Ranchers and Veterans Advisory Comm., *March 21 Recommendation's Rep.* (Harvey Reed III, 2021) ...........................................................12

*USDA Provides $1.8 Billion to Offset Market Fluctuations*, USDA Farm Serv. Agency (Nov. 1, 2021), https://www.fsa.usda.gov/news-room/news-releases/2021/usda-provides-1-8-billion-to-offset-market-fluctuations ............................................................13

U.S. Gov't Accountability Office, GAO-19-539, Agric. Lending: Info. on Credit & Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited (2019) ...............12

U.S. Gov't Accountability Office, GAO-19-464, Indian Issues: Agric. Credit Needs and Barriers to Lending on Tribal Lands (2019). .....................................................................12

U.S. Gov't Accountability Office, GAO-08-755T, USDA Mgmt. of Civil Rights Efforts Continues to Be Deficient Despite Years of Attention (2008) .........................................18

W. Hinson & E. Robinson, *"We Didn't Get Nothing:" The Plight of Black Farmers*, 12 No.3 J. of African American Stud. 283 (2008) ...............................................................16

## INTEREST OF *AMICI CURIAE*

The **National Black Farmers Association** (NBFA) is a non-profit, member-based organization founded in 1995 to represent Black farmers and ranchers in the United States. NBFA's education and advocacy efforts have been focused on civil rights, land retention, access to public and private loans, education and agricultural training, and rural economic development for Black and other small farmers and ranchers. The mission of NBFA is to encourage the participation of small and disadvantaged farmers in gaining access to resources of state and federal programs. NBFA has now grown to include 116,000 farmers and citizens in forty-six states. NBFA has members that are eligible for financial benefits under Sections 1005 of the American Rescue Plan Act who would be injured should this lawsuit enjoin that law. NBFA was founded by Dr. John Boyd Jr., a fourth-generation farmer farming for over 38 years.

The **Association of American Indian Farmers** (AAIF) is a non-profit, member-based organization founded in 2014 to provide advocacy for and outreach and technical assistance to American Indian farmers and ranchers as well as to support indigenous culture and practices as they pertain to agriculture. AAIF's members encompass over 350 Native American farmers and ranchers across the nation. AAIF has members that are eligible for financial benefits under Sections 1005 of the American Rescue Plan Act who would be injured should this lawsuit enjoin that law. AAIF was founded by Kara Boyd, an enrolled tribal member of the Lumbee Tribe of North Carolina. She has served on the board of the United Tribes of North Carolina.

Together, the Boyds have spent over thirty years advocating for civil rights and social justice for socially disadvantaged farmers, while trying to retain and increase land ownership for those farmers. They own and operate a 1,500-acre farming operation in Virginia, growing commodity crops such corn, soy, and wheat as well as specialty crops in addition to beef cattle.

1

## INTRODUCTION

As a fourth-generation farmer, Dr. John Boyd Jr. was not always into law and politics. Despite farming his whole life, his farm was struggling and was about to be foreclosed upon. *See* Hr'g on U.S. Dep't of Agric. (USDA) Civil Rights before the S. Comm. on Agric., Nutrition, and Forestry, 106th Cong. 35-36 (Sep. 12, 2000) (Statement, John Boyd). The Government refused to give him the funds or services he needed for his farm while he watched white farmers in his county thrive because they had access to those same Government supports that he was repeatedly denied. Realizing other Black farmers were facing similarly extreme hardships, Dr. Boyd "ceased to be simply a farmer and became a farming activist."[1] Dr. Boyd advocated in the courts and Washington, D.C. to seek justice for socially disadvantaged farmers. Ms. Boyd came to a similar understanding of the need to advocate for her fellow Native farmers in the wake of the *Keepseagle* settlement, when she saw so many in her community unable to receive the funds they deserved. When the settlements failed, NBFA and AAIF continued to push for new relief efforts. Each effort failed, until they put their hopes on Congress passing Section 1005 of the American Rescue Plan Act (ARPA). They testified before Congress numerous times about the urgent need for debt relief and did so again during the ARPA hearings. *See*, *e.g.*, A Hr'g to Review the State of Black Farmers in the U.S. before the H. Comm. on Agric., 117th Cong. 2160 (Mar. 25, 2021) (App'x, John Boyd) ("Boyd App'x") ("Why is it that Congress can pass laws to protect animals such as the brown bear, the bald eagle, the rock fish, and yet the black farmers who are human beings must return to Congress year after year to plead for relief for the egregious acts of discrimination we continue to face.")

---

[1] *The John Boyd Story*, Nat'l Black Farmers Ass'n (Feb. 8, 2018), https://www.nationalblackfarmersassociation.org/single-post/2018/02/08/the-john-boyd-story.

*Amici* believe Section 1005 is an appropriate and necessary remedy to USDA's racism. *Amici* are deeply knowledgeable about the harms minority farmers and ranchers[2] face and their needs. They witnessed how each of USDA's past remedial measures failed to fix the financial harms the agency inflicted on minority farmers. *Amici* have a unique ability to provide powerful anecdotal evidence presented to USDA, Congress, and the media about the effects of past as well as ongoing discrimination against socially disadvantaged farmers. This bolsters the Government's considerable evidence in support of passing Section 1005. *See generally* Defs' Mot. for Summ. J., Dkt No. 51 ("Gov't Br.").

*Amici's* anecdotal evidence also strengthens the Government's showing that Section 1005 is narrowly tailored remedy. *Amici* are actively receiving calls from their members and other farmers who have experienced discrimination or issues accessing USDA's programs and assistance and for whom the specific debt relief from Section 1005 would stop them from going into foreclosure. These farmers are currently being excluded from federal subsidies and relief and agricultural credit from USDA, putting them at a disproportionately higher risk of delinquency than white farmers during the COVID-19 pandemic. Given such heightened need and what *Amici* have seen in terms of prior failed relief, *Amici* believe a race-based Section 1005 may be the only effective way to provide desperately needed relief to these minority farmers.

## LEGAL STANDARD

Race-based actions by the Government are reviewed under strict scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Under strict scrutiny, the Government may take a race-based action if it is "narrowly tailored to further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). Remedying past and present discrimination is an

---

[2] Hereinafter, all references to farmers are inclusive of ranchers.

"unquestionably" compelling interest. *United States v. Paradise*, 480 U.S. 149, 167 (1987) (plurality opinion); *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 950 (7th Cir. 2016) (discussing "pervasive and systemic discrimination against minorities" as compelling interest); *Dean v. City of Shreveport*, 438 F.3d 448, 456 (5th Cir. 2006) (compelling interest shown through Government's admission, numerical disparities, and previous lawsuits concerning past discrimination).

To establish that Congress was warranted in passing Section 1005, the Government must prove with a "strong basis in evidence for its conclusion that remedial action was necessary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989). The Government should rely on "specific instances of racial discrimination" as opposed to generalized assertions. *Id.* at 501. Anecdotal evidence can be used to show discrimination, "especially if buttressed by relevant statistical evidence." *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 907 (11th Cir. 1997) (citation omitted); *Majeske v. City of Chicago*, 218 F.3d 816, 822 (7th Cir. 2000) ("We have previously held that this combination of persuasive statistical data and anecdotal evidence adequately establishes a compelling governmental interest"). Indeed, "the combination of anecdotal and statistical evidence is potent." *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003 (3d Cir. 1993).

In determining whether a statute is narrowly tailored, courts have considered alternative remedies to achieving the Government's interest, relationship of the remedy to the interest, and impact on third parties. *See Paradise*, 480 U.S. at 187 (listing criteria); *Peightal v. Metro. Dade Cty.*, 26 F.3d 1545, 1557 (11th Cir. 1994) (same). Narrow tailoring, however, "does not require exhaustion of every conceivable race-neutral alternative or mandate." *Grutter*, 539 U.S. at 326.

The goal is to ensure "there is little or no possibility that the motive for the classification was illegitimate racial prejudice." *Croson*, 488 U.S. at 493.

## ARGUMENT

### I.     The Government has a Compelling Interest in Remedying USDA's Past and Present Discrimination.

Congress passed Section 1005 atop a mountain of evidence that the USDA has and continues to discriminate against socially disadvantaged farmers and the dramatic loss of those farms and ranches as a result. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1278-79 (M.D. Fla. 2021) (summarizing "substantial evidence of historical discrimination" and "continued discrimination that permeates USDA programs."). The record before this Court is replete with evidence of unmitigated discrimination. *See* Gov't Br. at 8-25. Indeed, in reviewing the passage of Section 1005, the *Wynn* court noted that it is "undeniable—and notably uncontested by the parties—that USDA had a dark history of past discrimination against minority farmers." *Id.* at 1279. *Amici* and their members are witnesses to the effects of past and present discrimination.

*Amici* were founded to advocate for the fair and equal treatment for Black and Native American farmers. *Amici* testified before Congress about their members' experiences and their continued need for debt relief leading up to the passage of Section 1005. *See* H. Agric. Comm. Hr'g to Review the State of Black Farmers in the US, 117th Cong. 13-18 (Mar. 25, 2021) (Testimony, John Boyd) ("Testimony"). Dr. Boyd spoke of his and Ms. Boyd's own experience as farmers when, for example, they discovered liens against their property in 2019 due to USDA's failure to finalize six Certificates of Satisfaction from twenty-two years prior. *Id.* at 17. Dr. Boyd was spit on, called racial slurs by USDA representatives, and had his loan applications

thrown in the trash. *Id.* at 16-17. He also saw white farmers receive large checks without filing an application, while he was a denied a $5000 loan for basic operations and told to re-file.[3]

*Amici's* experiences are relevant here because they are emblematic of what continues to be the lived experiences of socially disadvantaged farmers. *Amici's* members and others raise the same issues that Dr. Boyd has endured decades ago.[4] Their testimony of USDA's systematic discrimination gives significant anecdotal evidence that the Government has a compelling interest in passing Section 1005. *Adarand*, 515 U.S. at 237 ("pervasive, systematic, and obstinate discriminatory conduct" justifies a race-based remedy); *Eng'g* Contractors, 122 F.3d at 924-25 (considering anecdotes of discrimination). This anecdotal evidence confirms the data in the Government's brief. While *Amici's* evidence put in front of Congress alone is sufficiently compelling, in light of the Government's considerable evidence in their brief, there can be no doubt of the compelling need to redress USDA's past and present discrimination. *See Midwest Fence*, 840 F.3d at 952 (anecdotes confirm disparities studies).

1. **The Government's prior remedies grossly failed to relieve the harm of past discrimination against socially disadvantaged farmers.**

Congress had a compelling interest to enact Section 1005 because prior remedies have not alleviated the pressures on minority farmers. *See* Gov't Br. at 20-22; *see also Wynn*, 545 F. Supp. 3d at 1279 (compelling interest is shown where "prior remedial measures failed to adequately remedy" discrimination). *Amici* and their members have provided direct testimony to

---

[3] P. Gaines, *USDA Issued Billions in Subsidies This Year. Black Farmers Are Still Waiting for Their Share*, NBC News (Oct. 28, 2020), https://www.nbcnews.com/news/nbcblk/usda-issued-billions-subsidies-year-black-farmers-are-still-waiting-n1245090.

[4] A. Folley & M. Johnson, *Black Farmers Facing 'Extinction' Fight for $5B in Promised Aid*, The Hill (Aug. 12, 2021), https://thehill.com/policy/finance/567486-black-farmers-facing-extinction-fight-for-5-billion-in-promised-aid.

the failure of the remedies that preceded Section 1005 and the continued unabated harm.[5]
*Majeske*, 218 F.3d at 822 (emphasizing importance of anecdotes). *Amici* have served as leaders
in advocating for these remedies. They have spent significant organizational resources increasing
awareness of each of these remedies, and particularly to help disseminate the settlement money
from the various class actions addressing USDA's racial discrimination.[6] *Amici* addressed media
inquiries and led public seminars to inform farmers.[7] This gave *Amici* a deep understanding of
the Government's procedural and substantive problems in disseminating the settlement money.
The Government's defective handling of those settlements and *Amici's* experiences of
unmitigated discrimination clearly establish Congress' compelling interest.

   a. *The Pigford Cases*

       NBFA and other advocates have continuously informed Congress that the *Pigford* cases
were not even a band aid to remedy the harms suffered by Black farmers. In *Pigford I*, even the
presiding judge questioned whether the settlements approved by USDA were adequate to remedy
the harsh discrimination experienced by Black farmers. *Pigford v. Glickman*, 185 F.R.D. 82, 108
(D.D.C. 1999) ("*Pigford I*") ("it is probable that…$50,000 is not full compensation in most
cases."). NBFA worked to help Black farmers participate in the claims process but saw that the
amount was often too little and that too many were unable to receive any funds at all.[8] The
Government's processes made it unclear who was eligible for the relief and made it difficult to

---

[5] *See id.*
[6] *Pigford v. Glickman*, No. 97-1978 (D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.);
*Garcia v. Veneman*, No. 00-2445 (D.D.C.); *Love v. Glickman*, No. 00-2502 (D.D.C.); *In re Black
Farmers Discrimination Litigation*, No. 08-mc-0511 (D.D.C.).
[7] S. Suwell, *There Were Nearly a Million Black Farmers in 1920. Why Have They
Disappeared?*,      The      Guardian      (Apr.      29,      2019),
https://www.theguardian.com/environment/2019/apr/29/why-have-americas-black-farmers-
disappeared.
[8] M. Martin, Nat'l Pub. Radio, *Will Settlement Bring Black Farmers Dignity?* (Oct. 4, 2013),
https://www.npr.org/templates/story/story.php?storyId=229199014.

obtain better compensation. *Pigford v. Vilsack*, Case 1:97-cv-01978-PLF, Dkt. No. 1812 at 62 (Mar. 31, 2012). NBFA also saw farmers being taxed heavily and erroneously under federal income and state tax laws. The settlement provided for tax relief, but it was limited to credit claims. *Id*. at 66. Even then, the Government failed to set up the administrative procedures in time for farmers. *Id*. In the midst of the debacle, the Internal Revenue Service forced collection.[9]

NBFA has long advocated that *Pigford I*'s most important aspect was debt relief. The settlement granted relief of debt "incurred under or affected by" discrimination. *Pigford*, 185 F.R.D. at 97. Sadly, very little of the funds were used for this purpose.[10] Many Black farmers continued to be liable for unduly restrictive and burdensome loans, undermining the premise of the settlements.[11] *Pigford II,* which followed *Pigford I*, did not solve the problems. *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011) ("*Pigford II*"). *Pigford II* extended the deadline for late-filing farmers but remained rife with confusion and poor implementation and NBFA continued to see Black farmers struggle.[12] It is unsurprising that Dr. Boyd once again testified to Congress that the settlements failed to alleviate the debt loads of Black farmers or prevent the loss of Black-owned farmland. Testimony at 17. Even to the extent

---

[9] Nat'l Black Agric. All., *Draft Recommendations to be Presented at the Fairness Hr'g* 2, Envir'l Working Group (EWG), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2011_Pigford-Results.pdf.

[10] Among 16281 farmers who prevailed, only 371 (2.28%) received debt relief. *Id.* at 1.

[11] "In addition to the modesty of payments, many participants mentioned problems with their distribution which led to worse financial situations for farmers after the settlement." Emma Bilecky, *Assessing the Impacts of USDA Civil Rights Settlements: Pigford in Advocacy & Context* 21 (2019) (Master's Project, Duke University), https://hdl.handle.net/10161/18439.

[12] Cong. Research Serv. (CRS), *The Pigford Cases: USDA Settlement of Discrimination Suits by Black Farmers* (May 29, 2013), https://www.everycrsreport.com/files/20130529_RS20430_dd9873a41009e49aa63cdc17a785093c21f8eb23.pdf

that there was some remedy, as the Government admits, USDA's discriminatory practices persisted. *See* Gov't Br. at 29.

  b. *Keepseagle v. Vilsack*

The Government's failure to address past discrimination against minority farmers writ large is also clear in its failed handling of Native American farmers' remedies in *Keepseagle v. Vilsack*. No. 99-cv-3119 (D.D.C. Nov. 1, 2010), ECF No. 576-1 ("*Keepseagle*"). AAIF conducted significant outreach with Tribes to try and increase participation in the settlement funds. Despite this effort, the settlement achieved almost nothing because of the Government's handling of the claims. AAIF's members faced firsthand the various problems of the settlement. The obvious inadequacy of the Government's actions in the *Keepseagle* settlement and continuing financial struggles of Native American farmers show that Congress had a compelling interest to enact Section 1005.

The Government's requirements to prove harm within a faulty system acted as a discriminatory barrier. One of the most serious problems with *Keepseagle* was that USDA had not kept records of loan applications and mismanaged past civil rights complaints, making it extremely difficult for an individual farmer or rancher to prove discrimination.[13] *See* 7 U.S.C. § 2297 (extending statute of limitations because of failures in USDA's complaint system). Historic distrust against the Government also deterred Native American farmers from filing a claim in the first place. This resulted in very few Native farmers participating in the process, yet there were no efforts to extend the deadline or allow late-filing claimants. AAIF struggled to help its members find relief due to these problems.

---

[13] M. Jalonick, *American Indian Groups Argue Over Settlement Money*, KSL.com (Dec. 2, 2014), https://www.ksl.com/article/32580541/american-indian-groups-argue-over-settlement-money.

9

Consequently, about half of the approved settlement funds in *Keepseagle* were diverted from their original purpose, and very few farmers received any payment let alone debt relief. *Keepseagle v. Perdue*, 856 F.3d 1039, 1042 (D.C. Cir. 2017). Despite advocating for additional time for outreach and using all available resources to inform Native American farmers, AAIF witnessed very few of its members and associates obtaining the relief they deserved. But, as mentioned, it was debt relief that would have effected a cure and allowed Native American farmers to continue their operations without having to pay off unfair loans or risk losing their property. Thus, although an important first step, *Keepseagle* did not adequately compensate Native American farmers for the discrimination they endured for decades, nor did it alleviate their unduly heavy debt burden caused by discrimination that keeps many Native farmers in much higher likelihood of defaulting on their loans.[14]

*Amici's* experiences with *Pigford* and *Keepseagle* and the continuing impact of past racism gives depth to the Government's evidence and elucidates Congress' compelling interest in enacting Section 1005. *See generally Adarand*, 515 U.S. at 237; *see also Eng'g Contractors*, 122 F.3d at 907. Those cases did not compensate nor stop the effects of racial discrimination, proving that "additional remedial action is warranted." *Wynn*, 545 F. Supp. 3d at 1279. In its expert report, the Government confirmed *Amici's* testimony that minority farmers are at a heightened risk of financial crisis due to lack of support. Gov't Br. at 16 (unequal distribution of relief will have an "especially significant" impact because of "increased financial instability caused by a pandemic."). In sum, Congress was well-versed in what was happening among minority farmers and enacted Section 1005 as a response to the unmitigated effects of past discrimination.

---

[14] C. Dominguez, *USDA Establishes Trial Food Sovereignty Initiative for Federal Lands*, Indian Country Today (Nov. 16, 2021), https://indiancountrytoday.com/news/usda-protecting-empowering-indigenous-food-ways.

**2. The Government must mitigate present discrimination by USDA against socially disadvantaged farmers.**

Section 1005 is also needed to confront current racism perpetuated by USDA. *Paradise*, 480 U.S. at 166 ("It is now well established that [the Government] may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination."); *Midwest Fence*, 840 F.3d at 935 ("Remedying the effects of…present discrimination can be a compelling governmental interest."). Regrettably, the Government does not admit so in its briefing. *Amici's* experience directly contrasts the Government's position and strengthens Congress's case for debt relief as drafted in Section 1005.

Despite USDA's current stance in Court, Congress had abundant evidence that structural racism is well and alive within USDA when it considered Section 1005. *Amici* and many other advocates testified to Congress that USDA continues to engage in discriminatory practices against racial minorities. *See*, *e.g.*, Testimony at 7, 99, 104. *Amici's* members who run farms and ranches across the nation routinely report civil rights violations and unfair treatment in accessing USDA programs and services and Dr. Boyd testified that "[t]oo many Black Farmers continue to request our assistance to address program complaints and civil rights violations." *Id*. at 17. Their experiences of discrimination—happening in the present tense—have been covered extensively by the media.[15] Legislators repeatedly recognized *Amici's* experiences. *See e.g.*, Hr'g on Mgmt. of Civil Rights at the USDA before the H. Subcomm. on Gov't Mgmt., Org., & Procurement, Comm. on Oversight & Gov't Reform, 110th Cong. 137 (2008) (hearing testimony from minority farmers). Despite the Government's current position, its own reports also substantiate *Amici's* stories of continued discrimination. Recent GAO reports document the steep barriers

---

[15] *E.g.*, C. Duster & J. Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as They Face Disparities Across the Board*, CNN (Dec. 15, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html.

minority farmers currently face to accessing agricultural credit and loan servicing.[16] Another review of USDA's civil rights office revealed that USDA frequently botched the investigation of discrimination complaints and failed to deliver results on time.[17] This, in turn, not only discouraged farmers from reporting violations, but also hid ongoing racial bias issues within USDA.[18] These findings all corroborate what *Amici's* members have known for a fact—that USDA currently discriminates in its credit and loan servicing based on race, heightening the need for debt relief. Congress clearly had a compelling interest to mitigate it.

USDA's extreme concentration of federal subsidies on white farmers is a another telling example of present discrimination. The Government provides ample evidence as to why past discrimination leads to this discrepancy, Gov't Br. at 27, but *Amici* continues to see that minority farmers are severely underrepresented in USDA's farm subsidy programs.[19] *Croson*, 488 U.S. at 501 (significant numerical disparities can show discrimination); *Dean*, 438 F.3d at 456 (finding compelling interest in part because only 10 of the City's 270 firefighters were black). Each year,

---

[16] U.S. Gov't Accountability Office (GAO), GAO-19-539, Agric. Lending: Info. on Credit & Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited 29 (2019), https://www.gao.gov/assets/gao-19-539.pdf; GAO-19-464, Indian Issues: Agric. Credit Needs and Barriers to Lending on Tribal Lands 19 (2019), https://www.gao.gov/assets/gao-19-464.pdf; USDA Minority Farmers, Ranchers and Veterans Advisory Comm., *March 21 Recommendation's Rep.* (Harvey Reed III, 2021) (recommending work needed to fix institutional problems that lead to discrimination).

[17] Off. of Inspector Gen., *USDA Oversight of Civil Rights Complaints* (2021), *available at* https://www.usda.gov/oig/audit-reports/usda-oversight-civil-rights-complaints (OIG Report).

[18] Nathan Rosenberg and Bryce Wilson Stucki, *How USDA Distorted Data to Conceal Decades of Discrimination Against Black Farmers*, The Counter (June 26, 2019), https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/. ("Under Vilsack, USDA employees foreclosed on Black farmers with outstanding discrimination complaints, many of which were never resolved…USDA staff threw out new complaints and misrepresented their frequency, while continuing to discriminate against farmers.")

[19] K. Cook, *Short Crop: How a Widening Farm Subsidy Gap is Leaving Black Famers Further Behind*, EWG (July 25, 2007), https://www.ewg.org/research/short-crop; Alex Formuzis, *Black Farmers and EWG Urge Congress to Increase Farm Subsidy Transparency*, EWG (Mar. 22, 2017), https://www.ewg.org/news-insights/statement/black-farmers-and-ewg-urge-congress-increase-farm-subsidy-transparency.

USDA disburses billions of dollars as subsidies to help cover cost and yield fluctuations.[20] The

recipients, however, are almost exclusively white farmers.[21] *Amici* and other organizations have

repeatedly raised the issue, but the discrimination and financial harm to socially disadvantaged

farmers persist.[22] Dr. Boyd gave a detailed testimony on this matter:

> Black farmers receive about $60 million in annual commodity subsidies, white farmers
> annually receive about $10 billion in commodity subsidies. While an eligible black
> farmer receives, on average, $7,755 in commodity subsidies, an eligible white farmer
> receives, on average, $17,206 in commodity subsidies.

Testimony at 17. This gap is no coincidence and evinces ongoing discrimination as well as

lingering effects of past discrimination. USDA determines subsidy recipients based on farm size,

revenue, and product types, but those factors cannot fully explain the disproportionate disparities

in who receives taxpayers' money. Boyd App'x at 2162 ("Review of agricultural census data

indicates that disparities in subsidy assistance between black and white farm operators cannot be

fully explained by the fact that blacks operate smaller farms or tend to grow 'non-program'

crops."). Such unfair exclusion of minority farmers and strong disparities in subsidy distribution,

buttressed by testimony from *Amici* and others, show that Congress was trying to remedy the

harms from ongoing racial discrimination through immediate debt relief.

3. **The Government needs to act now for socially disadvantaged farmers because of the compounded effects of discrimination and the pandemic.**

Congress's compelling interest in redressing discrimination has become more important

than ever because of the pandemic. *Adarand*, 515 U.S. at 237 (recognizing pervasive

---

[20] *USDA Provides $1.8 Billion to Offset Market Fluctuations*, USDA Farm Serv. Agency (Nov. 1, 2021), https://www.fsa.usda.gov/news-room/news-releases/2021/usda-provides-1-8-billion-to-offset-market-fluctuations.
[21] *Id.*
[22] A. Schechinger, *Under Trump, Farm Subsidies Soared and the Rich Got Richer /Biden and Congress Must Reform a Wasteful and Unfair System*, EWG (Feb. 24, 2021), https://www.ewg.org/interactive-maps/2021-farm-subsidies-ballooned-under-trump/.

discrimination as compelling interest). Section 1005 was enacted as part of a broader plan to relieve Americans of the "continued impact of COVID-19[.]"[23] Congress was concerned that the pandemic, overlayed with disproportionate financial troubles, have pushed minority farmers to the brink. Gov't Br. at 16. *Amici* have seen the people cited in the Government's reports. *Amici's* members struggle because of the impacts from the pandemic, while white farmers around them received COVID-19 relief payments. The Boyds struggled too. In 2020, like many others, they were unable to sell their livestock due to pandemic-related disruptions.[24]

Congress' concerns are not a set of hypothetical harms. *Amici* are receiving calls from members and other fellow farmers who desperately need relief to stop imminent foreclosure on their farms because of the discrimination they faced in obtaining capital layered with pandemic-related interruptions. *Amici* fear that a foreclosure crisis has already begun that will only wipe out the remaining minority farmers.[25] If implemented as written, Section 1005 would counteract the flow of bankruptcies and foreclosures and start to rebuild critical trust between the USDA and minority farmers. Testimony at 18. Hence, *Amici* and their members' experiences establish that Congress was properly responding to the precarious situation minority farmers face amidst longstanding discrimination and the pandemic.

## II.    Section 1005 is Narrowly Tailored to Redress Racial Discrimination Against Socially Disadvantaged Farmers.

*Amici* have seen and testified about the serious need for debt relief given in a way that does not replicate the failures of past attempts. Given the urgency of the pandemic to stop a crisis

---

[23] *Chairwoman Stabenow Statement on S. Passage of the American Rescue Plan Act*, US S. Comm. on Agric., Nutrition, & Forestry (Marc. 6, 2021), https://www.agriculture.senate.gov/newsroom/dem/press/release/chairwoman-stabenow-statement-on-senate-passage-of-the-american-rescue-plan-act.

[24] L. Stern, *Small Farmers, Big Stakes*, Field Work (May 5, 2021), https://www.fieldworktalk.org/episode/2021/05/05/small-farmers-big-stakes.

[25] *See supra* note 7.

of foreclosures, a single debt relief action that does not recreate past barriers constitutes a narrowly tailored "last resort." *Eng'g Contractors*, 122 F.3d at 926 (citations omitted); *Wynn*, 545 F.Supp.3d at 1282. *Amici* have also seen every "serious, good faith consideration of workable race-neutral alternatives," to debt relief fall overwhelmingly to white farmers, leaving their members further and further behind. *Grutter*, 539 U.S. at 339; *Paradise*, 480 U.S. at 187. *Amici's* experience with who needs relief and the stakes for who will be left out supports the Government's showing that Section 1005 is targeted, Gov't Br. at 26-37, and not "over- or under-inclusive[.]" *Midwest Fence*, 840 F.3d at 942.

1. **Congress had limited race-neutral or otherwise feasible alternatives to achieve its compelling interests for Section 1005.**

Congress had little option but to enact a race-based action like Section 1005 after seeing the glaring failures of prior remedies. *See Grutter*, 539 U.S. at 340 (discussing lack of "workable race-neutral alternatives"); *Midwest Fence*, 840 F.3d at 954 ("alternatives have not been sufficient to remedy discrimination."). *Amici's* view based on prior advocacy work is that race-neutral remedies have always failed to serve their members. Testimony at 17 ("Rather than right these historic wrongs, Government programs have largely perpetuated systemic racism."). This painful history is compounded by its repetition in the distribution of COVID-19 relief funds. *Id.*; *see also* Gov't's Br. at 16. The alternative of mandating individual proof of discrimination is infeasible because of systemic problems within USDA in documenting or investigating discrimination complaints. *Amici* not only experienced those failures directly, but also devote a large portion of their organizational resources to helping thousands of members navigate the

15

difficulties in lodging discrimination complaints.[26] They have seen these barriers prevent relief time and again. USDA's own failures created a unique factual situation requiring Congress to explicitly include socially disadvantaged farmers without requiring individualized determinations to ensure they finally receive this much-needed relief.

*Amici's* experience with the first COVID-19 relief program and the statistics behind it provides a clear example of why race-neutral remedies are not workable. The Government admits that it almost entirely went to white farmers.[27] Gov't Br. at 16. The skewed distribution is attributed to "race-neutral" factors of production scale and specific crop types. *Wynn*, 545 F. Supp. 3d at 1280 (discounting the disparities because there is some "race-neutral basis"). But historic discrimination created a severe racial division in farm size and crop type. Those factors cannot then be used to justify further discrimination whereby larger, white-run farms get more proportionate support than they should. Moreover, this disparity in fund allocation cannot be divorced from the dozens of other race-neutral programs that went disproportionately to white farmers. At some point, another means is warranted. *Midwest Fence*, 840 F.3d at 954. In *Amici's* experience, race neutrality means no relief to minority farmers. Especially in light of the unequal distribution of the first COVID-19 relief, Section 1005 had to be focused on minority farmers.

Requiring farmers and ranchers to prove discrimination is similarly flawed because *Amici* have repeatedly witnessed USDA's history of using bureaucracy as a form of racism.[28] As discussed below, problems with prior settlements were caused by eligibility determinations

---

[26] NBFA, *Black Farmer Takes Action in Fight Over Stalled $4 Billion Relief Funding, Calls Boycott*, PR Newswire (Feb. 10, 2022), https://www.prnewswire.com/news-releases/black-farmer-takes-action-in-fight-over-stalled-4-billion-relief-funding-calls-boycott-301480035.html.

[27] J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, EWG (Feb. 18, 2021), https://www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers.

[28] W. Hinson & E. Robinson, *"We Didn't Get Nothing:" The Plight of Black Farmers*, 12 No.3 J. of African American Studies 283, 290 (2008).

vitiated by the racism and lack of resources at USDA's Office of the Assistant Secretary for Civil Rights (OASCR). *Amici* and other advocates testified on these issues in front of Congress and shared stories of these discriminatory barriers with the media. Congress therefore understood the need to pass a law that removed the impassable structural hurdles and drafted Section 1005.

**2. Section 1005 is not over or under-inclusive.**

Section 1005 is not too broad or narrow. *See Midwest Fence*, 840 F.3d at 943-45, 955 (discussing inclusiveness of remedy); *Peightal*, 26 F.3d at 1560-61 (same). Though the Plaintiffs largely parrot the *Wynn* court's opinion from the preliminary injunction stage of these cases, they fail to show how any broader or narrower means would effectuate Congress' legitimate interest in providing socially disadvantaged farmers with debt relief. Pls.' M. for Summ. J., Dkt. No. 47, 20. To the contrary, *Amici* and others testified to Congress that (1) adding a claims process or other "individualized determinations" to Section 1005 would have rendered the relief impractical and ineffectual; and (2) the number of individuals who would receive debt relief who may not qualify are so few as to be fatal to Plaintiffs' arguments.

Section 1005 is not overinclusive. To eliminate any risk of over or under-inclusion, farmers and ranchers could have been called upon to apply and prove their eligibility for relief However, *Amici's* experience with the *Pigford* and *Keepseagle* settlements demonstrate that even a carefully considered claims process can be rife with issues, take many years to complete, and exclude the very people they are trying to reach. *Paradise*, 480 U.S. at 171 (requiring consideration of "the efficacy of alternative remedies"). *Amici* are acutely aware that the claims process imposed too high a hurdle for minority farmers who already distrust USDA and find the agency inaccessible. To this day, *Amici* receive confused calls from farmers asking to join the

settlements.[29] A protracted claims process defeats Section 1005's purpose of assisting minority farmers who face a high risk of foreclosure in the pandemic. Even with outreach efforts, it is extremely difficult to ask socially disadvantaged farmers to apply for relief and, in *Amici's* experience, many forms would be lost before their applications were reviewed. In short, Congress enacted Section 1005 without a claims process not because it was "administrative convenien[t]" to do so, but because it would have derailed relief. *Wynn*, 545 F.Supp.3d at 1286.

Congress also knew that socially disadvantaged farmers would be unable to prove the unfair treatment they experienced. *Amici* has worked with numerous farmers whose complaints were mishandled by USDA.  *Amici's* anecdotes are underscored by the Government's admission of USDA's defective history of managing civil rights complaints. Gov't Br. at 9-10. As discussed above, eligible farmers were turned down in *Pigford* and *Keepseagle* in part because USDA failed to keep records of denied loan applications or discriminatory complaints. And despite multiple audits over the years,[30] USDA still fails to properly manage discrimination complaints. An audit by the Inspector General last year buttresses *Amici's* lived experience. According to the audit, complaints take an average of 799 days to be processed by OASCR, even though USDA directives require 180 days.[31] USDA also does not adequately support how complaints are reviewed.[32] Filing a complaint is the principal means through which a farmer of any race may officially raise a claim of discrimination. When such complaints are not being processed in a timely manner, and when they are closed without proper analysis or evidentiary

---

[29] *Supra* note 11.
[30] *See, e.g.*, GAO, GAO-08-755T, USDA Mgmt. of Civil Rights Efforts Continues to Be Deficient Despite Years of Attention (2008), https://www.gao.gov/assets/gao-08-755t.pdf.
[31] OIG Report, *supra* note 17, at 5.
[32] *Id.* at 25 (finding that "actions pertaining to 9 of the 28 complaints of discrimination in our sample were not adequately supported or processed.").

support, minority farmers would have been unable to prove eligibility.[33] In this extraordinary circumstance where even USDA's civil rights office lacks integrity and has continuously failed to treat farmers equally, Congress was unable to further narrow the scope of Section 1005 without destroying its purpose. Thus, Section 1005 is not over-inclusive.

Section 1005 is not fatally underinclusive. Given the blatant discrimination committed by USDA, remedial efforts by the Government certainly should not end with Section 1005. Testimony at 18 (discussing changes needed in USDA programs). However, many of *Amici's* members have these farm loans, and this debt relief specifically targets them and prevents the loss of socially disadvantaged farmers due to farm loan troubles supercharged by the pandemic. *Amici* testified to Congress that socially disadvantaged farmers have all but disappeared due to economic harms caused by USDA's discrimination in its loan and subsidy programs. *Id*. Discharging Government loans while the pandemic wreaks havoc in their communities will provide acute relief. Indeed, considering the number of requests *Amici* receive, *Amici* believe that the temporary financial stability that Section 1005 provides is crucial to the survival of socially disadvantaged farmers before Congress pays attention to broader concerns of agricultural racism. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) ("A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."). Without a provisional measure like Section 1005, *Amici* believe there would be even less opportunities for Congress to repair and reverse the consequences of USDA's racism for their members and other minority farmers. Thus, Section 1005 was not underinclusive for the interests Congress was trying to advance.

---

[33] *Id.* at 26.

**III.**   ***Amici* and the Government's Interest Diverge on Remedy.**

Finally, *Amici* believe that the Government's position on expanding Section 1005 to include farmers who are not socially disadvantaged diverges from *Amici's* view of the law and proper course for Constitutional review, warranting an intervention. *See* Dkt. No. 31 (NBFA and AAIF Conditional Mot. for Leave to Intervene as Defs). The purpose of Section 1005 is not only to provide much needed debt relief to socially disadvantaged farmers, but Congress intended it to also remedy a historic imbalance. As the Government explained thoroughly in their brief, USDA's historic institutional racism led minority farmers to have smaller farms and qualify for less in terms of loan servicing and support. Gov't Br. at 12-14. By expanding the debt relief to a much larger group of farmers who have larger farms and larger loans, the relief program would simply exacerbate the already wide disparity gap. So, while *Amici's* members' urgently need debt relief, they firmly believe that expanding the program *without qualification* would thwart Section 1005's goal to help level the playing field and risks further disenfranchising socially disadvantaged farmers.

**CONCLUSION**

For the foregoing reasons, *Amici* urge the Court to deny Plaintiffs' motion for summary judgment.

Dated: March 8, 2022

Respectfully submitted,


**PUBLIC JUSTICE, P.C.**

*/s/ Jessica L. Culpepper*
Jessica Culpepper* (D.C. Bar No. 988976)
Lead Counsel
David Muraskin* (D.C. Bar No. 1012451)
1620 L Street NW, Suite 630
Washington, D.C. 20036
Telephone: (202) 797-8600
Facsimile: (202) 232-7203
jculpepper@publicjustice.net
dmuraskin@publicjustice.net

* Admitted *Pro Hac Vice*

*Counsel for the National Black Farmers*
*Association and the Association of American*
*Indian Farmers*

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was filed via the court's CM/ECF system on April 22, 2022, which will serve all counsel of record.

*/s/ Jessica L. Culpepper*
Jessica Culpepper